**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

In re Application of

FOUR WORLD EVENT OPPORTUNITIES LP
and GENESIS EMERGING MARKETS
INVESTMENT COMPANY,

Petitioners, for an Order Pursuant to 28 U.S.C.
§ 1782 to Conduct Discovery for Use in a Foreign
Proceeding.

Case No. 22-

**EXPERT DECLARATION OF JUSTICE INGRID MANGATAL IN SUPPORT**
**OF THE APPLICATION FOR AN ORDER OF JUDICIAL ASSISTANCE**
**PURSUANT TO 28 U.S.C. § 1782**

I, INGRID MANGATAL, hereby declare under penalty of perjury pursuant to 28 U.S.C.

§ 1746 that the following is true and correct:

1.      My name is INGRID MANGATAL and I am a retired judge of the Grand Court of

the Cayman Islands.  I am currently a Course Director at the Norman Manley Law School,

Kingston Jamaica, West Indies, tutoring final year Law School students in two courses, viz. civil

procedure and trial advocacy.

2.      I was called to the Bar in Jamaica in 1987.  I graduated from the University of the

West Indies, Mona Campus, Jamaica, with Upper Second-Class Honors in 1985 after pursuing a

three-year law degree program (L.L.B).  I thereafter attended the Norman Manley Law School

(1985-1987) where I gained my Certificate of Legal Education (C.L.E.) which qualifies one to

practice law in Jamaica and other English-Speaking Caribbean countries.

3.      I started my professional life in private practice (1987-2000) and became a Partner

in one of Jamaica's most prominent law firms – Dunn, Cox – practicing commercial and civil

litigation.  I started as an Associate at Dunn Cox in 1990 and was subsequently made a Partner in 1995 and I served in that capacity between 1995 and early 2000.  In 2000, I joined the Government service as a Resident Magistrate (Jamaica's lower court), and spent just over a year in that occupation.  I thereafter became a member of the Jamaican Attorney General's Department and between 2001-2003 served as the Director of Litigation in the Department. That post required me to supervise a large cadre of attorneys-at-law handling civil litigation brought against the Government and I argued many weighty judicial review and constitutional law cases in Court.

4.      In 2003, I was invited by the then Chief Justice of Jamaica to become a High Court Judge and I served in that position between 2003-2014.  I presided over both civil and criminal matters. Between 2011–2013, I served in Jamaica's Commercial Court, handling complex commercial matters.  Between 2013 and 2014, I acted on Jamaica's Court of Appeal, Jamaica's second highest Court, with the Judicial Committee of the Privy Council ("the Privy Council") being its highest. Whilst on leave from Jamaica's High Court, I also acted as a Grand Court Judge in the Cayman Islands in 2009 and in 2014, each time for a stint of approximately 3 weeks.

5.      In all, I spent 12 years on the bench in Jamaica before serving in the Cayman Islands.

6.      I was offered permanent appointment in the Cayman Islands in 2015 and sat as a Judge of the Grand Court for just under 5 years, between January 2015 and October 2019.  During that time, I sat in all Divisions of the Grand Court, including the Financial Services Division, the Civil, Family and Criminal Divisions.

7.      I have delivered numerous oral and written judgments/opinions in Jamaica and in the Cayman Islands.  In relation to the Cayman Islands, the reported opinions can be seen in the

Cayman Islands Law Reports and the unreported opinions are available on the Court's website at www.judicial.ky.

8.      I decided to return home to Jamaica in 2019, but I continue to be available to conduct arbitrations and provide expert evidence on Cayman Islands law from Jamaica.

9.      I have substantial knowledge of Cayman Islands law governing corporate and securities matters, including public and private M&A transactions, as well as corporate litigation matters before Cayman Islands courts. In addition, I have court experience involving the appraisal process in the Cayman Islands following corporate going-private transactions.

10.      I have presided over many matters filed in the Financial Services Division. This includes Appraisal cases pursuant to Section 238 of the Cayman Islands Companies Law ("Section 238" or "s.238"). I have made rulings and decisions in interlocutory applications, including rulings on discovery, the role of expert witnesses and have prepared for final hearings in Section 238 trials.

11.      In this paragraph, I mention some of the most prominent Section 238 Cases in which I presided, and the nature of the proceedings involved:

   a) FSD 75 of 2016: *Homeinns Hotel Group v Maso Capitals* (discovery).

   b) FSD 24 of 2017: *In the Matter of Qunar Cayman Islands Limited* (interim payment).

   c) FSD 129 of 2016: *Qihoo 360 Technology Co. Ltd.* (appointment of forensic expert).

   d) FSD 123 of 2015: *Fountain Medical Development Limited* (discovery, and expert evidence).

   e) FSD 170 of 2016: *E-Home (China) Holdings Limited v. Senrigan Master Fund* (Interlocutory ruling. Subsequently, 10- day trial commenced, but matter was settled by the parties on the 2nd day of trial while the Company's expert was giving evidence).

12.      I have been engaged by Petitioners in the above-captioned matter to provide opinions regarding Cayman Islands law to be used in applications ("Applications" or the

"Application") under 28 U.S.C. §1782 ("Section 1782") in connection with an appraisal action pending in the Cayman Islands concerning 58.com Inc. (the "Company"), Cause No. FSD 275 of 2020 (MRHJ) (the "Appraisal Proceeding").

13.     I understand that the Appraisal Proceeding was commenced by the Company, pursuant to Section 238, seeking the Court's determination of the fair value of the shares of those shareholders (the "Dissenting Shareholders") who have exercised their right to dissent from the merger through which the Company was taken private by a consortium of investors (the "Merger"). I further understand that the Cayman court has issued a Directions Order in the Cayman appraisal proceeding ("Directions Order").  A true and correct copy of the Direction's order is attached hereto as Exhibit 1.

14.     I further understand that Petitioners' Application seeks discovery in the United States from Robert Dodds ("Mr. Dodds").  I understand that Petitioners seek from Mr. Dodds, among other things, documents and deposition testimony relevant to a determination of the fair value of 58.com's shares (collectively, the "Requested Discovery").

15.     In support of Petitioners' Application, this declaration describes the nature of the statutory appraisal proceeding under Cayman Islands law, as well as certain evidentiary matters related to such proceedings. Specifically, set forth below is an explanation of the following aspects of Cayman Islands law for the benefit of the Court:

> a) the nature of Cayman Islands appraisal proceedings brought under s.238, including (i) the issue the Cayman Islands court will be deciding, how it will do so; (ii) what evidence it will review; and (iii) the respective roles of the opposing experts and the Cayman Islands court, as well as the Cayman Islands

court's expressed views on the nature and breadth of the evidence that should be considered when determining fair value;

b) the Cayman appraisal proceeding

c) the scope of discovery in the Cayman Islands appraisal proceeding, including with respect to non-parties;

d) that the Requested Discovery cannot be obtained in the appraisal proceeding; and

e) the extent to which the Cayman Islands court will be receptive to judicial assistance from the U.S. Courts, including (i) why the learning in the Caymans Islands court's decision in *Lyxor* [*Phoenix Meridian Equity Limited v Lyxor Asset Management S.A. and Scotiabank & Trust (Cayman) Limited* [2009 CILR 553]] is by no means an obstacle to the requested deposition; (ii) whether the Requested Discovery would be admissible in the Appraisal Proceeding; and (iii) why the Directions Order contains no bar against the Requested Discovery.

16.    To the extent the contents of this declaration are within my personal knowledge, they are true and accurate.  To the extent the contents are not within my personal knowledge, they are true to the best of my current knowledge, information, and belief.

**A.    The Cayman Islands Appraisal Process**

17.    Pursuant to Section 238 of the Cayman Islands Companies Law, where there has been a merger involving a Cayman Islands company, a shareholder who dissents from the merger has a statutory right to payment of the "fair value" of their shares, which is to be determined by the Cayman Islands courts.

18.    The text of Section 238 sets forth a precise procedural timeline for the shareholder to exercise its statutory rights.

19.    The first step is for the shareholder, before the vote on the merger, to notify the company in writing of its objection to the merger and include a statement that the shareholder intends to demand payment for its shares in the event the merger is approved.

20.    Within twenty days following the date of the vote approving the merger, the company must give written notice of the merger's approval to the objecting shareholder. Following this notice, the shareholder has twenty days to submit to the company a written notice of their decision to dissent from the merger, including a demand for payment of the fair value of their shares.

21.    Thereafter the company must make a written offer to each dissenting shareholder to purchase their shares at the price the company considers to be their fair value. This offer remains open for thirty days.

22.    In the event the dissenting shareholder does not accept the company's offer, or the company and dissenting shareholder do not otherwise agree upon the price to be paid for the shares, the company must (and any dissenting shareholder may) file a petition with the court for the determination of the fair value of the shares held by all of the dissenting shareholders pursuant to Section 238.

**B.    The Court's Role in the Appraisal Proceeding**

23.    After the appraisal proceeding is initiated, the Court is under a statutory obligation to determine the fair value of the shares of the dissenting shareholders—the sole issue in the case.

24.    While the singular issue before the Court is the fair value of the shares, the proceeding is no different in principle to any other civil litigation in the Cayman Islands.

25.    Unlike the judges in certain courts in the United States, the Cayman Islands Financial Services Division judges – who hear s.238 cases – do not consider themselves to be experts in valuation.  Instead, the judges are guided by the valuation experts called by the parties to give evidence.

26.     This was made clear by the Cayman Islands Court of Appeal ("**CICA**") in *Shanda*

*Games Limited* [2018 (1) CILR 352], a true and correct copy of which is annexed hereto as Exhibit

2.  At paragraph 22, Martin JA discussed the issue as follows:

> *Since the fair value is not necessarily the same as the merger price or the price at which the shares were trading before the market in them was affected by knowledge of the merger, it is inevitable that the determination will involve an assessment of a substantial quantity of information relating to the financial affairs of the company whose shares are to be valued. It is unlikely in the extreme that the court will be able to make that assessment without expert assistance.* In the ordinary case, as in this one, both the company and any dissenting shareholders will appoint experts; but even in a case where no dissenting shareholder is prepared to participate in the litigation, the company, and perhaps also the court itself, will instruct an expert. In every case, the court's task will be to assess the utility of the expert evidence to the determination of fair value.  Carrying out that task in the context of section 238 proceedings is no different in nature from carrying it out in ordinary inter-parties litigation.  In ordinary litigation, and in section 238 proceedings, the court will determine generally, or on an issue by issue basis, whether an expert's evidence is to be accepted in whole or in part and how conflicts are to be resolved.  If necessary, the court is entitled to substitute its own view for that of the experts.  The process, however, is one that will be familiar to most judges.  The fact that the outcome of the process in a section 238 case is capable of affecting persons other than those who participated in the litigation seems to me immaterial: shareholders who do not participate cannot complain if the fair value of their shares is determined by reference to evidence into which they have had no input. (emphasis added).

27.     The CICA's statement in *Shanda Games Limited* that "[i]t is unlikely in the extreme

that the court will be able to [assess the fair value of the shares] without expert assistance" (cited

above) reflects the fact that in order to make a determination of fair value, the Court will rely upon

valuation experts' analysis and assessments of the overall fairness.  It should be noted that the

decision of the CICA in *Shanda Games Limited* was further appealed to the Privy Council, the

Cayman Islands' highest court.  However, the decision of the Privy Council did not modify or alter

in any way the views expressed by the CICA in relation to the role of judges in Section 238

proceedings and the guidance obtained from expert evidence from valuation experts called by the parties.

28.     In *Qunar Cayman Islands Limited v Maso Capital Investments Limited and Others* [2017 (2) CILR 24], a true and correct copy of which is annexed hereto as Exhibit 3, Parker J likewise stated (at paragraph 18):

> *...in determining fair **value the Court is not itself an expert valuation tribunal and must be guided by the expert evidence from experienced valuers.** Such experts typically require access to relevant historical data, documents and information relating to the Company's past trading and auditing, together with its forecasts (whether produced by internal management or others) in relation to trading in the future and not only those that have been publicly disclosed (or disclosed to advisers in the course of the take-private process).* (Emphasis added).

29.     In sum, the court will consider, without limitation, all reasonable and accepted methodologies to determine fair value that are presented by the experts.  These have usually comprised the value agreed upon in the merger transaction, to the extent that the sales process was open, competitive and fair, as well as market price and values arrived at by application of a discounted cash flow or other analysis.

**C.     The Scope of Discovery in the Appraisal Proceeding**

30.     In assessing the fair value of the shares, the Court will consider factual evidence submitted by the parties concerning their competing views on the true value of the company's shares, including evidence relating to the fairness (or lack thereof) of the process that led to the merger.

31.     There is no automatic discovery in Section 238 proceedings similar to U.S.-style pre-trial discovery between the parties.  Instead, the Cayman Islands Court will order any party to the proceeding to provide discovery of "*documents which are in their possession, custody or power relating to any matter in question between them in the action*." (Grand Court Rules ("GCR") Order 24 rule 3).

8

32.    Each term and phrase in this rule has been interpreted to provide for discovery that covers documents the company physically or legally possesses, and which are directly or indirectly related to the action.  The terms "possession" and "custody" refer to documents that are physically in the hands of the party giving discovery, whatever the capacity in which they are held.  For example, a bailee or an agent has possession, but a servant would only have custody.  Company documents held by an employee or a director or officer of a company would be disclosable under one or other of these two bases.

33.    Next, the word "power" broadens the obligation to cover documents which a party does not have in his hands, but which he or she has the legal right to obtain from the person who holds them.  In *Lonrho v Shell* [1980] 1 WLR 627 (HL), Lord Diplock defined "power" for the purposes of Order 24 as follows at page 635:

> *a presently enforceable legal right to obtain from whoever actually holds the document inspection of it without the need to obtain the consent of anyone else. Provided that the right is presently enforceable, the fact that for physical reasons it may not be possible for the person entitled to it to obtain immediate inspection would not prevent the document from being within his power; but in the absence of a presently enforceable right there is, in my view, nothing in Order 24 to compel a party to a cause or matter to take steps that will enable him to acquire one in the future.*

34.    Finally, the phrase "relating to any matter in question between them in the action" is given a very wide meaning and is evaluated through the "train of inquiry" test that was first set out in the 19th Century English case *Campagnie Financiere et Commerciale du Pacifique v Peruvian Guano Co.* (1882) 11 QBD 55.  In *Peruvian Guano*, the Court of Appeal held that the equivalent of GCR Order 24 rule 3, quoted *supra* paragraph 31, was not confined to documents which would be evidence for or against a party in the action, but included any document which it is not unreasonable to suppose contains information which may, either directly or indirectly, enable a party either to advance his own case or to damage the case of his adversary.  This principle was expressed by Brett LJ in the following way:

> *It seems to me that every document relates to the matters in question in the action, which not only would be evidence upon any issue, but also which, it is reasonable to suppose, contains information which may - not which must - either directly or indirectly enable the party ... either to advance his own case or to damage the case of his adversary. I have put in the words "either directly or indirectly," because, as it seems to me,* **a document can properly be said to contain information which may enable the party … either to advance his own case or to damage the case of his adversary, if it is a document which may fairly lead him to a train of inquiry, which may have either of these two consequences"**

(at page 63, emphasis added).

35.     The "train of inquiry" test or "Peruvian Guano" test has been adopted in the Cayman Islands, *see* for example, *Algosaibi Bros v Saad Invs* [2013 (1) CILR 202] and *Renova Resources v Gilbertson* [2011 (2) CILR 148].  Further, it is worth noting that although the scope of discovery is broad, it is not unlimited and parties are not permitted to embark upon what the courts have pejoratively termed "fishing expeditions."

36.     Thus, the train of inquiry test allows for the discovery of documents that may be relevant to the issues in the action such that they could strengthen the argument of one party or weaken the others, and also of documents that may lead to additional information that might also advance or damage either party's case.  This is in contrast to stricter discovery parameters permitting discovery of only directly relevant documents.

37.     In line with the broad scope of discovery, Cayman Courts have held that discovery in appraisal proceedings will encompass anything that has any bearing on the value of the company or could lead an expert on a 'train of inquiry' regarding an issue relevant to valuation.   This has been set forth clearly in numerous Cayman decisions, including by the Court of Appeal in *Shanda Games Limited, supra,* where Martin JA stated: "*it is inevitable that the determination will involve an assessment of a substantial quantity of information relating to the financial affairs of the company whose shares are to be valued*." (Paragraph 22); *see also Qihoo 360 Technology Co., Ltd* (unreported, October 9, 2017 CICA) ("The sole task of the Court is to determine the fair value of

the dissenters' shares. To do that, it needs all information."). A true and correct copy of the Court of Appeal's *Qihoo* opinion is annexed hereto as Exhibit 4.

38.     The Court of Appeal further noted this in *Qunar Cayman Islands Limited v Maso Capital Investments Limited and Others, supra,* making clear that the Court must be exposed to all the relevant materials in order to arrive at a fair valuation.

39.     In the first instance, "*it should be a general obligation of the Company to search for and produce all documents relevant to fair value.*" *Qunar Cayman Islands Limited v Athos Asia Event Driven Master Fund et al.* (Unreported CICA 10 April 2018), a true and correct copy of which is annexed hereto as Exhibit 5.

40.     Indeed, that the Courts in the Cayman Islands continue to approach the role of the judges and that of the valuation experts as discussed in the Court of Appeal's decision in *Qunar* may be seen from a recent decision of Parker J in FSD 0184 of 2020 (RPJ) *In the Matter of FGL Holdings*, delivered 18 December 2020. A true and correct copy of this opinion is annexed hereto marked Exhibit 6 for identity.

41.     Documents in the hands of persons other than the Company are also highly relevant in this endeavor. Although the Court in *Qunar* was considering whether the dissenters should provide discovery, the following remarks by Rix JA in my view clearly apply to any third parties who may hold such relevant documents:

> 65. ... The company's own documents, however important to the issue of fair value (and no one would doubt that) must be exposed to the arguments which can flow from the findings, analyses, evaluations and factual selections which other sophisticated entrepreneurs, investors and analysts in the market have made or performed. ...

> 74. ... value, and the market, is for the world, not only the companies concerned, and that often such companies may not understand the world in which they operate as well as outsiders understand it. But whether that is true or not, value depends on a multiplicity of factors, and methodologies, about which sophisticated analysts have different insights, and no one is more relevantly concerned with getting the research and analysis and those insights right than those who are thinking of investing in or have invested in a company. However, "getting

> it right" is not the point at this stage of the proceedings. **What is needed is for the Court, at the end of the day, to get it right, having been exposed to all the material and all the arguments.**
>
> *75. if dissenters have in their possession, as they are likely to so,* **documents, reports, analyses, projections and so on about companies in which they invest, their products, their industries, their markets, their competitors, in other words, documentary material which relates to the value of such companies, then this material is as much a matter for disclosure as any such documents in the hands of the companies; and it matters not whether such material is possessed by the one side or the other, or is simply available as a matter of efficient research.** ...

(Exhibit 5) (emphasis added).

### D.    The Requested Discovery Cannot Be Obtained in the Appraisal Proceeding

42.    Critically, except in limited circumstances, and by means of a cumbersome procedure, the Cayman Islands court has no power to order discovery from non-parties; discovery is limited to the parties to the proceeding.  Though the Court does have the power to order a non-party to produce specified documents or to provide oral evidence at trial, the Court's power to do so is generally limited to non-parties who reside within the jurisdiction of the Court.

43.    I understand that Respondent is not a party to the Appraisal Proceedings, and is not within the jurisdiction of the Court.  Therefore, the Court's powers to compel documents or testimony at trial is inapplicable to Respondent.

44.    In those circumstances, I note the following to provide a comprehensive explanation of Cayman Islands discovery.

45.    The means by which the court may compel a non-party to provide evidence at trial is under GCR Order 38 rule 14, pursuant to which the Court may issue a writ of *subpoena ad testificandum* and a writ of *subpoena duces tecum*.  However, these must be served personally within the court's jurisdiction.  (Order 38 rule 17).

12

46.    The Court also has the power to order oral discovery under GCR Order 24 Part II in actions begun by writ.  However, this does not apply to Section 238 proceedings, which are begun by petition.

47.    The Court has additional power under GCR Order 39 rule 1 to order a deposition to be taken and may order documents to be produced which it considers necessary for the purposes of the deposition.  This applies to persons both within and outside the Court's jurisdiction. However, if the person to be deposed is outside the jurisdiction, then an application may be made for a letter of request to the judicial authorities of the country where that person's evidence is to be taken or, if the government of that country allows a person to be examined before a person appointed by the Court, the Court may appoint a Special Examiner to take the evidence.  Further, this power is discretionary, and the Court will only exercise it if satisfied that it is necessary in the sense that the witness can give substantial evidence material to the issue and that the evidence cannot be obtained in other ways (such as by a witness within the jurisdiction, by admissions or documents, or by an order that evidence may be given by affidavit).

48.    The Court may issue a letter of request which seeks only documents.  However, the party making the application is not entitled to what is in substance discovery; rather, "*[t]he letter of request must be confined to particular documents, although these may be described compendiously ...*" *see* per Nicholls V-C in *Panayiotou & Ors. v. Sony Music Entertainment* [1994] Ch.142, 153.

49.    Such applications are not common in the Cayman Islands.  In my experience, it is far more common for litigants in the Cayman Islands to use 28 U.S.C. §1782 to obtain evidence located in the United States.  This is a route which is often used by Cayman Islands liquidators of Cayman Islands companies, such as investment funds, where the managers and other service providers to such funds are often located in the United States.

50.     Indeed, it is the case that the letter of request procedure often proves to be a relatively more time-consuming and costly exercise. One plain reason is that the letter of request route entails an application being made to the Cayman Islands Court first. In contrast, the application by an "interested person" pursuant to §1782 can be made straight to the Courts in the United States.

51.     Thus, all told, the Court's powers to order discovery from third parties are of very limited application to the present case and, as I illustrate below, has not limited the Cayman Islands courts' receptivity to the use by parties before it of the tools provided by 28 U.S.C. § 1782.

**E.      Receptivity of Cayman Islands Courts to Judicial Assistance and Admissibility of Evidence**

52.     Under Cayman Islands law, evidence is admissible in civil proceedings if it is relevant and is not otherwise subject to an exclusionary rule of evidence. The threshold for relevance is low. In *Vernon v Bosley* [1994] PIQR P337, Hoffman LJ, at page 339, made clear that:

> The cardinal principle of admissibility is relevance. But relevance is always a matter of degree. How relevant must evidence be in order to be admissible? Ordinarily, the threshold is very low. ... But there are limits to the extent to which the parties can be allowed free rein.

53.     Similarly, the exclusionary rules are very narrow, and the only exclusionary rule that could have any realistic application to Section 238 proceedings would be the rules regarding privilege and possibly, in an unusual case, the rule against self-incrimination.

54.     Cayman Islands courts have had the opportunity to consider specifically the use of discovery obtained through Section 1782 in connection with Cayman Islands proceedings and have held that it is permissible for a litigant in a Cayman Islands proceeding to exercise any rights it may have under Section 1782 to obtain relevant evidence, including deposition testimony, for use in those proceedings.

14

55.    The case of *Phoenix Meridian Equity Limited v Lyxor Asset Management S.A. and Scotiabank & Trust (Cayman) Limited* [2009 CILR 553] is instructive as to the willingness of Cayman Islands courts to admit discovery obtained through Section 1782.  In *Lyxor*, the CICA held that the right to obtain full discovery, pre-trial deposition testimony and documents "is a right conferred by U.S. law-it is not a right conferred by, or to be withheld under Cayman law."  In *Lyxor*, the CICA thus ruled that when a party has a right to avail itself of legitimate foreign process, like under 28 U.S.C. § 1782, there must be a compelling reason to prevent it from doing so.  The CICA held that such a prohibition would only be appropriate where the party was acting oppressively by trying to rely on the foreign process (paragraph 57).  The Court upheld the decision of the Chief Justice (reported at [2009 CILR 342]) to refuse an injunction to prevent a party from exercising its rights under U.S. law to seek evidence under 28 U.S.C. § 1782 for use in Cayman Islands proceedings.  A true and correct copy of the *Lyxor* lower court opinion is annexed hereto as Exhibit 7.  A true and correct copy of the *Lyxor* appellate decision is attached hereto as Exhibit 8.

56.    There were two factors that were accorded considerable weight by the *Lyxor* Court: *First*, that there was a procedure for oral discovery available in Cayman Islands courts under Order 24 so that it could not be said that Cayman Islands law was hostile to pre-trial cross-examination. *Second*, that the U.S. courts would provide adequate protection against potential abuse of the depositions or oppression of the witnesses through the Federal Rules of Civil Procedure. In accordance with those rules, the depositions took place before a court reporter, and the deponents were accompanied by counsel, who could object to any question on the ground that it was embarrassing or oppressive.

57.    The relevant applicable principle identified by the CICA was that *prima facie*, a party who could invoke a legitimate right under foreign law would be entitled to do so unless it was acting oppressively by trying to rely upon it.

58.    Similarly, and of even more direct relevance to this application by Petitioners, discovery gathered pursuant to Section 1782 was considered by the Cayman Islands courts in a recent appraisal proceeding in the Cayman Islands, *In the Matter of Nord Anglia Education, Inc., FSD 235 OF 2017.* In common with the instant case, Houlihan Lokey ("Houlihan") served as the financial advisor to the special committee of the company's board of directors. Houlihan provided the special committee with an opinion that the Merger Price was fair and undertook significant financial analysis in support of the opinion, including conducting a discounted cash flow analysis. There, the Cayman Islands court expressly referred to the 2,900 documents Houlihan produced in a Section 1782 proceeding, which "evidenc[ed] the work that [Houlihan] did," and "which were *obviously relevant* to advancing a reasoned critique of Houlihan Lokey's DCF analysis." *In the Matter of Nord Anglia Education, Inc.,* FSD 235 OF 2017 at ¶ 49.[1]  A true and correct copy of the *Nord Anglia* opinion is annexed hereto as Exhibit 9.

59.    It follows from the foregoing authority that the Cayman Islands court is receptive to the judicial assistance offered by the application of Section 1782, especially where, as here, the requested discovery sought in the Section 1782 Application seeks documents and testimony pertaining to (i) the process by which the 58.com board and/or Special Committee negotiated and approved the Merger price, and (ii) the valuations relied upon by the 58.com Special Committee.

60.    It should be further noted that *Phoenix v Lyxor*, *supra*, concerned an application under Section 1782 to depose the other side's witnesses before trial, and so there was at least some

---

[1] Indeed, it appears that the Company in that case was able to make use of this evidence gathered by the Dissenters. *Id.* (testimony referring to Houlihan's "internal analysis").

basis for an argument that to do so could be oppressive. Notwithstanding those circumstances, the

CICA held that the use of Section 1782 discovery in that manner was, in fact, not oppressive and

refused to enjoin the deposition in the Section 1782 action from proceeding.

61.    Here, the Application under 28 U.S.C. § 1782 relates only to third parties, and so

there is no sound basis upon which the Company could suggest that it was oppressive.

62.    The question of the admissibility of the transcripts of depositions obtained under

Section 1782 was also considered by the CICA in *Phoenix v Lyxor*.  The case concerned a Section

1782 application seeking the depositions of persons who were the key witnesses for the defendant

at trial in the Cayman Islands proceedings so that the hearsay statements of those witnesses would

not ordinarily be admissible in evidence but could form the basis of cross-examination as evidence

of previous inconsistent statements.

63.    As noted, the CICA declined to enjoin the deposition from proceeding forward.

With respect to whether the deposition transcript might ultimately be admissible at trial, the court

made clear that that was not an issue relevant to determining whether to allow the deposition to

proceed.  That that would, rather, be a question for a later date was explained by the court as

follows:

> *47 The use to which the transcripts of depositions taken in New York*
> *may be put in the Cayman proceedings is, of course, a matter for the*
> *Grand Court. ... no transcript of depositions would be admissible as*
> *evidence at trial without an order of the Grand Court.  In deciding what*
> *order to make in this respect, it will be open to the Grand Court to*
> *restrict the use which can be made of the deposition transcripts in the*
> *course of any cross-examination of Mr. Rosenberg and Mr.*
> *Phlipponneau at the trial.*

64.    Here, the proposed deponent is not a party in the Appraisal Proceeding and

similarly will not be a witness at trial.  Accordingly, the deposition transcript of Respondent's

witnesses may be admissible as hearsay statements under the Cayman Islands Evidence Law, provided that the requisite notices are given under the provisions of GCR Order 38 Part III.

65.     Furthermore, *Lyxor* clearly points out that the Cayman rules themselves contain a procedure for oral discovery.  The trial court that the CICA affirmed in *Lyxor* had ruled that "[t]he existence of O.24, r. 16 in the Grand Court Rules made it impossible to assert that Cayman law regarded 'double cross-examination' as being, in and of itself, an abuse."  *Lyxor* ¶ 38.  *See also Lyxor* ¶ 52 ("the underlying premise is the same: the existence of a comparable (although not identical) procedure for oral discovery….. is a relevant factor. The court, by allowing the § 1782 proceedings to take their course is not giving effect to procedure which [in its own eyes] is obviously oppressive or vexatious:  it is not going 'far beyond any process of discovery' recognized by the law applicable in its own jurisdiction").

66.     It is to be noted that Cayman Islands courts expect the parties to obtain the evidence they believe is necessary to prosecute their case.  Thus, there is no requirement to obtain permission from a Cayman Islands court before seeking relevant evidence abroad.  *See* Males J in *Dreymoor Fertilisers Overseas Pte Limited v. Eurochem Trading Gmbh & Ors* [2018] EWCH 2267 (Comm), citing Peter Gross GQ in *Omega Group Holdings Ltd v Kozeny* [2002] CLC 132 ("In general, the English court leaves it to the parties to obtain the evidence they think necessary for the advancement of their case by the means of their choosing, provided such means are lawful in the country where they are deployed.").

67.     Finally, in order to examine what the Directions Order issued in the Cayman appraisal proceeding provides for and allows, it is necessary to refer to paragraph 51 of that order. The Directions Order provides a procedure for using evidence including that obtained through § 1782 as follows:

> Each party will disclose promptly to the other parties any and all documents
> received from any third-party or non-party as a result of any ancillary relief in aid
> of these proceedings obtained by the party (whether by way of an order of this
> Court, an order of any foreign Court or voluntary assistance by the third party).
> Disclosure shall be made in accordance with paragraphs 14 and 15 or 38 and 29 (as
> applicable).

Ex. 1, ¶ 51.

68.     The Directions Order contains no bar against the requested deposition of Mr.

Dodds.  It is true that the Directions Order lacks an explicit provision endorsing the taking of "a

pre-trial deposition," such as a Section 1782 deposition, of an affiant.  However, this by no means

amounts to a circumstance disfavoring of—let alone a bar against—such depositions.  Given that

the Directions Order does not explicitly address Section 1782 depositions, and that Cayman Civil

Procedure is, as set forth above, generally receptive to the taking of such depositions, I conclude

that the requested deposition is compatible with the Directions Order and the rules of Cayman civil

procedure.

69.     It follows, therefore, that Cayman Islands courts are receptive to the judicial

assistance offered by the application of Section 1782, and that any relevant evidence obtained

thereby is admissible in a Cayman Islands court.

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct. Executed on January 17, 2022 at Kingston, Jamaica, West Indies.

 **Justice Ingrid Mangatal (Ret'd) Judge of the Supreme Court of Judicature of Jamaica,
Former Judge of the Grand Court of the Cayman Islands.**

# Exhibit 1



IN THE GRAND COURT OF THE CAYMAN ISLANDS

FINANCIAL SERVICES DIVISION

CAUSE NO: FSD 275 OF 2020 (MRHJ)

IN THE MATTER OF THE COMPANIES ACT (AS REVISED)

AND IN THE MATTER OF 58.COM INC.

---

**DIRECTIONS ORDER**

---

**UPON** the Summons for Directions of the Petitioner (the "**Company**") dated 10 November 2020

**AND UPON** reading the First Affidavit of Guhan Subramanian dated 7 June 2021 and exhibit GS-1, the First Affidavit of Davin Teo dated 16 June 2021 and Exhibit DT-1, the First Affidavit of Michael Cliff dated 17 June 2021 and Exhibit MTC-1, the First Affirmation of Xiaomeng Wang dated 22 June 2021 and Exhibit XMW-1, the Second Affidavit of Michel Cliff dated I July and Exhibit MTC-2, the Affidavit of Gwynn Hopkins dated 8 July 2021 and Exhibit GDNH-1, the Second Affidavit of Guhan Subramanian dated 14 July 2021 and Exhibit GS-2, the Third Affidavit of Michael Cliff dated 14 July 2021 and Exhibit MTC-3, and the Second Affidavit of Davin Teo dated 16 July 2021

**AND UPON** hearing Leading Counsel for the Company and Leading Counsel for the dissenting shareholders listed in **Appendix 1** to this Summons (together, the "**Dissenters**" and each a "**Dissenter**")

**IT IS HEREBY ORDERED THAT:**

1      The Dissenters be joined as Respondents to the Petition.

**A.    Appointment of Experts**

2      The Company and the Dissenters shall have leave to instruct and call as a witness at trial one expert witness each (any actively participating Dissenters to jointly and severally instruct one expert between them) in the field of valuation (together, the "**Experts**") in order to opine upon the fair value of the Dissenters' shares in the Company, as a going concern as at 6 September 2020 (the "**Valuation Date**").

This DIRECTIONS ORDER is filed by Maples and Calder (Cayman) LLP, Attorneys for the Petitioner, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM\LBS\MKS/703174.000004)



3       The Experts shall be appointed by no later than 42 days from 26 July 2021 (the "**Deemed Directions Order Date**"), and on that date the Company and the Dissenters shall each advise the other in writing of the identities and email addresses of the respective Experts so appointed.

4       The Company and the Dissenters shall have leave to instruct and call, at a hearing following the Court's determination of fair value (the "**Interest Hearing**"), one expert witness each (any actively participating Dissenters jointly and severally to instruct one expert between them) to opine on the fair rate of interest for the purposes of section 238(11) of the Companies Act (2020 Revision) (together, the "**Interest Experts**").  For the avoidance of doubt, the same individual may be instructed and called as both a valuation Expert and an Interest Expert.  If the Company and the Dissenters, or either of them, consider an Interest Hearing necessary, the Interest Experts shall be appointed within 21 days of the date of the order made upon the Court's determination of fair value of the Dissenters' shares in the Company, and on that date the Company and the Dissenters shall each advise the other in writing of the identities and contact details including email addresses of the respective Interest Experts so appointed. Absent agreement between the parties at that time, and notwithstanding the provisions of any other direction herein, any party shall have liberty to apply for further directions regarding the exchange of reports and supplemental reports from, and production of a joint memorandum by, the Interest Experts, and in relation to any other matters connected with determining the fair rate of interest.

**B.      Confidentiality and Non-Disclosure Agreement**

5       No:

   5.1     Expert;

   5.2     Expert's appointee (being each person whom an Expert appoints to assist him/her in any work relating to the Proceedings, including the preparation of the Expert Reports (as defined at paragraph 43) and the Joint Memorandum (as defined in this Order) and any other preparations in relation to the Proceedings) (each an "**Appointee**" and collectively the "**Appointees**");

   5.3     Dissenter, including their agents, advisors, sub-advisors, representatives and consultants, (collectively their "**Representatives**"),

This DIRECTIONS ORDER is filed by Maples and Calder (Cayman) LLP, Attorneys for the Petitioner, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM\LBS\MKS/703174.000004)



shall be given access to the Data Room (as defined at paragraph 6 below) until and unless each Dissenter and Expert enters into, and exchanges, a Confidentiality and Non-Disclosure Agreement in the same or substantially similar form attached to this Order as **Appendix 2**.

**C.    Electronic Data Room and Company Disclosure Procedure**

6       Within 14 days from the Deemed Directions Order Date, the Company shall open an electronic data room (the "**Data Room**") and, subject to paragraph 5 above, provide access to the Experts, the Appointees, the Dissenters, and their respective Representatives and legal advisors.

7       At the same time as the Data Room is opened, the Company will upload to the Data Room the folders of documents identified at **Appendix 3** of this Order that comprise the entirety of the documents that were made available by the Company to members of the Buyer Group via the transaction due diligence data room utilised in the merger transaction negotiations (the "**Transaction Due Diligence Documents**").

8       Within 175 days from the Deemed Directions Order Date, the Company shall upload to the Data Room:

8.1     All documents (of whatsoever description, whether electronic, hard copy or in any other format) and communications (whether by email or otherwise) and other materials which are in its possession, custody or power comprising the categories of documents identified at Appendix 4 of this Order which were prepared or created in the five year period ending on the Valuation Date and which are relevant to the determination of the fair value of the Dissenters' shares in the Company as at the Valuation Date; and

8.2     All additional documents (of whatsoever description, whether electronic, hard copy or in any other format) and communications (whether by email or otherwise) in its possession, custody or power which are relevant to the determination of the fair value of the Dissenters' shares in the Company, as at the Valuation Date and which were prepared or created in the five year period ending on the Valuation Date.

8.3     The upload of the Company's disclosure in accordance with this Order 8 shall, absent further agreement between the parties, be in the following stages:

This DIRECTIONS ORDER is filed by Maples and Calder (Cayman) LLP, Attorneys for the Petitioner, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM\LBS\MKS/703174.000004)

3



(a)    within 42 days of the Deemed Directions Order Date, Categories A, B and C of Appendix 4;

(b)    within 72 days of the Deemed Directions Order Date , Category R of Appendix 4;

(c)    within 112 days of the Deemed Directions Order Date , Categories S, T, and U of Appendix 4; and

(d)    within 175 days of the Deemed Directions Order Date, all other Categories of Appendix 4 and all additional documents in the Company's possession, custody or power relevant to fair value in accordance with paragraph 8.2 above.

9    The Company shall comply with the disclosure protocol at Appendix 5 hereto when uploading documents to the data room.

10    Where documents in the Company's possession, custody or control are required to be redacted in order to comply with the laws of the People's Republic of China the protocol set out at Appendix 6 shall apply.

11    Subject to paragraph 36, the costs associated with the establishment and maintenance of the Data Room, including the Data Room provider's costs of:

11.1    uploading, processing and hosting the documents added to the Data Room;

11.2    producing the Data Room Index (as defined at paragraph 14 below) and any updated versions thereof;

11.3    technical support, including the costs of facilitating any bulk export or download of documents; and

11.4    Representatives seeking access to the Data Room,

shall be borne initially by the Company on an ongoing basis but shall ultimately be costs in the proceedings.

This DIRECTIONS ORDER is filed by Maples and Calder (Cayman) LLP, Attorneys for the Petitioner, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM\LBS\MKS/703174.000004)



12      Subject to paragraph 36, the Company shall, on an ongoing basis whilst the proceedings are extant, bear the costs of 12 access codes per Dissenter group (i.e. 12 in total to each group of Dissenters represented by a single Cayman Islands law firm), and as many access codes as the Experts may require, to facilitate access to the Data Room (such costs ultimately to be costs in the proceedings).  At least two Business Days (as defined at paragraph 21) prior to the end of each calendar month, each Dissenters group's Cayman Islands law firm shall inform the Company of any access codes not required by it for the next calendar month.  If a Dissenter group requires access codes to be kept live but fails to use an access code for a period of 30 days, as advised to the Company by the service provider of the Data Room, then they shall be liable to reimburse the Company for the costs of those access codes at the conclusion of the proceeding.  Should any Dissenter and/or its Representative(s) require additional access to the Data Room, such Dissenter shall bear the specific costs of such access, and the Company will arrange for such costs to be charged by the Data Room provider to the Dissenter directly.

13      No Data Room usage reports or any other analysis shall be run by any party on the usage of another party, its Representatives, legal advisors, or its appointed Expert and his/her Appointees without the written consent of that party.

**D.      Lists of Documents**

14      The Company shall ensure that the documents it uploads to the Data Room pursuant to paragraphs 7 and 8 above and 21 and 32A below will be appropriately indexed in an electronically searchable form (the "**Data Room Index**") pursuant to Appendix 5, paragraph 24.  This index shall be updated contemporaneously with any documents being added to the Data Room by the Company.  Any changes in the content of the Data Room shall be clearly identified to the Dissenters at the same time they are made.

15      In relation to the documents which are to be disclosed pursuant to this Order, the Company shall, in accordance with Section F paragraphs 16.12 and 16.13 and Sections G and H of Appendix 5, on or before the date for compliance with paragraphs 7 and 8 above and 21 and 32A below and from time to time thereafter as may be necessary, file and serve on the Dissenters a list of documents complying with GCR O.24, r.5.  The Data Room Index shall be treated as the Company's index of documents in accordance with GCR O.24, r.5(1) and any documents that may fall within GCR O.24, rr.5(2) to 5(4) shall be listed separately in

This DIRECTIONS ORDER is filed by Maples and Calder (Cayman) LLP, Attorneys for the Petitioner, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM\LBS\MKS/703174.000004)

5



accordance with Form No. 16 of Appendix 1 to the GCR. Nothing in this Order or in Appendix 5 hereto shall derogate from each party's implied obligation not to use the documents obtained thereby for any improper or collateral purpose.

## E.    Translations

16    Where documents added to the Data Room are not in the English language and the Company has an English translation thereof, an electronic copy thereof shall be uploaded by the Company to the Data Room. The English translation shall be uploaded to the Data Room together with the source document, which shall be cross-referenced and/or linked to the translation.

17    In the event that any party wishes to rely on a document which is not in the English language and a certified English translation is not available, that party shall procure and provide a certified English translation of the pages relied on at its own cost. An electronic copy of the English translation shall be uploaded to the Data Room as soon as practicable. The costs of any such translations shall be costs in the proceedings.

## F.    Experts' Information Requests of the Company

18    An Expert may submit to the Company written requests for any additional information, documents (of whatsoever description, whether electronic, hard copy or in any other format), and communications (whether by email, or otherwise) and any other materials prepared or created for this purpose which are or have been in its possession, custody or power or information requested by any Expert for the purpose of preparing his/her Expert Reports ("**Information Requests**"). For the avoidance of doubt, an Information Request may include requests for information, documents, communications or materials created after the Valuation Date.

19    Information Requests may be made from the date that the upload of documents to the Data Room pursuant to paragraph 8 above is completed until 28 days before the date fixed for the exchange of Expert Reports (as provided for at paragraph 43 below).

This DIRECTIONS ORDER is filed by Maples and Calder (Cayman) LLP, Attorneys for the Petitioner, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM\LBS\MKS/703174.000004)

6



20   Any Information Requests from an Expert and any responses from the Company thereto shall be copied simultaneously by email to the Expert for the other party or parties via the email addresses notified in accordance with paragraph 3 above.

21   The Company shall provide written answers to each batch of Information Requests and shall upload the written answers and any other responsive documents to the Data Room as soon as practicable, and in any event (unless otherwise agreed) within 21 days.  For the avoidance of doubt, should the Information Request be received by the Company after 5.30pm (Cayman Islands time), the timeframes above shall begin to run from 8.30am (Cayman Islands time) the following business day (being any calendar day on which banks are open in the Cayman Islands and Beijing ("**Business Day**")).

22   If, during the running of any 21 day period under paragraph 21 above, either Expert submits questions for a Management Meeting pursuant to paragraph 31, then the running of that 21 day period shall be suspended for the 14 days leading up to the Management Meeting and during the Management Meeting.

23   If an Expert submits an Information Request ("**Subsequent Request**") before the earlier of the: (a) deadline for the Company to respond to the Expert's immediately prior Information Request; or (b) date the Company actually responded to the Expert's immediately prior Information Request ("**Prior Request Deadline**"), then for the Subsequent Request the time period in paragraph 21 shall run from the Prior Request Deadline (rather than the date the Subsequent Request is submitted to the Company).

24   The Experts' Information Requests shall be made periodically and the Experts shall use their best endeavours to submit only concise and clear Information Requests.

**G.   Management Meetings**

25   Within 28 days of a request by either of the Experts, unless otherwise agreed or directed by the Court, the Company shall procure that appropriate members of its management team be available to meet with both Experts simultaneously for the purpose of providing information and answering queries which are relevant to the preparation of the Experts' respective Expert Reports (a "**Management Meeting**").

This DIRECTIONS ORDER is filed by Maples and Calder (Cayman) LLP, Attorneys for the Petitioner, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM\LBS\MKS/703174.000004)



26    The number of Management Meetings requested by the Experts shall not be restricted, save that that no Management Meetings may be requested by either of the Experts within 56 days of the Expert Reports being due to be exchanged (as provided for at paragraph 43 below), unless otherwise agreed between the parties or directed by order of the Court.

27    The parties shall agree on the time and date, attendees, format (video conference or in person), and (if applicable) location for a Management Meeting.

28    If agreement cannot be reached as to the time or date, attendees, format, and/or location of a Management Meeting, any party may apply to the Court for directions on not less than 5 working days' notice to the other parties, such matter to be resolved by the Court on the papers unless the Court otherwise orders.

28A    Only members of the Company's management team, the parties' Cayman Islands legal advisers, the Experts (together with the Expert's team members) and any interpreters (if applicable) shall attend Management Meetings, save that any Management Meetings held by video conference may also be attended by representatives of the Dissenters in an observatory capacity.

29    Management Meetings shall be conducted in English. If necessary to facilitate efficient and effective participation by any member of the Company's management team, the Company shall arrange for interpreters to be present at Management Meetings. The costs of any interpreter shall be borne equally by the Company and the Dissenters (to be shared between the Dissenters on a pro rata basis by reference to the number of shares they each held in the Company) and any such costs shall be costs in the proceedings.

30    Each party shall be responsible for its own travel, visa, accommodation and other logistical arrangements, and those of its Expert, in relation to any Management Meeting and the costs thereof shall be costs in the proceedings.

31    Each Expert shall provide a list of questions and/or topics ("**List of Questions and Topics**") to the Company not less than 14 days prior to the agreed date for a Management Meeting. The List of Questions and Topics shall be copied by email to the Expert for the other party or parties at such time as it is sent to the Company. Either Expert may ask reasonable follow-up questions at a Management Meeting to the extent that they consider it necessary. If an Expert

This DIRECTIONS ORDER is filed by Maples and Calder (Cayman) LLP, Attorneys for the Petitioner, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM\LBS\MKS/703174.000004)



reasonably wishes to raise a new question or topic not included in the List of Questions and Topics, reasonable accommodation shall be made by the Company and agreement to provide a response shall not be unreasonably withheld.

32     The Company shall arrange for Management Meetings to be recorded and for a transcript to be prepared (the "**Management Meeting Transcript**").    Both the recording and the Management Meeting Transcript shall be circulated to the parties and uploaded to the Data Room as soon as reasonably practicable thereafter and in any case within 14 days of the meeting.    The cost of such recording and Management Meeting Transcript shall be borne equally by the Company and the Dissenters (to be shared between the Dissenters on a pro rata basis by reference to the number of shares each held in the Company) and such costs shall be costs in the proceedings.

32A    Within 21 days of its receipt of a transcript of a particular Management Meeting, the Company shall be permitted to consider whether there are any errors in the transcript and, if so, explain any such errors to the Dissenters and produce (or, if already produced and uploaded to the Data Room, identify) the supporting documents which demonstrate any such error.  Within 7 days of providing notice of any purported errors and supporting documents, the Company shall circulate to the Dissenters and upload to the Data Room a copy of the transcript which identifies (a) any amendments agreed between the parties, and (b) any statements which the Company maintains are erroneous but which the parties have not agreed should be amended and the supporting documentation relied upon by the Company in support of its position.

33     To the extent an Expert intends to refer in her/his Report, Supplemental Report or Joint Memorandum to information in a Management Meeting Transcript she/he shall identify the passages from the Management Meeting Transcript that she/he intends to refer to no later than 14 days before the exchange of the relevant report in order to provide the Company with an opportunity to clarify, correct or comment upon the relevant passage, in writing, to the Experts and (if applicable) produce (or, if already produced and uploaded to the Data Room, identify) the supporting documents which demonstrate any error or misstatement. The Expert is not required to explain how or why he/she intends to rely on the Management Meeting Transcript extract(s). The Company shall provide any clarification, correction or comment within 7 days.

This DIRECTIONS ORDER is filed by Maples and Calder (Cayman) LLP, Attorneys for the Petitioner, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM\LBS\MKS/703174.000004)



**H.    Dissenter Disclosure**

34    Subject to the Company entering into, and exchanging, a non-disclosure agreement in the same or substantially similar form as that contained in Appendix 2, with the Dissenter as a disclosing party and the Company as the recipient, each Dissenter shall, in accordance with paragraph 36 below, upload to the Data Room within the time period to be ordered by the Court, if not agreed following delivery of judgment, documents within its possession, custody or power falling within the categories of documents to be ordered by the Court.

35    Each Dissenter shall, on or before the date for compliance with paragraph 34 above, file and serve upon the Petitioner a list of documents describing the documents to be provided under paragraph 34 above which are in the Dissenter's possession, custody or power.  The list of documents shall be treated as a list of documents in accordance with GCR O.24, r.5(1) and any documents that may fall within GCR O.24, rr.5(2) to 5(4) shall be listed separately in accordance with Form No. 16 of Appendix 1 to the GCR.  Nothing in this Order or in Appendix 5 hereto shall derogate from each party's implied obligation not to use the documents obtained thereby for any improper or collateral purpose.

36    Each Dissenter shall upload the documents disclosed pursuant to paragraph 34 above to the Data Room (or, if confidentiality, control or financial terms cannot be agreed with the Company's Data Room provider, by way of an alternative data room).  The costs of hosting such documents in the Data Room (but not in an alternative data room, which costs shall be borne initially by the Dissenters on an ongoing basis, but shall ultimately be costs in the proceedings) shall be borne initially by the Company on an ongoing basis but shall ultimately be costs in the proceedings. If the Dissenters set up their own alternative data room, then the Dissenters shall make up to 12 access codes available to the Company, at the Dissenters' initial expense, on equivalent terms to those provided for under paragraph 12.

37    Paragraphs 9, 10, 13 and 17 above shall apply in the same manner, and with the necessary modifications to give effect to those paragraphs, to the Dissenters' upload of documents to the Data Room.

38    Each Dissenter shall ensure that the documents it uploads to the Data Room pursuant to paragraph 34 above will be appropriately indexed in an electronically searchable form (the

This DIRECTIONS ORDER is filed by Maples and Calder (Cayman) LLP, Attorneys for the Petitioner, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM\LBS\MKS/703174.000004)

10



"**Dissenter Data Room Index**") pursuant to Appendix 5, Section H.   This index shall be updated contemporaneously with any documents being added to the Data Room by the Dissenter.   Any changes in the content of the Data Room shall be clearly identified to the Company at the same time they are made.

39      In relation to the documents which are to be disclosed pursuant to this Order, each Dissenter shall, in accordance with Section E paragraphs 16.12 and 16.13 and Sections G and H of Appendix 5, on or before the date for compliance with paragraphs 34 above and from time to time thereafter as may be necessary, file and serve on the Company a list of documents complying with GCR O.24, r.5.   The Dissenter Data Room Index shall be treated as the Dissenters' index of documents in accordance with GCR O.24, r.5(1) and any documents that may fall within GCR O.24, rr.5(2) to 5(4) shall be listed separately in accordance with Form No. 16 of Appendix 1 to the GCR.   Nothing in this Order or in Appendix 5 hereto shall derogate from each party's implied obligation not to use the documents obtained thereby for any improper or collateral purpose.

40      The Dissenters shall not be given access to each other's documents, but the Experts and the Company shall have access to all documents contained in the Data Room.

**I.      Factual Affidavits**

41      The Company shall file and serve any factual evidence by no later than 56 days from the date of uploading its documents to the Data Room pursuant to paragraph 8.3(d).   The Dissenters shall file any evidence in response by no later than 21 days of service of the Company's factual evidence upon them.   The Company shall file any evidence in reply by no later than 14 days of service of the Dissenters' evidence upon it.

42      Any factual evidence to be relied upon at the hearing of the Petition shall be given by affidavit and leave is hereby granted to the parties to cross-examine any deponent of any factual affidavit and the deponent(s) of any such affidavit(s) shall attend for cross-examination on the condition that notice requiring their attendance is given 14 days before the CMC (as defined at paragraph 52 below) or, if the CMC is dispensed with or the date of the CMC is fixed less than 14 days prior to the hearing of the CMC then the deadline shall be eight weeks prior to trial.

This DIRECTIONS ORDER is filed by Maples and Calder (Cayman) LLP, Attorneys for the Petitioner, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM\LBS\MKS/703174.000004)

**J.      Expert Reports and Joint Memorandum**

43      Signed reports of each of the Experts (the "**Expert Reports**") shall be:

    43.1    confined to the issue of the fair value of the Dissenters' shares as a going concern in the Company as at the Valuation Date;

    43.2    in accordance with the Rules for Expert Witnesses in the FSD Guide; and

    43.3    exchanged simultaneously 26 weeks after the date on which documents are uploaded to the Data Room pursuant to paragraph 8.3(d) above, unless otherwise agreed by all parties.

44      The Experts shall meet at a mutually convenient time, whether in person, by telephone call or video link or howsoever they shall decide (the "**Experts' Meeting**"), but no later than 28 days after the exchange of the Expert Reports, to discuss the differences between their respective Expert Reports with a view to narrowing the issues between them and producing the Joint Memorandum required by paragraph 45 below.

45      A joint memorandum of the Experts (the "**Joint Memorandum**") recording:

    45.1    the fact that they have met;

    45.2    when and where they met, and that they discussed the Expert issues;

    45.3    the issues on which they agree;

    45.4    the issues on which they disagree; and

    45.5    a brief summary of the reasons for any such disagreement,

shall be completed and issued to the parties by the Experts by no later than 28 days following the Experts' Meeting.

46      Any supplemental Expert Reports ("**Supplemental Reports**") shall be exchanged simultaneously by no later than 48 days following the issuance of the Joint Memorandum.

This DIRECTIONS ORDER is filed by Maples and Calder (Cayman) LLP, Attorneys for the Petitioner, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM\LBS\MKS/703174.000004)



47      The Company and the Dissenters shall each be at liberty to call as expert witnesses at trial their own appointed Expert whose report(s) have been exchanged pursuant to the provisions of this Order.

48      The Company shall be at liberty to cross-examine the Dissenters' appointed Expert at trial on his or her report(s) at trial, and the Dissenters shall be at liberty to cross-examine the Company's appointed Expert on his or her report(s) at trial.

**K.      Holiday blackout periods**

49      The following periods are dedicated holiday periods to enable the parties and the legal and Expert teams to take leave should they desire to do so. Time shall not run during these periods for any purpose in relation to this Proceeding, including any task provided for under this directions order and in respect of any correspondence exchanged in relation to this proceeding:

49.1      24 December to 2 January;

49.2      Chinese New Year, being seven calendar days from the first Bank Holiday in Beijing for Chinese New Year; and

49.3      National Day Golden Week, being seven calendar days from the first Bank Holiday in Beijing for the Golden Week.

**L.      Third Party disclosure**

50      Any party that seeks ancillary relief in aid of these proceedings, whether by way of third party discovery applications, applications in the United States of America under 28 U.S.C. s.1782, or otherwise, shall  notify the other parties as soon as practicable after having served such an application, and in any event within 7 days' of service.

51      Each party will disclose promptly to the other parties any and all documents received from any third-party or non-party as a result of any ancillary relief in aid of these proceedings obtained by the party (whether by way of an order of this Court, an order of any foreign Court or voluntary assistance by the third party). Disclosure shall be made in accordance with paragraphs 14 and 15 or 38 and 39 (as applicable).

This DIRECTIONS ORDER is filed by Maples and Calder (Cayman) LLP, Attorneys for the Petitioner, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM\LBS\MKS/703174.000004)



**M.    Case Management, Case Management Conference and Trial Dates**

52    Unless the parties otherwise agree, a Case Management Conference ("**CMC**") shall be held on the earliest date convenient to the Court and the parties' Counsel after the deadline for exchange of any Supplemental Reports, or in the event that no Supplemental Reports are exchanged, on the earliest convenient date once it is confirmed that no Supplemental Reports will be exchanged.  The parties may agree that the CMC be dispensed with provided that the Court does not indicate a CMC is necessary.

53    The Dissenters shall, on an ongoing basis while the proceedings are extant, pay 50% of the cost of the recording and transcription of the hearing of the Company's Summons for Directions, the CMC and the hearing of the Company's Petition (such costs ultimately to be costs in the proceedings), subject to the parties agreeing on the supplier and fee quote prior to each hearing.  Such costs shall be shared between the Dissenters on a *pro rata* basis by reference to the number of shares they each held in the Company.  The Dissenters shall be included on all correspondence between the Company and the supplier.

54    For convenience only, the deadlines set out in various paragraphs in this Order are tabulated in a schedule attached to this Order as Appendix 8.  To the extent there is any inconsistency between the terms of this Order and Appendix 8, this Order shall prevail.

55    Save as varied by this order or further order, the practice and procedures set out in the FSD Guide are to be followed.

56    Liberty for any party to apply for further directions in respect of the matters addressed in this Order and any other matters prior to the CMC.

57    Within 28 days of the parties filing their factual witness statements in accordance with the terms of this order, the parties shall seek to agree and thereafter promptly write to the Court to fix the trial dates, with the trial to commence at least eight weeks after the exchange of Supplemental Reports and subject to the Company's and the Dissenters' Counsels' availability.

This DIRECTIONS ORDER is filed by Maples and Calder (Cayman) LLP, Attorneys for the Petitioner, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM\LBS\MKS/703174.000004)

58      Within five days of the filing of this Order, the Company shall inform the Dissenters of the total number of shares that shall be the subject of the trial of the Petition, and shall inform the Dissenters of any change within one week of such change.

Dated this    8th November 2021

Filed this     8th November 2021



The Honourable Justice Margaret Ramsay-Hale

**JUDGE OF THE GRAND COURT**

This DIRECTIONS ORDER is filed by Maples and Calder (Cayman) LLP, Attorneys for the Petitioner, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM\LBS\MKS/703174.000004)

**APPROVED AS TO FORM AND CONTENT**

_____

**MAPLES AND CALDER (CAYMAN) LLP**

Attorneys for the Company

_____

**CAMPBELLS**

Attorneys for the Dissenters listed in Appendix 1 below at rows 4, 23, 24 and 34

_____

**CAREY OLSEN**

Attorneys for the Dissenters listed in Appendix 1 below at rows 10, 27, 28, 35, 36, 37, 38, 39, 40 and 41

_____

**COLLAS CRILL**

Attorneys for the Dissenters listed in Appendix 1 below at rows 5, 6, 11, 12, 13, 15, 16, 17, 26, 29 and 31

_____

**OGIER**

Attorneys for the Dissenters listed in Appendix 1 below at rows 1, 2, 3, 7, 8, 9, 14, 18, 19, 20, 21, 22, 25, 30, 32, 33, 42, 43, 44 and 45

This DIRECTIONS ORDER is filed by Maples and Calder (Cayman) LLP, Attorneys for the Petitioner, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM\LBS\MKS/703174.000004)

16

**Appendix 1**
**List of Dissenters before the Court**

| # | Name of Dissenter | No. of shares dissented |
|---|---|---|
| 1 | 405 ACM Ltd | 2,331,720 |
| 2 | Athos Asia Event Driven Master Fund | 1,663,386 |
| 3 | Athos Special Situations Funds SPC | 1,785,334 |
| 4 | Blackwell Partners LLC-Series A | 610,000 |
| 5 | Boothbay Absolute Return Strategies, LP | 240,750 |
| 6 | Boothbay Diversified Alpha Master Fund LP | 80,250 |
| 7 | British Coal Staff Superannuation Scheme | 65,180 |
| 8 | Brunel Pension Partnership Limited | 328,718 |
| 9 | Buma-Universal-Fonds I | 156,794 |
| 10 | Burlington Loan Management DAC | 3,358,088 |
| 11 | Corbin ERISA Opportunity Fund, Ltd | 245,004 |
| 12 | Corbin Opportunity Fund, LP | 174,998 |
| 13 | Corsun LLC | 705,760 |
| 14 | FMAP ACL Limited | 1,022,722 |
| 15 | Fourworld Event Opportunities, LP | 25,200 |
| 16 | Fourworld Global Opportunities Fund, Ltd | 1,100,000 |
| 17 | Fourworld Special Opportunities Fund, LLC | 524,048 |
| 18 | Genesis Emerging Markets Business Trust | 180,258 |
| 19 | Genesis Emerging Markets Fund Limited | 653,660 |
| 20 | Genesis Emerging Markets Investment Company SICAV | 1,448,240 |
| 21 | Genesis Emerging Markets LP | 301,060 |
| 22 | Genesis Group Trust for Employee Benefit Plans | 3,099,844 |
| 23 | Maso Capital Arbitrage Fund Limited | 1,794,000 |
| 24 | Maso Capital Investments Limited | 30,000 |
| 25 | Mineworkers' Pension Scheme | 67,524 |
| 26 | MSIV I LLC | 900,000 |
| 27 | Oasis Investment II Master Fund Ltd | 1,792,196 |
| 28 | Oasis Special Situations SPC-Beta SP | 572,000 |
| 29 | Pinehurst Partners, LP | 174,998 |

| # | Name of Dissenter | No. of shares dissented |
|---|---|---|
| 30 | Public Employee Retirement System of Idaho | 235,814 |
| 31 | Quadre Investments, LP | 606,018 |
| 32 | Qube Master Fund Ltd | 727,600 |
| 33 | Sphere ICAV – Torus Fund | 360,000 |
| 34 | Star V Partners LLC | 335,780 |
| 35 | T. Rowe Price Global Allocation Fund | 5,864 |
| 36 | T. Rowe Price International Growth Equity Trust | 1,775,584 |
| 37 | T. Rowe Price International Stock Fund[1] | 3,564,710 |
| 38 | T. Rowe Price International Stock Portfolio | 65,164 |
| 39 | T. Rowe Price Multi-Strategy Total Return Fund, Inc. | 22,100 |
| 40 | T. Rowe Price Non-U.S. Equities Trust | 202,640 |
| 41 | T. Rowe Price Science & Technology Fund, Inc. | 8,367,978 |
| 42 | Tech Opportunities LLC | 360,000 |
| 43 | The State Teachers Retirement System of Ohio | 295,558 |
| 44 | Wakefield Investments Ltd | 4,260,002 |
| 45 | Wakeland Securities LP | 9,939,998 |
| | **Total:** | **56,556,542** |

[1] On 14 October 2020 Carey Olsen, the Cayman Islands attorneys for T. Rowe Price Institutional International Growth Equity Fund, notified the Petitioner that on 2 October 2020 that Dissenter had merged into T. Rowe Price International Stock Fund.

**Appendix 2**

**Confidentiality and Non-Disclosure Agreement (pursuant to paragraphs 5 and 34 of the Order)**

This Confidentiality and Non-Disclosure Agreement (the "**Agreement**"), effective [Date] (the "**Effective Date**"), is entered into

**BETWEEN**

[**58.COM INC.** a company incorporated under the laws of the Cayman Islands and having its registered office address at c/o Maples Corporate Services Limited, PO Box 309, Ugland House, George Town, Grand Cayman KY1-1104, Cayman Islands] (the "[**Company**]")

**AND**

[NAME], a company incorporated under the laws of [jurisdiction] and having its registered office address at [address] (the "**Recipient**"),

(each herein referred to individually as a "**Party**", and collectively as the "**Parties**").

**WHEREAS**

A.   On 15 June 2020, the Company entered into a merger agreement with Quantum Bloom Group Ltd and Quantum Bloom Company Ltd (the "**Merger Sub**"), pursuant to which the Merger Sub merged with and into the Company (the "**Merger**").  The Merger received the approval of the requisite majority of the members of the Company at an extraordinary general meeting held on 6 September 2020 Cayman Islands time / 7 September 2020 Beijing time.

B.   The dissenting shareholders of the Company identified in Appendix 1 of the Directions Order (as defined herein) (each a "**Dissenter**", and collectively the "**Dissenters**") have dissented from the Merger pursuant to Section 238(5) of the Cayman Islands Companies Act (2020 Revision).

C.   On 10 November 2020, the Company petitioned the Grand Court of the Cayman Islands to determine the fair value of the Dissenters' shares in Cause No. FSD 275 of 2020 (MRHJ) (the "**Proceedings**").

D.   Pursuant to a directions order in the Proceedings which was determined at a hearing dated 27 July 2021, but which has yet to be formally sealed (the "**Directions Order**"), the Company is to establish an electronic data room (the "**Data Room**") to which discovered documents are to be uploaded for the purposes of the Proceedings.

E.   The [Company] is engaged in proprietary and confidential business activities, and could be prejudiced if Confidential Information (as defined herein) pertaining to the [Company] or its business is disclosed publicly or to third parties, or used by the Recipient, its Representatives and/or Appointees (as defined herein) for purposes not reasonably related to the purposes of the Proceedings.

**NOW, THEREFORE,** in consideration of the promises and the mutual agreements and covenants hereinafter set forth, and intending to be legally bound, the [Company] and the Recipient hereby agree as follows:

1

# 1     DEFINITIONS AND INTERPRETATION

1.1     In this Agreement   the following words and expressions shall have the following meanings:

    (a)     "**Affiliates**" means a corporation that is related to another corporation by shareholdings or other means of control; a subsidiary, parent, or sibling corporation.

    (b)     "**Appointee**" means each person whom an Expert appoints to assist him/her in any work relating to the Proceedings, including the preparation of the Expert Reports and the Joint Memorandum (such other terms as defined in the Directions Order).

    (c)     "**Representatives**" means, with respect to a Recipient, its Affiliates its agents, advisers, sub-advisers, legal advisors, representatives, and consultants.

1.2     References to recitals and clauses are references to the recitals to and clauses of this Agreement.

1.3     Headings to clauses and the use of bold type are for convenience only and shall not affect the interpretation or construction of this Agreement.

1.4     Words in the singular include the plural and vice versa.

# 2     CONFIDENTIAL INFORMATION

2.1     "**Confidential Information**" means:

    (a)     Any information disclosed by the [Company] to the Recipient, its Representatives and/or Appointees either directly or indirectly, in writing or orally, including (without limitation) information related to: trade secrets; business, commercial, or financial information; financial statements; financial or business plans and strategies; projections or analyses for future or prior periods; tax data; business and marketing plans and strategies; assets and liabilities; proposed strategic transactions or acquisitions, strategic alternatives, or business combinations; or other personally or commercially sensitive or proprietary information of the [Company] and its subsidiaries; and

    (b)     Any notes, analyses, compilations, studies, interpretations, documents or records containing, referring to, relating to, based upon or derived from, such Confidential Information, in whole or in part, created by the Recipient, its Representatives and/or Appointees.

2.2     Confidential Information shall not, however, include any information that:

    (a)     Was publicly known or made generally available to the public prior to the time of disclosure to the Recipient by the [Company];

    (b)     Has become publicly known or made generally available to the public after disclosure to the Recipient by the [Company] through no action or inaction of the Recipient in breach of this Agreement; or

    (c)     Is in the rightful possession of the Recipient without confidentiality obligations at the time of disclosure by the [Company] to the Recipient as shown by the Recipient's then contemporaneous written files and records kept in the ordinary course of business.

2.3     If the Recipient or its Representative becomes compelled by applicable law, rule or regulation or request of governmental or regulatory authority to disclose any Confidential Information, the Recipient will, insofar as it is permitted to do so by applicable law, rule or regulation and other than in the case of routine regulatory investigations, provide the [Company] with a written notice at least seven days in advance of such disclosure, where practicable, and will provide such reasonable assistance to the [Company] as the [Company] may require at the [Company's] sole expense in seeking a protective order or other appropriate remedy.

2.4     If the [Company] waives the Recipient's compliance with this Agreement or fails to obtain a protective order or other appropriate remedy, the Recipient will furnish only that portion of the Confidential Information that it is required to disclose by applicable law, rule or regulation provided that any Confidential Information so disclosed shall maintain its confidentiality protection for all purposes other than such disclosure compelled by applicable law, rule or regulation.

**3       MAINTENANCE OF CONFIDENTIALITY**

3.1     Except as may otherwise be agreed in writing by the [Company] or ordered by the Grand Court, all Confidential Information and its contents received by the Recipient, its Representatives and/or Appointees shall be:

(a)     Maintained as set forth in this Agreement;

(b)     Disclosed only to such persons and in such manner as permitted by this Agreement; and

(c)     Used solely for the purposes of the Proceedings.

3.2     Prior to its Representatives and/or Appointees being granted access to the Data Room and/or receiving the Confidential Information, the Recipient shall:

(a)     Ensure that its Representatives and Appointees expressly agree in writing to comply with the confidentiality terms imposed by this Agreement or are otherwise bound by confidentiality obligations no less restrictive than those contained herein; and

(b)     Confirm in writing to the [Company] that the agreements in clause 3.2(a) above have been obtained or obligations of confidentiality (as contemplated by clause 3.2(a) above) are otherwise in place.

3.3     The Recipient, its Representatives and its Appointees shall keep the Confidential Information confidential and shall not:

(a)     Disclose any Confidential Information or permit any Confidential Information to be disclosed, either directly or indirectly, to any third party (other than other Representatives, or Appointees or Recipients who have signed a confidentiality agreement in this form and their Representatives or Appointees)  without the [Company]'s prior written consent; or

(b)     Use the Confidential Information for any purpose other than as set out at Clause 3.1 above or exploit the Confidential information in any way, including without limitation:

(i)     In any court proceedings commenced in any jurisdiction save for the Proceedings;

3

(ii)   In communications with any competitor or competitors of the [Company] or its subsidiaries or affiliates; and/or

(iii)  As a basis for trading in the securities of the [Company] or its subsidiaries or affiliates.

3.4   The Recipient shall take necessary measures to protect the confidentiality, and to avoid disclosure and unauthorised use, of Confidential Information.   Without limiting the foregoing, the Recipient shall take at least those same measures it employs to protect its own confidential information.

3.5   The Recipient shall reproduce the [Company's] proprietary rights notices on any copies of documents, in the same manner in which such notices were set forth in or on the original.

## 4    BREACH OF CONFIDENTIALITY

4.1   The Recipient shall notify the [Company] of:

(a)   Any unauthorized use or disclosure, or suspected unauthorized use or disclosure, of Confidential Information by the Recipient, its Representatives and/or Appointees immediately upon becoming aware of such use and disclosure; and

(b)   Any actions by the Recipient, its Representatives and/or Appointees which are in breach of their respective obligations under this Agreement immediately upon becoming aware of such actions

4.2   The Recipient shall reasonably cooperate with any and all efforts of the [Company] to help the [Company] regain possession of Confidential Information and/or prevent its further unauthorized use or dissemination.

4.3   The Recipient agrees to be responsible for any breach of this Agreement by any of its Representatives and/or Appointees that has received or obtained Confidential Information.

4.4   Nothing in this Agreement shall prejudice in any way the rights of the [Company] to file an application with the Cayman Islands court for a protective order relating to any Confidential Information.  For the avoidance of doubt, any failure by the [Company] to obtain such an order or other protection after having a reasonable opportunity to do so shall not preclude the Recipient from making use of the Confidential Information in the Proceedings.

## 5    DESTRUCTION OF MATERIALS

5.1   Upon the earlier of (i) the final determination of the Proceedings (including all appeals therefrom), or (ii) a legally binding agreement having been reached between the [Company] and the Recipient as to the amount payable to it as a result of the Merger, and payment having been duly received by the Recipient (together the "**Final Determination**"), the Recipient, shall, upon request by the [Company] within 14 days of the Final Determination, take all reasonable and proportionate steps to:

(a)   Subject to clause 5.2, promptly destroy any materials that are in writing or other tangible medium or permanently erase any materials that are in an electronic or other non-tangible medium (to the extent technologically feasible) that constitute Confidential Information obtained or possessed by the Recipient;

(b)   Procure that all of its Representatives and/or Appointees destroy any materials that are in writing or other tangible medium or permanently erase any materials

that are in an electronic or other non-tangible medium (to the extent technologically feasible) that constitute Confidential Information obtained or possessed by the Recipient's Representatives and/or Appointees; and

(c)    Certify in writing to the Company that the Recipient has complied with the requirements of this Clause 5.

5.2    Notwithstanding the foregoing, one copy of the Confidential Information may be retained by each of the Recipient's legal department or outside attorneys to comply with applicable law or regulation, provided that copies so retained shall continue to be treated as confidential in accordance with the provisions of this Agreement.

5.3    Notwithstanding the destruction or erasure of Confidential Information pursuant to this Clause 5, the Recipient and its Representatives and Appointees shall continue to be bound by their confidentiality obligations and other obligations under this Agreement.

**6    INDEMNITY**

The Recipient shall indemnify the [Company] against all liabilities, costs, expenses, damages and losses (including but not limited to any direct, indirect or consequential losses, loss of profit, loss of reputation and all interest, penalties and legal costs (calculated on a full indemnity basis) and all other professional costs and expenses) suffered or reasonably incurred by the [Company] arising out of or in connection with any breach of this Agreement by the Recipient, its Representatives and/or Appointees.

**7    INADEQUACY OF DAMAGES**

The Recipient agrees that any violation of this Agreement may cause irreparable injury to the [Company] which cannot be adequately remedied in monetary terms or other damages, and accordingly the [Company] may be entitled to obtain injunctive relief, specific performance and/or any other equitable relief in addition to all other legal remedies concerning any threatened or actual breach of any of the provisions of this Agreement.

**8    TERM**

8.1    The obligations of the Recipient under this Agreement shall survive until 24 months following compliance with Clause 5 above.    Notwithstanding the foregoing, the Recipient's duty to hold in confidence any Confidential Information that was disclosed by the [Company] during the term of this Agreement shall remain in effect for five years from the date the Confidential Information was disclosed by the [Company].

8.2    The termination of this Agreement shall not affect any accrued rights or remedies to which the [Company] is entitled.

**9    NO WARRANTY**

THE [COMPANY] MAKES NO WARRANTIES, EXPRESS, IMPLIED OR OTHERWISE, WITH RESPECT TO NON-INFRINGEMENT OR OTHER VIOLATION OF ANY INTELLECTUAL PROPERTY RIGHTS OF A THIRD PARTY OR OF THE RECIPIENT.

**10    NO LICENSE**

This Agreement shall not be construed as creating, conveying, transferring, granting or conferring upon the Recipient any rights, license or authority in or to the Confidential Information except as expressly set forth in this Agreement.    Title to the Confidential Information will vest solely with the [Company].

5

## 11    MISCELLANEOUS

11.1    This Agreement shall bind and inure to the benefit of the Parties and their respective successors and permitted assigns; except that the Recipient may not assign or otherwise transfer this Agreement, by operation of law or otherwise, without written consent of the [Company].  Any assignment or transfer of this Agreement in violation of the foregoing shall be null and void.  The Recipient hereby represents and warrants that the person executing this Agreement on its behalf has express authority to do so, and, in so doing, to bind the Party thereto.

11.2    This Agreement contains the entire agreement between the Parties with respect to the subject matter hereof and supersedes all prior written and oral agreements between the Parties regarding such subject matter.

11.3    If any provision herein shall be determined to be void or unenforceable in whole or in part for any reason whatsoever such invalidity or unenforceability shall not affect the remaining provisions or any part thereof contained within this Agreement and such void or unenforceable provisions shall be deemed to be severable from any other provision or part thereof herein contained.

11.4    No provision of this Agreement may be waived except by a written instrument executed by the Party against whom the waiver is to be effective.  A Party's failure to enforce any provision of this Agreement shall neither be construed as a waiver of the provision nor prevent the Party from enforcing any other provisions of this Agreement.  No provision of this Agreement may be amended or otherwise modified except by a written instrument signed by the Parties to this Agreement.

11.5    The Parties may execute this Agreement in one or more counterparts, each of which is deemed an original, but all of which together constitute one and the same agreement. This Agreement may be delivered by email or facsimile transmission, and email or facsimile copies of executed signature pages shall be binding as originals.

## 12    GOVERNING LAW AND JURISDICTION

12.1    This Agreement and any dispute, claim, suit, action or proceeding of whatever nature (including non-contractual disputes or claims) arising out of or in connection with it or its subject matter or formation shall be governed by and construed in accordance with the laws of the Cayman Islands.

12.2    Each Party irrevocably agrees to submit to the exclusive jurisdiction of the courts of the Cayman Islands over any claim or matter arising under or in connection with this Agreement or the legal relationship established by this Agreement; provided that nothing in this Clause 12 shall prevent a Party from seeking interlocutory or interim injunctive relief in other jurisdictions.

12.3    Each Party irrevocably agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable law.

**IN WITNESS WHEREOF**, the Parties acknowledge that they have read and understood this Agreement and have executed this Agreement as of the Effective Date.

Signed for and on behalf of    )
**[58.COM INC.]**    )
by its duly authorised agent    )
    )    _____
    )    Name:
    )    Designation:
In the presence of:    )    Date:
    )
    )
    )
_____    )
Name:
Date:

Signed for and on behalf of    )
**[NAME OF RECIPIENT]**    )
    )    _____
    )    Name:
    )    Designation:
    )    Date:
In the presence of:    )
    )
    )
    )
_____    )
Name:
Date:

7

**Appendix 3**

**Categories of documents to be disclosed pursuant to paragraph 7 of the Order**

| 1. | Commercial | Business Overview | 01-房产 |
|---|---|---|---|
| | | | 02-人力资源 |
| | | | 03-生活服务 |
| | | | 04-汽车出行_汽车 |
| | | | 05-企业服务 |
| | | | 06-教育培训 |
| | | | 07-下沉市场 |
| | | | 08-技术&前沿 |
| | | | 09-装饰装修 |
| | | | 10-综合 |
| | | FCPA相关制度 | |
| | | General Company Data | Bank Analyst Reports |
| | | | Company Annual Reports |
| | | | Company Presentation |
| | | | Organization chart |
| | | Operational Data | |
| 2. | Finance | Annual auditing report (子公司) | |
| | | BU Management Account Report | |
| | | Financial Projection | |
| | | Revenue Build Up (2018 – 2019Q3) | |
| 3. | Legal | 1. 基本公司文件 | |
| | | 2. 股东、股权及控制关系 | |
| | | 3. 监管事项和业务合规性 | |

| | | 4. 经营合同 | |
|---|---|---|---|
| | | 5. 不动产 | |
| | | 9. 诉讼、处罚 | |

**APPENDIX 4**

**Categories of Documents to be disclosed by the Company**

**pursuant to paragraph 8.1 of the Order**

Documents which exist and are within the Company's possession, custody or power and which were created or received between 6 September 2015 and the Valuation Date (6 September 2020) (except where a different date range is expressly provided in any of the categories set out below), which are relevant to the question of the fair value of the Dissenters' shares in the Company as at the Valuation Date and which fall within the categories set out below.

In this Appendix 4, the following definitions apply:

"Document" shall include, without limitation, original and all non-identical copies of all written or printed items and electronically stored information, including letters, correspondence, emails, text messages, agreements, contracts, forms, chat messages (including Bloomberg messages, Instant Bloomberg chats, WeChat messages, WeCom messages, QQ messages, and WhatsApp messages), memoranda, calendars, diaries, legal pleadings, day planners, travel records, lists, outlines, summaries, records of telephone conversations, facsimiles, notes, reports, compilations, notebooks, work papers, graphs, charts, spreadsheets, books, pamphlets, brochures, presentations, analyses, circulars, manuals, instructions, ledgers, compact discs, computer files and disks, photographs, all written or graphic records or representations of any kind and description that are fixed in any medium upon which intelligence or information can be recorded or retrieved including documents electronically or digitally stored on disk or tape in a native format. A draft, non-identical, or marked copy is a separate document within the meaning of this term.

"Communication" means any written, or electronic transmission of information (in the form of facts, ideas, inquiries, or otherwise), including all meetings, discussions, dialogues, conversations, telephone calls, interviews, negotiations, cablegrams, mailgrams, telegrams, telexes, cables, correspondence, facsimiles, emails, text messages, chat messages (including Bloomberg messages, Instant Bloomberg chats, WeChat messages, WeCom messages, QQ messages, and WhatsApp messages), or other forms of written interchange, however transmitted, including reports, notes, memoranda, lists, agenda, proposals, opinions, messages, video tapes, and other documents or records of communication

A.    Any Communications with and Documents produced by, provided to or received from Houlihan Lokey (China) Limited or its affiliates (the "**Financial Advisor**") in relation to the merger which,

1

in this Appendix 4, includes all matters set out in the Company's proxy statement dated 7 August 2020 (the "**Proxy**") (the "**Merger**").

B.   Any Communications with and Documents produced by, provided to or received by the Company's Special Committee or its members.

C.   Any Communications with and Documents produced by, provided to or received from Robert Frank (Bob) Dodds, Jr and Li (Lily) Dong in their capacities as directors of the Company and in relation to their appointment as directors of the Company (including Communications and Documents made and produced prior to their appointment on 13 April 2020).

D.   Any Communications and Documents in respect of the Company's decision to form the Special Committee, including the Company's choice of independent directors and any internal or external analysis conducted in respect of their independence.

E.   Any Communications and Documents in respect of the Special Committee's selection and engagement of legal advisors and financial advisor.

F.   Any Communications and Documents and any other materials being drafts of or discussing any projections sent to the Financial Advisor and/or Special Committee, including earlier or alternative drafts or versions of such projections whether sent to the Financial Advisor and/or Special Committee or not.

G.   INTENTIONALLY LEFT BLANK

H.   [Not Yet Agreed]

I.   Any Communications with and Documents produced by, provided to or received from any member of the "**Buyer Group**" (as defined in the Proxy) in respect of the Merger and/or the purchase of shares in the Company.

J.   Any Communications with and Documents produced by, provided to or received from the "**Other Rollover Entities**" (as defined in the Proxy) in relation to the Merger.

K.   Any Communications with and Documents produced by, provided to or received from actual or prospective financiers of the Company or the Buyer Group in relation to the Merger.

L.   Any financial projections, forecasts, budgets, models, reports or plans relating to any anticipated synergies or cost savings expected to be achieved as a result of the Merger.

M.    Any Communications and Documents (including all prior versions and drafts) in relation to the negotiation of the Merger Agreement or the Merger or projections being prepared for the Buyer Group or the Other Rollover Entities or actual or prospective financiers.

N.    Any Communications with and Documents produced by, provided to or received from any other potential purchasers who considered making or did make proposals in respect of the Merger.

O.    Any Communications and Documents in relation to the engagement of, and provision of advisory services by, Kaihui Limited and its agents and affiliates ("**KL**") including (i) any contracts entered into with KL and (ii) all Communications and Documents in relation to KL's exploration of "potential strategic transactions, including possible minority or control transactions, mergers and acquisitions, debt financings or equity financings" as referred to in the Proxy; (iii) all Communications and Documents in relation to the Original Proposal (as defined in the Proxy); and (iv) all Communications and Documents in relation to the Merger.

P.    Any Communications and Documents (including all prior versions and drafts) in relation to the negotiation of the merger agreement and related Documents.

Q.    Any Communications and Documents produced by, provided to or received from the Company and any of its shareholders in relation to the Merger, including in relation to the shareholders' interests and incentives, including, without limitation, any Communications in relation to the exercise of shareholders' voting rights or voting agreements, or objections.

R.    Minutes and agendas of Board meetings and any supporting documentation and any other reports prepared for Board Meetings of the Company.

S.    Monthly management accounts for the Company.

T.    Consolidated quarterly accounts for the Company.

U.    Monthly and/or quarterly financials for the Company including, where available, budgets, profit and loss statements, balance sheets, cash flow statements and any accompanying notes, commentary, reports or business plans.

V.    INTENTIONALLY LEFT BLANK

W.    Any Communications or Documents relating to any aspect of the Company's business plans that 58.com believed it could not achieve as a publicly traded company.

3

X.   Any Communications or Documents relating to any off-balance sheet or non-operating assets and liabilities, including pension liabilities of the Company.

Y.   Any Communications or Documents relating to any material non-public information (MNPI) in relation to the Company and value of the shares of the Company.

Z.   Any reports on the Company prepared by stock market or industry analysts and any Communications with and Documents produced by, provided to or received from any such analysts of the Company.

AA.   Any third party market and industry reports relevant to the markets in which the Company operates, other than those which are publicly available.

BB.   Any internal Documents relating to market share of the Company broken down by business segment.

CC.   Any Communications with and Documents produced by, provided to, received from or communicated between the Company's directors, advisors and senior officers in relation to the market price, potential future market price, or value of the shares of the Company during the 12 months prior to the Valuation Date.

DD.   Any Documents and Communications relating to any other potential acquisition of the Company or any part of it sent to the Company's management or Board.

EE.   Any agreements between the Company and its major suppliers, being those suppliers providing 5% or more of the cost of goods sold by the Company.

FF.   Any Communications and Documents relating to any significant changes to the business of the Company or industry-related events that either had, or were perceived as having the potential to have, a significant effect on the long term projections of the Company.

GG.   Any Documents supporting the values of long-term investments, loans and other receivables and liabilities of the Company.

HH.   Any Documents or Communications relating to any potential stock buybacks and the price(s) at which 58.com would be willing to repurchase its own stock.

II.   The number, terms and class of shares issued by the Company as at the Valuation Date and any changes during the year leading up to the Valuation Date. This information may be provided in schedule form.

4

JJ.  The terms and conditions of any outstanding share options of the Company as at the Valuation Date.

KK.  Any significant transactions in the Company's shares.

LL.  Advice or analysis relating to corporation tax, withholding tax or other tax prepared by or for the Company's management.

MM.  Any Communications and Documents, including all valuations and analysis, relevant to any potential relisting or IPO of the Company, whether in the People's Republic of China or elsewhere, and whether or not the potential relisting or IPO was ultimately pursued.

NN.  Any Communications and Documents, including all valuations and analysis, relevant to the IPO and pre-IPO funding of Anjuke Inc., 58 Daojia and/or any other potential listing or IPO of any other Affiliates of the Company, whether in the People's Republic of China or elsewhere, and whether or not the potential listing or IPO was ultimately pursued.

**Appendix 5**

**Disclosure Protocol pursuant to paragraphs 9 and 37 of this Order**

A.    **Definitions**

1    **Document** has the same meaning as set out in Appendix 4 and includes Communications (as defined in Appendix 4).

2    **Metadata** means data about data. In the case of an electronic Document, metadata is typically embedded information about the Document that is not readily accessible once the native electronic Document has been converted into an electronic image or paper Document, for example, the date on which the Document was last printed or amended. Metadata may be created automatically by a computer system (system metadata) or may be created manually by a user (application metadata).

3    **MD5 Hash Value** means the Message Digest algorithm 5 which is used to provide a 128-bit hash or "digital signature" for electronic Documents and is generated upon the basis of the binary data of a file; where two or more items have the same MD5 Hash Value they are deemed to be duplicates.

4    **Native File Format** means an electronic Document stored in the original form in which it was created by a computer software program.

5    **Parent Document** means a Document with one or more attachment.  For example, an email is a parent Document and any Documents attached to the email are its attachments.

B.    **Preservation of Documents**

6    The parties will take steps to preserve all potentially discoverable Documents, including the metadata of such Documents, and to ensure no metadata is altered during the preservation, collection, review or disclosure process.

C.    **De-duplication**

7    Stand-alone electronic Documents or entire Document families with the same MD5 Hash Value will be identified and any duplicates removed, except:

7.1     where duplicates are added to a party's List of Documents because they are family members of other Documents which are also disclosed. Duplicates which are part of a family are not to be removed, unless the whole of the family are in fact duplicates.

7.2     scanned hard copy Documents.

8     A deNIST filter will be applied to the Documents during processing to identify and remove files that are generally created by operating systems or applications and contain no user-generated information or data. The deNIST culling process identifies files found on the National Institute of Standards and Technology (NIST) list of Documents that hold no value for litigation purposes.

**D.     Format**

9     Electronic Documents are to be provided in their Native File Format, subject to:

9.1     Documents, other than excel spreadsheets, that have been redacted in accordance with this protocol, which Documents will be produced in Tagged Image File Format (**TIFF**) with the relevant .opt file and Document ID coding;

9.2     Excel spreadsheets, that have been redacted in accordance with this protocol, which Documents will be produced in a Native Format or near Native Format by using a software solution that retains the full functionality of the excel spreadsheet while applying redactions, such as Milyli, Evolver, or Redact Assistant.

10     All PDF and TIFF Documents will be provided with corresponding Document level OCR text files where possible. All PDF and TIFF Documents will also be bates stamped with the Document ID.

11     Each party will ensure Documents are decrypted, or that passwords are supplied. To the extent encryption for Documents cannot be successfully processed despite reasonable efforts, a slip sheet stating that the Documents cannot be decrypted shall be inserted in its place, including the metadata required, to the extent it can be reasonably extracted from the file in its encrypted form.

12     Unless otherwise agreed or ordered by the Court, parties should not place any restrictions on Documents that prevent opposing parties from accessing them.

13     Family-inclusive Documents will be uploaded to the Data Room with metadata load files containing the family attachment range to allow linking of Documents from the same family. Subject to any claim to privilege or irrelevance and confidentiality, all family Documents are to be disclosed where only one member of a family Document is identified as relevant.

14     The following applies in relation to attachments to emails:

14.1     Any Document that is attached to or embedded within another Document is to be classed as an attachment (unless an excluded Document);

14.2     Attachments must be listed as separate Documents; and

14.3     In general, attachments will appear immediately after the Parent Document in the parties' Lists of Documents.

15     All parties who have been given access to the Data Room shall have full access rights to the Documents therein, save that no party will have the ability to modify Documents in-situ within the Data Room; however, Documents shall be in a form in which the Dissenters can download any versions of the Documents (e.g. TIFF or native) either individually or (upon request to, and facilitated by, the Data Room service provider) as a bulk download and, in turn, modify outside of the Data Room.

## E.    Document Coding

16     Parties are required to code Documents in the Data Room by providing the following metadata detail for each Document, where such detail is reasonably available:

16.1     Document ID: The document ID must be a unique reference and begin with "*58.com*-" for the Petitioner and "*D01-*", "*D02-*", etcetera for the Dissenters based on the order in which they appear in Appendix 1. The document ID should be 8 digits in length following the party indicator, utilising zeros if necessary, e.g. 58.com-00001234

16.2     Parent document ID: If there is no Parent Document, leave this field blank.

16.3    Last Modified Date: This should be the date and time last modified, or the manually coded date in the format DD/MM/YYYY, 00:00:00.

16.4    Date Created: This should be the original date and time a file was created and may be the same as the Last Modified Date.

16.5    Sent date: The date and time that the Document was sent in the case of an email and may be the same as the Date Created.

16.6    File name/subject/description: This may be the file name or subject line of an email or other descriptor.

16.7    Document title: The extracted title of the Document.

16.8    Document type: (ie. .pdf, .xls, .msg etc).

16.9    Sender/Author: The name of the author of a Document or sender of an email.

16.10    CC: The name of the recipient(s) of the Document in a CC. Use a semi-colon (;) symbol as the multi-value separator.

16.11    BCC: The name of the recipient(s) of the Document in a BCC. Use a semi-colon (;) symbol as the multi-value separator.

16.12    Recipient: The name of the recipient(s) of the Document. Use a semi-colon (;) symbol as the multi-value separator.

16.13    Custodian and Duplicate Custodian: The name of the custodian from whom the Document was drawn, and the names of any other custodians who had duplicate copies of the Document.

16.14    MD5 Hash Value: as defined.

16.15    Contains Redactions: This will be a binary "Yes/No" code applying where the whole or part of a Document has been redacted.

16.16   Reason for Redaction: This will identify the reason for the redaction using the following labels, as applicable (the labels at subparagraphs (a) to (d) relate to the People's Republic of China redaction regime set out at Appendix 6):

(a)     Personal Information;

(b)     State Secrets;

(c)     Unmarked State Secrets;

(d)     State Sensitive Information;

(e)     Litigation privilege;

(f)     Legal professional privilege;

(g)     Without prejudice privilege; and

(h)     Irrelevant and confidential.

17     When a Document is uploaded to the Data Room it shall contain the above information and such information should be visible to users of the Data Room.

## F.     Excluded Documents

18     Temporary internet files, cookies and irrelevant gif files (ie. company logos) are to be excluded from searches and discovery (to the extent possible).

## G.     Withholding Disclosure - Privilege and Confidentiality

19     Nothing in this Protocol will prevent a party from withholding Documents from production on the basis of any applicable Cayman Islands law.

20     If a claim of Cayman Islands law privilege is asserted over a portion of a Document only, that portion will be redacted and the Document produced.

21     Each party may redact confidential information that is not relevant to the Petition.

22    The redacted sections of a Document are to be identified as such either by being blacked out or by otherwise being marked as having been redacted and stating the reason for the redaction in the List of Documents.

23    If a party asserts that a Document is privileged and was uploaded inadvertently to the Data Room, then at the request of that party the Data Room service provider shall remove the Document from the Data Room and no party shall make use of it or any information derived therefrom save with the express leave of the Court. Any request to the Data Room service provider under this paragraph shall be in writing and on notice to the other parties.

## H.    List of Documents

24    In their List of Documents, the parties shall provide the following information to the extent that this information is reasonably available:

24.1    Document ID;

24.2    Parent document ID;

24.3    Last Modified Date;

24.4    Date Created;

24.5    Email sent date;

24.6    Conversion ID

24.7    Title/subject/description;

24.8    Document type: (ie. .pdf, .xls, .msg etc);

24.9    Sender/Author;

24.10    Recipient;

24.11    Contains Redactions;

24.12    Reason for Redaction.

25      Each party reserves the right to reasonably request further information from the disclosing party in relation to specific document(s), other than those fields listed above.

26      Each party's List of Documents will be ordered by family group, with attachments listed below Parent Documents.

27      The parties' List of Documents will be provided in an excel spreadsheet format (.xls).

**I.      Variation**

28      This protocol may be varied by agreement of the parties in writing or by order of the Grand Court of the Cayman Islands.

**Appendix 6**

**Protocol regarding documents required to be redacted in order to comply with the laws of thePeople's Republic of China**

A.    **REDACTION OF DOCUMENTS**

1    It is the Company's position that documents in the Company's possession, custody or control may need to be redacted prior to production in order to comply with the laws and regulationsof the People's Republic of China ("**PRC**") concerning the protection and cross-border transmission of Personal Information, State Secrets and State Sensitive Information (asdefined below).

2    The Dissenters make no admissions in respect of the Company's position that it is required to redact documents pursuant to this protocol. The Dissenters are entering into this protocol to avoid delays in these proceedings and reserve all rights.

3    The Company shall engage a third party law firm in the PRC (the "**PRC Counsel**") to carry outthe redaction of documents in the Company's possession, custody or control in accordance with this protocol.

4    Subject to this protocol, the Company may redact information on any one (or more) of the following grounds ("**Redacted Document**"), provided that it contains information of the type specified below (each a "**PRC Redaction Category**"):

4.1    "**Personal Information**" means information recorded in electronic or other forms, which can be used, independently or in combination with other information, to identify an individual's personal identity, including but not limited to the individual's name, date of birth, identity certificate number, passport number, driver license number, personal bank account number and bank statements, biometric data, residence address, telephone number, email address, health information, and whereabouts and which is not permitted to be transferred out of the PRC pursuant to the relevant PRC laws and regulations currently in force [1] or

---

[1] Cybersecurity Law of the People's Republic of China (as amended) ("**Cybersecurity Law**"); Criminal Law of the People's Republic of China (as amended) ("**Criminal Law**"); Interpretation of the Supreme People's Court and the Supreme People's Procuratorate on Several Issues Concerning the Application of Law in the Handling of Criminal Cases of Infringement of Citizens' Personal Information (as amended).

1

which may come into effect in the course of these proceedings (the Company shall notify the Dissenters as and when such PRC laws and regulations come into effect).

4.2    **"State Secrets"** means information expressly marked as a state secret by a PRC authority with a red stamp (or other similar markings) containing the words "绝密" (TopSecret), "机密" (Secret), "秘密" (Confidential) or other similar terms to that effect.

4.3    **"Unmarked State Secrets"** means a document that does not have an express mark by a PRC authority but which may also constitute a state secret if there is, in the PRC Counsel's judgment, sufficient evidence which indicates that the information inthe document in question has already been designated by the PRC authorities as a state secret.

4.4    **"State Sensitive Information"** means information that has not been expressly marked as a state secret by a PRC authority, but which, in the opinion of the PRC Counsel meets the criteria for a state secret (i.e., matters that have a vital bearing on the State security and national interests of the PRC as prescribed by the relevant PRClaws and regulations currently in force[2] or which may come into effect in the course of these proceedings, and the Company shall notify the Dissenters as and when such PRC laws and regulations come into effect).

5    The redacted sections of a document are to be identified as such either by being blacked out or by otherwise being marked as having been redacted. All redactions must be applied in a way that makes it clear, on the face of the redaction, which PRC Redaction Category is saidto apply. Redactions should only be made to the limited extent that such redaction makes it impossible to identify Personal Information, State Secrets, Unmarked State Secrets or State Sensitive Information in that Redacted Document.

6    The following codes must be used to identify the redactions made (in accordance with

---

[2] Law of the People's Republic of China on Guarding State Secrets (as amended); Implementing Regulations of the Law of the People's Republic of China on Guarding State Secrets (as amended); Criminal Law; Cybersecurity Law; Interpretation of the Supreme People's Court on Several Issues Concerning the Specific Application of Law in the Trial of Cases of Stealing, Spying into, Buying or Unlawfully Supplying State Secrets or Intelligence for Entities outside the Territory of China (as amended); Regulations on the Specific Scope and Secrecy Level of State Secrets in Tax Work (as amended); Definition Groups  Relating to National Security and Interests (as amended).

Appendix 5):

6.1     Personal Information;

6.2     State Secrets;

6.3     Unmarked State Secrets; and

6.4     State Sensitive Information.

**B.     REVIEW OF REDACTED DOCUMENTS**

7      Where documents have been redacted (fully or partially) to remove information of the type setout at paragraphs 4.1 to 4.4 of this Appendix, the PRC Counsel (with guidance from the Company's Cayman Islands legal advisors[3]) will review the redacted information within the PRC to determine whether the redacted information is relevant.

8      For the avoidance of doubt, only the PRC Counsel may review information that has been redacted on the basis that it constitutes State Secrets, Unmarked State Secrets or State Sensitive Information.

**C.     PRODUCTION OF REDACTED DOCUMENTS**

9      Where a fully or partially Redacted Document is relevant (whether because the redacted or unredacted portion or both is/are relevant, as the case may be), the Redacted Document will be uploaded to the Data Room in its redacted form.

10     The following information will be provided in the Data Room in relation to any Redacted Document in accordance with Appendix 5:

10.1    Whether the redactions are for Personal Information, State Secrets, Unmarked StateSecrets and/or State Sensitive Information; and

10.2    The document's metadata.

---

[3] The same guidance that would be given to any third party document reviewers routinely used in large disputes: that is, the background of the dispute, the relevance test and the categories of documents in Appendix 4. In the case of State Secrets or State Sensitive Information, the PRC Counsel will not reveal the content of the redacted information to the Company's Cayman Islands legal advisors

3

11      Upon uploading the Redacted Documents to the Data Room, the Company will upload to the Data Room a report ("**PRC Redaction Report**") setting out the following information for each Redacted Document:

11.1    the Document ID (as defined in Appendix 5);

11.2    the PRC Redaction Category that is said to apply;

11.3    the legal basis for the redaction (i.e. the relevant provisions of the law or regulation);

11.4    whether the redacted information is relevant.; and

11.5    in respect of redactions made for Unmarked State Secrets which are also relevant, a concise description of the nature of the redacted information.

12      Upon uploading the Redacted Documents to the Data Room, PRC Counsel will file sworn evidence in the Grand Court of the Cayman Islands confirming that they have made reasonable efforts to ensure that all of the redactions the PRC Counsel has applied to the Redacted Documents have been made in accordance with this PRC Redaction Protocol and that each redaction has been properly applied in compliance with the relevant PRC laws and regulations in force at the relevant time by exercising its professional judgement.

**D.      INSPECTION OF REDACTED DOCUMENTS IN UNREDACTED FORM**

13      The Dissenters and/or the Experts or their nominee can request inspection of a Redacted Document in its unredacted form in the PRC in accordance with the following paragraphs of this section.

*(1)*     Inspection of unredacted documents containing Personal Information

14      If the Dissenters and/or the Experts or their nominee wish to inspect an unredacted copy of a Redacted Document containing Personal Information, they must notify the Company's Cayman Islands legal advisors in writing.

4

15    Within two Business Days[4] of receipt of the said notice, the Company shall make the document requested available for inspection by the requesting party or its nominee in unredacted form.  Where a requesting party proposes to inspect the document via its nominee it shall specify the name of the nominee and its relationship to the nominee at the time it makes its request.

16    The requesting party may only review the unredacted document at a location designated by the Company within the PRC (the "**Designated Location**"), at a mutually convenient time and date, accompanied by a representative of the Company. The Designated Location will likely be the location where the server hosting the document in question is situated, and will be sufficiently large to accommodate all reviewers.

17    The parties inspecting the unredacted document at the Designated Location shall not:

17.1    Photograph, record, videotape, make notes of, or in any way reproduce any part of the redacted Personal Information during their inspection or bring any part of the redacted Personal Information out of the Designated Location; or

17.2    Disclose the redacted Personal Information or any part thereof to any third party whether during or after the inspection. However, the reviewers may discuss  the content in general terms with their colleagues, the Dissenters or their representatives so long as they do not disclose any redacted Personal Information.

18    Should the Dissenters wish to dispute the proposed redactions, the Dissenters may apply to the Grand Court for directions within 21 days of their inspection under paragraph 16 of this Appendix.

*(2)*    Inspection of unredacted documents containing State Secrets or State Sensitive Information

19    The Company will, upon a request from the Dissenters or the Experts, allow unredacted versions of Redacted Documents containing State Secrets, Unmarked State Secrets or State Sensitive Information to be inspected within the PRC by an independent PRC legal counsel jointly appointed by the Company and the Dissenters (the "**Independent**

---

[4] As defined at paragraph 21.2 of the directions order

**Counsel**").

20      The Independent Counsel will be jointly instructed by the parties by way of a joint letter of instruction agreed between the parties (the "**Joint Instructions**"). The Joint Instructions will incorporate the terms set out in this section (section D(2) of this Appendix), and will requirethe Independent Counsel to confirm that:

20.1      The Independent Counsel may only inspect unredacted information (as many times as isrequired) in a Designated Location, accompanied by a representative of the Company;

20.2      The Independent Counsel shall not photograph, record, videotape, make notes of, orin any way reproduce any part of the unredacted information during the inspection(s) or bring any part of the unredacted information out of the Designated Location; and

20.3      The Independent Counsel shall not disclose the unredacted information to any third partywhether during or after the inspection(s). "**Third party**" in this regard refers to anyone other than those persons who had conducted the inspection at the Designated Location.

21      If the Dissenters or the Experts require a document containing State Secrets, Unmarked StateSecrets or State Sensitive Information to be inspected by an Independent Counsel, they must notify the Company's Cayman Islands legal advisors of their request and the proposedIndependent Counsel.[5]

22      Within two Business Days of receipt of the said notice, the Company must make  the document requested available at the Designated Location in unredacted form for inspectionby the Independent Counsel.Within five Business Days of the inspection of the unredacted document, the IndependentCounsel will:

22.1      Advise the parties' Cayman Islands legal advisors in writing whether the Independent Counsel agrees or disagrees with the PRC Counsel's proposed redactions (that is, whether the Independent Counsel agrees that the proposed

---

[5] For the avoidance of any doubt: (1) such request may be made at any time; (2)the Company and the Dissenters will each be responsible for 50% of the fees of the Independent Counsel

redactions relate to State Secrets, Unmarked State Secrets or State Sensitive Information); and

22.2    Provide its reasons in writing to (i) the PRC Counsel, and (ii) the parties' Cayman Islands legal advisors provided no redacted information is divulged in doing so.

24    Within three Business Days of receipt of the Independent Counsel's reasons in paragraph 23.2 of this Appendix, the PRC Counsel will confirm in writing to the parties' Cayman Islands legal advisors whether it still considers the redactions to be necessary.

25    If the PRC Counsel no longer considers that the redactions are necessary, the Company shall upload the relevant document to the Data Room in unredacted form within two Business Days of its receipt of the PRC Counsel's written confirmation in paragraph 24 of this Appendix.

26    The parties may ask written questions of the Independent Counsel in relation to  a document that is the subject of the notice delivered under paragraph 21, and the parties' Cayman Islands legal advisors must be copied into all such correspondence with the Independent Counsel.  Any response by the Independent Counsel must:

26.1    Be in writing, copied to the parties' Cayman Islands legal advisors;

26.2    Not contain any of the redacted information; and

26.3    Certify that nothing within the response contravenes PRC law or regulation.

27    If any disputes pertaining to the redactions remain unresolved after the steps listed above have been completed, the Dissenters may apply to the Grand Court of the Cayman Islands fordirections within 21 days of receipt of the PRC Counsel's written confirmation in paragraph 24 above.

28    For the avoidance of doubt, as part of any application under paragraph 26 of this Appendix, the parties agree that the Company and the Dissenters may rely upon thecommunications provided by the Independent Counsel in paragraph 23 and 26 of this Appendix.

**Appendix 7**

**[Placeholder page]**

**Appendix 8**

**Schedule of Dates**

| # | Description | Order | Reference | Date |
|---|---|---|---|---|
| | A | B | C | D |
| 1 | Directions Order (the **"Order"**) issued | | - | |
| 2 | Company to inform Dissenters of total number of shares subject to the trial of the Petition | 58 | 5 days from filing of Order | TBC |
| 3 | Each party to appoint their respective Experts and to advise the other parties of the identities and email addresses of the respective Experts appointed | 3 | 42 days from date of Deemed Directions Order Date | 6 September 2021 (42 days from 26 July, being the deemed directions order date) |
| 4 | Company to enter into a Confidentiality and Non-Disclosure Agreement (Appendix 2) with the Dissenters and their Representatives as well as the Experts and their Appointees | 5 | 14 days from date of Deemed Directions Order Date | 9 August 2021 |
| 5 | Company to open an electronic Data Room | 6 | 14 days from date of Deemed Directions Order Date | 9 August 2021 |
| 6 | Company to upload Transaction Due Diligence documents to Data Room | 7 | 14 days from date of Deemed Directions Order Date | 9 August 2021 |

| # | A<br>Description | B<br>Order | C<br>Reference | D<br>Date |
|---|---|---|---|---|
| 7 | Company to upload to Data Room the Appendix 4, Category A, B and C documents | 8.3(a) | 42 days from date of Deemed Directions Order Date | 6 September 2021 |
| 8 | Company to upload to the Data Room the Appendix 4, Category R documents | 8.3(b) | 72 days from date of Deemed Directions Order Date | 13 October 2021 |
| 9 | Company to upload to the Data Room the Appendix 4 Category S, T, U documents | 8.3(c) | 112 days from date of Deemed Directions Order Date | 22 November 2021 |
| 10 | Company to upload to the Data Room all other<br><br>Appendix 4 Category documents and all additional documents in the Company's possession, custody<br><br>or power relevant to fair value | 8.3(d) | 175 days from date of Deemed Directions Order Date | 10 February 2022 |
| 11 | Dissenters to upload Appendix 5 and other documents to Data Room | 34 | 175 days from date of Deemed Directions Order Date | 10 February 2022 |
| 12 | Experts may start issuing Information Requests to the Company | 19 | From 175 days from date of Deemed Directions Order Date | 10 February 2022 |

| # | Description | Order | Reference | Date |
| | **A** | **B** | **C** | **D** |
|---|---|---|---|---|
| 13 | Service of factual evidence by the Company | 41 | 56 days from the date of the upload of documents to the Data Room | 7 April 2022 |
| 14 | Service of evidence in response | 41 | No later than 21 days of service of the Company's factual evidence upon them | 28 April 2022 |
| 15 | Service of evidence in reply | 41 | No later than 14 days of service of the Dissenters' evidence upon it | 12 May 2022 |
| 16 | Cut-off date for final Information Request from Experts to the Company | 19 | 28 days prior to the exchange of Expert Reports | 15 July 2022 |
| 17 | Experts to exchange their respective Reports | 43 | 26 weeks from the date of the upload of documents to the Data Room | 11 August 2022 |
| 18 | Experts' Meeting | 44 | Within 28 days of the exchange of Expert Reports | 8 September 2022 |
| 19 | Experts to issue their Joint Memorandum | 45 | Within 28 days of the Experts' Meeting | 13 October 2022 |
| 20 | Experts to exchange their respective Supplemental Reports (if any) | | Within 48 days of the Joint Memorandum | 30 November 2022 |
| 21 | Case Management Conference | 52 | To be determined | TBC |

3

| # | A<br>Description | B<br>Order | C<br>Reference | D<br>Date |
|---|---|---|---|---|
| 22 | Parties to seek to agree and write to the Court to fix trial dates | 57 | Within 28 days of the parties filing their factual witness statements | |
| 23 | Trial | 57 | At least 8 weeks after the exchange of Supplemental Reports and subject to the availability of counsel | After 13 February 2023 |

4

# EXHIBIT 2

**[2018 (1) CILR 352]**

# IN THE MATTER OF SHANDA GAMES LIMITED

## SHANDA GAMES LIMITED v. MASO CAPITAL INVESTMENTS LIMITED, BLACKWELL PARTNERS LLC— SERIES A and CROWN MANAGED ACCOUNTS SPC (acting for and on behalf of CROWN/MASO SEGREGATED PORTFOLIO)

## MASO CAPITAL INVESTMENT LIMITED, BLACKWELL PARTNERS LLC—SERIES A and CROWN MANAGED ACCOUNTS SPC (acting for and on behalf of CROWN/MASO SEGREGATED PORTFOLIO) v. SHANDA GAMES LIMITED

C.A. (Goldring, P., Martin and Morrison, JJ.A.) March 9th, 2018

*Companies — arrangements and reconstructions — dissenting shareholders — fair value of shares — valuation methodologies*

A company applied pursuant to s.238 of the Companies Law (2016 Revision) for a determination of the fair value of dissenting shareholders' shares.

The company entered into a merger transaction pursuant to Part XVI of the Companies Law. 99.3% of its shareholders approved the merger. The company applied pursuant to s.238 for a determination of the fair value of the shares of the dissenting shareholders.

The company and the dissenting shareholders each engaged experts. They agreed that the company was to be valued according to a discounted cash flow ("DCF") model. A DCF analysis required a prediction of future cash flows and the application of a discount rate to those cash flows in order to translate them into a present capital value and identify how much it would have cost at the valuation date to buy an investment with a rate of return and risk profile equivalent to the company's business. Prediction of future cash flows typically involved estimating cash flow in two or sometimes three periods: a future finite period, perhaps a transitional period, and a terminal period. The discount rate was generally taken to be the expected rate of return on equivalent investment opportunities in the capital markets, also known as the company's weighted average cost of

352

capital. The weighting exercise involved estimating the cost of the company's equity (it was common ground that the company had no debt, so the only assessment required was the cost of equity), through use of a capital asset pricing model assessing the rate of return on a risk-free investment and adjusting the rate to take account of risk factors.

One such factor was systemic risk represented by the relevant market as a whole, reflected by an equity risk premium, which was multiplied by a factor, beta, which measured the risk represented by a particular investment relative to the risk of the market as a whole. The parties' experts disagreed on six points in relation to how the beta value should be determined, including whether the beta value should be directly measured or indirectly measured according to a peer group.

A further factor that might be considered was a size premium reflecting the possibility that investors might require a higher expected return for small companies to compensate for the greater risk associated with them, calculated according to Duff & Phelps tables, which divided companies into categories and ascribed a size premium to each category. There were originally three broad categories, but the tables also contained ten deciles based on the market capitalization of listed equity securities between 1926 to 2014. The parties disagreed as to the value to attribute to the company for the purposes of calculating the small stock risk premium and whether to place it within the broad categories or the deciles. The company's expert had used the company's unaffected stock price or market value when determining the appropriate decile size classification as the Duff & Phelps tables were based on unaffected market values and use of the outcome of the DCF analysis to calculate the company's small stock risk premium, itself an element of the DCF analysis, would have been circular.

After the hearing but before the circulation of the Grand Court's draft judgment, the company instructed new attorneys who commissioned an expert to review the evidence and reports of the parties' experts. He concluded that the evidence given by the company's expert was so inadequate that the court had been misled at trial. The new expert supported a much lower value for the shares. The company therefore applied to reopen the trial in order to admit the additional expert evidence.

That application was dismissed by the Grand Court (Segal, J.) as the issues dealt with in the additional expert's report had been the subject of detailed submissions and cross-examination during the course of a long trial conducted by leading counsel, and most of the difficulties with the approach of the company's expert were clear during the trial. In addition, the trial had concluded in November 2016 but the company had waited until March 2017 to apply to reopen the case, and had failed to act with sufficient expedition.

The Grand Court (Segal, J.) determined the fair value of the shares to be US$8.34 per share, more than double the merger price, and the fair rate of interest to be 4.295%. This resulted in an order for payment to the dissenting shareholders of US$73,575,995 plus interest of US$2,788,801. The court held that no minority discount should be applied as no such

353

discount was applied in Delaware and Canada, which had similar regimes to that contained in s.238 of the Companies Law. The judge took the average of the experts' beta values. He used the unaffected market price in determining the company's small stock risk premium. The methodology and growth rate of 4.5% given by the dissenting shareholders' expert was to be adopted for the terminal period, but the transitional period was to be reduced from 10 years to 5 years. The fair value of interest was 4.295%, being the midpoint between 3.5% (the rate at which the company could have borrowed the amount representing the fair value of the dissenters' shares) and 5.09% (the rate which prudent investors in the position of the dissenting shareholders could have obtained).

The company appealed against the Grand Court's refusal to reopen the case. It submitted that it did not require leave to appeal. It also appealed against the court's judgment, submitting *inter alia* that (a) the court had erred in holding that no minority discount was to be applied to the value of the dissenting shareholders' shares; and (b) the court should not have adopted the midpoint approach to the calculation of the interest to be awarded to the dissenting shareholders, which was inconsistent with the purpose of an award of interest, and the judge should have awarded a rate representing only the cost to the dissenting shareholders of being deprived of their money, which was conventionally assessed as being the rate they would have had to pay to borrow money to replace the unpaid fair value of their shares.

The dissenting shareholders submitted in reply that (a) the company required leave to appeal against the Grand Court's dismissal of their application to reopen the case; and (b) the court had been correct not to apply a minority discount to the value of the dissenters' shares as fair value was different from market value.

The dissenting shareholders also appealed against aspects of the judgment concerning the methodology to be applied in determining the fair value of the company's business, namely (i) the beta component of the discount rate to be applied in the discounted cash flow analysis adopted by the experts as the appropriate method of valuing the business; (ii) the measure of market capitalization to which to apply a small stock risk premium; and (iii) the growth rate during the terminal period. They submitted *inter alia* that (a) the judge should not have averaged the two experts' beta estimates in order to determine the beta value for the DCF analysis, but should instead have simply adopted their expert's figure or adopted a "blending approach" or averaged the share values resulting from using each figure for beta; (b) in relation to the small stock risk premium, the judge had misunderstood the evidence of the company's expert, had misunderstood the Delaware jurisprudence and had failed to take into account the changes to the company's business during the two years between the last market valuation unaffected by the merger and the valuation date; and (c) in reaching his conclusion the judge failed to have proper regard to, or properly to apply, the evidence in relation to the appropriate terminal growth rate.

**Held,** ruling as follows:

(1) The company required leave to appeal against the judge's refusal to reopen the hearing. Section 6 of the Court of Appeal Law (2011 Revision) provided that, subject to certain exceptions not presently relevant, no appeal would lie from an interlocutory judgment of the Grand Court without the leave of that court or the Court of Appeal. The judge's order dismissing the application to reopen the hearing was plainly an interlocutory order, so that leave was required. While it was true that the judge determined the fair value and the fair rate of interest separately, with separate evidence being admitted on the latter, and that he left the calculation of the company's value to the parties in the light of his determination of the relevant principles, the suggestion that the hearing was otherwise divided into stages, so that the Court of Appeal Rules (2014 Revision), r.12 provided that the dismissal of the application became a final judgment, was wholly artificial. The refusal to allow the company to adduce further evidence was a decision about the conduct of an aspect of the trial and the judge's order was not in any respect determinative of the parties' substantive rights (paras. 18–19).

(2) Leave to appeal would not be granted unless there was a real prospect of the appeal succeeding, or there was a point in issue that should be considered by the Court of Appeal in the public interest. The court did not accept the company's contentions based on what it considered to be the nature of s.238 proceedings. Whilst it was true that s.238 required determination of the fair value of the shares, the significance of the determination was limited; the only persons affected by it were the company and the dissenting shareholders, whether or not they participated in the proceedings. A shareholder who consented to the merger or accepted the merger price could not claim to be entitled to a different price depending on the outcome of the s.238 proceedings. Essentially, the proceedings affected only those who had taken issue with the merger price, so that there was in reality a *lis* between them and the company. The purpose of the proceedings was to resolve that *lis*, and in that respect s.238 proceedings were no different from ordinary litigation. Moreover, the company's argument ignored the process by which the determination of fair value was to occur. Since the fair value of the shares was not necessarily the same as the merger price or the price at which they were trading before the market was affected by knowledge of the merger, it was inevitable that the determination of fair value would involve an assessment of a substantial quantity of information relating to the financial affairs of the company. It was extremely unlikely that the court would be able to make that assessment without expert assistance. In the ordinary case, as in the present, both the company and the dissenting shareholders would appoint experts. In every case, the court's task would be to assess the utility of the expert evidence to the determination of fair value. In s.238 proceedings, as in ordinary litigation, the court would determine generally or on an issue-by-issue basis whether an expert's evidence was to be accepted in whole or in part, and how conflicts should be resolved. If

necessary, the court was entitled to substitute its own view for that of the experts. That process was one that would be familiar to most judges. The fact that the outcome of such proceedings was capable of affecting persons other than those who participated in the litigation was immaterial as shareholders who did not participate could not complain if the fair value of their shares was determined by reference to evidence into which they had no input. The company's application had been made extremely late; it must have been apparent during the course of the hearing that there were significant problems with the evidence of the company's expert. Nevertheless, the application had been made over four months after the conclusion of the hearing. The judge had ample evidence to justify his conclusion that justice did not require him to accede to an application that was too late and too inadequate. In the light of these considerations, there was no reasonable prospect of an appeal succeeding, and nothing in the nature of s.238 proceedings to justify an appeal. Leave to appeal would not be granted. Even if leave were not required, the same considerations would have justified dismissing the appeal (paras. 20–24).

   (3) The judge was wrong to hold that a minority discount should not be applied in the assessment of the value of the dissenting shareholders' shares and the company's appeal on that point would be allowed. The judge had been wrong to apply the Delaware approach, as it was inconsistent with Cayman law. In the Cayman Islands under the Companies Law (2016 Revision), there were three mechanisms by which the shares of dissenting shareholders could be acquired: by squeeze out with a 90% majority; by scheme of arrangement with a 75% majority; and under s.238 with a two-thirds majority. Assuming that the approach in England and Wales to squeeze out and scheme of arrangement acquisitions would be applied in the Cayman Islands, those two mechanisms allowed a minority discount to be applied to the cost of acquisition of dissenting shareholders' shares. It was extremely unlikely that the simplified merger and consolidation regime introduced by Part XVI of the Companies Law was intended to depart from that approach. It was to be presumed that the three mechanisms, contained in the same piece of legislation and capable of serving the same purpose in different ways, were to be construed from the same standpoint. Nothing in the wording of s.238 suggested that a different approach was intended; indeed, there was nothing in the wording of the section to suggest that the focus was to be on the value of the company rather than the value of the shares. Section 238 required fair value to be attributed to what the dissenting shareholder possessed. If it possessed a minority shareholding, it was to be valued as such. If it held shares to which particular rights or liabilities attached, the shares were to be valued as subject to those rights or liabilities. This could be done by adjusting the value that the shares would otherwise have as a proportion of the total value of the company, but failing to make such adjustment would mean that particular rights or liabilities would often be ignored and shares valued incorrectly (paras. 45–50).

   356

C.A.                                                                IN RE SHANDA GAMES

(4) The company's appeal in relation to the interest to be paid on the sum owed to the dissenting shareholders would be dismissed. The judge did not err in principle in his approach to the assessment of a fair rate of interest. A determination of fair value under s.238, unlike an assessment of damages, did not proceed on the basis that any right of the dissenting shareholder had been infringed by the company. The legislative concern was not to restore him to some previous position but to ensure that he received fair value for the shares he was obliged by the Law to give up. Therefore, when assessing the fair rate of interest, the focus was the entirety of the circumstances, taking into account both the disadvantage to the dissenting shareholders and the advantage to the company. Adopting the midpoint between the rate at which the company could have borrowed the amount representing the fair value of the dissenters' shares in order to pay it to them and the rate which prudent investors in the position of the dissenting shareholders could have obtained if they had had the money to invest, was a logical way of balancing the advantage of the company in having the benefit of the sums owed and the disadvantage to the dissenting shareholders, with a fall-back reliance on the judgment rate if the evidence supported no other conclusion. Although it was possible to take the view that the cost of borrowing was a better measure of the dissenting shareholders' loss than the putative investment returns a prudent investor could have achieved, both measures represented the dissenting shareholders' lost opportunity and consequently the disadvantage of being out of their money. The judge had therefore been right to adopt the (former) Delaware practice in relation to the award of interest. The practice provided a principled approach that was not in conflict with Cayman law or practice (paras. 58–59).

(5) The dissenting shareholders' cross-appeal on the appropriate beta figure would be dismissed. The judge took the view that both experts had adopted methodologies that were *prima facie* reliable, but both estimates were nevertheless subject to risks and problems that could not be ignored or completely dismissed. It was impossible to conclude that the judge had concluded all points of difference in favour of the dissenting shareholders. In those circumstances, the judge was entitled to approach the assessment of the appropriate beta figure by averaging the beta figures proposed by the experts. The judge was entitled to take the view that he could not fairly distinguish between the beta figures suggested by the two experts and that in the absence of a more nuanced solution the most appropriate method of resolution was by averaging the two figures (para. 68; paras. 71–75).

(6) The dissenting shareholders' appeal on the small stock risk premium point would be dismissed. A small stock risk premium reflected the greater risk perceived to be associated with investment in smaller companies. In the present case, there had been no dispute between the experts that the Duff & Phelps tables should be used, but they differed in the value to attribute to the company and whether to place it within one of the broad categories or within the deciles. In the present case, the judge

357

had adopted the approach of the company's expert, which used the company's unaffected market value to determine an appropriate decile in the Duff & Phelps tables. The judge approached the DCF analysis on a step-by-step basis, as did the experts, and he was entitled to resolve disputes at each step. He was aware that the last unaffected quoted price for the company's ADSs was arguably out of date, but he considered the point to be finely balanced, with evidence going either way on the reliability of the market price. He could not be criticized for taking the view, which was supported by the Delaware authorities he cited, that the way in which the Duff & Phelps tables were compiled meant that the market capitalization was the appropriate measure of the company's size and that the unaffected share price was sufficiently reliable to be used for the purpose of ascertaining the small stock risk premium (para. 76; paras. 82–85).

(7) The dissenting shareholders' appeal on the transitional period point would be dismissed. The judge had not erred in concluding that there should be a transitional period of five years with the terminal period starting thereafter, and that the company's expert's methodology and calculations as to revenue during the transitional period and the rate of growth during the terminal period should be applied. In circumstances in which the only material capable of informing the judge's decision was that of the company's expert at trial (which cast no doubt on the validity of a growth rate of 4.5% in a terminal period starting after five years of transition), and his subsequent adoption without reasons of an average of the experts' original proposals, the judge was entitled to reach the conclusion that he did (paras. 92–93).

**Cases cited:**

(1) *Addbins Ltd.*, *Re*, [2015] EWHC 3161 (Ch), referred to.

(2) *Banque Keyser Ullman SA* v. *Skandia (UK) Ins. Co. Ltd.*, [1987] Lexis Citation 1106, *dicta* of Steyn, J. considered.

(3) *Bird Precision Bellows Ltd.*, *In re*, [1986] Ch. 658, referred to.

(4) *Blue Index Ltd.*, *Re*, [2014] EWHC 2680 (Ch), referred to.

(5) *CVC/Opportunity Equity Partners Ltd.* v. *Demarco Almeida*, 2002 CILR 77, distinguished.

(6) *Cavalier Oil Corp.* v. *Harnett*, Delaware Ct. of Chancery, February 22nd, 1988, 1988 WL 15816; on appeal, 564 A.2d 1137, considered.

(7) *Cede & Co. Inc.* v. *MedPointe Healthcare Inc.*, Delaware Ct. of Chancery, August 16th, 2004 (revised August 26th and September 10th, 2004), C.A. No. 19354–NC, unreported, followed.

(8) *DFC Global Corp. (Appraisal)*, *In re*, Delaware Ct. of Chancery, C.A. No. 10107–CB, July 8th, 2016, unreported, *dicta* of Bouchard, Chancellor considered.

(9) *Dell Inc. (Appraisal)*, *In re*, Delaware C.A. No. 9322–VCL, Delaware Ct. of Chancery, May 31st, 2016, unreported, considered.

C.A.                                                    IN RE SHANDA GAMES

(10) *Golar LNG Ltd.* v. *World Nordic SE*, [2011] SC (Bda) 10 Com; [2011] Bda
      LR 9, applied.

(11) *Grierson, Oldham & Adams Ltd.*, *In re*, [1968] Ch. 17; [1967] 1 W.L.R. 385;
      [1967] 1 All E.R. 192, followed.

(12) *Hoare & Co. Ltd.*, *Re* [1933] All E.R. Rep. 105; (1933), 150 L.T. 374,
      considered.

(13) *Integra Group, In re*, 2016 (1) CILR 192, overruled.

(14) *Irvine* v. *Irvine (No. 2)*, [2006] EWHC 583 (Ch); [2006] 4 All E.R. 102; [2007]
      1 BCLC 445, referred to.

(15) *Kummen* v. *Kummen-Shipman Ltd.* (1983), 19 Man. R. (2nd) 92, distinguished.

(16) *Ladd* v. *Marshall*, [1954] 1 W.L.R. 1489; [1954] 3 All E.R. 745, referred to.

(17) *Linton Park plc*, *Re*, [2005] EWHC 3545 (Ch); [2008] BCC 17, *dicta* of
      Lewison, J. considered.

(18) *Merion Capital LP* v. *3M Cogent, Inc.*, Delaware Ct. of Chancery, July 8th,
      2013, unreported, referred to.

(19) *Olive Group Capital Ltd.* v. *Mayhew*, Eastern Caribbean C.A., November, 7th,
      2016, considered.

(20) *Orchard Enterprises Inc.*, *The (Appraisal), In re,* Delaware C.A. No. 5713–
      CS; Delaware Ct. of Chancery, July 18th, 2012, unreported, referred to.

(21) *Strahan* v. *Wilcock*, [2006] EWCA Civ 13; [2006] 2 BCLC 555, *dicta* of
      Arden, L.J. considered.

**Legislation construed:**

Companies Law (2016 Revision), s.238:

   "(1) A member of a constituent company incorporated under this Law shall be
   entitled to payment of the fair value of his shares upon dissenting from a
   merger or consolidation."

Court of Appeal Law (2011 Revision), s.6:

   "No appeal shall lie—
          . . .
      (f)  without the leave of the Grand Court, or of the Court, from an
           interlocutory judgment made or given by the Judge of the Grand Court
           . . ."

Court of Appeal Rules (2014 Revision), r.12: The relevant terms of this rule are set
      out at para. 18.

*P. Jones*, *Q.C.*, *M. Heal*, *P. Madden* and *J. Elliott* for the appellant;

*R. Levy*, *Q.C.*, *M. Imrie* and *Gemma Freeman* for the respondent.

1    **MARTIN, J.A.,** delivering the judgment of the court:

**Introduction**

A shareholder in a Cayman-registered company who dissents from a merger or
consolidation of the company under Part XVI of the Companies

Law is entitled under s.238 of that Law to be paid "the fair value of his shares" as determined by the court, together with a fair rate of interest. These appeals raise important questions about the methodology to be applied in determining the fair value and fixing a fair rate of interest, and about the extent to which principles developed in other jurisdictions with similar regimes may legitimately be applied to a s.238 determination.

2   On November 18th, 2015, Shanda Games Ltd. ("Shanda"), a Cayman-incorporated company, merged with Capitalcorp Ltd. in the culmination of a take-private transaction led by Shanda's principal shareholders and management. At the EGM held on that date to authorize the merger, 99.3% of Shanda's shareholders that voted did so in favour of the merger. Under the terms of the merger, they received US$3.55 per share (or US$7.10 for each American Depository Share ("ADS"), those shares equating to two ordinary shares). Certain shareholders ("the dissenting shareholders") dissented from the merger: they are the respondents to the petition by Shanda seeking determination of the fair value of their shares that gives rise to these appeals.

3   On May 17th, 2017, Segal, J. made an order on Shanda's petition, determining the fair value of the dissenting shareholders' shares to be US$8.34 per share (US$16.68 per ADS)—more than double the merger price—and the fair rate of interest to be 4.295%. This resulted in an order for payment to the dissenting shareholders of US$73,575,995 plus interest of US$2,788,801. Shanda appeals with leave of the judge against the judge's refusal to discount the value of the dissenting shareholders' shares to reflect their minority holdings, and against his decision on the rate of interest. The dissenting shareholders appeal, again with the leave of the judge, against aspects of the methodology adopted by the judge to determine the fair value of the shares.

4   Shanda also took issue with the refusal of the judge to admit further expert evidence and defer his decision on value until after the evidence had been heard, and filed a notice of appeal without leave. On September 4th, 2017, we determined that leave was necessary and refused it, alternately dismissing the appeal if we were wrong about the necessity for leave. My reasons for this are incorporated in this judgment.

**Background**

5   In his commendably careful and comprehensive judgment, the judge set out in detail the history of the companies, the merger and the proceedings. For the purpose of these appeals, it is unnecessary to say more than the following.

6   Shanda was incorporated in the Cayman Islands on June 12th, 2008. It is an online game developer, operator and publisher. It is one of China's largest video game companies, offering a diverse portfolio of popular

360

online and mobile games primarily in China, as well as in overseas markets.

7    As at December 31st, 2014, Shanda had an aggregate of 537,832,318 ordinary shares outstanding, comprising Class A and Class B shares including Class A ordinary shares represented by the ADSs. The ADSs were publicly listed on the US NASDAQ Global Select Market from September 2009 until Shanda was taken private in November 2015. Each Class B ordinary share was convertible into one Class A ordinary share but carried ten times as many votes. At the conclusion of the merger the dissenting shareholders were between them the registered owners of 8,822,062 Class A ordinary shares, representing some 1.64% of the issued share capital.

8    The merger was effected under the provisions of Part XVI of the Companies Law. Those provisions, which were introduced in 2009, in their current form have the effect that a merger or consolidation ordinarily requires authorization only by special resolution of the shareholders of each constituent company—that is to say, by a two-thirds majority. As will be seen, this provides a simpler method of effecting a merger, consolidation or takeover than other regimes contained in the Companies Law, which require majorities of 90% or 75% and contemplate intervention by the court.

9    Section 238 (which forms part of Part XVI) contains a procedure for dissenting from a merger. It was complied with in the present case. One consequence of dissent is, by sub-s. (7), that from a period no longer than 40 days after the meeting approving the merger the dissenting shareholder ceases to have any of the rights of a member except the rights to be paid the fair value of his shares as determined by the court, to participate in the petition and to institute proceedings disputing the validity of the merger. A first step towards arriving at the fair value of the dissenter's shares is the making by the company of an offer for the dissenter's shares at a specified price that the company determines to be their fair value (sub-s. (8)); but that cannot occur before the dissenting shareholder has lost his rights as member by virtue of sub-s. (7). Such an offer was made in the present case by Shanda but was rejected by the dissenting shareholders.

10    Shanda's petition was issued on February 4th, 2016.

11    Each side engaged an expert. Shanda's expert was Professor Gregg A. Jarrell ("Professor Jarrell"), a tenured Professor of Economics and Finance at the University of Rochester's Simon Business School, where he has been a member of the faculty since 1988. He holds a Ph.D. in business economics from the University of Chicago (1978), with major concentrations in industrial organization and finance, as well as an MBA (1976) from the University of Chicago. The dissenting shareholders engaged William Inglis ("Mr. Inglis"), a senior managing director in the Singapore

office of FTI Consulting, a global expert services firm specializing, amongst other matters, in expert witness services and litigation support. Mr. Inglis is a chartered accountant and since 1989 has specialized in valuation and the quantification of loss in the context of legal disputes.

12    The hearing of the petition took place in November 2016 over eight days, of which five were taken up by the expert evidence. At all stages of the petition, up to and including the hearing, the attorneys acting for Shanda were Conyers Dill & Pearman ("Conyers"). On January 20th, 2017, however, Shanda gave the court and the dissenting shareholders notice that it had changed its attorneys and was now represented by Harneys.

13    On March 20th, 2017, the judge circulated a draft judgment. He had signalled his intention to do so at various stages over the preceding weeks, but because of an administrative error by the court, Harneys was unaware of this. On the same day, but before the draft was circulated, Shanda, acting by Harneys, issued a summons seeking liberty to reopen its case and to introduce additional expert evidence. The judge dismissed this summons on April 25th, 2017. He gave reasons for his decision on July 27th, 2017. As already stated, Shanda appealed against the judge's dismissal of the summons ("the reopen application"), contending that leave was unnecessary—although it applied for leave if in fact it was necessary. Also on April 25th, 2017, the judge formally released his substantive judgment. On May 6th, 2017, he produced a note on the fair value calculation; on May 16th, 2017, he issued a further judgment dealing with the fair rate of interest; and on May 17th, 2017, he made the order referred to in para. 3 above embodying his various decisions.

14    As I have said, both Shanda and the dissenting shareholders appealed against that order. I deal in turn with the reopen application, Shanda's substantive appeal and the dissenting shareholders' appeal.

**The reopen application**

15    Following its replacement of Conyers as Shanda's attorneys, Harneys commissioned Jaime d'Almeida ("Mr. d'Almeida") to review the trial transcripts and the reports and evidence of Professor Jarrell and Mr. Inglis. Mr. d'Almeida subsequently provided a fresh expert opinion, which concluded that the evidence from Professor Jarrell was so inadequate, both in its own methodology and approach and in its failure adequately to challenge Mr. Inglis's work and conclusions, that the court had been misled at trial. The basis of Shanda's summons was that Mr. d'Almeida's evidence was necessary if the court were to make a proper and just decision as to fair value.

16    The reasons given by the judge for refusing to allow Shanda to reopen its case and adduce the evidence of Mr. d'Almeida, which were

again expressed in a clear and comprehensive judgment that extended to 69 pages, may be summarized as follows.

(1) The court had jurisdiction to admit new evidence and reopen the trial after judgment had been handed down in draft. The principle to be applied when deciding to exercise the jurisdiction was the overriding objective to deal with cases justly and at proportionate cost. Although the application was made to the trial judge, the court should take into account the *Ladd* v. *Marshall* (16) factors restricting reliance on new evidence on appeal—which, even applied more leniently than on an appeal, meant that powerful factors or strong reasons would be needed to justify the application. When applying the overriding objective after a judgment had been handed down, the court needed to take into account the question of reconsideration and the prejudice caused by depriving a successful party of a judgment; and in the context of applications to admit new evidence after trial, whether or not a judgment had been handed down, there was a balance to be struck between on the one hand the court's desire (and the parties' entitlement) to have a decision based on the true factual position and on the other the need for finality in litigation.

(2) The court had to—

"consider and weigh in the balance in particular the reasons for the application, the conduct of the parties, the delay between the conclusion of the trial and the making of the application, the prejudice to the applicant as a result of not allowing the new evidence to be admitted and the trial re-opened, the prejudice to the other party of being deprived of the judgment or the further costs and delays of having to deal with new evidence and a new hearing and the need to secure the 'just, most expeditious and least expensive determination of every cause or matter on its merits' (see paragraph 2.2 of the Preamble to the Grand Court Rules). The need for justice to other litigants and a fair allocation of the court's resources must be taken into account."

(3) A number of factors weighed strongly in favour of dismissing the summons. They were as follows:

(a) The issues dealt with in Mr. d'Almeida's report had been the subject of detailed submissions and cross-examination during the course of a long trial conducted by leading counsel. Many if not most of the difficulties faced by Professor Jarrell during his cross-examination were crystal clear during the trial because he was candid and straightforward about the limited nature of his evidence and preparation and his failures fully to understand parts of Mr. Inglis's evidence. It had been Professor Jarrell's poor performance in the witness box on some issues that had presumably caused Shanda and

its counsel to make a series of concessions and not to contest a significant number of issues at trial.

(b) The trial had concluded on November 17th, 2016, but Shanda had waited until March 20th, 2017 to make its application. The fact that the court had not by then delivered its judgment was no excuse for the delay in a case where the problems with the expert witness and evidence were apparent at trial. The court's concern and criticism arose from Shanda's failure to act with sufficient expedition during or shortly after the trial, when the performance of the expert was visible and clear during the trial. Some delay was bound to be involved in instructing a new expert and awaiting the outcome of his work; but, even taking that into account, Shanda could have acted much more rapidly in bringing on an application to deal with the perceived deficiencies in, and problems with the expert evidence.

(c) The judge accepted that Harneys had not been aware of his updates regarding the timing of the handing down of the judgment, and consequently did not take the view that the application was an abuse of process. He did, however, comment that it was a remarkable coincidence that the filing of the summons almost precisely coincided with the handing down of the draft judgment, and he said that he felt himself entitled at least to note that the filing of the summons could be viewed as a litigation tactic to delay the conclusion of the litigation.

(d) If the summons were acceded to, the whole process of preparation of revised experts' reports—including the provision of further information, further meetings with management, and a further joint meeting of the experts—would have to be gone through again, and there would have to be another trial at which they could both be cross-examined. In many respects, the proceedings would need to revert to the stage reached when the original directions order had been made. This would involve significant further cost to the parties, delays and significant further amounts of limited court time and resources.

(e) The real thrust of Shanda's complaint was that Professor Jarrell had been negligent in the performance of his duties. The negligent performance of his duties by an expert would not generally be, and in the present case was not, sufficient to allow the party that selected him to reopen the trial and instruct a second expert (and in effect have a second bite at the cherry). The prejudice suffered by the party concerned could be remedied by making a claim against the expert. It would be disproportionate and unjust to make the other party suffer the consequences when both had been able to select whichever expert they chose.

(f) Shanda had rightly accepted that it needed to demonstrate that the problems with the experts meant that the court's decision was unsafe. In this respect a s.238 petition was no different from other cases. Although the court had to determine the fair value for itself and form its own independent view, it was (both generally and in the present case) particularly dependent on the expert evidence to assist it. If it could be shown that the expert opinion evidence was fundamentally flawed, the court's decision-making would of necessity be unsafe because there would be no other evidence on which the court could have relied for the purpose of forming its view.

(g) Shanda had asserted that both Professor Jarrell and Mr. Inglis had failed properly to deal with a number of critical issues, with the result that their valuations were fundamentally flawed and their evidence was so seriously deficient that the court had been materially misled by the entire corpus of opinion evidence going to value and its determination of fair value was as a result unreliable. However, Mr. d'Almeida's report did not establish that Mr. Inglis's evidence on the material matters he identified was so deficient and incompetently prepared as to be outside the range of reasonable professional opinions on the valuation issues. The court had been properly able to rely on Mr. Inglis's evidence, as well as on parts of Professor Jarrell's evidence. Although parts of Professor Jarrell's evidence were weak and unreliable, his failures did not undermine the credibility and reliability of all his evidence. On a number of issues he had demonstrated the expertise of a properly qualified expert and had given evidence that was reasonable and consistent with the academic and professional literature and accepted methodologies of those qualified in the field of financial valuation and statistical analysis. Nor did Professor Jarrell's failure to raise the points and challenge Mr. Inglis on the issues identified by Mr. d'Almeida mean that Mr. Inglis's evidence must be treated as unsafe.

(h) There had been problems caused by serious deficiencies in the factual record that had required the experts and ultimately the court to make certain assumptions or inferences. That had been largely the fault of Shanda; but it was not in any event a sufficient reason for concluding that the expert evidence given at trial was unsafe as a whole or to a material extent. Mr. Inglis had dealt with the evidential deficiencies properly and reasonably and had produced an opinion that was reasonable and reliable and based on reasonable assumptions informed by accepted professional practice. The fact that Shanda had belatedly found an expert who was prepared to support a much lower value for the shares was not sufficient to justify the conclusion that the evidence at trial was seriously compromised and flawed and that the judgment was unsafe. It would be wrong to

permit Shanda to indulge in opinion shopping and to impose on the dissenting shareholders the further costs and delays associated with further evidence and a new trial (as well as to cause them the significant prejudice resulting from being deprived of the judgment already delivered).

17    Shanda filed a notice of appeal on August 9th, 2017, and on the same day filed a summons in the Grand Court seeking leave to appeal. That summons was not pursued; but in its initial skeleton argument in support of the reopen application, Shanda sought leave to appeal from the Court of Appeal, albeit only in paras. 50 to 53 of the 54-paragraph document. The dissenting shareholders formally objected to the appeal being pursued without leave; and Shanda devoted its reply skeleton (but not its oral submissions, which were directed to the merits of the reopen appeal) to the issue of whether leave was or was not required.

18    Section 6 of the Court of Appeal Law (2011 Revision) provides that, subject to certain exceptions not presently relevant, no appeal shall lie from an interlocutory judgment of the Grand Court without the leave of that court or of the Court of Appeal. Shanda's contention was that the order dismissing the application to reopen the hearing was not an interlocutory order but a final order. This startling proposition was argued in the reply skeleton in the following way.

(a) Rule 12(3) of the Court of Appeal Rules (2014 Revision) provides: "A judgment or order shall be treated as final if the entire cause or matter would (subject only to any possible appeal) have been finally determined whichever way the court below had decided the issues before it."

(b) Rule 12(4) provides: "For the purposes of subrule (3), where the final hearing or the trial of a cause or matter is divided into parts, a judgment or order made at the end of any part shall be treated as if made at the end of the complete hearing or trial."

(c) Properly analysed, the petition fell into two parts or stages: identification of the relevant valuation principles, followed by the determination of the fair value by reference to those principles.

(d) Shanda's summons was made "so that Mr d'Almeida's report could be *admitted* into evidence at the first stage, but taken into account at the *second* stage i.e. the stage at which the court (with the assistance of the experts) would determine the actual dollar amount representing fair value" [emphasis in original].

(e) "It was no part of the Company's case on the Summons that there should be a re-*hearing* of the first stage. It sought only to re-*open* its case prior to the conclusion of the first stage to adduce evidence to be taken into account later" [emphasis in original].

366

(f) If the judge had allowed Shanda's summons, "the first stage would still have been at an end at that point. Any expert evidence in reply by the Dissenters and/or cross-examination by them of Mr d'Almeida would have happened as part of the second stage. Clearly the first stage was also at an end upon the Summons being dismissed. In other words, whether or not the orders sought in the Summons were granted, either way the first stage of the trial of the petition was at an end."

(g) The dissenting shareholders were wrong to classify the order as having been made on a summons for directions, since the purpose of such a summons was to make preparations for trial. They were also wrong to classify the order as one made on an application for a new trial or rehearing; all that Shanda wanted to do was to add to its evidence before judgment. None of the deeming provisions in r.12 applied.

19   It is in my view plain that the order was interlocutory. Whilst it is true that the judge determined the fair value and the fair rate of interest separately, with separate evidence being admitted on the latter, and that he left the calculation of Shanda's value to the parties in the light of his determination of the relevant principles, the suggestion that the hearing of the petition was otherwise divided into stages is wholly artificial. So also is the suggestion that any evidence in rebuttal, or cross-examination of Mr. d'Almeida would have been heard at the stage of turning valuation principles into actual value, rather than at the stage where the expert evidence was being taken. The refusal to allow Shanda to adduce further evidence was a decision about the conduct of an aspect of the trial, and the judge's order was not in any respect determinative of the parties' substantive rights. Leave to appeal was required.

20   Leave to appeal will not be granted unless there is a real prospect of the appeal succeeding, or there is a point at issue that should be considered by the Court of Appeal in the public interest. Shanda contends that it is entitled to leave on both bases.

21   Shanda's contentions were founded on what it said was the nature of s.238 proceedings. The purpose of such proceedings was to establish a fair value for all the shares, and the court's determination of that value was binding on the entire world. Although in fact in the present case all shareholders who had dissented from the merger were parties to the proceedings, that would not always necessarily be the case; and any shareholder who had dissented from the merger but had elected not to participate in the litigation would be entitled to receive the same fair value for his shares as was due to those shareholders who had litigated. It followed that the proceedings were not ordinary litigation, and the court's task was not just to do justice between the parties but to determine the fair value of the shares for the benefit of all. That in turn meant that the court was to have regard to anything which might assist it to arrive at the fair

367

value; and accordingly the only real issue on the reopen application was whether or not Mr. d'Almeida's evidence was relevant to the court's determination of fair value. It was submitted that it plainly was relevant, particularly but not exclusively in areas where the judge had not accepted the evidence of either Professor Jarrell or Mr. Inglis. The judge had mischaracterized the reopen application as being an application to adduce fresh evidence after judgment, and had therefore required Shanda to satisfy a stricter test than was appropriate. The fact that he had delivered a judgment in draft did not make the situation one where a formal judgment had been delivered, so that questions of recalling his decision and disappointing the expectations of the successful party did not arise. Nor were *Ladd* v. *Marshall* (16) considerations relevant, even in the modified form in which the judge had dealt with them, since the trial was not at an end. Although the judge had gone on to consider Mr. d'Almeida's evidence, he had done so only in his judgment refusing the reopen application. What he should have done was to appreciate that he was being asked to admit additional evidence during the course of the trial; and had he done so he would have realized that the evidence would assist him in his only task, that of determining fair value, and that any prejudice to the dissenting shareholders could be met by an appropriate award of costs.

22    I do not accept the fundamental premise of Shanda's argument. Whilst it is true that s.238 requires determination of the fair value of the shares, the significance of the determination is limited: the only persons affected by it are the company and dissenting shareholders, whether or not they participated in the litigation. A shareholder who consented to the merger or accepted the merger price cannot claim to be entitled to a different price depending on the outcome of the s.238 proceedings. Essentially, the proceedings affect only those who have taken issue with the merger price, so that there is in reality a *lis* between them and the company. The purpose of the proceedings is to resolve that *lis*, and in that respect a s.238 petition is no different from ordinary litigation. Moreover, Shanda's argument ignores the process by which the determination of fair value is to occur. Since the fair value is not necessarily the same as the merger price or the price at which the shares were trading before the market in them was affected by knowledge of the merger, it is inevitable that the determination will involve an assessment of a substantial quantity of information relating to the financial affairs of the company whose shares are to be valued. It is unlikely in the extreme that the court will be able to make that assessment without expert assistance. In the ordinary case, as in this one, both the company and any dissenting shareholders will appoint experts; but even in a case where no dissenting shareholder is prepared to participate in the litigation, the company, and perhaps also the court itself, will instruct an expert. In every case, the court's task will be to assess the utility of the expert evidence to the determination of fair value. Carrying out that task in the context of s.238 proceedings is no different in

368

C.A.                                                IN RE SHANDA GAMES

nature from carrying it out in ordinary *inter partes* litigation. In ordinary litigation, and in s.238 proceedings, the court will determine generally, or on an issue-by-issue basis, whether an expert's evidence is to be accepted in whole or in part and how conflicts are to be resolved. If necessary, the court is entitled to substitute its own view for that of the experts. The process, however, is one that will be familiar to most judges. The fact that the outcome of the process in a s.238 case is capable of affecting persons other than those who participated in the litigation seems to me immaterial: shareholders who do not participate cannot complain if the fair value of their shares is determined by reference to evidence into which they have had no input.

23    Shanda's argument came very close to amounting to an assertion that the judge had no real discretion and was obliged to take into account any evidence relevant to fair value presented to him before formal delivery of his judgment. As I have pointed out above, however, the judge's decision related to the conduct of an aspect of the trial, and was plainly a matter for his discretion. It seems to me impossible to fault his exercise of that discretion. Even accepting, as the judge did, that Harneys had not been kept informed of the progress of his draft judgment, Shanda's application was made extremely late. As the judge said, it must have been apparent during the course of the hearing that there were significant problems with Professor Jarrell's evidence; indeed, the only possible explanation for the engagement of Mr. d'Almeida was that Shanda had recognized those problems. Nevertheless, the application was not made until just over four months after the conclusion of the hearing. Moreover, the judge was best placed to assess the extent to which he could place reliance on the evidence of Professor Jarrell and Mr. Inglis, and the extent to which the assistance to be derived from Mr. d'Almeida's evidence justified a resumption of the hearing. The passage from his judgment I have quoted in para. 16(2) above demonstrates that the judge had firmly in mind the relevant considerations; and, although on occasion he does appear erroneously to have regarded the application as one for a reopening of the trial after judgment, there was ample material to justify his conclusion that justice did not require him to accede to an application that was too late and too inadequate.

24    These considerations meant that there was no reasonable prospect of an appeal succeeding, and nothing in the nature of s.238 proceedings to justify an appeal, so that leave to appeal should not be granted. The same considerations justified dismissing the reopen appeal if, contrary to our view, leave to appeal was unnecessary.

**Shanda's substantive appeal**

25    Shanda's notice and grounds of appeal as originally drawn took issue with several aspects of the methodology used by the judge to arrive at his

369

decision on the fair value of the dissenting shareholders' shares. All but one of these was abandoned, however, and before us Shanda's only contention (apart from in relation to interest) was that the judge should have discounted the value of the dissenting shareholders' shares to reflect the fact that they had only minority holdings ("the minority discount point").

### The minority discount point

26   The shares held by the dissenting shareholders between them amounted to about 1.64% of Shanda's issued share capital. So small a proportion would give them virtually no influence, and still less control, over Shanda's affairs. They would not be able on their own to promote or resist any type of shareholder resolution. This lack of influence and control would ordinarily have an adverse impact on the market price of the shares; and Shanda argued before the judge that this should be reflected by way of a minority discount in the valuation of the dissenting shareholders' shares. The experts agreed that if such a discount were to be incorporated in the valuation it should be 23%. According to Shanda, this would mean that the value of the dissenting shareholders' shares would reduce by about US$16.9m.

27   The judge held that no minority discount should be applied. His reasoning was as follows.

   (a) In Delaware and Canada, each of which had regimes similar to that contained in s.238 of the Companies Law, it was clear that no minority discount was to be given. The shares of a dissenting minority were to be valued as a proportion of the value of the company, not as a block of shares offered for sale. In Delaware, this was in part a consequence of the rejection of market value as the measure of fair value.

   (b) In *In re Integra Group* (13), Jones, J. in the Grand Court considered that there should be no minority discount, although the point had not been argued or live.

   (c) The purpose of the fair value standard was to ensure that the dissenting minority was fully protected. That meant that they should be compensated for the full value of their interest in the company, which was their proportionate share in the capital and value of the company.

   (d) This approach was consistent with one aspect of the legal nature of a share and the rights of a shareholder, namely that a shareholder owned an undivided share in the share capital of the company.

   (e) The full value of a dissenting shareholder's interest included the right to a distribution of his share of the company's assets and value following a sale or other realization of the company's business. This was equivalent to the value of a partner's interest in a partnership, which was

370

based on a notional sale of the business as a whole to an outside purchaser and the distribution to the partners of their share of the partnership property.

(f) The English and Bermuda cases relied on by Shanda, to which I refer below, were distinguishable.

28   Shanda's principal contention was that the judge should not have followed the Delaware (and Canadian) jurisprudence, but should instead have looked to the English authorities dealing with the compulsory acquisition of shares by way of a scheme of arrangement or a "squeeze out" or in a claim of unfair prejudice—all of which applied or permitted a minority discount. There was nothing in jurisprudential terms to distinguish between a merger, a squeeze out and a scheme of arrangement as a mechanism for compulsory purchase of shares, and similar principles should apply to all three. The judge should also have had regard to authorities from Bermuda and the British Virgin Islands, both common law jurisdictions, which again recognized the possibility of a minority discount. The Delaware jurisprudence, which was to the effect that a dissenting shareholder was entitled to his proportionate interest in the overall fair value of the corporation appraised as a going concern, was influenced by public policy considerations that had no place in the Cayman Islands, or in England and Wales. It had never been part of the public policy of the Cayman Islands or of England and Wales that there was anything unjust in the compulsory purchase of shares for less than the amount a shareholder would receive on the sale of the company's business and the distribution of the proceeds. Moreover, the language of the Delaware statute required valuation of a dissenter's "shares of stock" and so placed the emphasis on the totality of the stock. By contrast, the statutory criterion in s.238 was "the fair value of his shares," which focused on what the dissenter owned. A shareholder who had a minority shareholding should receive the fair value of what he possessed, namely a minority shareholding. Applying conventional principles of statutory construction, there was no justification in the wording of the section for valuing the company rather than the shares themselves. Unless the shares, as opposed to the company, were valued, there would be no means of giving effect in the valuation to differences in the rights and obligations attaching to different classes of shares, for example preferential rights to distributions of income and capital or to votes (such as the voting rights of the Class B shares in the present case), or liability to calls; but there was no justification for leaving such differences out of account. If it was right to take them into account, however, then the difference between a majority and a minority shareholding should likewise be taken into account in the valuation exercise.

29   The principal contentions of the dissenting shareholders were as follows. Section 238 required determination of the "fair value of the

371

shares," and the focus should be on the expression "fair value," not on "the shares." Fair value was different from market value, and different from the value at which shares might trade on a stock exchange. The United Kingdom, Bermuda and BVI authorities were distinguishable. There was no provision in the United Kingdom legislation relating to schemes of arrangement, squeeze out acquisitions or unfair prejudice petitions that required the court expressly to apply a standard of fair value; but that was the criterion in the Delaware and Canadian legislation, and on the grounds both of similarity of the statutory language and because Delaware, like the Cayman Islands, was a substantial financial centre the Delaware jurisprudence should be followed. That was the course taken in *Integra* (13), and the judge was right to follow it. The Delaware principle of valuing the shares as a proportion of the value of the business represented the reality of the situation in a merger, where all the shares were being acquired, whether voluntarily or compulsorily, and the entirety of the business merged in the new structure.

30   In order to deal with these contentions, it is convenient first to consider the position in other jurisdictions.

### *Delaware*

31   A number of states in the USA have appraisal regimes, but the one that is most used is the one in Delaware. The relevant statutory provision in Delaware is s.262 of the Delaware General Corporation Law. Sub-section (a) provides that any holder of "shares of stock" in a Delaware corporation who dissents in defined circumstances from a merger "shall be entitled to an appraisal by the Court of Chancery of the fair value of the stockholder's shares of stock" through a defined process. Sub-section (h) provides that through that process "the Court shall determine the fair value of the shares exclusive of any element of value arising from the accomplishment or expectation of the merger or consolidation, together with interest, if any, to be paid upon the amount determined to be the fair value."

32   The Delaware appraisal regime has been the subject of substantial authority. In relation to the minority discount point, the judge referred to and quoted from three of those authorities: *Cavalier Oil Corp* v. *Harnett* (6); *In re Appraisal of The Orchard Enterprises Inc.* (20); and *In re Appraisal of Dell Inc.* (9). Three points in particular emerge from these decisions. First, the concept of "fair value" in the Delaware jurisprudence, in the words of Laster, V.C. in *Dell*, "draws more from judicial writings than from the appraisal statute itself" and is "a largely judge-made creation, freighted with policy considerations." (*Dell* has very recently been overturned in part on appeal by the Supreme Court of Delaware, primarily on the basis that insufficient weight was given to the merger price. However, the statement I have quoted was not affected.) Secondly,

372

the object of a Delaware appraisal is to value the corporation itself and allocate to a dissenting shareholder "his proportionate interest in the overall fair value of the corporation, appraised as a going concern" (Jacobs, V.C. in *Cavalier*). Thirdly, and consequent on the second point, no allowance is to be made for the size of a shareholding. This point is stated most clearly by Walsh, J. in the Delaware Supreme Court in *Cavalier* (564 A.2d at 1144):

> "In rejecting a minority or marketability discount, the Vice Chancellor concluded that the objective of a section 262 appraisal is 'to value the *corporation* itself, as distinguished from a specific fraction of its *shares* as they may exist in the hands of a particular shareholder' [emphasis in original]. We believe this to be a valid distinction.

A proceeding under Delaware's appraisal statute, 8 Del.C. § 262, requires that the Court of Chancery determine the 'fair value' of the dissenting stockholders' shares. The fairness concept has been said to implicate two considerations: fair dealing and fair price. *Weinberger v. UOP, Inc.*, 457 A.2d at 711. Since the fairness of the merger process is not in dispute, the Court of Chancery's task here was to value what has been taken from the shareholder: 'viz. his proportionate interest in a going concern.' *Tri-Continental Corp. v. Battye*, Del.Supr., 74 A.2d 71, 72 (1950). To this end the company must be first valued as an operating entity by application of traditional value factors, weighted as required, but without regard to post-merger events or other possible business combinations. See *Bell v. Kirby Lumber Corp.*, Del.Supr., 413 A.2d 137 (1980). The dissenting shareholder's proportionate interest is determined only after the company as an entity has been valued. In that determination the Court of Chancery is not required to apply further weighting factors at the shareholder level, such as discounts to minority shares for asserted lack of marketability . . .

The application of a discount to a minority shareholder is contrary to the requirement that the company be viewed as a 'going concern.' Cavalier's argument, that the only way Harnett would have received value for his 1.5% stock interest was to sell his stock, subject to market treatment of its minority status, misperceives the nature of the appraisal remedy. Where there is no objective market data available, the appraisal process is not intended to reconstruct a *pro forma* sale but to assume that the shareholder was willing to maintain his investment position, however slight, had the merger not occurred. Discounting individual share holdings injects into the appraisal process speculation on the various factors which may dictate the marketability of minority shareholdings. More important, to fail to accord to a minority shareholder the full proportionate value of his

373

shares imposes a penalty for lack of control, and unfairly enriches the majority shareholders who may reap a windfall from the appraisal process by cashing out a dissenting shareholder, a clearly undesirable result."

### Canada

33   The principal appraisal regime in Canada is that under s.190 of the Canada Business Corporations Act, although there are also provincial appraisal statutes. Section 190 applies in a number of situations including a resolution by a corporation to carry out a going-private transaction or a squeeze out transaction. Sub-section (3) provides, so far as relevant, that "a shareholder who complies with this section is entitled, when the action approved by the resolution from which the shareholder dissents . . . becomes effective, to be paid by the corporation the fair value of the shares in respect of which the shareholder dissents . . ."

34   There has been less litigation about the Canadian provisions than about the Delaware provisions, apparently partly because Canada ordinarily allows only a reasonable rate of interest, whereas Delaware now ordinarily awards compound interest at 5% p.a. over the Federal Reserve discount rate, and partly because adverse costs orders are ordinarily available in Canada but not in Delaware. Moreover, although some Canadian provincial legislation allows a dissenter to acquire shares after the intended transaction becomes public knowledge, as does Delaware, the ordinary rule in Canada is that the dissenters must already have held their shares. These factors have historically made Canada less attractive to "appraisal arbitrageurs" (that is to say, speculators who purchase shares with the intention of exercising appraisal rights to make a profit), and that in turn has resulted in a lower volume of litigation. However, it is well established in Canada, at least at provincial level, that no minority discount is to be applied in determining fair value. In *Kummen* v. *Kummen-Shipman Ltd.* (15), a decision of the Manitoba Court of Appeal, the rationale for the exclusion of a minority discount was said to flow from the context in which appraisals of fair value take place: the shares are effectively being purchased by existing shareholders to consolidate their existing position.

### England and Wales

35   England and Wales does not have an appraisal regime similar to s.238 or to those in Delaware and Canada. There are, however, two circumstances in which majority shareholders may acquire the shares of an unwilling minority; and each of these has a direct parallel in the Companies Law in this jurisdiction.

374

(a) The first of these circumstances is known as a squeeze out, under which the offeror in a proposed takeover that has been approved by 90% of the shareholders of the target company may acquire the remaining shares. The current provisions, which are contained in Chapter 3 of Part 28 of the Companies Act 2006, apply where the offeror has acquired or unconditionally contracted to acquire 90% in value and (if the shares are voting shares) by voting rights of the shares or class of shares; and on giving notice the offeror is entitled and bound to acquire the shares on the terms of the offer unless the court, on an application made by the shareholder under s.986, orders that the offeror is not entitled and bound to acquire the shares or that the terms on which he is entitled and bound to acquire them shall be such as the court thinks fit. Section 986(4) provides that the court may not require consideration of a higher value than that specified in the offer unless the holder of the shares shows that the offer value would be unfair. In their earlier, simplified form the squeeze out provisions were contained successively in s.155 of the Companies Act 1929 and s.209 of the Companies Act 1948, and the relevant part of each of these was in identical terms to s.88 of the (Caymanian) Companies Law. They applied, as does s.88, where a scheme or contract involving the transfer of shares to another company had been approved by the holders of not less than 90% by value of the shares in the transferor company; and the transferee company was then "unless the Court thinks fit to order otherwise" entitled to acquire the shares of any dissentients on the same terms as were offered to the approving shareholders. This formulation too imported considerations of fairness. Thus in *Re Hoare & Co. Ltd.* (12) Maugham, J., considering s.155 of the 1929 Act, said this (150 L.T. at 375):

> "I have some hesitation in expressing my view as to when the court should think fit to order otherwise. I think, however, the view of the legislature is that where not less than nine-tenths of the shareholders in the transferor company approve the scheme or accept the offer, prima facie, at any rate, the offer must be taken to be a proper one, and in default of an application by the dissenting shareholders, which includes those who do not assent, the shares of the dissentients may be acquired on the original terms by the transferee company. Accordingly, I think it is manifest that the reasons for inducing the court to 'order otherwise' are reasons which must be supplied by the dissentients who take the step of making an application to the court, and that the onus is on them of giving a reason why their shares should not be acquired by the transferee company.

> One conclusion which I draw from that fact is that the mere circumstance that the sale or exchange is compulsory is one which ought not to influence the court. It has been called an expropriation, but I do not regard that phrase as being very apt in the circumstances

of the case. The other conclusion I draw is this, that again prima facie the court ought to regard the scheme as a fair one inasmuch as it seems to me impossible to suppose that the court, in the absence of very strong grounds, is to be entitled to set up its own view of the fairness of the scheme in opposition to so very large a majority of the shareholders who are concerned. Accordingly, without expressing a final opinion on the matter, because there may be special circumstances in special cases, I am unable to see that I have any right to order otherwise in such a case as I have before me, unless it is affirmatively established that, notwithstanding the views of a very large majority of shareholders the scheme is unfair."

The fact that the offer price involved a minority discount did not make the scheme unfair. That was established in *In re Grierson, Oldham & Adams Ltd.* (11), in which Plowman, J. (dealing with s.209 of the 1948 Act) said this ([1968] Ch. at 35 and 36–37):

"Then it is said that the price of 6s. a share does not reflect the advantages to Holts by their obtaining complete control of company. I agree with Mr. Instone [for Grierson] that that might possibly be used as an argument to justify paying a shareholder with a controlling interest a larger price for the shares than the price paid to minority holders. But, in my judgment, *it is not unfair to offer a minority shareholder the value of what he possesses, i.e., a minority shareholding.* . . . [O]n general principle . . . in my judgment, the element of control is not one which ought to have been taken into account as an additional item of value in the offer of these shares." [Emphasis supplied.]

(b) The second circumstance in which a minority shareholding may be acquired is under a scheme of arrangement. Such schemes are dealt with by Part 26 of the Companies Act 2006. So far as material, s.899 provides for an arrangement between a company and its members that is approved by a majority in number representing 75% of the members by value to bind all members if sanctioned by the court. Section 900 applies in the case of an application made under s.899 for sanction of a scheme of arrangement proposed for the purpose of the amalgamation of two companies involving the transfer of the whole or part of the undertaking of one of those companies to the other; and it allows the court to deal with, among other things, the provision to be made for any persons who dissent from the arrangement. These provisions are mirrored in ss. 86 and 87 of the (Caymanian) Companies Law. Schemes of arrangement may be utilized in a wide range of circumstances, but are commonly used to effect a merger, consolidation or takeover. In *Re Linton Park plc* (17) Lewison, J. said this ([2005] EWHC 3545 (Ch), at para. 5 and para. 13):

376

"5 A court will usually sanction a scheme if (1) the requirements of the statute have been complied with; (2) the class is fairly represented by those who attended the meeting and the statutory majority were acting bona fide; and (3) the scheme is one which an honest and intelligent person acting in his own interests as a member of the class might reasonably approve. Thus stated the third limb of the test is not whether the opposing shareholders or creditors have reasonable objections to the scheme. A shareholder or creditor may be equally reasonable in voting for or against the scheme. In such a case shareholder democracy or creditor democracy, as the case may be, should normally prevail.

. . .

13 The third question is whether the terms of the scheme are fair. The issue here is the price of the shares, not the principle of the scheme. The philosophy underlying s.425 is that the members of the company are better able to pass judgment on what is in their best financial interests than a judge. There are safeguards in the requirement that not only a majority in number of the shareholders vote in favour of the scheme but also that they represent three quarters in value of the shares. Mr. Kinch relies on the proposition that the price on offer is at a discount to net asset value which the independent directors did not take into account. The evidence, so far as it goes, shows that the independent directors did take into account the net asset value of Linton Park and also the net asset value of Camellia. Teller and Greenwood, the advisers to the independent directors, in addition reworked Mr. Kinch's figures and concluded that the share price of both Linton Park and Camellia traded at a roughly equal discount to net asset value. This is clearly a question upon which different views are possible, indeed a question upon which different views may be equally reasonable. But whether the package on offer is a fair price for the shares is a matter which the shareholders are far better to able to judge than the court, and for that reason the court will be very slow to depart from the majority view."

This case accordingly establishes that in ordinary circumstances the majority will be regarded as the best judge of the fairness of the price, even if that price is at a discount to the net asset value.

36    There is a further circumstance in United Kingdom law (although one not directly reproduced in Caymanian law) in which shares may be ordered to be transferred at a discount. In the context of a petition brought under s.994 of the Companies Act 2006 on the grounds that the affairs of the company are being or have been conducted in a manner unfairly prejudicial to shareholders, s.996(2)(e) provides that the court may order the purchase of the shares of any members of the company by other

377

members or by the company itself. The general rule is that the court will direct that the shares be purchased at a discount reflecting the size of the holding unless the case is one of quasi-partnership. The position was summarized in *Irvine* v. *Irvine (No. 2)* (14) in a passage quoted in the Bermudan decision of *Golar LNG Ltd.* v. *World Nordic SE* (10) (see para. 38 below); and was stated as follows in the Court of Appeal in *Strahan* v. *Wilcock* (21) by Arden, L.J. ([2006] EWCA Civ 13, at para. 17):

> "The burden of the dispute between the parties on this appeal is as to the basis of valuation in the buy out order. Shares are generally ordered to be purchased on the basis of their valuation on a non-discounted basis where the party against whom the order is made has acted in breach of the obligation of good faith applicable to the parties' relationship by analogy with partnership law, that is to say where a 'quasi-partnership' relationship has been found to exist. It is difficult to conceive of circumstances in which a non-discounted basis of valuation would be appropriate where there was unfair prejudice for the purposes of the 1985 Act but such a relationship did not exist. However, on this appeal I need not express a final view on what those circumstances might be."

Although some doubt has been cast on this general rule by two recent first instance decisions (*Re Blue Index Ltd.* (4) and *Re Addbins Ltd.* (1), both proceeding on the basis that the oppressing majority should not ordinarily be rewarded for their oppressive conduct by receiving the benefit of a minority discount), it appears to me that the rule as I have described it is established at least at Court of Appeal level in England.

### *Bermuda and BVI*

37   Bermuda and the British Virgin Islands also have appraisal regimes. In Bermuda, the relevant provision is s.103 of the Companies Act 1981, which is in the following terms:

> "(1) The holders of not less than ninety-five per cent of the shares or any class of shares in a company (hereinafter in this section referred to as the 'purchasers') may give notice to the remaining shareholders or class of shareholders of the intention to acquire their shares on the terms set out in the notice. When such a notice is given the purchasers shall be entitled and bound to acquire the shares of the remaining shareholders on the terms set out in the notice unless a remaining shareholder applies to the Court for an appraisal under subsection (2):
>
> Provided that the foregoing provisions of this subsection shall not apply unless the purchasers offer the same terms to all holders of the shares whose acquisition is involved.

(2) Any shareholder to whom notice has been given under subsection (1) may within one month of receiving the notice apply to the Court to appraise the value of the shares to be purchased from him and the purchasers shall be entitled to acquire the shares at the price so fixed by the Court."

38   This provision was considered in *Golar LNG Ltd.* v. *World Nordic SE* (10). Ground, C.J. held ([2011] SC (Bda) 10 Com, at para. 5) that the shares should be appraised at their fair value; and in relation to minority discounts he said this (*ibid.*, at paras. 23–24):

"23. This was a relatively small shareholding in a quoted public company. In such a case I consider that it is appropriate to apply a minority discount to any share value derived from the pro-rated NAV. It may be that in this respect the law of Canada has diverged from that of England, but if I had to choose I would choose to follow the latter. In that regard I have been helped by the review of the law conducted by Blackburne J in Irvine v Irvine (No. 2) [2007] 1 BCLC 445, and by his conclusion at 449 [11]:

'A minority shareholding, even one where the extent of the minority is as slight as in this case [*there the split was 50% plus and minus one share on each side*], is to be valued for what it is, a minority shareholding, unless there is some good reason to attribute to it a pro rata share of the overall value of the company. Short of quasi-partnership or some other exceptional circumstance, there is no reason to accord to it a quality that it lacks.'

Applying that to this case, this was not a quasi-partnership and there are no exceptional circumstances, and so a minority discount should be applied.

24. It is also necessary to keep a sense of perspective, and bear in mind that the NAV is an entirely hypothetical figure which cannot easily be realised, particularly in a case such as this where the sudden sale of the entire tanker fleet at valuation is likely to be unachievable. The reality is that in a case such as this there is no possible way for the NAV to translate into money in a shareholder's pocket without incurring substantial break-up costs and associated losses. It is therefore appropriate to discount the NAV . . ."

39   In BVI the relevant provision is s.179 of the BVI Business Companies Act 2004, which entitles a member of a company to payment of the fair value of his shares upon dissenting from a merger or consolidation, as well as in certain other circumstances. The appraisal mechanism is set out in s.179(9), which is in the following terms:

379

"If the company and a dissenting member fail, within the period of 30 days referred to in subsection (8), to agree on a price to be paid for the shares owned by the member, within 20 days immediately following the date on which the period of 30 days expires, the following shall apply:

(a)   the company and the dissenting member shall each designate an appraiser;

(b)   the two designated appraisers together shall designate an appraiser;

(c)   the three appraisers shall fix the fair value of the shares owned by the dissenting member as of the close of business on the day prior to the date on which the vote of members authorising the action was taken or the date on which written consent of members without a meeting was obtained, excluding any appreciation or depreciation directly or indirectly induced by the action or its proposal, and that value is binding on the company and the dissenting member for all purposes; and

(d)   the company shall pay to the member the amount in money upon surrender by him of the certificates representing his shares."

In *Olive Group Capital Ltd.* v. *Mayhew* (19), a decision of the Eastern Caribbean Court of Appeal, it was held that the BVI appraisal provisions as a matter of law allowed for the application of a minority discount, but whether or not one should be applied in any given case was a matter for the appraisers to determine.

***The position in the Cayman Islands***

40    Apart from the present case, there are two Caymanian decisions that do or may bear on the question of the proper approach to minority discounts.

41    The decision of Jones, J. in *Integra* (13) is directly to the effect that no minority discount is permissible in a fair value determination under s.238. More generally, since that decision the Delaware and Canadian jurisprudence has been regarded as relevant to such determinations. In his substantive judgment in that case (2016 (1) CILR 192, at para. 16), Jones, J. cited from an article published in the Canadian *Annual Review of Civil Litigation*, 25, at 9–31 (2011) called "'*Fair Value'—A Common Issue With Surprisingly Sparse Canadian Authority*" by Clarke Hunter, Q.C. and Clarissa Pearce, which he said he had found to be helpful in a number of respects; and he remarked on the fact that the Canadian legislation was very similar to s.238. At para. 19, he set out a summary of the comparable

380

United States legislation provided by the expert instructed by the dissenting shareholders and accepted it as a useful summary of the Delaware jurisprudence, which he said he thought could be relied on as a helpful guide to the meaning of "fair value" in s.238. At para. 20, he agreed with the following proposition, expressly based on Delaware and Canadian principles, from an article called "*Dissenting Shareholders' Appraisal Rights in Cayman Islands Mergers and Consolidations*," 18 *The M&A Lawyer* 11 (2014) by Tony Heaver-Wren and Andrew Jackson:

"1. Fair value is the value to the shareholder of his proportionate share of the business as a going concern, save where it is worth less on a net assets (i.e. liquidated) basis as at the merger date: ex hypothesi the shareholder has bought into the company as a going concern, not in anticipation of participating in a liquidation, and it follows that, when he elects to dissent from a merger or consolidation brought about at the behest of the majority, he is thereafter deprived of his proportionate share of an active enterprise and is entitled to be compensated for it. In determining the measure of such compensation, the Court should be guided by the following considerations:

(a) Fair value does not include any premium for forcible taking (i.e., expropriation of the shares).

(b) It is neither appropriate nor permissible to apply a minority discount when making the determination."

At para. 27, he expressed his conclusion as follows:

"In conclusion, the court is therefore required to determine the fair value of Integra's business as a going concern as at the valuation date, meaning at the point immediately before the merger was approved. The fair value of the respondents' shares is their proportionate share of this amount without any minority discount or any premium for the forcible taking of their shares. There is no presumption that the fair value offer made by Integra on July 2nd, 2014 in accordance with s.238(8) constitutes a minimum price and it is open to the court to determine that the fair value is less than US$10 per share."

42    The second case (although the first in time) is the decision of the Privy Council on appeal from this court in *CVC/Opportunity Equity Partners Ltd. v. Demarco Almeida (5)*. That case arose in the following way. As I have indicated in para. 36 above, s.994 of the Companies Act 2006, which gives a remedy in cases of unfair prejudice, has no direct parallel in Cayman law. In this jurisdiction, the only remedy available to a minority shareholder who alleges that the company's affairs have been conducted in a manner oppressive to him is to petition for the winding up

of the company on the just and equitable ground; although s.95(3) of the Companies Law now gives the court power to make a range of alternative orders, including an order for a buy-out of shares, on a just and equitable winding-up petition. A threat to present such a petition will often have the effect that the majority shareholders make an offer to buy the shares of the minority in order to avert the risk that the company will be put into liquidation. The purpose of the offer will be to encourage the court to make an order for the acquisition of the shares under s.95(3). So long as the offer is of an "appropriate" amount, the court will restrain presentation of a petition. That is what happened in *CVC/Opportunity.* There, the issue was as to the appropriateness of the offered price; and the outcome was that the minority shareholder was entitled to an offer that reflected his interest in the business as a going concern and was not subject to a minority discount. The opinion of the Board was delivered by Lord Millett, and it is necessary to quote a substantial part of what he said under the heading "The basis of the valuation" (2002 CILR 77, at paras. 41–46):

"41    The parties cannot be expected to agree upon the monetary value of Mr. Demarco's interest. This is a matter of judgment and opinion, and their respective advisers may be expected to disagree. But there should be no difficulty in agreeing the basis of valuation and the machinery for resolving any disagreement. There are essentially three possible bases on which a minority holding of shares in an unquoted company can be valued. In descending order these are: (i) as a rateable proportion of the total value of the company as a going concern without any discount for the fact that the holding in question is a minority holding; (ii) as before, but with such a discount; and (iii) as a rateable proportion of the net assets of the company at their break-up or liquidation value.

42    Which of these should be adopted as the appropriate basis of valuation depends on all the circumstances. The choice must be fair to both parties, and it is difficult to see any justification for adopting the break-up or liquidation basis of valuation where the purchaser intends to continue to carry on the business of the company as a going concern. This would give the purchaser a windfall at the expense of the seller.

43    If the going-concern value is adopted, a further question arises as to whether a discount should be applied to reflect the fact that the holding is a minority one. An outsider would normally be unwilling to pay a significant price for a minority holding in a private company, and a fair price as between a willing seller and a willing purchaser might be expected to reflect this fact. It would seem to be unreasonable for the seller to demand a higher price from an unwilling purchaser than he could obtain from a willing one. Small private companies commonly have articles which restrict the transfer of

382

shares by requiring a shareholder who is desirous of disposing of his shares to offer them first to the other shareholders at a price fixed by the company's auditors. It is the common practice of auditors in such circumstances to value the shares as between a willing seller and a willing buyer and to apply a substantial discount to reflect the fact that the shares represent a minority holding.

44    The context in which the shares fall to be valued in a case such as the present is, however, very different. Mr. Demarco is not desirous of disposing of his shares. He would rather keep them and continue to participate in the management of the company. It is Opportunity's conduct in excluding him from management that has driven him, however reluctantly, to seek to realize the value of his investment. In this situation the case law in England is that normally the shares should be valued without any discount: see, *e.g. In re Bird Precision Bellows Ltd. . . . Virdi* v. *Abbey Leisure Ltd. . . .* and *O'Neill* v. *Phillips . . .* In *In re Bird Precision Bellows Ltd.* ([1986] Ch. at 667), Oliver, L.J. cited with evident approval the observations of Nourse, J. (as he then was) at first instance where he said ([1984] Ch. at 430):

> 'I would expect that in a majority of cases where purchase orders are made under section 75 in relation to quasi-partnerships the vendor is unwilling in the sense that the sale has been forced upon him. Usually he will be a minority shareholder whose interests have been unfairly prejudiced by the manner in which the affairs of the company have been conducted by the majority. On the assumption that the unfair prejudice has made it no longer tolerable for him to retain his interest in the company, a sale of his shares will invariably be his only practical way out short of a winding up. In that kind of case it seems to me that it would not merely not be fair, but most unfair, that he should be bought out on the fictional basis applicable to a free election to sell his shares in accordance with the company's articles of association, or indeed on any other basis which involved a discounted price. In my judgment the correct course would be to fix the price pro rata according to the value of the shares as a whole and without any discount, as being the only fair method of compensating an unwilling vendor of the equivalent of a partnership share. Equally, if the order provided, as it did in *In re Jermyn Street Turkish Baths Ltd. . . .* for the purchase of the shares of the delinquent majority, it would not merely not be fair, but most unfair, that they should receive a price which involved an element of premium.'

383

To require Mr. Demarco to submit not only to his exclusion from the company but to the acquisition of his shares at less than their going concern value by a purchaser which intends to carry on the business is hardly less unfair.

45   The rationale for denying a discount to reflect the fact that the holding in question is a minority holding lies in the analogy between a quasi-partnership company and a true partnership. On the dissolution of a partnership, the ordinary course is for the court to direct a sale of the partnership business as a going concern, with liberty for any of the former partners who wish to bid for the business to do so. But the court has power to ascertain the value of a former partner's interest without a sale if it can be done by valuation, and frequently does so where his interest is relatively small: see *Syers* v. *Syers* (7). But the valuation is not based on a notional sale of the outgoing partner's share to the continuing partners who, being the only possible purchasers, would offer relatively little. It is based on a notional sale of the business as a whole to an outside purchaser.

46   In the case of a company possessing the relevant characteristics, the majority can exclude the minority only if they offer to pay them a fair price for their shares. In order to be free to manage the company's business without regard to the relationship of trust and confidence which formerly existed between them, they must buy the whole, part from themselves and part from the minority, thereby achieving the same freedom to manage the business as an outside purchaser would enjoy."

43   The dissenting shareholders placed great reliance on this passage. They pointed out that they were no more "desirous of disposing of [their] shares" than Mr. Demarco had been in that case: under the terms of s.238(7) the consequence of their dissent was that they automatically ceased to be shareholders in the company, and the offer subsequently made to them by the company was unacceptable. They were being forced to give up their investment in the company, whereas following the merger the business would continue as a going concern. To require them to submit not only to their exclusion from the company but to the acquisition of their shares at less than their going-concern value by a purchaser which intended to carry on the business would, just as in Mr. Demarco's case, be most unfair. The passage demonstrated that, at least so far as concerned minority discounts, the public policy of the Cayman Islands coincided with that of Delaware.

44   In my judgment, neither the passage I have cited, nor *CVC/Opportunity* (5) read as a whole, supports the dissenting shareholders' case. The statements on which the dissenting shareholders rely are all premised on the existence of a relationship of trust and confidence that

384

means the company is to be regarded as a quasi-partnership: see in particular para. 41, but also the references to quasi-partnership in the quotation from Nourse, J.'s judgment in *Bird Precision Bellows* (3), to exclusion from management in para. 40, and to the relationship of trust and confidence in para. 42. As I have said when discussing the English unfair prejudice cases, it is established as a general rule that a minority discount will be applied unless the case is one of quasi-partnership; and *CVC/Opportunity* is consistent with that general rule. It is, however, only "in the case of a company possessing the relevant characteristics" that the shares will be valued as a proportion of the value of the company itself; and it is plain that Shanda is not a quasi-partnership company.

### Discussion

45   As the authorities I have cited demonstrate, the position in relation to the availability of minority discounts differs between Delaware and Canada on the one hand and England and Wales and Bermuda (and to a extent BVI) on the other. In Delaware and Canada it is established that no minority discount is to be applied; in England and Wales, the fact that shares are to be acquired at a discount is no obstacle to a squeeze out or scheme of arrangement, and the application of a discount is the general rule where shares are purchased in the context of an unfair prejudice claim unless the company is a quasi-partnership. The position in Bermuda follows the English rule in unfair prejudice cases, and BVI permits (although does not prescribe) a minority discount. Although the English cases do not concern an appraisal mechanism, or deal with a statutory standard of fair value, they are concerned with fair value of the shares: see the explicit references to fairness in *Re Hoare* (12), *In re Grierson* (11), para. 13 of *Re Linton Park* (17) and para. 38 of *CVC/Opportunity* (5). The same applies in Bermuda (see para. 5 of *Golar* (10)) and explicitly in the BVI legislation.

46   In para. 75 of his judgment in the present case, the judge recorded that when s.238 was introduced the Hon. G. Kenneth Jefferson noted, when moving the second reading of the Companies (Amendment) Bill 2009 in the Legislative Assembly, that "this Bill responds to requests from the private sector in relation to merger and consolidation provisions and reflects extensive consultation with the private sector as well as the review of Bermuda, BVI, Delaware and U.K. legislative precedents" (Official Hansard Report, 2008/2009 Session, at p.1050, March 20th, 2009). In para. 76, he said that it therefore appeared that Delaware was one of the jurisdictions whose statutory merger law was reviewed, although there was no indication that s.238 was intended to implement or closely follow the Delaware model in particular; and in para. 79 he said that "Delaware was perhaps particularly in mind since it was mentioned as being one of the jurisdictions whose laws had been reviewed and the jurisdiction with

the most substantial and sophisticated jurisprudence in the area." For my part, I do not think that the statement made in the Legislative Assembly provides any assistance in the interpretation of s.238. The jurisdictions said to have been reviewed do not necessarily provide consistent answers to the problems capable of arising from an appraisal regime, and in the case of minority discounts they provide different answers. Moreover, the appraisal regime to which s.238 bears most similarity is that of Canada, but its legislation is not said to have been reviewed. That is not to say that the Delaware jurisprudence is incapable of being of help in the interpretation of s.238: it is, as the judge remarked, frequently used and has given rise to a large number of cases and a well-developed jurisprudence. So long as that jurisprudence does not conflict with Caymanian law and practice, it is sensible to look to Delaware for assistance in solving problems that are novel to Cayman but not to Delaware. There is no point in trying to reinvent the wheel. I think, however, that the judge went too far when he said in para. 79 that "when this Court comes to consider the meaning under Cayman law of the terms used in and language of section 238 it is entirely appropriate to have regard to and pay close attention to the decisions of the courts in Delaware (and Canada)," and that it was "preferable, where possible, to ensure consistency of approach by focusing on one rather than a multiplicity of jurisdictions."

47    As the judge himself recognized, again in para. 79, "it will also be necessary always to take care and be satisfied that the law and practice developed by such other courts fits and is consistent with other relevant parts of Cayman law and practice." The judge appears not to have been alerted to the possible relevance of the squeeze out and scheme of arrangement regimes, and in relation to English law was taken only to the unfair prejudice regime—which he held was clearly distinguishable, on the ground that it assumed a sale of the shares, whereas s.238 required an assessment of fair value and so was not predicated on a sale. Since the English cases are concerned with fair value, this does not seem to me to be an adequate ground of distinction. It is possible that, had the judge been directed to the other regimes, he would have taken a different view; but be that as it may, it appears to me that in relation to the question of minority discount the judge failed to ensure that his application of the Delaware rules was consistent with other relevant parts of Cayman law.

48    As is made clear by the quotation from *Dell* (9) set out in para. 32 above, the Delaware approach to fair value is heavily influenced by, if not based on, considerations of public policy. The relevant policy appears to be that stated at the end of the quotation, also set out in para. 32 above, from *Cavalier* (6):

"More important, to fail to accord to a minority shareholder the full proportionate value of his shares imposes a penalty for lack of control, and unfairly enriches the majority shareholders who may

386

reap a windfall from the appraisal process by cashing out a dissenting shareholder, a clearly undesirable result."

So stated, the policy is in direct conflict with what was said in *In re Grierson* (11) (para. 35(a) above) ([1968] Ch. at 35 and 36–37):

> "Then it is said that the price . . . does not reflect the advantages to Holts by their obtaining complete control of the company . . . But, in my judgment, it is not unfair to offer a minority shareholder the value of what he possesses, i.e., a minority shareholding . . . [T]he element of control is not one which ought to have been taken into account as an additional item of value in the offer of these shares."

49   In my judgment, it is the latter policy which should prevail. As I have pointed out, the squeeze out provisions interpreted in *In re Grierson* and *Re Hoare* (12), and the scheme of arrangement provisions considered in *Re Linton Park* (17), are replicated in ss. 86, 87 and 88 of the Companies Law in this jurisdiction. Those provisions are capable of being used to acquire the shares of a dissenting minority on a takeover, merger or consolidation. The position in the Cayman Islands is accordingly that there are now three mechanisms contained in the Companies Law by which the shares of dissentients may be acquired: by squeeze out with a 90% majority, by scheme of arrangement with a 75% majority, and under s.238 with a two-thirds majority. Assuming, as I do, that the English approach to squeeze out and scheme of arrangement acquisitions would be applied in the Cayman Islands, those two mechanisms allow a minority discount to be applied to the cost of acquisition of dissentients' shares. It seems to me unlikely in the extreme that the simplified merger and consolidation regime introduced as Part XVI of the Companies Law was intended to depart from that approach: it is to be presumed that the three mechanisms, contained in the same piece of legislation and capable of serving the same purpose in different ways, are to be construed from the same standpoint. Nothing in the wording of s.238 suggests that a different approach was intended; indeed, as Shanda pointed out, there is nothing in the wording of the section that suggests that the focus is to be on the value of the company rather than on the value of the shares. The absence of such wording is overcome in Delaware by the application of policy considerations; and in Canada the rationale for the exclusion of a minority discount is said to lie in the context, which is in effect that the majority are purchasing the shares of the minority in order to consolidate their existing position (see *Kummen* (15), referred to in para. 34 above). However, that is also the context in which shares may be purchased by squeeze out or scheme of arrangement, and in England that context does not have the effect of requiring the shares to be valued as a proportion of the value of the company itself.

387

50   For these reasons, it appears to me that s.238 requires fair value to be attributed to what the dissentient shareholder possesses. If what he possesses is a minority shareholding, it is to be valued as such. If he holds shares to which particular rights or liabilities attach, the shares are to be valued as subject to those rights or liabilities. As a matter of mechanics, this can be done by adjusting the value that the shares would otherwise have as a proportion of the total value of the company; but failing to make such adjustments means that particular rights or liabilities will often be ignored, and the shares will be valued as something they are not. It follows that the judge (and Jones, J. in *Integra* (13) before him) was wrong to hold that a minority discount should not be applied in the assessment of the value of the dissenting shareholders' shares. I would allow Shanda's appeal on the minority discount point.

**Interest**

51   Shanda's other complaint is about the judge's award of interest.

52   The rate of interest awarded by the judge was 4.295%, being the midpoint between 3.5% (being the rate at which he decided Shanda could have borrowed the amount representing the fair value of the dissenting shareholders' shares in order to pay it to them) and 5.09% (being the rate which he decided prudent investors in the position of the dissenting shareholders could have obtained, had they had the money to invest).

53   In adopting a midpoint approach the judge followed the approach taken by Jones, J. in *Integra* (13) and by the Delaware courts. He recorded that Jones, J. had said that the provision for a fair rate of interest appeared to have been reproduced from an earlier version of s.262(h) of the Delaware General Corporations Law, and then cited the following passage from  and paras. 76–77):

"72   … The Delaware courts interpreted this provision in a way which involves balancing the rate which the surviving corporation would have had to pay to borrow funds and the rate which a prudent investor could have earned on cash or cash equivalents during the relevant period. The 'legal rate' payable on judgment debts was treated as a useful default rate in cases where the parties failed to adduce any relevant evidence (*Cede & Co. Inc.* v. *MedPointe Healthcare Inc.* (1)).

73   The 'legal rate' under Delaware law is the equivalent of the 'prescribed rates' payable on judgment debts under the Judgment Debts (Rates of Interest) Rules in the sense that it is the statutory rate payable on judgment debts, but I have no evidence about the way in which the Delaware rate is fixed. The prescribed rates applicable in this jurisdiction are fixed from time to time by the Rules Committee for a basket of different currencies using the following formula:

three-month LIBOR (or equivalent) rounded to the nearest one-eighth percent plus two percentage points or increased by 125%, whichever is the greater. The prescribed rate for US$ has been fixed at 2.375% since February 1st, 2013 . . .

76    The respondents [dissenting shareholders] have not adduced any evidence about the effective rate of interest which they actually earned or which a prudent investor could reasonably have expected to earn on cash or cash equivalents during the relevant period. Integra's audited consolidated financial statements reflect that it had the equivalent of US$59,468,000 in cash and cash equivalents as at December 31st, 2013 but the notes do not disclose the results of its cash management operations . . . In the absence of any affidavit evidence about the way in which Integra has actually been managing its treasury operation during the period since the merger, I think that it is reasonable to assume that it was generating around 0.2% per annum.

77    Counsel for the respondents submits that the court should adopt a mid-rate between the prescribed rate for US dollars (2.375%) and Integra's assumed US dollar borrowing rate (9.7%), which would be 6.0375% per annum. There is no obvious logic to this submission. The prescribed rate does not reflect the rate which a judgment creditor can expect to earn on cash deposits. The mid-rate between Integra's assumed return on cash (0.2%) and Integra's assumed US dollar borrowing rate (9.7%) is 4.95% per annum. I conclude that this is a 'fair rate of interest' which should be awarded to the respondents from July 2nd, 2014 until payment."

54    The judge also cited, as representing the proper approach for him to adopt, the following passage from the judgment of Noble, V.C. in *Cede* v. *MedPointe Healthcare* (7), referred to by Jones, J.:

"The award of interest serves two important purposes. First, '[i]t compensates the plaintiff for the loss of the use of his money during this period,' and thus 'endeavors to place the dissenting shareholder in the position she would have been in had the corporation promptly paid the value of her shares.' Second, 'it forces the surviving corporation to disgorge the benefit it received from having the use of the plaintiff s funds.'

'In determining the fair rate of interest, the Court may consider all relevant factors, including the rate of interest which the surviving or resulting corporation would have had to pay to borrow money during the pendency of the proceeding.' In addition to looking to the company's cost of borrowing, or 'borrowing rate,' the Court 'has historically examined the return that a prudent investor would have received if he had invested the judgment proceeds at the time of the

merger.' The Court may also consider the legal rate of interest; indeed, '[t]he legal interest rate serves as a useful default rate when the parties have inadequately developed the record on the issue.'

The Petitioners' argument that the interest rate should be based solely on the borrowing rate or the rate 'a prudent investor would require to provide a substantial unsecured loan to the Respondent' must be rejected. As noted above, this Court traditionally looks at both the 'prudent investor rate' and the 'borrowing rate' in fixing the interest rate and the Petitioners have provided no compelling argument as to why this Court should deviate from this practice. Awarding the proposed [unsecured loan] interest rate of 9.949% would grant an 'undeserved windfall' given the volatility of the market."

55    The judge then said this, starting at para. 19 of the fair interest ruling:

"19. The Vice Chancellor's explanation of the purpose of the statutory right to an award of a fair rate of interest seems to me to be consistent with the nature and purpose of the statutory jurisdiction and language—to protect the dissenting shareholders from the effects of the forced merger and in particular to compensate them for being out of their money and to fix a 'fair' rate of interest. Furthermore, the need to take into account all relevant factors having regard to the facts of the case also seems to me to be what is required in order to ensure that a fair rate is used.

20. It also seems to me that the balancing of interests and positions involved in the midpoint approach is consistent with the statutory mandate to establish a fair rate. Interest should address the dissenting shareholders' financial disadvantage of being out of their money. The disadvantage materialises either in loss of earnings on the funds or in the costs of having to borrow a loan to substitute for the funds not received. Equally the debtor gains a financial advantage through withholding the sums payable to the dissenting shareholders. In the meantime he or she can yield returns from investing the funds or avoid the cost of a loan. Therefore the non-payment of a sum of money results in what can be described loosely as an unjustified enrichment of the debtor. It follows that for the assessment of the financial consequences of the delay two different perspectives have to be borne in mind. The mid-point approach achieves this. In some respects the exercise which the Court is required to undertake is similar to that which the Court undertakes when exercising its discretion under section 34(1) of the Judicature Law (2013 Revision) to award interest on a debt or damages in respect of which a judgment is awarded.

21. I accept that the Court may have regard to the prescribed rate (that is the statutory rate of interest payable on judgment debts which

390

C.A.                                                 IN RE SHANDA GAMES

is 2.375% for U.S. dollars, as set out in the Judgment Debts (Rates of Interest) Rules 2012) as a reference point, particularly in cases where there is no or insufficient evidence filed by the parties. However, it does not seem to me appropriate to place much weight on it. Had the intention been to use the prescribed rate section 238(11) could easily have referred to it. Furthermore, the statutory requirement to establish a fair rate, as I have noted, does seem to me to involve taking into account the purpose of the requirement to pay interest and to balance the position of and impact of the delay in payment on both the company (debtor) and the dissenting shareholders."

56    It was common ground before the judge that the midpoint approach was the correct one to adopt. On appeal, however, Shanda asserted that that approach was inconsistent with the purpose of an award of interest under English (and hence Caymanian) law, and that the judge had accordingly erred in principle. He should instead have awarded a rate representing only the cost to the dissenting shareholders of being deprived of their money, which was conventionally to be assessed as equivalent to the rate which they would have had to pay to borrow money to replace the unpaid fair value of their shares. The rationale for that conventional basis was that the payee could by borrowing an equivalent sum have done exactly the same as he would have done if the money had been paid, so that his loss was not the lost opportunity to deploy the money but the cost of making the borrowing. In the present case, neither party had led any evidence of the cost to the dissenting shareholders of borrowing: instead, working on the basis that the midpoint approach applied, they had supplied information about Shanda's cost of borrowing and the likely investment return to a prudent investor in the position of the dissenting shareholders. This meant that, if the Court of Appeal accepted that the judge had erred in principle, there would be no material on which it could arrive at a proper interest rate. It could therefore either remit the matter to the judge, or in default of anything else award interest at the judgment rate of 2.375% for US dollars.

57    The cornerstone of Shanda's argument on this point was the following passage from the judgment of Steyn, J. concerning interest on damages in *Banque Keyser Ullman SA* v. *Skandia (UK) Ins. Co. Ltd.* (2) ([1987] Lexis Citation 1106):

"The issue of the appropriate rates of interest must now be considered. The selection of an appropriate interest rate is a matter of discretion. But it is not an entirely open textured discretion. A practical and consistent approach has emerged. The purpose of the award of interest is to achieve restitutio in integrum. The enquiry does not focus, in a case such as the present, on the profit to the defendant of the use of the money. It is directed to an estimation of the cost to the plaintiff of being deprived of the money which he

391

should have had. But for practical reasons courts will not allow an enquiry into the plaintiff's actual loss. To do so might sometimes involve enquiries, in relation to the ancillary relief of interest, approximating the length of the trial. Instead, in cases such as the present, courts award a commercial rate of interest or the rate which somebody in the position of the plaintiff would have had to pay to borrow the money. In the interests of a cost effective administration of civil justice, the courts must adopt a fairly broad brush approach to the award of interest. On the other hand, in the light of the overriding criterion of fairness, the courts are vigilant to ensure that the broad brush approach does not become too blunt an instrument.

. . .

On this question I have been assisted by a judgment of Forbes J in Tate & Lyle Food and Distribution Ltd v Greater London Council [1981] 3 All ER 716, [1982] 1 WLR 149. In dealing with the approach to be adopted Forbes J said (at p 154C–E):

> 'I feel satisfied that in commercial cases the interest is intended to reflect the rate at which the plaintiff would have had to borrow the money to supply the place of that which was withheld. I am also satisfied that one should not look at any special position in which the plaintiff might have been: one should disregard, for instance, the fact that a particular plaintiff, because of his personal situation, could only borrow money at a very high rate or, on the other hand, was able to borrow at specially favourable rates. The correct thing to do is to take the rate at which plaintiffs in general could borrow money. This does not, however, to my mind, mean that you exclude entirely all attributes of the plaintiff other than that he is a plaintiff. There is evidence here that large public companies of the size and prestige of these plaintiffs could expect to borrow at 1 per cent over the minimum lending rate, while for smaller and less prestigious concerns the rate might be as high as 3 per cent over the minimum lending rate. I think it would always be right to look at the rate at which plaintiffs with the general attributes of the actual plaintiff in the case (though not, of course, with any special or peculiar attribute) could borrow money as a guide to the appropriate interest rate.'

> That is, if I may say so, a sensible and practical approach. All I would respectfully add is that an issue as to the appropriate categorisation of a particular plaintiff involves the exercise of judicial discretion."

58    I accept that this statement accurately represents the position in England. It is important, however, to appreciate that it is a statement about

392

the principles to be applied in assessing interest on damages. Such an assessment can of course be made only when damages have been awarded, and damages can be awarded only when some right of the plaintiff has been infringed. The purpose of an award of interest will be to ensure that the plaintiff is put back, so far as money can, in the position he would have been in had his right not been infringed. That inevitably places the focus solely on the plaintiff: it is only his position that is of relevance. A s.238 determination, however, does not proceed on the basis that any right of the dissentient shareholder has been infringed by the company. The legislative concern is not to restore him to some anterior position but to ensure that he receives fair value for what he is obliged by statute to give up. In my view, that has the effect when it comes to an assessment of the fair rate of interest of removing the entire focus from the dissentient and instead placing it on the entirety of the circumstances. When those circumstances are considered, it is right to say—as the judge did—that both the disadvantage to the dissentient and the advantage to the company should be taken into account. To adopt the midpoint approach is a logical way of balancing the advantage and disadvantage, with a fall-back reliance on the judgment rate—which must theoretically itself represent a rate deemed to be fair— if the evidence supports no other conclusion. Although it is possible to take the view that the cost of borrowing is a better measure of the dissentient's loss than the putative investment returns a prudent investor in his position could have achieved, both measures represent the dissentient's lost opportunity and consequently the disadvantage to the dissentient of being out of his money. Overall, it seems to me that Jones, J. and the judge were right to adopt the (former) Delaware practice in relation to the award of interest. That practice, as explained in *Cede* (7), provides a principled approach that is not in conflict with Caymanian law or practice. Accordingly, I consider that the judge did not err in principle in his approach to the assessment of a fair rate of interest. It was accepted by Shanda that, if the judge had applied the right principle, there was evidence on which he was entitled to reach the conclusion he did about the fair rate.

59   For these reasons, I would dismiss Shanda's appeal in relation to interest.

### The dissenting shareholders' appeal

60   The dissenting shareholders complain about three aspects of the judge's judgment, each of them relating to an element of the methodology to be applied in determining the fair value of Shanda's business, and hence of the dissenting shareholders' shares. These elements are (1) a component—known as beta—of the discount rate to be applied in the discounted cash flow analysis adopted by the experts as the appropriate method of valuing Shanda's business; and (2) the measure of market

393

capitalization to which to apply a small stock risk premium ("SSRP"); and (3) the growth rate during the terminal period.

*Context*

61    Professor Jarrell and Mr. Inglis agreed that Shanda's business was to be valued by use of a discounted cash flow ("DCF") model. As its name indicates, a DCF analysis contains two main elements: a prediction of future cash flows, and the application to those cash flows of a discount rate so as to translate the future cash flows into a present capital value. In effect, the exercise is designed to identify how much it would have cost at the valuation date to buy an investment with a rate of return and a risk profile equivalent to that of the company's business.

62    As a result, the discount rate will generally be taken as the expected rate of return on equivalent investment opportunities in the capital markets, also known as the weighted average cost of capital ("WACC") of the company. The weighting exercise implicit in determining the WACC involves estimating the cost of equity of a company and its debt. It was common ground in the present case that Shanda would have no debt, so the only assessment required was of the cost of its equity. Assessment of the cost of equity is ordinarily done, and was in this case done, through use of a capital asset pricing model ("CAPM"). A CAPM starts by assessing the rate of return on a risk-free investment, and then adjusting that rate upwards to take account of risk factors. One such factor is systematic risk, which is the risk represented by the relevant market as a whole. This systematic risk is reflected in an equity risk premium; and the equity risk premium is in its turn multiplied by a factor, beta, which measures the risk represented by a particular investment relative to the risk of the market as a whole. A further factor which may be added is a size premium, reflecting the possibility that equity investors will require a higher expected return from small companies to compensate for the greater risk associated with them. Each of these factors has the effect of increasing the discount rate and consequently decreasing the value; but because beta is used to multiply one of the factors, rather than being added as a separate factor, small changes to it are capable of having large effects on the discount rate, and consequently on the value. I take as an example of the operation of a CAPM Mr. Inglis's initial report, in which he proposed a discount rate of 10.24% derived from a CAPM made up as follows: 2.27% as the risk-free rate, equal to the yield on 10-year US government bonds; plus 6.00%, being (a) an equity market risk premium of 6.00% as the expected rate of return of the market in excess of the risk-free rate, multiplied by (b) 1.00, his estimate of Shanda's equity beta, based on the betas of Chinese games companies listed on the NASDAQ; plus a small stock risk premium of 1.07%; plus 0.90% as a country risk premium for perceived additional economic, financial, or political risk

394

associated with investment in China. The values given by Professor Jarrell to the various factors were different; but the most significant difference was his use of a beta of 1.78 as opposed to Mr. Inglis's 1.00, a difference which is said on its own to have had the effect of reducing the value of each of Shanda's ADSs by US$9.06.

63    Predicting future cash flows typically involves estimating cash flow in two, or sometimes three, periods: a finite future period, at the end of which the company will ordinarily be expected to have achieved a steady state or maturity; perhaps a transitional period, designed to iron out possible future volatility in the cash flows; and a terminal period. Cash flows in the first period, and to some extent in the transitional period, will be based on, or at least have regard to, the company's past performance and its own estimates of its likely future earnings; whereas cash flows in the terminal period will usually be derived from a formula designed to project indefinitely into the future as a constant the rate of growth identified at the conclusion of the prior stage or stages, by which time the rate of increase or reduction in cash flow will have stabilized.

64    In the present case, the judge had to resolve disputes between the experts relating to whether cash flows should be estimated in two stages or three; as to whether cash flows in the first period should be based on the company's own management projections or on figures derived from the performance of similar companies; as to how certain elements of the company's business, in particular the likely performance of one of its internet games, should be reflected in the cash flow estimates; and as to how the discount rate should be ascertained. Only three of his conclusions on valuation methodology are now disputed, all of them by the dissenting shareholders. The first two concern the judge's assessment of beta ("the beta point") and the small stock risk premium ("the SSRP point") in the ascertainment of the discount rate; the third of them arises out of his decision to adopt a three-stage approach to the assessment of cash flows ("the transitional period point").

**The beta point**

65    As I have said, beta is a measure of the risk of a particular investment relative to the systematic risk of the market as a whole. Because it focuses on the special risk attaching to a particular investment, it requires identification and assessment of particular elements of risk associated with that investment. In this case, the notional investment was Shanda's business, and the exercise involved identifying and valuing risk factors associated with that business. At para. 147 of his judgment, the judge identified six differences of approach to this topic between the experts as follows:

"(a). Should Shanda's beta estimate be based solely on data relating to the period (and has Mr Inglis established that Professor Jarrell's beta estimate is unreliable because of his use of a measurement period) that ended prior to the public announcement of the First Buyer Group's proposal on 27 January 2014 (is Professor Jarrell's beta estimate out of date) (the staleness point)?

(b). Should Shanda's beta estimate ignore (and has Professor Jarrell established that it is appropriate to use) data relating to the period of the China effect in U.S. markets occurring from early 2011 to late 2013 (the China effect point)?

(c). Should Shanda's beta estimate be based only on directly measured betas or only on indirectly measured betas and if indirect betas can be used is the peer group selected by Mr Inglis sufficiently comparable so that they can be used in the estimate of Shanda's beta (the direct/indirect betas point)?

(d). What should the measurement period be—should it be 4.3 years or two years (the measurement period point)?

(e). Should weekly or monthly returns be used (the weekly/monthly returns point)?

(f). If monthly returns are otherwise preferable, should Shanda's beta be estimated using monthly returns measured from month end to month end (the month end measurement point)?"

66    The judge considered these points in turn and expressed a conclusion on each of them as follows:

The staleness point: "It seems to me this issue is finely balanced. Mr Inglis has raised a serious doubt as to the reliability of Professor Jarrell's use of and sole reliance on the pre-deal announcement data. Professor Jarrell's response does provide some evidence that Shanda's beta is unlikely to have changed in the period between that announcement and the Valuation Date but that is not conclusive or completely convincing for the reasons given by Mr Inglis. The gap between the date of the observations and the Valuation Date and the failure to use any more recent data does in my view raise doubts about the reliability of Professor Jarrell's beta estimation. While it would be possible to show that there was no problem if there was sufficient evidence to demonstrate that Shanda's beta had or was likely to have remained constant (and I agree that the peer companies otherwise relied on by Mr Inglis to support his estimate of Shanda's beta are a good guide for doing so), Professor Jarrell's analysis, and the results of his comparison with the betas of the peer companies, did not seem conclusive or clear-cut" (para. 149(e)).

396

The China effect point: "Once again the evidence is finely balanced. But I am satisfied that there is sufficient evidence of the problem identified by Mr Inglis to raise material concerns that the data derived during the relevant period has been subject to exceptional and distorting effects such that it might be unreliable and result in an error in the beta estimate" (para. 150(f)).

The direct/indirect betas point: "In my view NetEase Inc (despite the revenue differences highlighted by Professor Jarrell) is sufficiently comparable with Shanda to be a useful and reliable peer company for the purpose of calculating Shanda's beta. Changyou also has a significant number of points in common and on balance I am satisfied that it is appropriate to use it in the estimate of Shanda's beta. I find it more difficult to assess, on the evidence, how close the comparison is with the U.S. companies but I have not been convinced by the evidence of Professor Jarrell that Mr Inglis's opinion is unreasonable and that they are of no assistance and therefore to be ignored" (para. 151(q)).

The measurement period point: "As with so many issues that arise in relation to the estimate of a company's beta, there are trade-offs between different approaches and it is necessary to make a judgment about which approach is most appropriate on the facts of the particular case. In this case Mr Inglis's use of the shorter two year period has been driven by his view that the data relating to a longer period is tainted. As I have already noted, it seems to me that this is not an unreasonable view in the circumstances. The question then becomes whether a two year period is too short to be reliable and it seems to me to be clear from the cited textbooks and literature that it is not. The further question then arises as to whether the use of a 4.3 year period (ending with the public announcement in January 2014) is clearly preferable. I do not think it is, but neither is two year period clearly preferable either. While the longer period offers the benefits noted in the extract from Professor Damodaran's book quoted in paragraph 152(c) above, and is clearly a measurement period which can be reliable and consistent with the literature, it is in this case subject to the risks of error that Mr Inglis has identified and which I have found to be credible and incapable of being dismissed" (para. 152(d)).

The weekly/monthly returns point: "In the present case the R-squareds [one of two statistical bases for assessing the reliability of a beta estimate, the other being standard error] for the monthly betas were significantly higher than those for the weekly betas. This means that they support the view that the monthly betas [used by Professor Jarrell] capture more of the Shanda specific risk and are therefore more reliable. However the monthly betas have a higher standard error than the daily and weekly betas that [Mr. Inglis] presents and therefore can be considered to be less reliable (since this weekly and daily data is likely to be closer to Shanda's true beta). I see that both these statistical measures are helpful in making the

397

comparison between weekly and monthly measurement period but it seems to me that in this case neither is determinative. R-squared is focussing on how much risk comes from the company rather than the market; standard error focusses on how far away from the true beta the estimated beta could be. The monthly betas are strong on one measure and weaker on the other. However, that does not, in my view, mean that the application of the statistical measures entitles the Court to conclude that one is clearly to be preferred and more reliable than the other" (para. 153(d)).

The month end measurement point: "I have quoted the extract from Professor Jarrell's answer at length because it seems to me to involve a candid admission that he has been unable to dismiss or find a convincing solution to Mr Inglis's challenge to his use of month end observations, which he agrees is 'troubling' and which suggests that there is an arbitrary element in the estimate of beta on such a basis. It appears that this is not an issue that has yet been adequately addressed in the literature or seriously been raised before. The Court is not in a position to resolve the dispute but must assume that there is a material doubt over this approach to calculating betas. It is, on the other hand, correct to say, as Professor Jarrell does, that reliance on monthly betas calculated by reference to month end observations is a frequent and perhaps standard practice but that does not, to my mind, remove the risk that Professor Jarrell's methodology is subject to error" (para. 154(b)).

67    At paras. 155 to 160, the judge set out his conclusions on the beta point. It is sufficient to quote paras. 155 and 160, omitting at this stage a discussion of two Delaware cases (including a decision of Bouchard, Chancellor in *In re Appraisal of DFC Global Corp.* (8)):

"155. I have carefully considered the opinions of both experts, their respective challenges to the reliability of each other's beta measurement and the extensive arguments and submissions made by Mr Meeson and Mr Levy and reached the following conclusions:

(a)   It seems to me that both experts have adopted methodologies which are consistent with accepted practice and the literature and to that extent each is, prima facie, reliable. But each of their estimates is subject to certain risks and problems which the Court is unable to ignore or completely dismiss.

(b)   As I have explained, in my view there are risks of error associated with a beta estimate for Shanda based solely on the use of (i) data gathered in the period before the announcement of the First Buyer Group proposal in January 2014; (ii) data gathered during the period between 2011 and 2013 affected by the US market undervaluation of the shares in Chinese companies; and (iii) monthly betas based on

398

C.A.                                                IN RE SHANDA GAMES

> month end observations. There are also risks of error associated with a beta
> estimate based solely on (i) a small peer group, some of whose members
> are only just comparable with Shanda and where there remains some
> room for argument as to the extent of their compatibility since there are
> a number of points of difference between members of the group and
> Shanda and (ii) weekly betas measured over a two year period where
> on some statistical measures the weekly betas are clearly less reliable
> that the monthly betas.
>
> (c)  It therefore seems to me that in such circumstances it is not safe to rely
>       on just one estimate on its own but preferable (as a way of reducing the
>       risk of error and to take the widest sample available) to use and rely on
>       both estimates. The right course is for the Court to use and combine
>       both estimates and use the average of the two for its beta. It does seem
>       to me to be more reliable in this case to blend and use both the directly
>       and the indirectly measured betas . . .
>
> 160. In the present case, because the issues and uncertainties affecting each
> expert's calculation of beta relate not just to the use of direct or indirect beta I
> consider that the preferable approach is to use an average of Mr. Inglis's beta
> of 1 and Professor Jarrell's beta of 1.78; that is 1.39. Had I used the blending
> approach applied by Chancellor Bouchard and simply added Professor
> Jarrell's directly measured beta to the seven peer companies identified by Mr
> Inglis the result would have been 1.2925. The difference in this case will no
> doubt have a not immaterial effect on the amount payable to the dissenting
> shareholders but for the reasons I have given I prefer and will adopt the former
> approach."

68   Before I come to the dissenting shareholders' complaints about the judge's
decision on the beta point, I think it desirable to point out some of the key features
of the passage I have just quoted. First, as appears from para. 155(a), the judge took
the view that both experts had adopted methodologies that were *prima facie*
reliable, but the estimates of both were nevertheless subject to risks and problems
that could not be ignored or completely dismissed. Secondly, para. 155(b) falls into
two parts: the first part, from the beginning to the words "month end observations,"
identifies problems with views expounded by Professor Jarrell; the second part,
from the words "There are also risks of error" to the end, does the same with views
expounded by Mr. Inglis. Thirdly, the opening words of para. 160 make explicit
that there were issues and uncertainties affecting the calculation of beta put forward
by both experts. All of this is consistent with the phraseology used by the judge
when setting out his conclusions on the six differences of approach. In essence, the
judge's position was that there was something to be said for the methodology and
outcome

adopted by each expert, but neither of them was immune from criticism. As he put it in para. 158:

> "Of course, I have not concluded on the beta issue that each approach is realistic and without risk. Instead, I have taken the view that both approaches are essentially or prima facie reasonable but because of risks identified in relation to each the best approach, which minimises the risk involved, is to use and combine both estimates."

69   The dissenting shareholders contended that the judge was wrong to arrive at his figure for beta by averaging the beta figures put forward by the two experts. He should instead have disregarded Professor Jarrell's beta in its entirety and simply adopted Mr. Inglis's figure; but, if there were a basis for taking account of Professor Jarrell's beta figure, the judge should either have adopted the blending approach suggested by the Delaware jurisprudence or averaged the share values resulting from using each figure for beta. What he had in fact done had unduly favoured Shanda, since averaging the betas did not achieve an equal split in the ultimate value.

70   The foundation for the first part of the complaint, namely that the judge was wrong to place any reliance on Professor Jarrell's beta methodology or outcome, was the assertion that there was no credible support for Professor Jarrell's beta, whereas there was no criticism or identified error in Mr. Inglis's analysis. Professor Jarrell's evidence was described by the judge as "not conclusive or completely convincing," as not seeming "conclusive or clear cut," and on the month end measurement point as involving "a candid admission that he has been unable to dismiss or find a convincing solution" and as being unable to "remove the risk that [his] methodology was subject to error."

71   Whilst it is the case that these remarks were made by the judge about Professor Jarrell's evidence, their selection fails to give anything like the full picture. It is simply impossible to claim that the judge concluded all of the points of difference in favour of Mr. Inglis. The true position, as I have identified in para. 68, was that the judge had found the issues finely balanced, with appropriate methodologies adopted by both experts but with both—not just Professor Jarrell—open to some criticism. Although I accept that the overall impression given by the judgment is that Professor Jarrell came off rather worse than did Mr. Inglis (an impression fortified by the attitude taken by Shanda on the reopen application), in relation to the assessment of beta honours were broadly even. In my judgment, the judge was in those circumstances entitled to approach the assessment of the appropriate beta figure by balancing the proposals put forward by the two experts.

72   The question then becomes whether he chose the correct method of balancing the opposing views. The dissenting shareholders contended that, because of the impact the choice of beta can have on the outcome of a DCF analysis, averaging the two figures unduly favoured Shanda—a result that, even on the basis that there was overall nothing to choose between the experts, could not have been the judge's intention. The first alternative proposed by the dissenting shareholders was a blending approach. This method, which involved blending the company's beta with that derived from a peer group, was adopted in *DFC* (8), and was explained as follows in a passage quoted by the judge:

   "I agree that using DFC's beta in isolation would expose the discounted cash flow model to measurement error. At the same time, the most comparable company to DFC is DFC itself, and in my view it is appropriate to factor DFC's beta into the analysis, a proposition that Dages supports and Beaulne did not rebut. The simplest way to do so is by adding it as a seventh beta in the peer analysis. Although commentary on this approach is somewhat sparse, constructing a beta that blends the company's beta with a peer group's betas finds some support in financial literature and this Court's precedent.

   In the *Golden Telecom* case, this Court supported the theory in two ways. First, the Court used as a peer group an index of NASDAQ-traded telecommunications companies, which the Court noted included the subject company itself. Second, and more importantly, the Court's final beta was a blend of the Company's observed beta, weighted 2/3, and the industry peer group's beta, weighted 1/3. By adding DFC as a seventh 'peer' in the beta calculation, I am essentially performing the same exercise, albeit with a smaller peer group and a more modest weight applied to the subject company than in *Golden Telecom*, to arrive at a final beta weighted 14% (1/7) to DFC's beta and 86% (6/7) to the peer group's betas. Because DFC's own observed beta is a meaningful input alongside the betas of its peers, I consider this weighting preferable to the 0% weighting DFC would receive in the peer-only analysis. I therefore use DFC and its six peers to estimate DFC's beta."

73   The judge's reason for rejecting this balancing method, given in para. 160, was that "the issues and uncertainties affecting each expert's calculation of beta relate not just to the use of direct or indirect beta." As a matter of fact, the judge was plainly right about that: the direct/indirect beta point was one of the six differences between the experts, and it was only one element in their overall estimates of Shanda's beta. Using the blending method by adding Professor Jarrell's direct beta to the betas derived from Mr. Inglis's peer group would have meant that one component of the calculation was treated as determinative of the entire beta, and in my view

401

the judge was entitled to take the view that some other method of resolving the overall difference between the experts would be preferable.

74    The dissenting shareholders' alternative suggestion, that the ultimate values put on the shares by the experts should have been averaged, also suffers from the defect that it places the focus too narrowly. Although the value attributed to beta has a significant effect on a DCF analysis, it is far from being the only element in the analysis. To average the outcome of the entire analysis to reflect an inability to resolve differences affecting one element of it lacks logic. Moreover, the experts had dealt with the components of the valuation on a step-by-step basis, and the judge had no sensible option but to resolve the differences arising at each step. Even so, it was important that he should keep a general eye on the likely effect, individual and cumulative, of his decisions; but it is apparent from para. 160 that he was aware of the potential impact of his decision to average beta, since he said that the difference between the result of averaging and the result of blending would no doubt have a not immaterial effect on the amount payable to the dissenting shareholders.

75    In the circumstances, it appears to me that the judge was entitled to take the view that he could not fairly distinguish between the beta figures suggested by the two experts and that in the absence of a more nuanced solution to the dilemma the most appropriate method of resolution was by averaging the two figures. Accordingly, I would dismiss the dissenting shareholders' appeal so far as it relates to the beta point.

**The SSRP point**

76    As I have indicated, a small stock risk premium reflects the greater risk perceived to be associated with investment in smaller companies. It is ordinarily calculated by reference to Ibbotson tables, now called Duff & Phelps tables. These tables divide companies into categories and ascribe a size premium to each category. There were originally three broad categories; but the tables now also have ten equally populated portfolios, or deciles, based on the market capitalization of listed equity securities from 1926 to 2014. There was no dispute between Professor Jarrell and Mr. Inglis that the tables should be used, but they differed in how to use them in two respects: what value to attribute to Shanda, and whether to place it within the broad categories or within the deciles. Professor Jarrell took the view that Shanda's value should be derived from its last market price before the price was affected by the merger, and that the resulting value should be placed in the appropriate decile. On that basis, he proposed a SSRP of 1.71. Mr. Inglis's position was that Shanda's value should be the value resulting from his DCF analysis, that value being placed in the appropriate broad category. That resulted in a SSRP of 1.07.

77   The judge accepted Professor Jarrell's figure. He quoted extracts from a further Delaware authority, *Merion Capital LP* v. *3M Cogent, Inc.* (18), a decision of Parsons, V.C. that points out that the Ibbotson tables look at the statistical relationship between market capitalization and equity size premium and assume knowledge or estimation of a company's market capitalization, which determines which decile the company falls into. At para. 175, he expressed his conclusion as follows:

> "Vice Chancellor Parson's analysis and the commentary from the other Delaware cases seem to me to provide a convincing explanation of the basis of the Ibbotson tables and support Professor Jarrell's view that their application must be based on the use of market capitalisation established before calculating and without reference to the expert's DCF."

78   The dissenting shareholders contended that the judge had misunderstood Professor Jarrell's evidence, which was in fact that use of an appraised value resulting from a DCF calculation was an acceptable option. He had also misunderstood the effect of the Delaware authorities, and had failed to take into account the changes to Shanda's business occurring during the nearly two years between the last market valuation unaffected by the merger and the valuation date.

79   In his first report, Professor Jarrell explained his approach as follows:

> "Because Duff & Phelps' empirical study of size premiums is based entirely on a ranking of market capitalizations calculated from publicly-traded stock prices, I generally believe it to be most appropriate to rely on the unaffected market value of a subject-company when choosing a size premium, so that I am using exactly the same 'apples-to-apples' basis that Duff & Phelps uses in the construction of those size premiums."

80   Having seen what Mr. Inglis said in his own first report, Professor Jarrell said this in paras. 71 to 73 of his supplemental report:

> "71. In my opinion, when performing a valuation of a publicly-traded company such as Shanda, the first step in determining the appropriate decile size classification is to use the unaffected stock price of that company to obtain a market-based measure for the overall market capitalization of that firm's equity. As stated in the Jarrell Report, this is critically important because Duff & Phelps' empirical study of size premiums is based entirely on a ranking of market capitalizations calculated from publicly-traded stock prices. Duff & Phelps does not perform separate DCF valuations for the thousands of companies in its study. Instead, it simply uses the market capitalizations indicated by publicly traded 'unaffected' stock prices.

403

72. If the Duff & Phelps' size classifications were somehow based on DCF-implied fair values, instead of on market trading prices of all publicly-traded companies, then the boundaries of the size classifications would need to be elevated above what is reported by Duff & Phelps. Using Shanda's DCF-implied fair value to determine a size category that is based on trading prices of publicly-traded companies, as Mr. Inglis does, does not result in an apples-to-apples comparison. Mr. Inglis's mismatched comparison renders his selected size premium unreliable.

73. By using Shanda's unaffected stock price for the determination of its appropriate size premium, I am using exactly the same 'apples-to-apples' basis that Duff & Phelps uses in the construction of those size premiums. In my opinion, this is a much more scientifically valid selection process for a publicly-traded firm than performing 'circular' valuations."

81 Notwithstanding these apparently clear statements, the dissenting shareholders suggested that Professor Jarrell had changed his position in cross-examination so as to accept that Mr. Inglis's use of the fair value derived from his own DCF valuation was permissible. The relevant passage is as follows:

"Q. Yes, there are three possibilities aren't there. There's market cap 22 months before the valuation date.

A. Yes.

Q. Then there is merger price—and that, we say, is bad because nobody contends that that is actually the correct value of the company as at the valuation date.

A. Well, at least it is an objective measure of value.

Q. It is a measure, I agree with that.

A. But I agree with you.

Q. It is an objective measure but it is 22 months old and no one says that is the actual value as at the valuation date.

A. True.

Q. Then you have the merger price. Nobody says that's the actual value at the valuation date?

A. Correct.

Q. It is a measure but everyone says it is wrong.

A. Right.

404

Q. Then you can have—the third alternative, it seems to me, is to use the appraised price as at the valuation date. So the court actually works out what is the value of the company at that date and to use that number to determine the size premium. Those are the only three alternatives, aren't they?

A. Sounds reasonable.

Q. It is a matter for his Lordship, I do not think we need spend a great deal of time—

A. All of this is a matter for his Lordship.

Q. I agree, but his Lordship can choose one of those three or he may come up with a fourth; it is his job to determine it.

A. Correct."

82   I do not consider that this passage bears the weight the dissenting shareholders wish to place on it. To start with, it is confused: it is unclear whether the first six exchanges relate to the unaffected market price or to the merger price. The answer "sounds reasonable" is hardly a wholehearted acceptance of the proposition being put; and it is unclear whether the final answer, "Correct," relates to the whole proposition or merely to the suggestion that it is for the judge to determine matters. Moreover, nothing in the passage I have quoted or in Professor Jarrell's cross-examination taken as a whole suggests that he was intending in this apparently casual way to abandon his central thesis that only use of the unaffected market price was consistent with the way in which the Duff & Phelps tables were compiled.

83   Professor Jarrell had in fact identified precisely what was wrong with Mr. Inglis's proposal when he spoke in his supplemental report of circular valuations: what Mr. Inglis was doing was relying on the outcome of a DCF analysis in order to determine what small stock risk premium should be used in the course of the same DCF analysis. Mr. Inglis was asked about this in the following passage from his cross-examination:

"Q. On the other hand, your DCF approach involves the illogicality of using your output to size one of your inputs.

A. I accept there is a theoretical issue there but in fact, and I have checked this, were I to apply Professor Jarrell's small company stock premium as opposed to my own, I would still be in the same range and still have the same small company stock premium. So while it is a theoretical issue, in this particular case, it is not an actual issue.

Q. But isn't the reason for that that you are using the three broad categories of stock rather than the ten deciles?

405

A.   Yes, well, although funnily enough I have checked the ten decile one, and in fact it is the same conclusion and I would in fact have a slightly smaller company stock premium were I to use the ten decile one."

84   This exchange was said to show that there was no circularity in fact. The argument was that, if Professor Jarrell's SSRP of 1.71 were substituted in Mr. Inglis's DCF calculation for Mr. Inglis's own 1.07, the outcome of the analysis would value Shanda in the same category or decile as Mr. Inglis had chosen in the first place. It was said that another way of demonstrating the point was to assume that the judge had taken Mr. Inglis's SSRP instead of Professor Jarrell's, the effect being to increase Shanda's appraised value from US$4.6 bn. to US$4.9 bn. without affecting the category or decile in which a company of that size fell. In my view, this is merely sleight of hand. In both cases, what is happening is that the ultimate result of the discounted cash flow analysis—whether that carried out by Mr. Inglis or that decided on by the judge—is being used to determine one of the factors in the analysis. That is where the circularity lies; and that it does make a difference in fact is demonstrated by the difference between the US$4.6 bn. that Shanda was valued at on the basis of the judge's decision to adopt Professor Jarrell's SSRP and the US$4.9 bn. that would have been the consequence of adoption of Mr. Inglis's SSRP. The judge approached the DCF analysis on a step-by-step basis, as did the experts, and he was entitled to resolve disputes at each step. He was well aware that the last unaffected quoted price for Shanda's ADSs was arguably out of date, since that was the thrust of the staleness point; but he had held that point to be finely balanced, with evidence going either way on the reliability of the market price; and I do not consider that he can be criticized for taking the view, which was supported by the Delaware authorities he cited, that the way in which the Duff & Phelps tables were compiled meant that the market capitalization was the appropriate measure of Shanda's size and that the unaffected share price was sufficiently reliable to be used for the purpose of ascertaining the SSRP.

85   Accordingly, I would dismiss the dissenting shareholders' appeal on the SSRP point.

**The transitional period point**

86   I have explained the context of the transitional period point in para. 63 above. The judge adopted a three-stage estimation of future cash flows, as Mr. Inglis had proposed, and that approach is not in itself controversial; but the dissenting shareholders complain that the judge's failure to adopt Mr. Inglis's proposal in its entirety, in particular so far as concerns the length of the transitional period, has meant that the overall cash flow figures have been illegitimately understated.

87    The judge's reasons for adopting a three-stage approach were stated in para. 136 of his judgment as follows:

> "As I have noted, the experts agree that a transitional period should be used when the projected revenue growth in the last year of the forecast period is much greater than the constant growth rate assumed for all years thereafter into perpetuity. In the present case, Shanda's forecast assumes growth of 18.5% in 2019 but since Shanda assumes that its business would enter steady state growth thereafter Shanda estimates a range of constant growth rates from 1% to 2%. The implicit drop in growth rate is dramatic and not credible. It seems to me that it is reasonable to treat the last year of the forecasts as being 2019 and to compare the projected growth rate for that year with the constant rates assumed for the perpetuity period. When that is done in the present case it is clear that the difference is large and therefore that the usual justification for a transitional period is satisfied."

88    Having considered Professor Jarrell's and Mr. Inglis's respective proposals (two or three years in Professor Jarrell's case, if a transitional period were to be adopted at all, and ten years in Mr. Inglis's case) and the methodologies underlying them, the judge concluded at para. 140 that the preferable approach was to follow Mr. Inglis's basic methodology but to reduce the transitional period to five years. He did not, however, say anything about what impact, if any, this ruling would have on the rate of growth to be adopted in the terminal period—as to which Professor Jarrell had suggested a rate of 5.4% from 2020, Mr. Inglis a rate of 4.5% from 2029.

89    Following circulation of the judge's draft ruling, the parties corresponded with the court about the value to be attributed to the shares in the light of the judge's decisions as to the principles to be applied. Ultimately, the only issue on which they could not agree was as to the growth rate in the terminal period, and it is accordingly necessary only to set out what was said about that issue.

   (a) The correspondence started with a letter dated March 28th, 2017 from Maples and Calder (for the dissenting shareholders), which included the following statement:

> "Inglis's Terminal Growth Rate of 4.5% related to a period in time running from after 2029 into perpetuity; Jarrell's Terminal Growth Rate of 5.4% related to a period of time running from after 2019/2020 into perpetuity; the terminal period following a 5 year transition period runs from after 2024 into perpetuity. Inglis has therefore taken the midpoint between his previous Terminal Growth rate and Professor Jarrell's terminal growth rate."

Attached to the letter were a letter and worksheet prepared by Mr. Inglis, in the former of which he explained that "Because the terminal period (after 2024) is between mine (after 2029) and Professor Jarrell's (after 2019/2020), I use the midpoint of our terminal growth rates of 4.95%."

(b) Harneys (for Shanda) dealt with these materials in a letter dated April 6th, 2017, enclosing an amended worksheet, and stating:

"From a review of Mr Inglis's worksheet, it would appear that Mr Inglis applied an average of his own and Professor Jarrell's long-term growth rate, presumably as it resulted in a higher-growth rate and, as a consequence, a higher ADS per share. The long-term growth rate has been amended to 4.5% which is consistent with the contents of his Lordship's draft judgment."

(c) On April 12th, 2017, Maples and Calder responded as follows:

"That leaves a single issue between us, which per point 1 of your letter is the terminal growth rate ('TGR'). This accounts for the remaining different US$0.47 per ADS. Mr Inglis has used a TGR of 4.95% which is the midpoint between his own TGR at trial of 4.5% and Professor Jarrell's TGR of 5.4%. This is not, as you unfairly 'presumed', because it resulted in a higher growth rate and so a higher fair value. Rather, Mr Inglis has very clearly explained why he adopted that approach. To reiterate, Mr Inglis's TGR at trial related to a terminal period running from 2029 (i.e. using a 10 year terminal period), whereas Professor Jarrell's evidence at trial supporting a 5.4% TGR related to a period running from 2019/2020. However, in the draft judgment, Segal J has rejected Mr Inglis's contention for a 10 year terminal period, and has instead found that it is appropriate to "reduce the terminal period to five years", such that the terminal period runs from after 2024 (see paragraph 140). You are therefore incorrect when you assert that the TGR of 4.5%, which is self-evidently tied to the rejected 10 year terminal period, is 'consistent with its Lordship's draft judgment'. To the contrary, that amounts to an attempt on your client's part to take the 'good' without the 'bad'. In light of the above, we invite your client either to accept this change, or to explain clearly why it is not accepted."

(d) Harneys replied on April 19th, 2017, saying this:

"As for your clients' approach to the terminal growth rate (TGR), our client does not agree that this is correct. It appears that your clients/Mr Inglis are conflating the terminal period and the applicable TGR. Paragraph 140 of the draft judgment reads as follows:

'In these circumstances it seems to me that the preferable approach is to follow Mr Inglis's basic methodology and to

408

C.A.                                    IN RE SHANDA GAMES

reduce the terminal period to five years as calculated by Mr Inglis'.

In order to give effect to this paragraph, Mr Inglis's methodology must be applied (i.e. the TGR of 4.5%) to the reduced terminal period of five years. At no point in the draft judgment is there a suggestion that the difference in TGR be split and a mid-point applied when calculating the TGR."

(e) Also on April 19th, 2017, Maples and Calder wrote to the court, attaching and summarizing the relevant correspondence and saying this:

"This morning, 19 April, we received a belated response from Harneys to our 12 April letter, which suggested that our clients and Mr Inglis had conflated the issue of the terminal and applicable TGR. To the extent this brief letter adds anything of substance to the discussion, it misses the point. The length of the terminal/transitional period and therefore the start date of the period covered by the TGR are inextricably linked. The 4.5% number that Mr Inglis had previously used was based on a period of time starting after the end of a 10 year transitional/terminal growth period. The Honourable Judge has not accepted Mr Inglis's 10 year transitional/terminal growth period, but has instead applied a transitional/terminal period of 5 years. As Mr Inglis has explained (and as it set out in the above-mentioned correspondence), that finding then has an impact on the TGR as it now begins 5 years earlier than the period for which his 4.5% TGR relates. As Mr Inglis has explained he has applied a TGR of 4.95% in the calculation being the midpoint of his TGR which related to a period of time starting after a 10 year transitional period and Professor Jarrell's TGR which began after no transitional period. The Petitioner and its advisors have wholly failed to address that point, such that they must now be taken to have no further answer to it."

90   The judge dealt with this issue in his note dated May 6th, 2017, and upheld Harneys' contentions. In para. 3 of the note, he said this:

"My conclusion was that there should be a transitional period of 5 years (to 2024) with the terminal period starting thereafter and that Mr Inglis's methodology and calculations (as presented in his evidence at trial) as to the revenue during the transitional period and the growth rate during the terminal period should be applied. That results in a growth rate of 4.5% during the terminal period. I have held that Shanda enters a steady state after 2024 and it seems to me that the growth rate that Mr Inglis had used at trial for Shanda during that period (i.e. in a steady state) still should be applied. This is 4.5%. Therefore the fair value is US$16.68 per ADS. I did not intend that, as a result of my decision that the transitional period be reduced to 5

409

from 10 years, there should, nor do I consider it to be necessary for there to, be a revision to Mr Inglis's evidence and opinion on the growth rate for the terminal period. It seems to me once a date is established on which Shanda enters a steady state (earlier on my view than on Mr Inglis's approach) the projected growth rate for the terminal period can then be applied and it is appropriate to use Mr Inglis's estimate as given in his evidence at trial."

91   The dissenting shareholders complained that in reaching this conclusion the judge had failed to have proper regard to, or properly to apply, the evidence in relation to the growth rate. The only evidence as to the appropriate terminal growth rate in a transitional period of five years was that provided by Mr. Inglis in the post-hearing correspondence; and in the absence of contrary evidence from Professor Jarrell (or Mr. d'Almeida) the judge was bound to accept Mr. Inglis's view.

92   I do not accept that the judge was wrong on this aspect of the matter. The express foundation for his view was the evidence given by Mr. Inglis at trial. That evidence was directed to a terminal period starting after a transitional period of 10 years, but nowhere in his evidence did Mr. Inglis suggest that the growth rate he proposed would be different if the transitional period were shorter. The material he supplied after circulation of the draft judgment cannot sensibly be described as evidence: although it may no doubt be inferred that he thought that the growth rate of 4.95% was appropriate, that rate was no more than the product of a mechanical exercise of averaging the rates that he and Professor Jarrell had originally proposed. In their reply skeleton, the dissenting shareholders sought to provide a more reasoned basis for the 4.95% figure. They pointed out that both Mr. Inglis and Professor Jarrell had arrived at their original figures by using the OECD long-term projections of GDP for China (and, in Professor Jarrell's case, for Korea), and suggested that—since China's GDP was projected to decline gradually over time— the earlier the starting point for the terminal period the higher the growth rate. That was because basing the growth rate on a 10-year terminal period took into account declining performance in the latter years of that period, whereas the adoption of a five-year period automatically included only the superior performance in the earlier years and excluded the later declining performance. However, this material was not available to the judge; and, even before us, was not evidence but submission. In circumstances where the only material capable of informing the judge's decision was Mr. Inglis's evidence at trial (which cast no doubt on the validity of a growth rate of 4.5% in a terminal period starting after five years of transition) and his subsequent adoption without stated reasons of an average of the experts' original proposals, I consider that the judge was entitled to reach the conclusion he did.

410

C.A.                                        IN RE SHANDA GAMES

93    Accordingly, I would dismiss the dissenting shareholders' appeal so far as it relates to the transitional period point.

### Disposition

94    We have already dealt with the reopen application by refusing leave or, if leave was not required, by dismissing it.

95    As to Shanda's substantive appeal, I would allow it so far as concerns the minority shareholding point but dismiss it so far as it relates to interest.

96    I would dismiss the dissenting shareholders' appeal.

97    GOLDRING, P. and MORRISON, J.A. concurred.

*Appeal allowed; cross-appeal dismissed.*

Attorneys: *Harneys* on behalf of the appellant; *Maples & Calder* for the respondent.

———————————————

# EXHIBIT 3

**[2017 (2) CILR 24]**

## IN THE MATTER OF QUNAR CAYMAN ISLANDS LIMITED

## QUNAR CAYMAN ISLANDS LIMITED v. MASO CAPITAL INVESTMENTS LIMITED and SEVEN OTHERS

GRAND CT. (Parker, J.) July 20th, 2017

*Companies — arrangements and reconstructions — dissenting shareholders — fair value of shares — on application for determination of fair value of shares under Companies Law (2016 Revision), s.238, company has general and ongoing obligation to disclose relevant documents — experts best judges of relevance*

A company applied for the determination of the fair value of its shares pursuant to s.238 of the Companies Law (2016 Revision).

The company was a Cayman Islands exempted limited company, the operations and business of which had been mainly conducted in China. Its merger with two other companies was approved at an EGM in February. There were eight dissenting shareholders forming four groups: the Maso dissenters, the Athos dissenters, the Senrigan dissenters and the PAG dissenters. The company sought the determination of the fair value of its shares pursuant to the dissenters' action under s.238 of the Companies Law (2016 Revision).

There were disputes between the parties concerning the scope of the company's discovery obligations and the way it should give discovery; whether the dissenters should be ordered to give discovery; and whether the dissenters should instruct one expert jointly or be given leave to instruct one expert each.

On behalf of the Maso dissenters it was submitted *inter alia* that the court should not limit in advance the types of documents that the experts should be entitled to see and that the company should be required to list all relevant documents at the outset. The Maso dissenters sought leave to instruct their own expert, rather than relying on an expert jointly instructed on behalf of the dissenting shareholders.

The company submitted that (a) it should give discovery of documents that were relevant to the court's determination of fair value by reference to specific categories of documents in accordance with O.24, r.3 and there was no jurisdiction to order general discovery in actions begun by

24

petition; (b) the categories of documents in Schedule A to its draft order had been agreed by the Maso dissenters' expert and further documents would only be disclosed if requested by an expert; (c) it should be provided that a requesting expert should be required, if asked, to explain why requested documents were relevant, which was a matter of proportionality; (d) s.238 petitions were adversarial civil proceedings and O.24, r.3(1) provided that the court could order any party to give discovery; and (e) the court should order the dissenting shareholders to give discovery.

**Held,** ruling as follows:

(1) Dissenting shareholders were not required to accept a merger or consolidation agreement that had been approved by the requisite majority. They were instead entitled to dissent and demand payment for the fair value of their shares. The effect of having given notice of dissent was that they ceased to have any of the rights of shareholders except the right to be paid the fair value of their shares and the corresponding right to participate in the proceedings before the court for the determination of the fair value. The information contained in the company's own books and records was highly relevant to any appraisal of its fair value as a going concern. In the context of establishing an electronic data room, all the relevant material to that issue should be uploaded and made available for inspection by the experts (and those instructing them), subject to giving appropriate confidentiality undertakings. The experts were the best judges of the information that was relevant for their purposes and a company should not control what information should be made available to them, based on its own assessment of relevance. Section 238 of the Companies Law did not dictate any particular valuation methodology. It was well established in both Canadian and Delaware jurisprudence that fair value should be proved by any techniques or methods that were generally considered acceptable in the financial community and were otherwise admissible in court. In determining fair value, the court was not itself an expert valuation tribunal and must be guided by the expert evidence from experienced valuers. Such experts typically required access to relevant historical data, documents and information relating to the company's past trading and auditing, together with its forecasts (whether produced by internal management or others) in relation to future trading and not only those which have been publicly disclosed (paras. 17–18).

(2) The company should give discovery by uploading all documents relevant to determining the fair value of its shares, after having first uploaded to the data room the specific classes of documents which came into being in the "take private" process, which it should have readily available. This was the usual order and there was no good reason to depart from it in the present case. In a number of cases, orders for directions had been made which were consistent with regard to a company giving discovery on a "catch all" general basis, after it had given the specific discovery agreed. The court did not accept the company's submission that there was no power under the GCR to order general discovery in actions

25

begun by petition. It should be a general obligation of the company to search for and produce all documents relevant to fair value. The company would know the documents it possessed, whereas the dissenting shareholders would not. They were essentially outsiders and if the company were to be properly valued as a going concern they had to have access to its information, concerning both its existing business and future projections. Although the question of relevance was primarily for the experts, the company should have a general obligation to produce information and documents of relevance to value based upon which the experts could, if they deemed it necessary, request further specific information. It was not appropriate, therefore, to limit the company's discovery to the documents listed in Schedule A to its draft order and then to rely on only searching for and producing further documents relevant to valuation on the basis that they were requested. In addition, the documents should be disclosed in the prescribed form, *i.e.* by way of a list (GCR Appendix 1, Form No. 16). As the company likely held all the relevant information for a determination of fair value, it was necessary not to limit in any way the company's obligation to produce it for the court's assessment (paras. 22–31).

(3) No additional protection would be included in the discovery order to protect the company from futile and onerous requests by experts for evidence. The parties' conduct would ultimately be regulated by the court. As the question of fair value was a matter for the court's judgment to be made in light of all the factual evidence put before it and on the basis of expert assistance from valuation experts on both sides, it was not for the company or its expert to seek to limit in advance the experts' line of enquiry. If the requests were oppressive, disproportionate or calculated to embarrass or harass the company, the court would intervene if asked to do so. Likewise, it would intervene if the company unreasonably delayed or failed to give proper discovery. It was not necessary to provide for such eventualities in an order that protected the company in advance which would risk overburdening the dissenting shareholders' expert and could lead to further interlocutory applications and take up scarce court resources with matters that could and should be resolved by the parties' experts (paras. 36–40).

(4) The dissenting shareholders would be ordered jointly to instruct an expert. The court had discretion to give leave for a party to call expert evidence and it could also limit expert evidence by O.38, r.4. The discretion was exercised not merely as a matter of case management, efficiency and economy (in accordance with the overriding objective) but also of course to ensure a fair trial so that each party had a proper opportunity to put forward its case and test the other party's case. In the interests of ensuring that the overriding objective was achieved at trial and because the other dissenters should be entitled to instruct an expert in whom they too had complete confidence and to whom they had at least equal access and transparency in communications, one expert jointly instructed for all dissenters should be ordered. If the court were to have

26

GRAND CT.                                IN RE QUNAR CAYMAN ISLANDS LTD.

granted the Maso dissenters leave to instruct their own expert, that would have been likely to lead to five experts (one for the company and one for each dissenter group), which would not be a sensible way to proceed in the present case. Experts were instructed in order to assist the court on matters within their expertise and were to provide independent assistance to the court by way of an objective and unbiased opinion. As no good reason had been put forward in the present case for the Maso dissenters to instruct their own expert, their desire to do so should yield to the interests of the other dissenting shareholders who were prepared to instruct an expert jointly. Furthermore, one expert instructed by all the dissenters was likely to be of most assistance to the court. The court was not persuaded that the Maso dissenters had the right to instruct an expert of their choice. It was a case management decision for the judge to take, balancing the competing interests of all parties involved in the trial. The court was not persuaded that the Maso dissenters would be prejudiced by an order for the appointment of a single joint expert on behalf of all the dissenters who, although business competitors, had the same interests in this case (paras. 47–54).

  (5) There were no grounds for ordering the dissenting shareholders to give discovery. In a s.238 petition it would not be appropriate for dissenting shareholders to be ordered to give discovery in the usual way pursuant to a standard direction under O.24 of the GCR. Although the court had jurisdiction to order discovery of specific documents in the possession of dissenting shareholders, it would only do so in exceptional circumstances when there were clear grounds that an order for discovery was appropriate and would assist the court in determining the fair value of the shares. The court would have to be satisfied under GCR O.24, r.8 that discovery was necessary under r.3 and would not make an order if it was not necessary for disposing fairly of the matter or for saving costs. The overriding objective would also need to be satisfied to ensure that the substantive law was rendered effective and that it was carried out consistently by saving expense and dealing with the matter proportionately. It would not be a ground upon which to make such an order that the material might be of assistance to the company in seeking to undermine the credibility of the dissenters or witnesses. For example, material that might give an indication of value which the dissenters themselves might have thought the company or its shares to have had prior to or for the purposes of mergers would be irrelevant and of no assistance to the court in determining fair value. Nor would the motivations and views of dissenting shareholders assist the court in its rather narrow valuation exercise. Section 238 cases should not be treated as ordinary civil litigation in respect of discovery where parties sought to undermine each other's cases through evidence obtained by discovery (paras. 64–76).

**Cases cited:**

  (1) *Bona Film Group Ltd.*, *In re*, Grand Ct., Cause No. FSD 215 of 2016, March 13th, 2017, unreported, referred to.

27

    (2)*China Shanshui Cement Group Ltd., In re*, 2015 (2) CILR 255, referred to.
    (3)*Dole Food Co. Inc. (Appraisal)*, *In re* (2014), 114 A.3d 541, distinguished.
    (4)*Homeinns Hotel Group* v. *Maso Capital Invs. Ltd.*, 2017 (1) CILR 206, followed.
    (5)*Howard's Will Trusts*, *In re*, [1961] Ch. 507; [1961] 2 All E.R. 413, referred to.
    (6)*Integra Group, In re*, 2016 (1) CILR 192, followed.
    (7)*Lornamead Acquis. Ltd.* v. *Kaupthing Bank HF*, [2011] EWHC 2611 (Comm); [2013] 1 BCLC 73, referred to.
    (8)*Morelle Ltd.* v. *Wakeling*, [1955] 2 Q.B. 379; [1955] 2 W.L.R. 672; [1955] 1 All E.R. 708, referred to.
    (9)*Qihoo 360 Technology Ltd.*, *In re*, Grand Ct., Cause No. FSD 129 of 2016, January 26th, 2017, unreported, referred to.
(10) *Shanda Games Ltd.*, *In re*, Grand Ct., Cause No. FSD 14 of 2016, April 25th, 2017, unreported, *dicta* of Segal, J. considered.

**Legislation construed:**
Companies Law (2016 Revision), s.238:
    "(1) A member of a constituent company incorporated under this Law shall be entitled to payment of the fair value of his shares upon dissenting from a merger or consolidation.
    . . .
    (9) If the company and a dissenting member fail, within the period specified . . . to agree on the price to be paid for the shares owned by the member . . .
      (a)  the company shall (and any dissenting member may) file a petition with the Court for a determination of the fair value of the shares of all dissenting members . . ."
Grand Court Rules 1995 (Revised), Preamble, para. 1.1:
    "The overriding objective of these Rules is to enable the Court to deal with every cause or matter in a just, expeditious and economical way."
O.1, r.2: "(1) Subject to the following provisions of this rule, these Rules shall apply in relation to all proceedings in the Court."
O.24, r.3: "(1) Subject to the provisions of this rule and of rules 4 and 8, the Court may order any party to a cause or matter . . . to make and serve on any other party a list of the documents which are or have been in his possession, custody or power relating to any matter in question in the cause or matter . . .
    . . .
    (3) An order under this rule may be limited to such documents or classes of documents only or to such only of the matters in question in the cause or matter, as may be specified in the order."

O.24, r.8: "On the hearing of an application for an order under rule 3 or 7 the Court, if satisfied that discovery is not necessary, or not necessary at that stage of the cause or matter, may dismiss or, as the case may be, adjourn the application and shall in any case refuse to make such an order if and so far as it is of opinion that discovery is not necessary either for disposing fairly of the cause or matter or for saving costs."

O.38, r.4: "The Court may, at or before the trial of any action, order that the number of medical or other expert witnesses who may be called at the trial shall be limited as specified by the order."

*T. Mowschenson*, *Q.C.* and *L. Greig* for the company;

*N. Meeson*, *Q.C.* and *E. Bodden* for the PAG dissenters;

*P. Girolami*, *Q.C.*, *T. Heaver-Wren* and *A. Jackson* for the Athos dissenters;

*R. Levy*, *Q.C.* and *R. Cecere* for the Maso dissenters;

*P. Girolami, Q.C.* and *S. Maloney* for the Senrigan dissenters.

1    **PARKER, J.:**

### Introduction

Qunar Cayman Islands Ltd. ("the company") seeks determination of the fair value of the company's shares pursuant to a dissenters' action under s.238 of the Companies Law (2016 Revision).

2    There are eight dissenters in total. They have formed four groups. One group of dissenters is known as Maso (and Blackwell), the others are Athos, Senrigan and PAG. They are all separately represented.

3    The Athos dissenters own 31.4% of the total shares of all dissenters, Senrigan dissenters own 16.5%, PAG dissenters own 35.6% and Maso dissenters own 16.5%.

4    There are two summonses for directions. The first is issued by Maso and Blackwell ("Maso") (FSD No. 73 of 2017) and the second by the company (FSD No. 76 of 2017). The two sets of proceedings have been consolidated by agreement bearing the number and title Cause No. FSD 76 of 2017.

### Background

5    The company is a Cayman Islands exempted limited company. Its operations and business have mainly been conducted in the People's Republic of China ("the PRC"). It has described itself in a public filing as "one of the leading mobile and online commerce platforms for travel in China." The company, which had been listed on NASDAQ since 2013, was the subject of a "take private" transaction which was announced on June 23rd, 2016 and concluded on February 28th, 2017.

29

6   On October 19th, 2016, the company entered into an agreement and plan of merger ("the merger") with Ocean Management Holdings Ltd. and Ocean Management Merger Sub Ltd.

7   On January 24th, 2017, the company gave notice of an extraordinary general meeting to be held on February 24th, 2017 to consider, amongst other things, the approval of the merger.

8   The merger was approved at the EGM and on February 28th, 2017 the plan of merger was filed with the Registrar of Companies in the Cayman Islands.

9   The dissenters have taken all the necessary steps to object to and dissent from the merger.

**The summonses**

10   There are a number of areas of disagreement over directions. Two of them are: (i) whether the dissenters should be ordered to give discovery; and (ii) whether they should be given leave to instruct one expert jointly, or be given leave to instruct one expert each.

11   There are also disputes in a third area concerning the scope of the company's discovery obligations and the way it should give discovery. I will deal with this last point first as a matter of principle.

**Approach to discovery**

12   Mr. Levy, Q.C., who represents Maso, appeared last year for dissenting shareholders in a case which dealt with directions under s.238: *Homeinns Hotel Group* v. *Maso Capital Invs. Ltd.* (4). That was heard by Mangatal, J. He referred me to the submissions he made in that case. Her Ladyship's judgment was delivered on August 12th, 2016 and in material part provides as follows (2017 (1) CILR 206, at para. 20):

> "In my judgment, overall, the draft order presented by the dissenting shareholders . . . in relation to discovery appears more consonant with the requirements of the court in adjudicating an application under s.238. In particular, it does appear to me that the discovery order should contemplate the documents listed . . . which the [company] has readily to hand and which must be relevant. The discovery order in a s.238 application is somewhat unusual in that it is the company that will have the documents and information relevant to the determination of fair value. I accept the submission of Mr. Levy, Q.C. in . . . the skeleton argument. In particular, I accept that the experts and the court are to have regard to all relevant documents and information, not just publicly available information. Further, in my judgment, it is not appropriate to make a standard order under O.24 of the GCR for disclosure by both parties. In my judgment, it is not

GRAND CT.                                      IN RE QUNAR CAYMAN ISLANDS LTD.

in keeping with the purposes of s.238 for the dissenting shareholders to be ordered to provide discovery."

13   Mr. Levy, Q.C. relies on Her Ladyship's decision and also referred to a number of other s.238 cases (*In re Shanda Games Ltd.* (10); *In re Bona Film Group Ltd.* (1); *In re Qihoo 360 Technology Ltd.* (9)) which have had, in his submission, some tried and tested similar directions. He submits that the court should not limit in advance the types of documents which the expert should be entitled to see and to call for and that the company should be required to list all relevant documents at the outset.

14   Those directions, in so far as relevant and in summary, have provided for—

- the establishment of an electronic data room;

- the company to upload to the data room certain specific classes of relevant documents which came into being in the course of the "take private" process (which by definition, will have been a transaction that closed relatively recently and should therefore be readily to hand so far as the company is concerned);

- the company also to upload all other documents relevant to fair value (NB no obligation to do so by dissenters);

- experts to ask questions of and request further documents from the company;

- the company has the ability, within 7 to 21 days of such a request, to apply to the court to be relieved of the obligation to comply; and

- there are to be meetings between the experts and the company's management.

15   He submits that the Maso dissenters' summons seeks an order which is in materially similar terms and there is no good reason for the court to depart from these directions.

16   He also referred me to the judgment of Jones, J. in *In re Integra Group* (6).

17   In that case, which was the first time that the court had been called upon to value a company's shares in connection with a merger carried out in accordance with Part XVI of the Companies Law, Jones, J. helpfully set out the jurisdiction and general approach of the court (under s.238), from which I respectfully derive the following propositions:

31

(a) Dissenting shareholders are not required to accept a merger or consolidation agreement which has been approved by the requisite majority. Instead they are entitled to dissent and demand payment for the fair value of their shares.

(b) The effect of having given notices of dissent is that they cease to have any of the rights of shareholders, except the right to be paid the fair value of their shares and the corresponding right to participate in the proceedings before the court for the determination of the fair value.

(c) The information contained in the company's own books and records is highly relevant to any appraisal of its fair value as a going concern and (in the context of establishing an electronic data room) all the relevant material to that issue should be uploaded and be available for inspection by the experts (and those instructing them), subject to giving appropriate confidentiality undertakings.

(d) The experts are the best judges of what information is or is not relevant for their purposes and so a company should not control what information should be made available to the experts based upon its own assessment of relevance.

(e) Section 238 does not dictate any particular valuation methodology. It is well established in both Canadian and Delaware jurisprudence that fair value should be proved by any techniques or methods which are generally considered acceptable in the financial community, and are otherwise admissible in court.

18   In addition to these general propositions, I also accept Mr. Levy, Q.C.'s submission that in determining fair value the court is not itself an expert valuation tribunal and must be guided by the expert evidence from experienced valuers. Such experts typically require access to relevant historical data, documents and information relating to the company's past trading and auditing, together with its forecasts (whether produced by internal management or others) in relation to trading in the future and not only those that have been publicly disclosed (or disclosed to advisers in the course of the "take private" process).

19   In *In re Shanda Games Ltd.* (10), Segal, J. said (at para. 55 of his judgment):

"The Directions Order also provided that all additional documents or information needed and requested by the parties' experts would be made available within fourteen days of receipt of a request and easily accessible to them via the data room (or sent to them directly if uploading to the data room was impossible). By this means it was envisaged that [the company] would make full disclosure of all relevant documents and information on a timely basis (although the Directions Order did not refer to the discovery procedures and

32

> obligations in GCR O.24 and there was at this stage no consideration as to whether GCR O.24 applied to a section 238 petition, the effect of the Directions Order, made by consent, was that [the company] assumed an obligation to make disclosure in terms similar to those contained in GCR O.24, and in some respects in wider terms)."

20    Mr. Mowschenson, Q.C., on behalf of the company, submits that the company should give discovery of documents that are relevant to the court's determination of fair value by reference to specific categories of documents in accordance with O.24, r.3. He argues that there is no power to order general discovery in actions begun by petition.

21    He submits that O.24, rr. 3 and 8 provide the tools with which a court should regulate disclosure to what is necessary or which relates to matters in question. The overriding objective in the Preamble to the GCR, para. 1, requires a court to ensure that the substantive law is rendered effective and that it is carried out consistently with saving expense and dealing with the matter proportionately. He relies on the first and second affidavits of Mr. Reid in support of his argument to limit discovery in the first instance to certain categories of documents which according to Mr. Reid would be "sufficient . . . to produce a robust valuation analysis." He argues that the categories of documents in Schedule A of the company's draft order has been agreed by the Maso dissenters' expert, Mr. Arboit, in his first affidavit dated June 9th, 2017 at para. 23, and that they should not be given a second tranche to cover other documents relevant to fair value without more. Further documents would only be provided on request by an expert.

**Decision**

22    The company should give discovery by uploading all documents that are relevant to fair value, after having first uploaded to the data room the specific classes of documents which came into being in the course of the "take private" process, which it should have readily available. This is the usual order and I can see no good reason to depart from it in this case.

23    Whilst directions given in particular cases are not to be regarded as precedents, I am cognizant that there have been a number of cases in which orders for directions have been made which have been consistent with regard to the company giving discovery on a "catch all" general basis, after it has given the specific discovery agreed. I do not accept Mr. Mowshenson, Q.C.'s submission that there is no power under the GCR to order general discovery in actions begun by petition.

24    GCR O.1, r.2 sets out specific circumstances where the rules will not apply. Then by sub-para. (1): "Subject to the following provisions of this rule, these Rules shall apply in relation to all proceedings in this Court." See also Quin, J. in *In re Qihoo 360 Technology Ltd.* (9) (at para. 69).

33

25   This seems to me to be in keeping with the court's approach in these types of cases. I do not think the company should be made to do so only if an expert requires further documents and asks for them; rather it should be a general obligation of the company to search for and produce all documents relevant to fair value.

26   I bear in mind that the company will know what documents it has, whilst the dissenting shareholders will not. They are essentially outsiders and if the company is to be properly valued as a going concern they must have access to the information that the company has, both with regard to its existing business and future projections.

27   Whilst the question of relevance is primarily one for the experts, the company should have a general obligation to produce information and documents of relevance to value based upon which the experts can, if they deem it necessary, ask for further specific information.

28   It is not appropriate therefore to limit the company's discovery to the documents listed in Schedule A of the company's draft order and then to rely on only searching for and producing further documents relevant to valuation on the basis that they are asked for. In addition, and as is well known, discovery is an ongoing obligation. In this regard I prefer the evidence of Mr. Arboit to that of Mr. Reid.

29   Moreover, in case there is any doubt, the documents should be disclosed in the prescribed form, *i.e.* by way of a list (GCR Appendix 1, Form No. 16). In that way Schedule 1, Part 1 to the list could be satisfied by incorporation by reference of the data room index, but as is also well known, Part 2 of the list requires the identification of documents which the company objects to produce (usually on the grounds of privilege).

30   Schedule 2 also requires the company to identify relevant documents which it has had, but has not now, in its possession, custody or power (because they have been lost or destroyed or for some other reason). The company is also required to state whether and when any such documents were last in its possession or power, what has become of them, and in whose possession they are now. As Jones, J. stated in ):

   "The Canadian courts have emphasized . . .

      '. . . the problem of finding fair value of stock is a special problem in every particular instance. It defies being reduced to a set of rules for selecting a method of valuation, or to a formula or equation which will produce an answer with the illusion of mathematical certainty. Each case must be examined on its own facts, and each presents its own difficulties. Factors

34

which may be critically important in one case may be meaningless in another. Calculations which may be accurate guides for one stock may be entirely flawed when applied to another stock.

    The one true rule is to consider all the evidence that might be helpful, and to consider the particular factors in the particular case, and to exercise the best judgment that can be brought to bear on all the evidence and all the factors. I emphasize: it is a question of judgment. No apology need be offered for that. Parliament has decreed that fair value be determined by the courts not by a formula that can be stated in the legislation.'"

31   Since the company will likely hold all the relevant information which will go to a determination of fair value, it is therefore necessary not to limit in any way the company's obligation to discover and produce it for the court's assessment.

32   Another related issue was argued by Mr. Mowschenson, Q.C. for the company concerning whether in response to a request for documents and/or information the requesting expert should be required, if so asked by the company, to state (and if necessary verify) why the information and documents were relevant to the determination of fair value and necessary for the expert to complete his report and/or where appropriate, whether the expert's request can be limited.

33   He said that it is a matter of proportionality and raises an important issue for case management in these types of cases.

34   He argues that dissenting shareholders regularly make time-consuming, futile and successively onerous requests for information and there needs to be some kind of protection mechanism for companies facing such a barrage.

35   Mr. Levy, Q.C. submits on his part that companies regularly give inadequate disclosure and any attempt to limit disclosure should be viewed with scepticism by this court.

36   I approach this case on the basis that all parties will comply with orders of the court. They will in their conduct ultimately be regulated by the court, in the sense that the court will rule, as it must when asked to do so, on all matters relating to law and procedure leading up to the trial. No doubt the communications between experts doing their best to assist the court and the parties will involve clarification and explanations relating to the relevance of requests.

37   I do not believe that any additional check or balance needs to be specifically built into the discovery order as Mr. Mowschenson, Q.C. has suggested in order to give the company some added protection. Since the

35

question of fair value is a matter for the court's judgment to be reached in light of all the factual evidence put before it and on the basis of expert assistance from valuation experts from both sides, it is not for the company or its expert to seek to limit in advance the expert's line of enquiry. Of course, if the requests are oppressive or disproportionate or calculated to embarrass or harass the company, the court will step in if asked to do so. Likewise, the court will step in if the company is unreasonably delaying or failing to give proper discovery.

38    I do not think it is necessary to provide for these eventualities in an order which protects the company in advance as there is a risk that the dissenting shareholders' expert would be overburdened with having to justify by reference to relevance and necessity each and every request made.

39    The experts' overriding duty is to assist the court and that should ensure that all requests are proportionate and of relevance to the fair value issue and not any other issue. I accept there may be different approaches and what one expert considers necessary and relevant another expert may not. That does not mean that the dissenting shareholders' expert should have to justify each and every request.

40    This could in my view lead to further interlocutory applications and could result in scarce court resources being taken up with matters which could and should be dealt with by parties who have instructed expert professionals to assist them in the presentation of their cases.

41    All parties will have liberty to apply to the court at any stage if the process is not being followed or is being circumvented in some way.

42    There had been some debate about the costs occasioned by the setting up of the data room which by the time the hearing concluded was effectively agreed so I say no more about that.

43    I turn now to the second issue, namely the number of experts, and whether all the dissenters should be given leave to instruct only one between them, or one each.

**Number of experts**

44    Mr. Levy, Q.C., who was in the minority on this issue, argues that he cannot be made to instruct one expert jointly with anyone else and that he is entitled to his own expert; he should not be forced to rely on the expert of another party or to have imposed upon him the terms of instructions of a particular expert, to include funding. He submits that it would be inconsistent with the *FSD Guide*, 2nd ed., at para. B5.1(b) (2015) and the right to a fair trial to force him to do so.

36

45    Para. B5.1(b) is to the effect that where the use of a single joint expert is not considered appropriate (and none of the parties advocates a single joint expert) then "each party will generally be given leave to call one expert in each different field requiring expert evidence." That he says is consistent with *Phipson on Evidence*, 19th ed., para. 33–35, at 1207 (2017): "the prevailing judicial attitude appeared to be to allow the parties to call the experts of their choice just as they could call the factual witnesses of their choice."

46    The company and the other dissenters all agree that there should be two experts, one for the company and one to be instructed jointly by all of the dissenters.

**Decision**

47    The court in its discretion may give leave for a party to be allowed to call expert evidence. The court may also limit expert evidence by O.38, r.4. The discretion is exercised not merely as a matter of case management, efficiency and economy (in accordance with the overriding objective), but also of course to ensure a fair trial so that each party has a proper opportunity to put forward its case and test the other party's case.

48    It was apparent in argument that the Maso dissenters wish to retain their own expert to achieve a greater degree of control over the instruction of and communications with that expert than a joint instruction of an expert with the other dissenters would afford them.

49    It seems to me that both in the interests of ensuring that the overriding objective is achieved at trial, and because the other dissenters should be entitled to instruct an expert in whom they too have complete confidence and to whom they have at least equal access and transparency in communications, one expert jointly (and severally, in case one or more parties wishes to settle before trial) instructed for all three camps should be ordered. No confidence issues were raised by Mr. Levy, Q.C. over the expert that the other two parties were content to instruct.

50    The Athos and Senrigan and PAG dissenters between them hold all but 16.5% of the shares whose fair value falls to be determined and if the court were to grant the Maso dissenters leave to call their own expert, Mr. Meeson, Q.C. and Mr. Girolami, Q.C. for the other three camps say that they would require their own experts. That would in all likelihood lead to five experts (one for the company and one for each dissenter group) all trying to assist the court. That in my view is not a sensible way to proceed in this case. After all it is the duty of experts under Cayman Islands law to help the court on matters within their expertise, and that is paramount and overrides any obligation to the party from whom they may have received instructions or by whom they are paid. Given that their evidence should be and should be seen to be independent work product uninfluenced by the

pressures of litigation or any party, so that they can provide independent assistance to the court by way of an objective and unbiased opinion, there is no room for them in any way taking on the features of an advocate for their client.

51   In circumstances where no good reason relating to the sole issue in the case has been put forward for the Maso dissenters to instruct their own expert, in my judgment their desire to have their own expert should yield to the interests of the other dissenting shareholders who are prepared to jointly instruct an expert.

52   I am told by counsel that the identity of the expert is not the issue, so that should not produce an immediate practical problem. The issue, although put forward as one of principle by Mr. Levy, Q.C., seemed to me to be around access and instructions, which should be capable of resolution.

53   Furthermore, I take the view that one expert instructed by all dissenters is likely to be of most assistance to the court, especially in relation to interactions with the company's expert, and will be in keeping with the overriding objective.

54   I was not persuaded by Mr. Levy, Q.C. that his client had the right to call an expert of its choice. In my view this is a case management decision for a judge to take, balancing the competing interests of all parties involved in the trial, namely the other dissenters and the company. I am not persuaded that Mr. Levy, Q.C.'s clients will be prejudiced by an order for the appointment of a single joint expert on behalf of all dissenters who all share a common interest in the determination of a fair value for their shares. They may be business competitors but their interests should be aligned in this case. I turn now to the final issue.

**Should the dissenters be ordered to give discovery?**

55   Mr. Mowschenson, Q.C. submits that s.238 petitions are adversarial civil proceedings between the parties and O.24, r.3(1) provides that the court may order any party to a cause or matter (whether begun by writ, originating summons or otherwise) to give discovery.

56   He points to the notes to the *Supreme Court Practice 1999* which confirm that, unlike the provisions for automatic discovery in r.2(1), O.24, r.3 is not limited to an action with pleadings and allows a party to apply for discovery by list. He accepts that (just as he submits that O.24, r.3(3) limits discovery in actions begun by petition to documents or classes of documents as may be specified in the order for directions for the company), so he too is limited in applying for specific discovery of documents against the dissenters. I have already decided that discovery in

GRAND CT.                                    IN RE QUNAR CAYMAN ISLANDS LTD.

s.238 cases begun by petition is not so limited and that the company should give discovery of all relevant documents in its possession.

57    He submits that Mangatal, J.'s decision in *Homeinns* (4) did not determine once and for all the question of whether dissenters should be required to give discovery by list of documents relevant to fair value in their possession. He seeks a narrower class of documents he says than would be required by an order for standard discovery under O.24, rr. 1 and 2.

58    He relies in particular on a Delaware decision in *In re Appraisal of Dole Foods Co. Inc.* (3), which apparently was not cited to Mangatal, J. *Dole* is a decision of the Court of Chancery in Delaware. Vice Chancellor Laster ordered discovery of the material sought by the company from the dissenting shareholders and gave reasons in support of his decision. Mr. Mowschenson, Q.C. submits that much of the Vice Chancellor's reasoning is of general application, including that—

  (a) pre-litigation valuations are relevant to the central issue in appraisal proceedings, namely the fair value of the company (114 A.3d at 549);

  (b) such materials are also relevant to issues facing the experts such as the appropriate inputs and considerations for valuation methodologies (*ibid.*);

  (c) they are also potentially relevant to witness credibility, for example dissenter-advanced positions in litigation that were at variance with its own pre-litigation views; the information might be useful for purposes of cross-examination or rebuttal of expert testimony;

  (d) the court may consider a wide range of factual evidence in support of its decision, including the market price, merger price, other offers, prices at which knowledgeable insiders sold their shares, internal corporate documents and valuations prepared for pre-litigation purposes (*ibid.* at 550);

  (e) where the court relies primarily on court-appointed experts to determine fair value, factual evidence relating to valuation is often relied on as a cross-check or reality check and may bear on witness credibility; and

  (f) experts themselves often referred to other valuation work in their own report, for example by citing other valuations to demonstrate the reasonableness of their inputs (*ibid.*, at 553).

59    From this decision, Mr. Mowschenson, Q.C. argues that there are persuasive reasons that, as a matter of principle, the dissenters' discovery is relevant to the issue of fair value and ought to be ordered. He points to the decision of Segal, J. in *Shanda* (10) as support for the proposition that although Delaware authorities are not binding on this court, s.238 uses the

same core concepts and terms as well as similar procedural mechanisms and that Delaware in particular has a well-developed jurisprudence. He urged me to follow *Dole* (3).

60   Mr. Levy, Q.C. submits that by definition the dissenters are all outsiders and will not have the detailed information the experts will require to fulfil their duties. All of the information will be based upon the company's own books and records and will be "inside" valuation materials rather than a valuation based on publicly available materials.

61   Moreover, he relies on the decision of Mangatal, J., which he says is an end of the matter, unless I am convinced that she was wrong; see *Lornamead Acquis. Ltd.* v. *Kaupthing Bank HF* (7) and *In re China Shanshui Cement Group Ltd.* (2).

62   He submits that it is well established that judges of one division should speak with the same voice—see *In re Howard's Will Trusts* (5)—and that this is clearly sensible for reasons of certainty and comity.

63   He relies on the affidavit evidence of Mr. Margules to show that the procedure for giving disclosure in Delaware is radically different from that which pertains in the Cayman Islands. Relying on *Morelle Ltd.* v. *Wakeling* (8), he submits that Mangatal, J.'s decision was not given *per incuriam* because *inter alia* the Delaware authority in *Dole* was not binding on this court.

**Decision**

64   I am prepared to accept that in a hypothetical case discovery from dissenters may be ordered by this court for specific documents that are in the dissenters' possession but not the company's.

65   The court would require very clear grounds upon which to make such an order, which would be solely directed towards assisting the court in determining fair value. The court would, under O.24, r.8, have to be satisfied that discovery was necessary under r.3 and would not make an order if it was not necessary either for disposing fairly of the cause or matter or for saving costs. The overriding objective would also need to be satisfied to ensure that the substantive law was rendered effective and that it is carried out consistently by saving expense and dealing with the matter proportionately.

66   It would not be a ground upon which to make such an order that the material might be of assistance to the company in seeking to undermine the credibility of the dissenters or its witnesses. The reasoning in *Dole* (3) is not of much assistance when one is applying Cayman law and procedure on this question.

40

67    For example, material which might give an indication of value which the dissenters themselves may have thought the company or their shares to have had prior to or for the purposes of merger, is irrelevant and of no assistance to the court in determining fair value in this jurisdiction.

68    So although I do not rule out the possibility of dissenters being ordered to give specific discovery in an exceptional case, such a case would be very rare indeed and would require clear grounds. No such grounds are being advanced by Mr. Mowschenson, Q.C. in this case.

69    I am not persuaded by Mr. Reid's second affidavit that valuations of third parties based on public information are relevant to a determination of fair value. Once an expert has the company's full records I do not see that anything helpful could be gained by reviewing third-party valuations. It may be that the dissenters being hedge funds and private equity firms have used securities analysts to gather and interpret data about companies, industries and financial markets in order to express opinions on the investment potential of stocks and securities, as Mr. Reid suggests. Those analysts would not have access to all of the company's information, but will have access to a large amount of information that is generally available in respect of publicly listed companies, including investor relations information. I do not agree with Mr. Reid's view that the views of these securities analysts relying on those sources of information "are potentially highly relevant to the issue of the fair value of the company."

70    I prefer the evidence of Mr. Arboit which he gives in his first affidavit at paras. 53 and 54 to the effect that the documents listed in the company's request for information relating to the dissenters' investment in the company and internal analyses are not relevant to the determination of fair value of a publicly listed company's shares. He does not consider that any analysis produced by the dissenting shareholders to be relevant to valuation and he would not factor their analysis into his own valuation, he states, "in order to ensure that my valuation was wholly my own."

71    He goes on to say that analyses produced by dissenting shareholders are no doubt produced for a variety of purposes and are likely to be informed by their own methodologies.

72    I agree with Mr. Arboit's evidence in this regard. Moreover the motivations and views of the dissenting shareholder are unlikely to assist the court in its rather narrow exercise of adjudication, informed as it will be by the expert evidence.

73    Section 238 cases should not be treated like ordinary civil litigation as it pertains to discovery where parties seek to undermine each other's cases through evidence obtained in discovery or other related interlocutory proceedings, which may be designed to assist in the cross-examination of witnesses.

74   In this case, the witnesses facing cross-examination on previous inconsistencies or matters related to their investment strategies would be on the dissenting shareholders' side if the court ordered them to give discovery. Those matters are irrelevant to the court's task and may indeed be inadmissible in a s.238 trial.

75   As to *Dole* (3), of course I take into account and pay close attention to the decisions of the courts in Delaware (and Canada for that matter) to assist me in determining matters of substantive law, given the similarity of the jurisprudence and the actual words used in s.238. However, I derive little assistance in relation to procedural matters such as discovery where the Delaware jurisdiction is so different. As Segal, J. said in *Shanda* (10):

> "However, it will also be necessary always to take care and be satisfied that the law and practice developed by such other Courts fits and is consistent with other relevant parts of Cayman law and practice."

76   Whilst I take the view that the possibility of discovery from dissenters should not be ruled out, in an exceptional case, I take some comfort from the fact that I do not consider it to be very likely that discovery would be ordered to be given by dissenters in a s.238 case. This is in keeping with the approach taken both in *Integra* (6) and *Homeinns* (4). It follows, in my respectful opinion, that Mangatal, J. was clearly right in her decision that it was not appropriate for dissenting shareholders to be ordered to provide discovery in the usual way pursuant to a standard direction under O.24 of the GCR in the context of a s.238 appraisal action.

**Conclusion**

77   No doubt counsel will be able to agree an order reflecting my decision in relation to the three issues which have arisen on this application.

*Orders accordingly.*

Attorneys: *Harney Westwood & Riegels* for the company; *Conyers Dill & Pearman* for the PAG dissenters; *Appleby* for the Athos dissenters; *Mourant Ozannes* for the Maso dissenters; *Ogier* for the Senrigan dissenters.

# EXHIBIT 4

IN THE COURT OF APPEAL OF THE CAYMAN ISLANDS

ON APPEAL FROM THE GRAND COURT OF THE CAYMAN ISLANDS

FINANCIAL SERVICES DIVISION

CICA NO. 20 OF 2017

(ON APPEAL FROM CAUSE NO FSD 129 OF 2016 (IMJ))

IN THE MATTER OF THE COMPANIES LAW (2016 REVISION)

AND IN THE MATTER OF QIHOO 360 TECHNOLOGY CO. LTD.

BETWEEN:-

QIHOO 360 TECHNOLOGY CO. LTD.

Petitioner/Proposed Appellant

-and-

(1) MASO CAPITAL INVESTMENTS LIMITED
(2) BLACKWELL PARTNERS LLC- SERIES A
(3) CROWN MANAGED ACCOUNTS SPC ACTING
    FOR AND ON BEHALF OF CROWN/MASO
    SEGREGATED PORTFOLIO

Respondents/Proposed Respondents

BEFORE:

**The Honourable John Martin QC, Justice of Appeal**
**The Honourable Sir George Newman, Justice of Appeal**
**The Honourable Dennis Morrison, Justice of Appeal**

Appearances:

Madeleine Heal, James Elliott and Dhanshuklal Vekaria of Harneys for the
Proposed Appellant. Robert Levy QC instructed by Nicholas Dunne and Rupert
Bell of Walkers for the Respondents.

> Hearing and Judgment: 31 August 2017
> Reasons released: 9 October 2017

MARTIN JA:

1.    On 31 August 2017 we refused the applicant Company leave to appeal
      against an order ("the Order") dated 27 July 2017 of Mangatal J. These
      are our reasons for that decision.

2.    The Order was made in the context of a petition brought by the
      Company under section 238 of the Companies Law (2016 Revision).
      That section entitles members of certain Cayman companies who
      dissent from a merger or consolidation to be paid the fair value of
      their shares. In default of agreement, the fair value is to be determined
      by the Court.  The respondents are members of the Company who
      have dissented from a merger of the Company. They are referred to in
      these reasons as "the Dissenting Shareholders".

3.    Proceedings under section 238 present two particular difficulties to
      the courts. First, all or nearly all of the financial information necessary
      to enable the Court to determine the value of a company's business,
      and hence of its shares, will inevitably be held by the company itself.
      The proper conduct of the valuation exercise will accordingly require

that the company make adequate disclosure of that information. Secondly, although the task of determining the value is one for the Court alone, the Court will not usually be equipped to derive a value from the financial information without expert assistance.  The consequent importance of the expert evidence means that the Court must have confidence that the valuations proposed are based on sufficient information; and that in turn means that the experts will often have to be given a substantial degree of autonomy in determining what information is needed for their valuations. Although care must be taken to ensure that this autonomy is not abused (a point to which we return at the end of these reasons), in general we agree with the statement of Jones J in *In the matter of Integra Group* [2016] (1) CILR 192 at [11] that "the experts are the best judge of what information is or is not relevant for their purposes".

4. In the present case, these two difficulties were initially addressed by the making of a consent order (dated 25 October 2016), which in relevant part was in the following terms:

"IT IS ORDERED that:

1. The Petitioner shall, by 4.00 pm on 1 November 2016 (Cayman Islands time), open an electronic data room (the "Data Room").

2. The Data Room shall be accessible to each of the parties and the parties' respective advisors, consultants and experts for inspection of the documents contained therein each upon the entry into [a confidentiality agreement].

3. ...

4. By 4.00 pm on 18 November 2016 (Cayman Islands time), the Petitioner shall upload to the Data Room all documents (of whatsoever description, whether electronic, hardcopy or any other format) and communications (whether by email or otherwise) and other materials which are or have been in their respective possession, custody or power and which are

relevant to the determination of the fair value of the shares in the Petitioner as at 30 March 2016 (the "Valuation Date").

5. Provided that such documents are within the possession, custody or power of the Petitioner, paragraph 4 shall include for the avoidance of doubt the following categories, namely all documents and communications (including, without limitation, emails):

(a) previously provided to or obtained from J. P. Morgan Securities (Asia Pacific) Limited or its affiliates (the "Financial Adviser") in relation to the fair value opinion, including those passing between the Financial Adviser and:

    (i)    the independent directors or Special Committee of the Petitioner; and

    (ii)    the Petitioner's other directors, management, employees, counsel and/or advisers; and

    (iii)    the bidding consortium,

for the purposes of compiling the fair value opinions; and/or

(b) previously provided to or obtained from the Petitioner's financiers (whether to or from any of the persons mentioned in 5(a) above) for the purposes of securing finance for the merger transaction (including but not limited to all management forecasts provided to the same); and/or

(c) previously provided to or obtained from the bidding consortium or former members thereof (whether provided to or from any of the persons mentioned in 5(a) or (b) above) or passing between such persons for the purposes of undertaking due diligence on the Petitioner (including but not limited to all management forecasts provided to the same).

6. ...

7. The (a) Petitioner and (b) Dissenting Shareholders shall each have leave to separately instruct an expert witness in the field of valuation in order to opine upon the fair value of the shares in the Petitioner as a going concern at the Valuation Date (both such experts together, the "Experts"). The Experts shall be appointed by no later than 1 November 2016, and on that date each of the Petitioner and the Dissenting Shareholders should advise the other in writing of the identities and email addresses of the respective Experts so appointed.

8. The Petitioner shall upload to the Data Room any additional documents, materials, communications (whether by email or otherwise) or information requested by either expert for the purpose of preparing their own opinion within 14 days of receipt of such a request, unless otherwise agreed or directed by order of the Court, and such request for information of either Expert shall be made prior to the date 21 days before the exchange of expert reports, or any such other date as mutually agreed by the parties. For the avoidance of doubt, if the Experts so request, this may include documents, materials or information produced after the Valuation Date, and such requests may be made from the date of the upload of documents to the Data Room pursuant to paragraph 4 above. Any such request from or response to an Expert shall be copied by email to the Expert for the other party to the email addresses notified in paragraph 7.

9. The Petitioner shall procure that appropriate members of its management team be available to meet with both Experts together, in person or by telephone or by way of video link, such meetings to be scheduled to take place at a mutually convenient place and time for the purpose of providing information and answering queries which are relevant to the preparation of the Experts' respective opinions ...".

The consent order then went on to provide for the exchange of experts' reports, for a meeting between the experts, for the provision of a joint memorandum of the experts identifying areas of agreement and disagreement, for the provision of supplemental reports and for the holding of a case management conference after exchange of supplemental reports.

5.    The consent order was subsequently amended by further order dated 21 December 2016. The amendments are not relevant to the issues on this application.

6.    On 3 March 2017 the Dissenting Shareholders issued a summons for relief in terms of a draft order attached to it. In essence, the draft order provided for preservation of electronic devices and data; for specific discovery "pursuant to Order 24, rule 7 of the Grand Court Rules [and to] paragraphs 4, 5 and 8 of the [consent order]" of documents listed in a schedule containing 44 categories of document, and the appointment of a forensic expert to conduct a search in the Company's IT systems and on its electronic devices for documents containing certain keywords. The 44 categories of document were summarised by the judge at paragraph [28] of her judgment as being documents and communications related to the 2025 Projections; documents and communications to and from, or in the possession of, JP Morgan; documents and communications to or from the Company's financiers; meeting file notes; documents and communications to and from the Buyer Group; internal employee communications, documentation and analysis; Skadden emails; and tax analysis.

7.    It was this summons that led to the making of the Order, which is in the following terms:

"IT IS ORDERED that

1. The Company shall forthwith take all steps necessary to preserve all computers, servers, network systems, cloud storage,

laptops, back-up tapes, archives, handheld electronic devices or other means of transmitting or receiving or storing data ("Electronic Devices") and all or any data in the Company's possession, custody or power which may be relevant to these proceedings which is held or stored on or by Electronic Devices or similar means in any jurisdiction whatsoever until the conclusion of the cause or further Order of the Court.

2. The Company shall, in the manner hereinafter appearing, give specific discovery pursuant to Order 24, rule 7 of the Grand Court Rules, of (a) all correspondence between the Company and J.P. Morgan Securities (Asia Pacific) Limited ("JP Morgan") regarding JP Morgan's refusal to provide documentation; and (b) all emails from Skadden, Arps, Meagher & Flom LLP in their native format (the actual electronic email with any attachments).

3.      The Company shall prepare and serve a list of documents by 21 August 2017, such list to identify all relevant documents including of any electronic file type (and for the avoidance of doubt such documents must include inter alia (whether in hard copy or electronic form on any Electronic Device wherever they may be) memoranda, graphic files, office based documents, drafts, notes of meetings and discussions, including telephone conversations and e-mails (including attachments) or other data sent to or from any e-mail address used by any of the directors, officers or employees or anyone else on its behalf, which relate in any way to the determination of the fair value of the shares in the Company as at the Valuation Date (as defined in the Order for Directions dated 25 October 2016 (the "First Directions Order")) ("Documents") which are or have been in the possession, custody or power of the Company (the "List").

4.      The List shall be verified by an affidavit sworn by a director of the Company and such director shall attend in person at the trial of the cause to be cross-examined unless the director's  attendance

is not required by the written agreement of the Dissenters or further Order of the Court.

5.      Within 7 days following the provision of the List, the Dissenters and the Company shall designate specific key words to be used to search all Electronic Devices used by or available to the Company and its directors, officers or employees or anyone else on the Company's behalf for the Documents (the "Keywords").

6.      Subject to the provision of appropriate confidentiality undertakings (which, in the event that there is no agreement, the Court shall determine such terms), the Company and the Dissenters shall jointly appoint an independent forensic technology expert (the "Forensic Expert") to conduct an audit of the Company's information technology systems and all Electronic Devices used by or available to the Company and its directors, officers or employees or anyone else on the Company's behalf for documents (including but not limited to any documents and/or information in Schedule A to the Summons, save for paragraph 40 of Schedule A to the Summons) containing the Keywords (the "Forensic Audit").

7.      The Forensic Expert shall be a person with considerable experience of conducting forensic examination of electronic sources and the appointment shall be approved in advance by agreement of the parties, failing which the Court shall determine the identity of the Forensic Expert on the application of any of the parties.

8.      The Company shall provide all such assistance and access as requested by the Forensic Expert, including but not limited to providing access to the Company's information technology systems and all Electronic Devices referred to in paragraph 6 above and to allow the Forensic Expert to take forensic copies and/or image any emails (including attachments) and/or other electronic Documents.

9.    The Forensic Expert shall report to the Court and the Dissenters' Cayman Islands attorneys ("Walkers") on a weekly basis, such report to contain details of the progress of the Forensic Audit, including but not limited to what has been searched, the Keywords used, the results of the Forensic Audit, the assistance and access provided by the Company pursuant to paragraph 8 above and any impediments to the Forensic Audit.

10.    The Forensic Expert shall provide all results of the Forensic Audit to the Company's Cayman Islands attorneys ("Harneys") on a rolling basis.

11.    Harneys shall review the documents obtained from the Search for privilege and shall cause all non-privileged documents to be uploaded to the Data Room (as defined in the First Directions Order) within 3 days of receipt from the Forensic Expert.

12.    The Forensic Expert shall give notice to the Court, Walkers and Harneys when the Search has been completed.

13.    The time for exchange of experts' reports in accordance with paragraph 11 of the First Directions Order be extended to the date falling four weeks after either the final document has been uploaded to the Data Room pursuant to paragraph 11 above or the Forensic Expert has given notice pursuant to paragraph 12 above, whichever is later.

8.    It can be seen that this order has four elements: (a) an order for preservation of electronic devices and data (paragraph 1); (b) an order for specific discovery of two categories of documents, including emails from Skadden, Arps in native format (paragraph 2); (c) an order for service of a verified list of documents (paragraphs 3 and 4); and (d) the appointment of an expert to conduct a search of the Company's IT systems and electronic devices for documents containing certain key words (the rest of the order).

9.      The Company challenges each of these elements, although elements
        (a) and (d) are dealt with together. It does so on three grounds: that
        the judge erred in law by failing properly to apply the test for specific
        discovery set out in Order 24, rule 8; that she was wrong in law to
        treat the Company's verifying affidavit as not conclusive; and that she
        was wrong in law to regard the appointment of an independent
        forensic technology expert as a remedy available under Order 24, rule
        7. We deal with these grounds in turn.

*Ground 1: specific discovery*

10.     Specific discovery is dealt with by Order 24, rule 7, of the Grand Court
        Rules.  Order 24, rule 8 provides so far as relevant that on the hearing
        of an application under rule 7 the Court "shall in any case refuse to
        make such an order if and so far as it is of the opinion that discovery is
        not necessary either for disposing fairly of the cause or matter or for
        saving costs".

11.     The judge largely rejected the Dissenting Shareholders' application for
        specific discovery. At paragraph [107] of the judgment, she said that
        "save for the correspondence regarding JP Morgan's refusal to provide
        documentation, and the Skadden documents, in my judgment the
        Dissenters have not satisfied the standard required for the Court to
        order the specific discovery sought in paragraph 2 of the Summons
        and as set out in Schedule A.  This is because they have not
        demonstrated objectively the existence of these specific documents or
        categories of documents".

12.     In relation to the two categories of documents in respect of which she
        did order specific discovery, her reasoning was as follows. As to the JP
        Morgan correspondence, she said at paragraph [103] of the judgment
        that "in order to properly understand the context of JB Morgan's letter
        of 7 April 2017, which has been disclosed, it does seem to me that the
        correspondence between the Company and JP Morgan's refusal to

provide documentation should be discovered. This is in my view relevant, necessary and proportionate". As to the Skadden emails, she referred at paragraph [104] to the reason given by the Dissenting Shareholders for asking for the documents in native format, namely that the versions disclosed were in PDF format and only if the emails were uploaded in their native format would the experts be able to see the attachments. At paragraph [105] she rejected the Company's assertion that the Skadden emails were not in its power, possession or custody on the grounds that, since Skadden were the Company's former attorneys, the Company was entitled to seek the documents from its attorneys. She then set out as follows two reasons quoted as to Skadden's stance:

*"It is not protocol to provide "native" files, especially not to an adversarial party in litigation, due to various reasons:*

*(1)      If the documents are provided in their native format, there is no way to place identifying markers on them (e.g. dates stamping is not possible), so there is no way to maintain appropriate control over the documents and what is being claimed or discarded as part of the production set.*

*(2)      Additionally, when documents are provided in their native format, all of the information related to the documents, (i.e. the forensics) are inevitably provided, including but not limited to each time it was edited, saved, opened, what edits were made, and the author of the edits. Such information could potentially be privileged and cannot be removed from the documents. We do not provide the forensics unless ordered to do so by a court."*

Finally, at paragraph [106], the judge said this:

"However, in my judgment, any question of privilege attaching would be the privilege of the client, the Company, to waive, and I therefore accept Mr. Levy QC's submission that the Company ought to be able to compel Skadden to hand over the documents for uploading to the Data Room in their native form. In my judgment

> discovery of these documents is relevant, reasonable, necessary and proportionate."

13. The Company complained that, having regard to the evidence filed on behalf of the Company, there was no proper foundation for the judge's conclusion that an order for specific discovery was reasonable, proportionate or necessary. The only possible basis for that view was a statement by the expert engaged by the Dissenting Shareholders, James Nicholson, in a letter dated 10 March 2017, that the information and documents set out in the schedule to the Dissenting Shareholders' summons (which included the JP Morgan and Skadden documents) was "relevant to my assessment of fair value as at the Valuation Date". But, in the words of paragraph [15] of the Company's written submissions, "the learned Judge also failed to take account or any proper account of the fact that the [Dissenting Shareholders] had not said why specific discovery of such documents was necessary for the fair disposal of the proceedings or how their perceived deficiencies in [the Company's] discovery are preventing their expert from preparing his report. Nor did they say how they are relevant to the question of fair value."

14. The judge dealt with this issue extensively between paragraphs [77] and [89] of her judgment. She stated that although in ordinary cases of discovery relevance was not a matter of opinion but was determined by the pleaded issues, in a section 238 petition the sole issue was fair value. The discovery exercise was absolutely central to the proper determination of the value, and experts had a special role to play. She accepted that an expert must express his views as to relevance with independence, and must not allow the instructing party or its attorneys to dictate relevance; but she held at [85] that it would be highly speculative for her to come to the view on this interlocutory application, without cross-examination, that the view expressed in Mr Nicholson's letter was not his own opinion and considered view of

what was relevant for his assessment, and what was needed to complete his work. She considered the Company's submission that it was not enough for Mr Nicholson simply to state that the documents were relevant, but held that the matter had to be viewed against the backdrop of the repeated requests made by Mr Nicholson's firm. She considered also the relevance of the fact that the Company's expert had indicated that he was able to complete his report without the additional documents, but said that that did not have the effect of convincing her that Mr Nicholson was being unreasonable in requesting to see the documents and to obtain the information. She pointed out that experts may differ in approach and also as to the degree of detail or information required in order to give a valuation. Ultimately, she concluded at paragraph [89] that the court was "not in a position to second-guess or to sift through Mr Nicholson's assertion of relevance".

15.  In our view, the judge's reasoning on this aspect of the matter is clear, cogent and persuasive, and her conclusion eminently within the range of conclusions open to her. We do not consider that this ground raises any realistic possibility of challenge to her decision.

*Ground 2: verifying affidavits conclusive*

16.  The foundation of this ground of appeal is the assertion that affidavits verifying discovery are ordinarily conclusive. The Company relied in particular upon *Lonrho v Fayed (No 3)*, The Times, 24 June 1993, a decision of the Court of Appeal of England and Wales, in which Stuart-Smith LJ gave the leading judgment. The relevant part of the report is as follows:

"His Lordship concluded that on whatever grounds the order for a further affidavit was made, whether because of some admission by the deponent or the belief of the opposite party that other documents existed, the deponent's oath was conclusive; it could not be contravened by a further contentious affidavit and could not

be the subject of cross-examination. ... The reasons for the rule
were not far to seek. In the great majority of cases where it was
alleged that one party or the other had suppressed documents,
that issue would be crucially relevant to the issues in the trial and
could only be properly determined after the judge at trial had
heard all the evidence. To try the issue at an interlocutory stage
could involve injustice to both sides."

17.    The judge dealt with this aspect of the case between paragraphs [92]
and [102] of her judgment. She started by accepting the Company's
submission that the verifying affidavits sworn on the Company's
behalf would normally be conclusive as to whether or not the
Company had in its custody, possession of power any relevant
documents other than those disclosed. She said, however, that they
would not be conclusive if there had been an insufficiency of discovery
which could be established from (a) the pleadings, the list, the
affidavit, or documents referred to in them; (b) any other source that
constituted an admission of the existence of discoverable documents
not previously disclosed; and (c) an apparent exclusion of documents
from discovery under a misconception. She said that what had caused
her concern was the Company's approach to the discovery process,
which had been in instances somewhat careless and cavalier, resulting
in incomplete and ineffective discovery. There were areas where the
Company had given inconsistent responses to requests, examples of
which she identified; and she remarked that some of the variations in
the responses were hard to reconcile without full or complete
discovery. She referred to instances where the Company had claimed
not to have certain categories of documents, but had subsequently
disclosed them. One of those instances related to 431 documents
concerning the Company's quarterly budgets, which the Company
uploaded after the issue of the summons, having previously asserted
that it did not create quarterly budgets. In paragraph [102], she said
this:

"in my judgment, the Company has not misunderstood the case or
mis-conceptualised it. What it is saying is that a lot of categories of
information do not exist and never have existed in document form,
which the Dissenters say is incredulous and incapable of relief. The
position taken by the Company may well be strange. By itself, that
is not sufficient for the Dissenters to discharge the burden of
demonstrating objectively that the documents exist. However, in
light of the Company's inconsistent positions, coupled with its
cavalier approach to previous aspects of the discovery process, in
my judgment there has been an insufficiency of discovery. If
anything, the Company may have mis-conceptualised the
discovery process. This insufficiency has been established, based
on the specific facts, as well as the surrounding circumstances. It is
such that I cannot say that I find the Company's statements that it
has given complete and full disclosure reliable. I make a distinction
between credibility and reliability, because I am not saying that
there has been deliberate concealment or deletion, but rather that
the discovery process has not been handled with the care required
in order for the Court to ensure that its Orders are carried out and
that the discovery process is carried out fairly".

18. Again, we do not think that the judge's approach to this aspect of the
matter can be validly criticised. There clearly were grounds on which
she was entitled to conclude that, despite the Company's assertions to
the contrary, complete disclosure had not been given. She was right
also to recognise that there were exceptions to the general rule that an
affidavit verifying discovery is conclusive. This has been clear in
England and Wales since at least 1912: see *British Association of Glass
Bottle Manufacturers Ltd v Nettlefold* [1912] AC 709, 714, where
Viscount Haldane said this:

"But while it is true that as a general rule you cannot go behind the
affidavit in the absence of admissions in that or some other
document, the rule is qualified where the basis on which the

affidavit of documents has been made turns out to have been wrong. If the party making the affidavit has misconceived his case, so that the Court is practically certain that if he had conceived it properly, and had acted upon a proper view of the law, he would have disclosed further documents, then the Court can refuse to recognise an affidavit as conclusive, and order a further affidavit".

19.    It is, in our view, also important to recognise that the rationale of the conclusivity presumption does not apply in the special circumstances of a section 238 petition. As identified in *Lonrho v Fayed (No 3)*, the rationale is that allegations of suppression of documents are capable of being relevant not only to discovery but to the substantive issues in the litigation. That was obviously the case in *Lonrho v Fayed* itself, where the issue was what was the ultimate source of funds for the purchase of House of Fraser and the object of the specific discovery application was to establish that the asserted source of funds was a fabrication. In such circumstances, it is obviously unsatisfactory that a substantive issue should be decided at an interlocutory stage. It is also the case that, in ordinary litigation, an absence of discovery can be dealt with by the drawing of adverse inferences: if the court is satisfied that a document that must exist has not been disclosed, the court may if appropriate conclude that its contents are harmful to the interests of the party failing to disclose it. In the case of a section 238 petition, however, neither of these considerations applies. The sole task of the Court is to determine the fair value of the dissenters' shares. To do that, it needs full information. If that information is lacking in some material respect, the court is not prejudging any substantive issue by ordering its disclosure. Nor can the absence of information be dealt with by drawing adverse inferences: the court needs to know what the information is, and concluding that it has been deliberately withheld does not help the court identify its contents.

20.    In the present case, having identified inconsistencies and problems
with the Company's discovery, the judge was fully entitled to order
further disclosure. There is no real prospect of this ground of appeal
succeeding.

### Ground 3: no jurisdiction to order an IT audit

21.    This ground is based partly on the assertion that appointing an expert
to conduct or supervise discovery undermines the principle of
conclusivity, and we have already stated our views on that topic.
However, the Company goes further, and contends that the order for a
forensic audit, requiring the Company to preserve all its electronic
data and devices and submit them to examination by an external
expert, is outside the powers of the court under its discovery
jurisdiction and its inherent jurisdiction. The Company submits that
the order "is a highly intrusive form of injunctive relief akin to an
*Anton Piller* order but without the safeguard of a supervising solicitor.
Relief of that kind was unjustified and wholly inappropriate in this
case and would not be granted in reliance solely on specific discovery
rules in any Commonwealth jurisdiction".

22.    The judge dealt with this issue at paragraphs [108] to [115] of her
judgment. She quoted from Hollander, *Documentary Evidence* (12th ed,
2015), paragraph 8.18, including the following passage:

"It is obvious that an order requiring a party to give access to his
opponent to enable disclosure to be effected is an exceptional
remedy and gives rise to serious issues which need addressing.
Thus in *Nucleus Information Systems v Palmer[1]* Lewison J was told
that the applicant did not accept that the other party had given
proper disclosure of the relevant contents of his home computer,
and sought an order that he should have access to the computer in
order to search through his lawyers. The judge refused direct

[1] [2003] EWHC 2013 (Ch)

access to the computer, pointing out that it raised ECHR and
privilege issues.

In *Mueller Europe Ltd. v Central Roofing (South Wales) Ltd.*[2] the
issue was lack of the relevant expertise rather than deliberate
failure. It had become apparent that the relevant individual from
the defendant did not have the expertise to perform a meaningful
search for back-up tapes, which had been previously ordered.
Coulson J held that he had power to order that the search be
carried out by a suitably qualified IT consultant on behalf of that
party in order to ensure that the orders of the Court were
effectively complied with...

From this line of cases, it is apparent that the court has power to
order inspection of a computer by an expert, or that disclosure be
given in whole or part by an expert rather than the party, but that
this is an exceptional order which will only be given when the
particular circumstances justify it, and normally after there has
been a failure to comply with disclosure orders."

23.    The judge then said that the court had inherent jurisdiction to order
discovery by means of a forensic audit. That would be in keeping with
the overriding objective of dealing with cases justly and in a way that
was proportionate to the amount of money involved, the importance
of the case, and the complexity of the issues.  The case was
exceptional, not only because of the central importance of discovery in
section 238 proceedings and the role of the company in that process,
but also because of the Company's inconsistent and cavalier approach
to discovery. The case was analogous to the *Mueller* case where there
was a lack of expertise in carrying out the discovery process. An order
for a forensic audit was necessary to avoid a denial of justice to the
Dissenting Shareholders and to permit the court to appraise the fair
value of the Dissenting Shareholders' shares. Although the order was
undoubtedly intrusive, it was justified in this case.

_____

[2] [2012] EWHC 3417 (TCC); [2013] TCLR 2

24.     As we have indicated, part of the Company's challenge to this part of
        the Order was based on the assertion that it went far beyond specific
        discovery as contemplated by Order 24, rule 7 – which, so the
        Company said, was the jurisdiction invoked by the Dissenting
        Shareholders' summons. We agree that rule 7 would not, on its own,
        justify an order for the disclosure exercise to be conducted by a third-
        party expert. However, the Dissenting Shareholders' summons was
        also expressly intended to procure compliance with defined
        paragraphs of the Consent Order, which they contended – and the
        judge plainly accepted – had not been complied with by the Company.
        The court has an inherent jurisdiction to ensure that its orders are
        observed, and it was that jurisdiction that the judge exercised, as her
        references to the inherent jurisdiction (paragraph [110]) and the
        insufficiency of discovery under previous orders (paragraph [112])
        demonstrate. The Company relied on cases concerned with the
        court's inherent jurisdiction to order security for costs, such as *Dyxnet
        Holdings Limited v Current Ventures II Limited* [2015 (1) CILR 174] and
        *In re Bancredit Cayman Limited* [2009 CILR 578], to demonstrate that
        the exercise of the inherent jurisdiction, in the words of Lord Scott of
        Foscote in the latter case at [9], "is subject to what has become the
        settled practice of the court"; and from that base it was contended that
        the court "cannot simply invent orders that are otherwise unknown
        to the laws of these Islands and which are highly and unjustifiably
        intrusive. ...The discretion must be exercised not merely in a generally
        judicial manner, but in a manner which accords with the settled
        practice of the Court, as circumscribed or extended by primary or
        secondary legislation".

25.     Although the judge did not rely on it, there was in fact an available
        basis in the Grand Court Rules for the order she made. Order 24, rule
        20(1) provides as follows:

"Where the Court has made an order for discovery (either of documents or by way of oral examination) against any party and such party fails to comply, the Court may make such order as it thinks just, including, in particular, an order that the action be dismissed or, as the case may be, order that the defence be struck out and final judgment entered accordingly".

This power not only in terms gives a wide discretion as to the orders that may be made, but extends to striking out the case of the defaulting party. The inherent jurisdiction of the court to deal with deficiencies in discovery, to the extent that it is necessary to invoke it, cannot be less wide. On either basis, there was a clear jurisdictional basis for the order the judge made. She had ample grounds for concluding that a forensic audit was the only practical way of ensuring that the Company complied with its disclosure obligations. She recognized that the order was intrusive and exceptional, and put in place protections for the Company – in particular the provision in paragraph 11 preserving privilege. There are in our judgment no realistic grounds for believing that a challenge to this part of the order could succeed on appeal; and we do not regard the exceptional nature of the order as giving rise to a point of general importance sufficient to justify an appeal.

26.   According to a note made by the Company of the judge's reasons for refusing leave to appeal, she said that she doubted whether an appeal would have a real prospect of success because it involved a pure question of discretion and also involved an exercise of her discretion in relation to case management issues. In this, as in her decision generally, we consider that the judge was plainly correct. She had a sound jurisdictional basis for the order she made, identified the correct considerations, and reached a decision that is clearly within the bounds of her discretion. An appeal against the decision would have no reasonable prospect of success.

27.    As presaged in paragraph 3 of these reasons, we come back to the possibility of abuse of the autonomy that is of necessity to be given to experts in section 238 proceedings. In paragraph 63 of her judgment, the judge recorded a submission by leading counsel for the Company "that section 238 fair value claims must not be allowed to become a carte blanche for dissenters to conduct a "drains up" inspection of the entire business, regardless of relevance to fair value". We think there is a danger that the liberty given to the experts to define what is relevant to value could be abused, and even used to put pressure on a company to agree an inflated value for dissenters' shares rather than accept the wholesale disruption of an external inspection of its physical and electronic records. At paragraph 114 of her judgment, the judge said that she wished to make it clear that she was not at all holding that an order for appointment of a forensic expert would be appropriate in every section 238 proceeding; and again she was right to do so. It is, however, observable that such orders have been made in at least two cases – this one, and *In the matter of Shanda Games Limited*[3] (although in the latter case the order was made by consent) - and we are concerned that they may become accepted practice. We stress that they are to be regarded as exceptional remedies, not common currency in section 238 petitions.

Martin JA

Newman JA

Morrison JA

---

[3] Unreported, Segal J, 25 April 2017

# EXHIBIT 5

IN THE COURT OF APPEAL OF THE CAYMAN ISLANDS
ON APPEAL FROM THE GRAND COURT OF THE CAYMAN ISLANDS
FINANCIAL SERVICES DIVISION

CICA NO 24 OF 2017
FSD CAUSE NO 76 OF 2017 (RPJ)

IN THE MATTER OF THE COMPANIES LAW (2016) REVISION
AND IN THE MATTER OF QUNAR CAYMAN ISLANDS LIMITED

BETWEEN

QUNAR CAYMAN ISLANDS LIMITED

*Appellant*

and



1.  ATHOS ASIA EVENT DRIVEN MASTER FUND
2.  FMAP ACL LIMITED
3.  BLACKWELL PARTNERS LLC – SERIES A
4.  MASO CAPITAL INVESTMENTS LIMITED
5.  SENRIGAN MASTER FUND
6.  PAG ASIA ALPHA LP
7.  PAG QUANTITATIVE STRATEGIES TRADING LIMITED
8.  PAG-P ASIA FUND LP

*Respondents*

| Appearances: | Petitioner/Appellant: represented by Thomas Lowe QC, Paul Madden and Lachlan Greig instructed by Harney Westwood & Riegels |
|---|---|
| | 1st, 2nd and 5th Respondents: represented by Paul Girolami QC and Andrew Jackson, instructed by Appleby |
| | 3rd and 4th Respondents: represented by Robert Levy QC and Rocco Cecere and Jessica Bush, instructed by Mourant Ozannes |
| | 6th, 7th and 8th Respondents: represented by Nigel Meeson QC and Erik Bodden, instructed by Conyers Dill & Pearman |

Before:

THE RT HON SIR JOHN GOLDRING *President*
THE RT HON SIR BERNARD RIX, JA
THE HON SIR RICHARD FIELD, JA

Date of Hearing:        13 November 2017

Date of Delivery:       10 April 2018

## DISCLOSURE JUDGMENT

**Sir Bernard Rix, JA**

1.  This appeal concerns three aspects of disclosure which formed part of a Judgment dated 20 July 2017 and an Order dated 31 August 2017, both of the Hon Mr Justice Parker.

2.  The appeal arises in the context of proceedings pursuant to section 238 of the Companies Law (2016 Revision) by which dissenting shareholders (the Respondents) challenge the price offered for their shares in a merger by which Qunar Cayman Islands Limited, the Appellant, a NASDAQ quoted company, was taken private by Ocean Management Merger Sub Limited, a wholly owned subsidiary of Ocean Management Holdings Limited. The Appellant (the **"Company"**) continues as the surviving company.

3.  The Respondents (the **"Dissenting Shareholders"**) between them owned 5.2% of the issued share capital of the Company. The Dissenting Shareholders fall into three groups (the judge below said there were four) each of which has been separately represented. As a result there was a certain unevenness in the quantity of the submissions made on behalf of the Company and the Dissenting Shareholders respectively.

4.  The merger was proposed on 23 June 2016, a finalised merger agreement was executed on 19 October 2016, and the merger was approved on 24 February 2017 by a special resolution of the Company's shareholders at an AGM called for that purpose. The Dissenting Shareholders had already given notice in writing of their objection prior to the AGM (pursuant to section 238(2)). As of 28 February 2017 the merger was certified as effective by the Assistant Registrar of Companies.

5.  The value of the Company according to the merger price was some US$4.6 billion. This reflected a price per share of US$10.13 (or US$30.39 for American Depository Shares, each representing three ordinary shares). Despite their dissent, the Dissenting Shareholders' shares were cancelled, pursuant to section 238, in exchange for the right to receive the "*fair value*" of their shares.

6.     On 24 April 2017 two petitions were filed pursuant to section 238(9) seeking a determination of the fair value of the Company's shares. It was agreed that the proceedings should be consolidated.

7.     Directions Summonses were heard on 23 June 2017 before Mr Justice Parker. The Company's appeals concern three aspects of the outcome of those summonses, two of which relate to the disclosure to be given by the Company and the third of which relates to the disclosure to be given by the Dissenting Shareholders. In brief, the Company complains that the Company is being required to give too much disclosure, and that the Dissenting Shareholders are being required to give no disclosure at all.

*Section 238*

8.     For present purposes the critical parts of section 238 are as follows:

> *"(7)*    *Upon the giving of a notice of dissent under subsection (5), the member to whom the notice relates shall cease to have any of the rights of a member except the right to be paid the fair value of his shares and the rights referred to in subsections (12) and (16)...*
>
> *(11)*    *At the hearing of a petition, the Court shall determine the fair value of the shares of such dissenting members as it finds are involved, together with a fair rate of interest, if any, to be paid by the company upon the amount determined to be fair value."*

*The experts*

9.     For the purposes of assisting the parties in relation to disclosure, the Company and the Dissenting Shareholders each appointed experts. My understanding is that these will not be the experts who will ultimately give respective opinions on fair value.

Page 3 of 36

*CICA 24 of 2017 - In the matter of Qunar Cayman Islands Ltd – Disclosure Appeal Judgment*

10.     The Company appointed Mr Timothy James Reid, of Singapore, and the Dissenting
        Shareholders appointed Mr Bruno Arboit, of Hong Kong. For the purposes of the
        Directions Summons, each expert produced two affidavits.

11.     In his first affidavit sworn 23 May 2017, Mr Reid spoke to a schedule of documents to
        be disclosed by the Company. This schedule came to be called Schedule A (because it
        was so-called as attached to the Company's Summons for Directions). Mr Reid said of
        this Schedule:

> *"The Schedule is intended to be equally relevant and applicable to both
> the company and the dissenting shareholders in any given section 238
> action. That is, the categories of documents listed are sufficient for
> either side's expert to produce a robust valuation analysis. In preparing
> this, I have been careful to acknowledge and take into account the
> inherent imbalance between the information available to the company
> and that available to the dissenting shareholders."*

12.     Mr Reid went on to say this about the process of valuation:

> *"...there are five widely recognised and accepted valuation
> methodologies used to value the total assets of a company or the equity
> in that company. A decision of which methodology or methodologies to
> use will be influenced by the purpose of the valuation, the nature of the
> assets being valued and the relevant available information. In theory all
> valuations are based on cash flows that are then discounted to reflect
> the time value of money. Valuations methodologies which do not use the
> discounted cash flow methodology are, in theory, surrogates for cash
> flow based valuations. The other four basis recognised methodologies
> are:*
> *(a) Capitalisation of future maintainable profits;*
> *(b) Notional realisation of assets;*
> *(c) Value of net tangible assets;*

*(d) Capitalisation of future maintainable dividends."*

13.    In his first affidavit sworn 9 June 2017, Mr Arboit acknowledged Appendix A as broadly following the categories of documents ordered in other section 238 cases in the Cayman Islands, but he emphasised that such categories should not be regarded as closed. It was *"a good starting point"*. He also said this:

> "28.    *In my opinion, it is an essential and critical requirement that the Experts be allowed the opportunity to request further documents/information and to have reasonable access to Company management, particularly those involved in the production and finalisation of any management projections or heavily involved in the strategic planning of the business...*
>
> 29.    *Additionally, companies in different sectors may require different documents in order to produce a report. It is only after an expert has done extensive research on the company, its business model, and competitors within the sector, that the relevance of certain documents might become clear to him/her...*
>
> 36.    *Additionally, it is unclear why Appendix A limits information to those from within the last three years prior to the date of valuation. I consider that information from a longer time period (usually five years) will be required to clearly demonstrate historical patterns of growth...*
>
> 45.    *...The experts may also reference fair value by way of comparison with peers (where appropriate) but often directly comparable companies do not exist.*
>
> 46.    *In my professional opinion, a review of documents is required in order to determine the appropriate methodology/ies..."*

14.   Mr Arboit also referred extensively to Cayman Island jurisprudence on section 238 valuations, inter alia to Mangatal J in *Homeinns Hotel Group*, from whose judgment he quoted this:

> *"I am of the view that the additional requirements should relate not only to documents, but also to information...experts are the best judge of what is relevant when it comes to disclosure..."*

15.   Mr Arboit next turned to a so-called Schedule B, also attached to the Company's Summons for Directions, in which documents sought from *the Dissenting Shareholders* were set out. As to Schedule B he said this:

> *"53.    I do not consider that the documents listed in Qunar's Request for Information – Appendix B, that is documents and information relating to the Dissenters' investment in the Company and internal analysis, are relevant to the determination of fair value of a publicly listed company's shares. The rationale and motivations of each dissenting shareholder in making investment in the Company are not factors that I would take into account in forming my own independent determination of fair value and would have no bearing on my opinion thereof.*

> *54.    To this end I would not consider any analysis produced by dissenting shareholders to be relevant to a valuation and would not factor their analysis into my valuation (in order to ensure that my valuation was wholly my own). Analyses produced by dissenting are no doubt produced for a variety of purposes, and are likely to be informed by their own methodologies."*

16.   In sum, Mr Arboit, as the expert appointed by the Dissenting Shareholders, was anxious to get the widest possible disclosure from the Company, but repeatedly asserted the irrelevance of the Dissenting Shareholders' documents relating to their investment in

the Company. For this he gave no reason other than his personal anxiety to distance his own opinion from anything revealed from such documentation. He said, no doubt plausibly, that dissenters' analyses are likely to be informed by their own methodologies – but given his own evidence that at this stage methodology remains open and that "*a review of documents is required in order to determine the appropriate methodology/ies*", the fact that dissenters may adopt methodologies of their own can hardly be a factor negative to the relevance of their analyses. It may be noted moreover that among the categories of documents Mr Arboit sought from the *Company* were third-party market and industry reports relevant to the markets in which the Company operates which were included in the order made by the judge in Appendix 2 to his Order as item (l). It is not immediately clear why such third party and industry reports in the possession of the Company are relevant for disclosure by the Company, and not if in the possession of Dissenting Shareholders, even though they may be incorporated in and/or relevant to their own analyses of the Company and its operations.

17.    Mr Arboit's first affidavit elicited a response from Mr Reid in his second affidavit, sworn 16 June 2017. He there stated as follows:

> "*14.    As an expert valuer it is helpful to consider all forms of valuations of the Company and especially those conducted at or around the time of merger and particularly those that were participating in the market at that time as willing buyers and sellers.*
>
> *15.    I understand that all of the Dissenters are hedge funds or private equity firms who specialise in investing in companies prior to a merger or management buy-out. The strategy of these firms is to identify companies where the merger or buy-out has been 'mis-priced', allowing them to make a profit for their investors and clients. Such firms will usually employ experienced securities analysts to identify suitable companies for this type of event-driven investment.*

16.   *Securities analysts are finance professionals who gather and interpret data about companies, industries and financial markets in order to express opinions on the investment potential of stocks and securities. They employ a wide range of techniques, from conducting comparisons of similar companies to modifying the figures in a company's annual statements where the analyst spots items in those statements that can be questioned. A securities analyst will typically produce detailed research and valuation reports to justify his or her recommendations in relation to a particular investment opportunity.*

17.   *In my opinion, the views of securities analysts employed by the Dissenters are potentially highly relevant to the issue of the fair value of the Company. While the analysts do not have access to all of a company's internal information, they are able to rely on the large quantity of information that is available generally…It is highly likely that the Dissenters have produced their own sophisticated and informed valuations and analyses of the Company, and in my opinion these are potentially highly relevant due to the experience and expertise of the securities analysts."*

18.   Appendix A also includes *"External projections and reports relating to the Company's long-term plans"* and *"Third-party market and industry reports relevant to the markets in which the Company operates"*. While such documents would not have been prepared internally by the Company, they can still be relevant for many reasons, including as a cross-check and to compare any inputs and/or assumptions employed. I note again that Arboit 1 does not dispute the relevance of these documents. In my opinion any valuations relied on by the Dissenters would be just as relevant for an expert valuer's purposes as third-party valuations or reports in the Company's possession. As with third-party reports used by the Company, the fact that the reports or valuations originate

outside the Company itself does not prevent them from being useful or relevant for valuation purposes.

19.    Mr Arboit also made a second affidavit, sworn 20 June 2017. On the subject of disclosure by the Dissenting Shareholders, he had this further to say:

"5.    *I re-iterate that "the valuers should be valuing as if they are 'inside the company', rather than outsiders" (Arboit 1, paragraph 30). Relevant information for these purposes entails the universe of both public information and private information available to the Company...*

6.    *...to the extent that third-party market reports have been relied upon by the Company (and may have informed the views of the Company's management on the question of valuation), I would consider these reports relevant because in valuing from "inside the company", the Experts will necessarily require full access to the information that may have influenced Company management in its business planning or may underpin the assumptions in any projections.*

7.    *That is not to say that in a determination of fair value I would not seek access to publicly available information beyond that which is known to be (or have been) in the possession of the Company, however this information is available, as it is in the public domain, and can (and should) be sourced independently. Whilst the public documents themselves may be relevant, the opinions of specific investors derived from these public sources are of no relevance and would not inform my valuation. The Experts should develop their own deeper understanding of the true drivers of the intrinsic value of the Company...*

8.  *...They* [the Dissenters] *will have necessarily performed their analysis disclosure on the basis of publicly available information. That is, they have no more information than the experts would already have access to in the public domain. I consider the request for disclosure in Appendix B to be irrelevant for the purposes of determining fair value because the valuation opinion of the Dissenting Shareholders is precisely that – simply an opinion. That is, an opinion based on less relevant and complete information than the Experts would already have access to by way of the information supplied by the Company..."*

20.  I add to these extracts the observation that both Mr Arboit and Mr Reid, beginning with Mr Arboit, cited some jurisprudence, both in the Cayman Islands and elsewhere. However, I will consider that jurisprudence below. The experts may be experts in valuation, but they are not lawyers.

*Schedules A and B*

21.  Reference has been made above to Schedules A and B. Schedule A became a document agreed between the experts listing disclosure to be made by the Company: it was annexed to the judge's Order as Appendix 2 thereto. Schedule B, however, was not annexed because the judge determined that anything in the possession of the Dissenting Shareholders was irrelevant. I will refer to the judge's judgment below. It is relevant, however, to set out Schedule B, as proposed by the Company and supported by Mr Reid's evidence:

1.  All documents reflecting or relating to any valuations or similar analyses of the Company that the Respondents prepared, reviewed, or considered, including but not limited to:

1.1   all written documents, including Excel files, that set forth, summarise, or otherwise reflect valuation analyses of the Company or Company shares;

1.2   any internal valuations of the Company or the Company's shares; and

1.3   any valuations of the Company or Company stock reviewed or considered by the Respondents in connection with this action.

2.   A list of any communications that the Respondents had, whether in writing, electronically or verbally, with any representative of the Company prior to the date of the merger;

3.   Confirmation of the date the Respondents purchased any or all of their shares in the Company, including the method of purchase;

4.   A history of the Respondent's trades in the shares of the Company;

5.   Confirmation as to whether the Respondents have ever taken a short position in the Company's shares; and

6.   All documents, information and material issued or shared between the Respondents' investment manager and/or investment advisor and the Respondents' Investment Committee for their consideration of the Company's go-private action including file notes of meetings, meeting agendas and all forms of written communications.

22.   In effect Mr Arboit was saying that because, in his opinion, Company documents would be *more* relevant or more persuasive than Dissenting Shareholders' documents, therefore the latter had no relevance at all. That is not, to my mind, a sound argument.

*The three issues on appeal*

23.   There are three issues raised on this appeal by the Company concerning the judge's Judgment and Order. The first two relate to the extent of the Company's disclosure.

The second relates to the complete absence of any disclosure required from the Dissenting Shareholders.

24. Thus the Company complains about the terms of paragraphs 6 and 11 of the judge's Order. Under paragraph 6, the Company is required to give general disclosure of all relevant documents, beyond that required by Schedule A or Appendix 2 which is the separate subject-matter of paragraph 5. The Company complains that there is no case for such general disclosure. And under paragraph 11, the Company is required to provide such further disclosure and/or information as the experts might require after they have assimilated the first rounds of disclosure. The Company complains that there is no call for such further disclosure, nor, separately, for the right to obtain further information from the Company. The Company submits that this is, inappropriately, to delegate powers to the experts, and to do so on a flimsy basis.

25. I shall set out the terms of paragraphs 6 and 11 below. These are the basis of the Company's first two issues on appeal, which it is convenient to call the "*paragraph 6 issue*" and the "*paragraph 11*" issue respectively.

26. As for disclosure from the Dissenting Shareholders, the Company submits that the judge was wrong to rule that any such disclosure was irrelevant and on that ground to decline to order it.

*The Order and the judgment*

27. The relevant paragraphs of the Order made by the judge are as follows:

> "5. *By 4.00 pm on 4 September 2017 (Cayman Islands time), the Company shall upload to the Data Room all documents (of whatsoever description, whether electronic, hard copy or in any other format) and communications (whether by email or otherwise) and other materials which are in its possession, custody or power comprising the categories of documents*

*prepared or created in the five year period ending with 24 February 2017 (the **"Valuation date"**) set out in **Appendix 2** together with an index of the same.*

6.   *In addition to paragraph 5 above, by 4pm (Cayman Islands time) on 18 September 2017, the Company shall upload any additional documents (of whatsoever description, whether electronic, hard copy or in any other format) and communications (whether by email or otherwise) and other materials which are in its possession, custody or power which are relevant to the determination of the fair value of the shares in the Company as at the Valuation Date and shall include any such documents in the index.*

...

11.   *The Company shall upload to the Data Room any additional documents, materials, communications (whether by email or otherwise) or information requested by any Expert for the purpose of preparing his/her own opinion within 14 days of receipt of such a request, unless otherwise agreed or directed by order of the Court, and such requests for information of any Expert shall be made prior to the date 21 days before the exchange of expert reports, or any such other date as mutually agreed by the parties. For the avoidance of doubt, if the Experts so request, this may include documents, materials or information produced after the Valuation Date, and such requests may be made from the date of the upload of documents to the Data Room pursuant to paragraph 5 above. Any such request from or response to an Expert shall be copied by email to the Expert for the other party or parties to the email addresses notified in paragraph 10.*

12.    *The Company by consent agrees to procure that appropriate members of its management team shall be available to meet both Experts, in person or by telephone or by way of video link, such meetings to be scheduled to take place at a mutually convenient place and time for the purpose of providing information and answering queries which are relevant to the preparation of the Experts' respective opinions..."*

28.    Thus it will be seen that the judge provided for disclosure by the Company (i) pursuant to Appendix 2 (by para 5), (ii) 2 weeks later in respect to *"any additional documents...relevant to the determination of the fair value"* (by para 6), and (iii) by subsequent request *"by any Expert for the purpose of preparing his/her own opinion"*, albeit *"unless otherwise agreed or directed by order of the Court"* (by para 11). Any expert could also (by para 11) request *"information"*, and para 12 *"by consent"* of the Company provides for the manner in which such information might be provided, in addition to the documentary form in which it was to be given or copied to an opposing party's expert under para 11.

29.    The judgment explained these orders for production of documents and information as follows.

30.    The judge referred to prior cases under section 238, such as *In the matter of Homeinns Hotel Group* (FSD 75 of 2016, unreported 12 August 2016: *"I accept that the experts are to have regard to all relevant documents and information, not just publicly available information" per* Mangatal J at para 20); and *In the matter of Integra Group* (FSD 92 of 2014, unreported 28 August 2015, Jones J), from which the judge derived a number of propositions including that *"The experts are the best judges of what information is or is not relevant for their purposes and so a Company should not control what information should be made available to the experts, based upon its own assessment of relevance" (per* Parker J at para 17); and *In the matter of Shanda Games Limited* (FSD 14 of 2016, unreported 25 April 2017: where, albeit by consent, the disclosure order *"also provided that all additional documents or information needed*

*and requested by the parties' experts would be made available within fourteen days of receipt of a request"* at para 55 *per* Segal J).

31.   The judge also spoke (at para 20 of his judgment) of a submission made by Mr Terence Mowschenson QC on behalf of the Company that there was no power to order general discovery (under Order 24 rule 1) in actions begun by petition (as distinct from actions begun by writ) and that disclosure should therefore be confined to disclosure by request for specific categories of documents under rules 3 and 8 – such as the requests made in Schedule A, which were agreed, and which were all that was necessary, and that *"Further documents would only be provided on request by an expert"* (at para 21).

32.   The judge decided otherwise, however (at paras 22ff). He said that disclosure of *"all documents that are relevant to fair value"*, on a *"catch-all basis"*, after production of specific classes of document agreed, *"is the usual order"* (as indeed the authorities he had cited demonstrate). He rejected the submission that there was no power under the GCR to order general discovery in actions begun by petition. That was in respect of the paragraph 6 issue.

33.   The judge then turned (at para 32 of his judgment) to the paragraph 11 issue, which he described as the issue *"whether in response to a request for documents and/or information the requesting expert should be required, if so asked by the Company, to state (and if necessary verify) why the information and documents were relevant."* Mr Mowschenson had submitted that this requirement was necessary, in the interests of proportionality and to prevent abusive requests.

34.   The judge answered this issue, however, in the negative. He said:

> *"36.   I approach this case on the basis that all parties will comply with the orders of the Court. They will in their conduct ultimately be regulated by the Court, in the sense that the Court will rule, as it must when asked to do so, on all matters relating to the law and procedure leading up to the trial…*

> 37.    *I do not believe that any additional check or balance needs to be specifically built into the discovery order as Mr Mowschenson QC has suggested, in order to give the Company some added protection. Since the question of fair value is a matter for the Court's judgment to be reached in the light of all the factual evidence put before it and on the basis of expert assistance from valuation experts from both sides, it is not for the Company or its expert to seek to limit in advance the expert's line of enquiry. Of course, if the requests are oppressive or disproportionate or calculated to harass the Company, the Court will step in if asked to do so…"*

35.    Thirdly, the judge addressed the disputed question of whether the Dissenting Shareholders should give disclosure of their documents (at paras 55ff). Mr Mowschenson submitted that they should, and pointed to the fact that, in a similar situation of the assessment of fair value in Delaware, dissenters were required to give disclosure: *In re Appraisal of Dole Foods Company, Inc*, CA No 9079 (December 9, 2014). On the other side, however, Mr Robert Levy QC said that the decision of Mangatal J in *Homeinns*, to the effect that "*it is not in keeping with the purposes of section 238 for the dissenting shareholders to be ordered to provide discovery*" (*Homeinns* at para 20), was an end to the matter, and that judges of one division should speak with the same voice.

36.    On this issue too, the judge decided in favour of the Dissenting Shareholders. He said that he preferred the evidence on this subject of Mr Arboit over that of Mr Reid. It will be recalled that Mr Arboit said that the Dissenting Shareholders' documents were "*not…relevant*". The judge agreed. He said (at para 69) that "*I am not persuaded by Mr Reid's second affidavit that valuations of third parties based on public information are relevant to a determination of fair value*". He said (at para 70) that he preferred the evidence of Mr Arboit that the Dissenting Shareholders' internal analyses "*are not relevant*". He said (at para 73) that "*Section 238 cases should not be treated like ordinary civil litigation as it pertains to discovery*". As for the Delaware case of *Dole*,

he said (at para 75) that he would pay close attention to the decisions of the Courts in Delaware on matters of substantive law "*given the similarity of the jurisprudence and the actual words used in section 238*". But not on matters of procedure, where care had to be taken that Delaware law was consistent with Cayman law and practice. He concluded (at para 76):

> "*Whilst I take the view that the possibility of discovery from dissenters should not be ruled out, in an exceptional case, I take some comfort from the fact that I do not consider it to be very likely that discovery would be ordered to be given by dissenters in a section 238 case. This is in keeping with the approach both in **Integra** and **Homeinns**. It follows that in my respectful opinion that Mangatal J was clearly right in her decision that it was not appropriate for dissenting shareholders to be ordered to provide discovery in the usual way...*"

*The first issue, concerning paragraph 6 of the Order: submissions*

37.   On this appeal, Mr Mowschenson QC, although present in court to present a different appeal on behalf of the Company, was replaced by Mr Thomas Lowe QC. It was suggested that this was because Mr Mowschenson had conceded the paragraph 6 and paragraph 11 issues below, before the judge.

38.   Be that as it may, Mr Lowe submitted on behalf of the Company that there should not be automatic or "*blanket*" disclosure of all relevant documents in an action begun by petition; that discovery should be by requested categories under Order 24 rules 3, 8 and 14, not rule 1, and that such requests had to be justified as necessary and proportionate; and that in any event production should not be ordered unless so justified.

39.   On behalf of the Dissenting Shareholders, Messrs Girolami QC, Mr Levy QC and Mr Meeson QC all submitted that the judge was right, inter alia because paragraph 6 had been agreed below between the parties. It was true that in para 20 of his judgment, Parker J had mistakenly suggested that paragraph 6 was in issue: but that reflected an earlier stage of skeleton argument, whereas by the time of the court hearing the parties

had agreed on the terms of a "*catch-all*" provision in paragraph 6 of the draft order, in addition to the Schedule A categories for disclosure which had been agreed pursuant to paragraph 5 of the draft order. In any event counsel submitted that the judge had been right, for the reason he proposed, to conclude that a catch-all provision was necessary, as had previous judges before him in section 238 cases.

*The first issue: discussion and decision*

40.     To some extent, in their oral submissions the three counsel appearing for one or another of the Dissenting Shareholders, sought to divide up their fire-power so as not to overlap on the three issues. But there was no complete success in this endeavour. In any event, all three had filed full written skeleton arguments. This had the effect of somewhat overwhelming the advocacy.

41.     Be that as it may, this first ground of the Company's appeal was wholly undermined by clear evidence that the Company had conceded the catch-all provision of paragraph 6 below. Such agreement was not altogether surprising in the light of previous orders possibly agreed but in any event sanctioned in earlier section 238 cases.

42.     Thus, a travelling draft of what was ultimately agreed as paragraph 6 demonstrated that the Company had accepted paragraph 6 and had made some (albeit relatively small) changes to it.

43.     In any event, it is clear that rule 3 applies in any proceedings ("*whether begun by writ, originating summons or otherwise*") and allows the court to make an order for general discovery. It is unlike rule 7 which is concerned with discovery of particular documents. Whereas rule 7 requires an affidavit from the requesting party, rule 3 does not. And although it is true that production goes beyond discovery and inspection, and that production will only be ordered where necessary, it is likely to be an unusual case where the documents discovered as being relevant go beyond what is necessary for production – even if that can of course happen where disclosure is vast and goes well beyond what is necessary for a fair trial of the proceedings, especially on matters of only tangential interest. Because of discovery by list, it will be open to the parties to anticipate how

Page 18 of 36

much actual production will be necessary. Where there is a dispute, rule 14 makes it clear that the burden is on the party seeking production.

44.    In the present case, however, it was agreed that the relevant documents, whether under paragraph 5 (Appendix 2 documents) or under paragraph 6 (the catch-all provision) were not merely to be discovered by list but "*uploaded*" ie produced.

45.    In a section 238 fair value proceeding, moreover, such an attitude to the Company's disclosure obligations is entirely understandable. It is the Company itself which has put forward a price for the merger buy-out of its shares, and it has done that on the basis of its own internal assessment of its business and its prospects. For these purposes it knows better than anyone else the documentary material which is relevant to its assessment. Although independent experts may make a good start at categorising likely documents for disclosure, as has been done in Schedule A/Appendix 2, and, subject to the second issue concerning paragraph 11 of the Order discussed below, those experts may usefully be able to follow through with further requests for documentation, it makes good sense for the standard obligation on a party, to make disclosure of its relevant documents, to stand behind such initiatives. The judge said (at para 25 of his judgment):

> "*This seems to me to be in keeping with the Court's approach in these types of cases. I do not think the Company should be made to do so only if an expert requires further documents and asks for them, rather it should be a general obligation of the Company to search for and produce all documents relevant to fair value.*"

46.    In these circumstances, the appeal with respect to paragraph 6 of the Order is dismissed.

*The second issue, concerning paragraph 11 of the Order: submissions*

47.    Mr Lowe submitted on behalf of the Company that the process contemplated in paragraph 11 of the judge's Order was "*wholly outside Order 24*". The judge had no power to delegate his powers under Order 24. Rule 7 was the regular process for seeking further specific documents, and that process required support in the form of an affidavit

Page 19 of 36

and was subject to well recognised limitations. In the present case, the Dissenting Shareholders' (new) expert had produced two long lists of additional materials which had every appearance of being an unrestrained catch-all. Moreover, the reference to "*information*" in paragraph 11 was an additional error: it effectively allowed an expert to administer interrogatories, which usually required the specific permission of the court. By delegating its functions to the experts, the court had put it out of its power to control the process of disclosure and interrogatories in a way that circumvented recognised safeguards.

48.    On behalf of the Dissenting Shareholders, however, it was again submitted that the Company had agreed to the essential terms of paragraph 11 in the run-up to the hearing before the judge below. This was demonstrated by the travelling drafts of the draft order prior to the hearing, from which it was clear that the Company had agreed both to the concept of further experts' requests for documents and to their requests for information, and had only disagreed on how such requests might be policed. Thus the Company sought protection in the form below (with emphasis added by me):

> "*11.    Each expert personally and not through parties' attorneys, can make a request for such additional documents or information as he/she reasonably believes to be relevant to the determination of the fair value of the shares in the Company at the Valuation date and for the purposes of preparing his/her own opinion...*
>
> *12.    The Company or Respondent shall respond to the expert request...within 21 days of receipt of such a request unless otherwise agreed. In responding to such request the Company or Respondent may, if they consider appropriate, request further clarification of the request from the expert if the Company or the Respondent is concerned that the request is too broad, disproportionate or not relevant to the determination of fair value...and for the purposes of the expert preparing their own report...*

> 13. *The expert shall respond to any request for clarification...within 7 days of such request providing the clarification requested...*
>
> 15. *The Company may, on 5 days' notice, apply to the Court for an order that the Dissenters' Expert certify by affidavit that the documents sought are both relevant and necessary for him/her to prepare his/her report.*"

49. Ultimately, however, the judge decided in effect, with the aid of prior cases, that the experts were less likely to abuse their position than the Company was. He also inserted into his Order at para 11 the words *"unless...directed by order of the Court"* and made specific reference in his judgment (at para 41) to a liberty to apply, in these terms: *"All parties have liberty to apply to the Court at any stage if the process is not being followed or is being circumvented in some way."*

50. During submissions, Mr Lowe accepted that the words inserted into paragraph 11, understood as the Court made clear it understood them, namely as a further protection on the part of the Court against any abuse on the part of the experts and maintaining the ultimate control of the Court over the paragraph 11 process, went far and perhaps the whole way to meet the Company's objection to that process.

*The second issue: discussion and decision*

51. In the circumstances, there is little that needs to be said under this heading. Mr Lowe effectively withdrew the Company's appeal against paragraph 11 during the course of submissions. In my judgment, the Company cannot in any event successfully appeal against the concept of expert engagement in the process of disclosure which had been sanctioned by the Parties and the Court not only in paragraph 11 of the Order, but also in paragraph 6 (dealt with above) and in paragraph 12 (against which there has been no appeal).

52. In sum, I would dismiss the Company's appeal on the paragraph 11 issue.

*The third issue, concerning disclosure by the Dissenting Shareholders: submissions*

53.    In the event, this was the issue which most divided the Parties on this appeal.

54.    On behalf of the Company, Mr Lowe submitted that the Dissenting Shareholders' own documents concerning the valuation of the Company were relevant and it was for the Dissenting Shareholders to show why they should not be disclosed. The Company's expert had asked for these documents, as set out in Appendix B, on the basis they were relevant for the purposes of a report on fair value. There was no logic in the judge's rejection of the Company's expert's views in favour of relevance. The judge was wrong to say that the requested documents were irrelevant.

55.    On behalf of the Dissenting Shareholders, Counsel supported the judge's decision refusing any disclosure from the Dissenting Shareholders for the reasons he had given. In essence: it was a matter of precedent in the Cayman Islands where in all previous section 238 cases *"disclosure has been a one-way process"*; a conflicting view from Delaware in the *Dole* case could be explained on the basis of a different and broader view about disclosure there, inter alia because disclosure was allowed simply on the basis that it was relevant to credit in cross-examination, which was not the case in the Cayman Islands, and reference was also made to what Segal J had to say about Delaware authorities in *Shanda* at paras 73-80, and in any event it was the law of the forum which prevailed; the question of fair value was a matter for independent experts examining objective data; the views of the Dissenting Shareholders were subjective, based on merely public and incomplete information, and in any event irrelevant as mere opinion, and what was worse opinion from non-experts and non-independent sources; there was no need for any *"reality check"* since experts could be trusted; any documents were likely to be privileged; the judge's decision was a case management decision within his discretion and could not be faulted on any of the limited grounds on which an exercise of discretion could be attacked.

*The third issue: discussion and decision*

56.     It was somewhat anomalous that the Dissenting Shareholders devoted much more
        energy to responding to this branch of the Company's appeal than the Company itself
        devoted to advancing it. That was not only due to the fact that the Dissenting
        Shareholders had three separate skeleton arguments and three separate leading counsel
        duplicating their submissions. However, the point is of substantial importance in
        section 238 proceedings generally, and arises in the Court of Appeal substantially for
        the first time.

57.     I approach this issue from the point of view that one sided disclosure on the central
        issue of a case (a fortiori where that issue is one of fair value and the Dissenting
        Shareholders are only shareholders in the first place because, as professional and
        sophisticated investors, they have taken a decision to invest in the Company whose
        value is in issue), is anomalous, unprecedented outside section 238 cases in the Cayman
        Islands, and prima facie counter-intuitive, and therefore the argument in favour of such
        one-sided disclosure has to be considered with the greatest of care.

58.     I ask myself first what can be learned from previous cases in the Cayman Islands. It
        appears that, whatever may have been done in practice, the *issue* has only risen in two
        cases, one of which is cited by the judge and the other of which emerges from one of
        the skeleton arguments before the Court. The case cited by the judge is *Homeinns*, a
        decision of Mangatal J which he cited at para 12 of his judgment and referred to again
        at paras 61 and 75. I repeat the relevant part of her judgment (at para 20 thereof):

                *"Further in my judgment it is not appropriate to make a standard order
                under order 24 of the GCR for disclosure by both parties. In my
                judgment, it is not in keeping with the purposes of section 238 for the
                dissenting shareholders to be ordered to provide discovery."*

59.     The case relied on in Mr Levy's skeleton is *Trina*. The court does not have a judgment
        in that case, but Mr Levy has annexed to his skeleton an email dated 25 July 2017 (5
        days after the judgment of Parker J in the present case) sent by Segal J to the parities in
        that case, in which the following appears:

Page 23 of 36

> "*As regards the Petitioner's application for a direction that the Dissenting Shareholders upload to the Data Room and provide discovery of the documents listed in paragraph 7 of the draft directions order dated 4 July, I am not persuaded by the evidence relied on by the Petitioner that valuations of third parties based on public information are relevant to a determination of fair value. It seems to me that once an expert has the Petitioner's full records he does not need to see and nothing helpful could be gained by reviewing such third-party valuations. Nor do I consider that the other documents referred to in paragraph 7 (being information relating to the Dissenting Shareholders' investment in the Petitioner and the Dissenting Shareholders' internal analyses) are relevant to the determination of fair value of a publicly listed company's shares.*"

60.  The trouble with these views, as it seems to me, are as follows. Mangatal J's only reason for her conclusion is that discovery from dissenters "*is not in keeping with the purposes of section 238*". However, she does not explain, and I can find nothing within section 238 to explain, why any discovery from dissenters is inappropriate or not in keeping with the purposes of section 238. As for Segal J's views, he is equally against disclosure of "*valuations by third parties*" and dissenters' "*internal analyses*". As for the former, he says that the experts do not need them; as for the latter he says simply that they are "*not relevant*". Nevertheless, both experts in this case are agreed that third party valuations are relevant and helpful, and, where in the possession of the Company, should be disclosed; and at any rate Mr Reid is of the opinion that Schedule B documents, which include the Dissenting Shareholders' analyses, are also relevant and will assist him for the purposes of a report. Segal J gives no reason for his statement that such documents are irrelevant. In my judgment, if third party valuations in the possession of the Company are relevant, so are third party valuations not in the possession of the Company, but, for instance in the possession of the Dissenting Shareholders. After all, the question of fair value is closely related to the question of what a willing buyer and a willing seller would exchange for the shares of the Company (or for the Company as a whole): and that question is closely related to valuations

conducted within the market generally. And if that is the case, then analyses and
valuations conducted by the Dissenting Shareholders, which may well in any event be
based in part on "*third party*" valuations, assessments and analyses, are as relevant as
any such valuations, assessments and analyses, or even more so for the very reason that
the Dissenting Shareholders are not merely potential investors, but actual investors in
the Company. They are active members of the market who are willing to put their
money where their analysis is.

61.    I conclude therefore that prior decisions in the Cayman Islands are of very little
assistance to this Court.

62.    I also remind myself that the Dissenting Shareholders' counsel, when asked, could cite
no other jurisprudence, in the Cayman Islands or in the United Kingdom, in which
wholly one-sided discovery has been tolerated or practised, outside section 238 in the
Cayman Islands.

63.    Next I go to the jurisprudence of Delaware, which has had long familiarity with the
concept of fair value in the context of dissenting shareholders and a statute with similar
wording to section 238. Reference was made to the case of *Dole* before the judge, and
in the Dissenting Shareholders' skeleton arguments before this Court. A significant part
of the judge's judgment below consisted in setting *Dole* aside as throwing any light on
the issue before this Court. Mr Lowe did not refer to it in his submissions, but that as it
seems to me does not relieve this Court of the need to consider whether the judge was
justified in what amounts to his disparagement of that case for present purposes. I do
not, however, take any account of *Dole* as constituting any authority or precedent. In
any event it comes from a separate jurisdiction. However, I cannot ignore
considerations which are addressed in *Dole* as though such matters did not exist in the
world. That would be to shut my eyes to the realities of life.

64.    What I find in *Dole* is a sophisticated, well-informed, modern, judgment (delivered in
2014), with extensive citation of jurisprudence. The current issue, of disclosure by
dissenting shareholders, is considered in real depth, unlike the brief assertions made in
the Cayman Islands jurisprudence cited above. I assume that the Delaware law of

Page 25 of 36

discovery is broader than the law in the Cayman Islands, and that it also allows discovery going to credit, which is not the law in the Cayman Islands or in English law. I therefore fully understand that in these respects Delaware jurisprudence will be an unsafe guide. I will also assume, for the sake of argument, that experts in Delaware may be less conscious of the need to assist the Court as distinct from promoting the interests of the party appointing them, than will be the case in the Cayman Islands (or from wherever the experts in Cayman Islands cases may be brought). Nevertheless, a reading of *Dole* demonstrates that its reasons for requiring normal cross-party disclosure go much deeper than could be explained by those factors. I cite passages in Vice Chancellor Laster's Opinion to exemplify the power of its reasoning (but omitting the extensive footnotes):

> "*Several Court of Chancery decisions have ordered production of pre-suit valuation material prepared by appraisal petitioners. These decisions recognize that the pre-litigation valuations are relevant to the central issue in the proceeding, which is the value of the subject company. They are also relevant to issues of such as the appropriate inputs and considerations for valuation methodologies...*
>
> *The petitioners argue that their valuations are opinions, not facts, and that the question of valuation in an appraisal is purely a matter for the experts...In my view, the valuation-related information that Dole seeks easily satisfies the potential admissibility requirement. A statutory appraisal proceeding is not a fault-based case in which one side has the burden of proof and loses if it fails to meet its burden...*
>
> *...In making its determination, this court can consider a wide range of factual evidence, including, but not limited to, the market price, the merger price, other offers for the company or its assets, prices at which knowledgeable insiders sold their shares, internal corporate documents from the respondent, and valuation work prepared for non-litigation purposes. Even when the parties have retained valuation experts and the court relies on their opinions when determining fair value, the court*

has considered factual evidence relating to valuation as a cross-check, or reality-check, on the litigation-driven figures generated by the experts. The fact that a party has retained an expert does not enable the party to shield factual material relating to valuation that otherwise would be discoverable and admissible...

...Nor, in this case, are the petitioners' witnesses unqualified to express views on value. In my view, their testimony and their pre-litigation valuations will be "helpful to...the determination of a fact in issue," namely the determination of the fair value of Dole..."

Experts on valuation in this court often consider other valuation work when rendering their opinions. For example, when developing a weighted average cost of capital for the subject company, an expert may prepare her own calculation and then demonstrate the reasonableness of the selected inputs by showing that other valuations have used the identical or similar inputs, or that the inputs that the expert selected were more conservative than the inputs used by others. The expert may employ similar reasoning to attack the opposing expert's work by showing that other valuations have not used comparable inputs or that the approach selected by the other side's expert was particularly aggressive. Comparisons are made frequently to reports from securities analysts, presentations by the investment bankers who worked on the deal, or internal materials prepared by corporate personnel...

The petitioners' internal, contemporaneous valuations are real-world assessments by "astute investors" who must "back their beliefs with their purses". Their views may prove to be as or even more credible than the litigation-crafted opinions of valuation experts...

Experts can act strategically when selecting comparable companies or precedent transactions, when picking multiples, or when choosing inputs for their cost-of-capital calculations. Perhaps more importantly,

Page 27 of 36

*academic studies have shown that experts unconsciously reach higher or lower results depending on whether they represent the plaintiff or the defendant due to cognitive phenomena like attachment bias. It is helpful to check an expert's litigation-driven work or a party's litigation-inspired arguments against other valuations, particularly pre-litigation analyses ...*

*Discovery into the petitioners' analyses also should help promote settlement...Access to both sides' pre-litigation valuations should help de-bias the litigation positions, constrain the range, and promote settlement... "*

65.    Irrespective of the foreign source of these remarks, I consider there is wisdom in them. It has been my experience in cases in which experts, and share valuation experts, play a significant or dominant role, that such experts, however professional and loyal to Court or tribunal rather than party, always tend to diverge from each other in favour of their appointing party. It has also been my experience in share valuation cases that there can be much room for issues on the facts of a company's history, its financial performance, the validity of its predictions, projections as to the state of an industry, or markets, or products, or technological developments, and so on. However important a company's own documents may be on such matters, the company and its personnel and advisors have no monopoly on understanding of or insight into the world in which the company operates. The company's own documents, however important to the issue of fair value (and no one would doubt that) must be exposed to the arguments which can flow from the findings, analyses, evaluations and factual selections which other sophisticated entrepreneurs, investors and analysts in the market have made or performed. Moreover, it must be remembered that the documents of investors prior to litigation are not driven by the litigation itself but by their willingness to put their own cash to work in support of those findings and evaluations. There is a reality to that which must not go unrecognised.

66.    I turn next to the evidence of the experts involved in the current stage of these proceedings, Mr Reid and Mr Arboit. In a nutshell, Mr Arboit says that the Dissenting Shareholders' documents cannot be relevant, Mr Reid says that they are likely to be highly relevant. Mr Arboit says that he would prefer to distance himself from them (because as I understand it, they are the documents of his appointing party), whereas Mr Reid says that he would use them as being relevant for the purposes of his report. The judge accepted the evidence of Mr Arboit and rejected the evidence of Mr Reid. Why? In my respectful opinion, there is something unbecoming about an expert appointed by one party opining that its appointing party's documents *cannot* be relevant; and there is something unfortunate in a judge at a merely interlocutory stage choosing between the differing views of the experts, when it will only ultimately be at trial, and in the light of adequate disclosure and of experts' reports that an objective position is capable of satisfactory evaluation.

67.    It is often the case that at the *procedural and interlocutory* stage of disclosure, one or other party to a dispute seeks to take up an extreme position about the irrelevance of some category of documents, when what it is really doing is making an unwarranted assumption about the final outcome of the *substantive* arguments raised in the parties' dispute. Courts have to be wary of that approach, for otherwise they may find themselves taking up a final position about some aspect of the argument before they are in a position to do so. Something of that kind seems to me to be going on in this case. The Dissenting Shareholders, who want to focus on the Company's own internal documents, almost to the exclusion of any other documents (I will revert to that "*almost*"), does so because that approach best suits their case that the Company is the most knowledgeable judge of its own affairs. No one else can be privy to as much of its own information as itself. Public information is all very well, but that is only half the story. Because only the Company is privy to all the information, both public and internal, the Dissenting Shareholders point to the Company's own submission (even if that is not accepted) that its view of its own value has a precedence which cannot be challenged by anyone with only a partial view. Therefore the views of others are irrelevant. And saying that the views of others are irrelevant, involves also saying, albeit implicitly, that their views of everything which goes to make up a business's value is irrelevant: not only their ultimate view of value, but every ingredient which goes to

make up that ultimate view, such as the state of the industry, the state of the market, the position of competitors, the state of the Company's products and competing products, the ability to predict the future, the discount which has to be made for that uncertainty, the cost of capital, both loan and equity, and so on and so on. But the implicit theory of the Company's submissions, supported by Mr Arboit, is that everyone's views on all these matters are irrelevant.

68.    Except, (and I now come to that "*almost*"), that Mr Arboit, although he seeks to make that case of total irrelevance, inter alia by talking about valuers valuing "*as if they are 'inside the company'*" (see above at para 18) – in itself an arguably controversial concept, unless all it means is that the Company's internal documents have to be considered as of significant importance, but I doubt that that is all it means – nevertheless still has to accept that he would take into consideration as potentially relevant both (a) "*third-party market reports...relied upon by the Company*", and (b) "*publicly available information beyond that which is known to be (or have been) in the possession of the Company*":  but even so *not*, he says, (c) the reports of specific investors, which "*are of no relevance*" (*ibid*). This does not make sense to me: if the reports of third parties should be taken into account, I do not understand why the reports of specific investors should not also be taken into account. They are part of the market, they are third parties so far as the Company is concerned and were in every sense third parties immediately before their investment, and their reports are likely to be all the more pertinent in that they are likely to be highly contemporaneous and professional reports of sophisticated members of the market who are not only observers but ready to act on their own research and scholarship (see Mr Reid's second affidavit cited at para 17 above). In these circumstances, I do not understand Mr Arboit's view that only these reports are irrelevant, or, with respect, why the judge was willing to act on that view. I respectfully consider that the judge was wrong to do so, and wrong in principle to find any support in Mr Arboit's view for a totally exceptional exclusion of any obligation of disclosure from one party.

69.    Mr Arboit, of course, had to accept that third party reports were relevant, because he had put his agreement to asking the Company to produce inter alia "*third party and*

*industry reports relevant to the markets in which the Company operates*" (ex Schedule A/Appendix 2).

70.    Moreover, I find it inconsistent that the judge was willing to accept, under the regime provided for in paragraph 11 of his Order, that the view of *either* expert as to further documents or information to be provided by the Company was sufficient, subject to the order of the Court, for the Company to have an obligation to provide such material, whereas he was not willing to accept Mr Reid's well-reasoned evidence that *he* would require the documents of the Dissenting Shareholders on value to assist him in the preparation of a report on fair value, even if Mr Arboit would choose to ignore them. It is a strong thing indeed, in the face of a general regime for mutual disclosure, or even in the absence of such a regime, to rule at an interlocutory hearing that documents that an expert says that he would find useful in the preparation of his report would not be permitted to him.

71.    I would next refer to the oddity of the contrast between the Dissenting Shareholders', Mr Arboit's and the judge's views that *all* factors are relevant to the Court's finding of fair value, and the selection of the Dissenting Shareholders' documents as alone being excluded from that totality. The judge's judgment is replete with references to the width of the investigation leading to the Court's determination of fair value (section 238(11): "*the Court shall determine the value of the shares*"). Thus the judge cites (i) Mangatal J in *Homeinns* that "*In particular I accept that the experts and the Court are to have regard to all relevant documents and information, not just publicly available information*" (at para 12 of his judgment); (ii) Mr Levy's submission that the section 238 cases of *Perfect World; Shanda; Mindray; Bona;* and *Qihoo* demonstrated that "*the Court should not limit in advance the types of documents which the expert should be entitled to see and to call for*" (at para 13); (iii) the proposition which (inter alia) the judge derived from the judgment of Jones J in *Integra* to the effect that "*Section 238 does not dictate any particular valuation methodology…fair value should be proved by any techniques or methods which are generally considered acceptable in the financial community*" (at para 17); (iv) his own view that "*it should be a general obligation of the Company to search for and produce all documents relevant to fair value*" (at para 25); (v) Jones J in *Integra* that "*The one true rule is to consider all the evidence that*

*might be helpful, and to consider the particular factors in the particular case, and to exercise the best judgement that can be brought to bear on <u>all the evidence and all the factors</u>. I emphasise: it is a question of judgment. No apology need be offered for that. Parliament has decreed that fair value be determined by the Courts not by a formula that can be stated in the legislation"* (at para 30); (vi) his own view that "*Since the question of fair value is a matter for the Court's judgement to be reached in the light of <u>all the factual evidence</u> put before it and on the basis of expert assistance from valuation experts from both sides, <u>it is not for the Company or its expert to limit in advance the expert's line of enquiry</u>"* (at para 37; and I would add that what applies to the Company or its expert applies equally to the Dissenting Shareholders or their expert); and (vii) his own view that "*<u>I accept that there may be different approaches and what one expert considers necessary and relevant another expert may not</u>"* (at para 39) (emphasis added).

72.    What is then striking is the contrasting approach that the judge takes to (a much smaller number of) documents identified by an expert as relevant documents in the hands of Dissenting Shareholders, a contrasting approach which the judge asserts on the a priori conception that *all* the relevant documents will be held by the *Company* (a proposition which not even Mr Arboit accepts), and that dissenters' documents relating to fair value are irrelevant. Thus the judge repeatedly assumes the conclusion at which he arrives, for he states: (i) "*Since the Company will likely hold all the relevant information which will go to a determination of fair value...*" (at para 31); (ii) "*The Court would require very clear grounds upon which to make such an order [discovery from dissenters]*" (at paras 64/65); "*material which might give an indication of value which the dissenters themselves may have thought the company or their shares to have had prior to or for the purposes of the merger, is irrelevant...*" (at para 67); (iii) "*although I do not rule out the possibility of dissenters being ordered to give specific discovery in an exceptional case, such a case would be very rare indeed and would require clear grounds*" (at para 68); (iv) "*I am not persuaded by Mr Reid's second affidavit that valuations of third parties based on public information are relevant*" (at para 69: but he ordered the disclosure by the Company of such third party valuations on the basis that they were relevant, as they were agreed to be by both experts); (v) "*I prefer the evidence of Mr Arboit that* [the requested documents] *are not relevant...*" (at para 70).

(vi) *"Section 238 cases should not be treated like ordinary civil litigation as it pertains to discovery…"* (at para 73); (vii) *"Mangatal J was clearly right in her decision that it was not appropriate for dissenting shareholders to be ordered to provide discovery in the usual way…"(*at para 76).

73.    It seems to me that all these statements are at root the same simple assertion of irrelevance. Rather inconsistently, the judge allowed that in exceptional cases some (unidentified) documents might have a special case made for their disclosure from dissenters. But that perhaps merely reflects the judicial caution of *"Never say never"*. On the judge's assertion of irrelevance, however, no case could be made, and even if in theory it could be, no one could ever know of what documents to ask for.

74.    I have stated my reasons above for respectfully disagreeing with the judge's a priori assertion of irrelevance. In sum, dissenters live in the same world as companies whose fair value has to be assessed. Such companies may have internal information and projections which are not in the public domain, albeit in the case of a listed company like Qunar the room for such private information may be more limited than in the case of unlisted companies. In any event, no one disputes the relevance and potential importance of such companies' documents. It remains true, nevertheless, that value, and the market, is for the world, not only the companies concerned, and that often such companies may not understand the world in which they operate as well as outsiders understand it. But whether that is true or not, value depends on a multiplicity of factors, and methodologies, about which sophisticated analysts have different insights, and no one is more relevantly concerned with getting the research and analysis and those insights right than those who are thinking of investing in or have invested in a company. However, *"getting it right"* is not the point at this stage of the proceedings. What is needed is for the Court, at the end of the day, to get it right, having been exposed to all the material and all the arguments.

75.    In my judgment, it is unhealthy in such a context, and in litigation especially, to form a priori assumptions about relevance. The normal rule is that disclosure is a mutual obligation. Mutuality in this respect is equity and fairness. Of course some litigants may have more of what needs to be disclosed than other litigants. And it is always possible

that the documents of one party will turn out to be of greater influence than those of the other side. But I would need to be clearly persuaded that section 238 litigation is the unique field in which one-sided disclosure ought to be practised, and I would in principle regard that as a heavy task. Counsel have not suggested that there is one-sided disclosure in any other field. I am not persuaded of that extreme and unique position by repeated assertions that only the companies concerned, and not its sophisticated investors, have disclosure relevant to fair value. It seems to me that if dissenters have in their possession, as they are likely to do, documents, reports, analyses, projections and so on about companies in which they invest, their products, their industries, their markets, their competitors, in other words documentary material which relates to the value of such companies, then this material is as much a matter for disclosure as any such documents in the hands of the companies: and it matters not whether such material is possessed by the one side or the other, or is simply available as a matter of efficient research. In this context I find the evidence contained in Mr Reid's second affidavit, which merits repeated re-reading (see at para 18 above) highly persuasive. At any rate it is arguably highly persuasive, and that is all that is needed at this stage of the proceedings.

76. It is submitted for the Dissenting Shareholders that the judge's decision is an exercise of discretion and not readily amenable to appeal, subject to the usual limited grounds on which the exercise of discretion can be attacked. There are three answers. First, the ruling is not so much an exercise of discretion (for instance in relation to particular documents) as a decision of law (as to relevance) and/or principle. The fact that the judge allowed the remote possibility that in some (unexplained) case a dissenter could be made to disclose a document in exceptional circumstances does not change the reality of the judge's rationale. Secondly, however, even if his decision were a matter of discretion, the judge has erred fundamentally and in principle, by creating a unique field for one-sided disclosure. Thirdly, the judge wrongly considered himself to be following in the line of established precedent, in the form of Mangatal J in *Homeinns*, and even if not strictly binding on him: but it is clear to me that her assumption, that section 238 somehow makes disclosure by dissenters inappropriate, cannot carry weight.

77.   Finally, I refer briefly to two judgments of this Court of Appeal on the subject of disclosure in section 238 proceedings, albeit judgments only at the permission to appeal stage. The first is *Qihoo 360 Technology Co Ltd v. Maso Capital Investments Limited & Ors* (CICA no 20 of 2017, 9 October 2017), where permission to appeal against disclosure by the company concerned was refused, but this Court (Martin JA, Newman JA and Morrison JA) ended by warning of the possibility of abuse by dissenters conducting "*a 'drains up' inspection of the entire business regardless of the relevance to fair value*" (at para 27). The second is to the permission to appeal judgment of Martin JA in this very case, where he repeated his concern about possible abuse by dissenters in their disclosure demands of companies, and was also clearly concerned in general that, in the light of a series of section 238 petitions coming before the Grand Court, the Court of Appeal should have an opportunity to consider the proper parameters of the interlocutory stages of a section 238 petition. It seems to me that in the present case there is as yet no sign of danger of abuse in respect of potential further requests of the experts from the Company, provided that they are properly held subject to the control of the Court, which will wish to prevent anything abusive or disproportionate. However, there would to my mind be a danger of abuse in a situation where one sided disclosure is demanded of a company, on matters of relevance to fair value, but dissenters are given carte blanche to address any arguments on fair value they wish or can, free of any discipline that would be imposed by having, where necessary, to present to the experts and ultimately to the Court their own documents on matters of relevance to fair value, which must inevitably exist.

78.   Thus Dissenting Shareholders in this case have not submitted that they do not possess the documents which they have been requested to disclose pursuant to Schedule B. The list of documents within Schedule B is a short list, and certainly not a difficult list to answer, and there is nothing disproportionate about that list. It has not been suggested that there is. The list has been sanctioned by the Company's expert.

79.   Even so, item 5 is not so much a request for documentation as a request for information, and I would not allow that. Item 4 could be reflected in documentation, but it is much simpler if the position is simply scheduled, as requested. If the schedule is challenged, the Dissenting Shareholders should stand ready to confirm it by documents.

Page 35 of 36

(Incidentally, the idea that Dissenting Shareholders should not be required to disclose their dealings in the shares of a section 238 company seems to me to be inexplicable.) Item 4 may incidentally answer the question in item 5. Item 2 should be confined to communications regarding the value of the Company or its shares. Item 1.3 should be amended to read "*in connection with the above*" rather than "*in connection with this action*".

80.    Subject to the above paragraph, I would therefore allow the Company's appeal under this third issue.

*Conclusion*

81.    In sum, I would dismiss the Company's appeal on the first two issues, against paragraphs 6 and 11 of the Order, but allow the Company's appeal on the third issue, concerning discovery from the Dissenting Shareholders, so as to grant discovery as set out in Schedule B to the draft order, subject to the detailed comments at para 79 above.

**Sir Richard Field JA**

82.    I agree.



**Sir John Goldring P**

83.    I also agree

# Exhibit 6



**IN THE GRAND COURT OF THE CAYMAN ISLANDS**
**FINANCIAL SERVICES DIVISION**

**CAUSE NO. FSD 184 OF 2020 (RPJ)**

**IN THE MATTER OF SECTION 238 OF THE COMPANIES ACT (2020 REVISION)**
**AND IN THE MATTER OF FGL HOLDINGS**

**BETWEEN**

**FGL HOLDINGS**

<u>**Petitioner**</u>

**And**

**1. KINGSTOWN PARTNERS MASTER LTD**
**2. KINGSTOWN PARTNERS II LP**
**3. KTOWN LP**
**4. KINGFISHERS LP**
**5. KINGSTOWN 1740 FUND LP**

<u>**Respondents**</u>

| | |
|---|---|
| **Appearances:** | Mr Mac Imrie, Mr Malachi Sweetman, Mr Lukas Schroeter of Maples for the Petitioner |
| | Mr Simon Salzedo QC of Brick Court Chambers and Mr Simons Dickson, Ms Jessica Vickers and Mr Adam Barrie of Mourant for the Dissenting Shareholders |
| **Before:** | **The Hon. Justice Parker** |
| **Heard:** | 6  November,  2020 |
| **Draft judgment circulated:** | 10 December,  2020 |
| **Judgment delivered:** | 18 December, 2020 |

<u>**HEADNOTE**</u>

*Section 238 Companies Act-company disclosure-dissenter disclosure-Information requests of dissenters-Management Meeting transcripts.*

**JUDGMENT**

## Introduction

1.  FGL Holdings (the company) applies by way of petition dated 17 August 2020 under section 238 of the Companies Act for a determination by the court of the fair value of shares held in the company. The company provides life insurance and annuities products in the USA.

2.  Prior to 1 June 2020, the company's common stock was listed on the New York Stock Exchange. By a series of mergers on that date, pursuant to a merger agreement dated 7 February 2020, the company was taken private and became a subsidiary of Fidelity National Financial Inc (FNF) (the Merger).

3.  FGL Holdings merged with Cayman Islands companies affiliated with FNF, another US listed company, which carried on business as a real estate title insurance company. As a consequence the petitioner company became a wholly-owned subsidiary of FNF, now known again as FGL Holdings. The merger was approved by special resolution of the shareholders on 29 May 2020 (the Valuation Date) and became effective on 1 June 2020. The total value of the Merger was approximately US$2.7 billion.

4.  The dissenters are the investment funds of a US-based investment manager, Kingstown Capital Management, which each held shares in the company prior to the Merger. The dissenters were long-standing stakeholders in the company and its predecessor.

5.  They have exercised their statutory right to dissent from the Merger and to receive the fair value of their shares as determined in accordance with section 238 of the Companies Act.

6.  This judgment follows a summons for directions hearing. The parties have been proactively negotiating a detailed draft directions order which for the most part follows the directions that have emanated from recent s.238 cases. The court endorses this approach, which should generally be followed, unless there is a good reason to depart in any particular case. The court also notes that most of the relevant matters have been agreed.

7.  Mr Mac Imrie and Mr Lukas Schroeter appeared for the company. Mr Simon Salzedo QC appeared for the dissenters.



8.    The main outstanding issues concern disclosure. They are essentially whether the company's discovery which ,in keeping with other s238 cases is a huge exercise, should be restricted in two disputed areas and whether the dissenters' discovery, which they have agreed to give, should be expanded.

9.    The company also seeks a provision for the experts to ask Information Requests of the dissenters.

10.    There are then some miscellaneous disagreements as to conditions to be applied to the company's liberty to apply for enhanced confidentiality protections for documents it may disclose, some disputes as to timetabling, and the approach to be taken in finalising Management Meeting transcripts.

11.    It is convenient to deal with the issues in turn, whilst at the same time recording my decision and reasons.

### *The Company's discovery*

12.    It is well settled that extensive discovery of documents within their possession, custody or power of petitioner companies is essential in section 238 proceedings. This is because the company is the object of the valuation exercise and will have a large amount of information and material of critical relevance to that exercise[1]. This 'information gap' has been emphasized in numerous decisions of this court and the Court of Appeal.

13.    It is acknowledged that this is an onerous and expensive burden on the company, but it is essential for the fair determination of the matter. The dissenters as 'outsiders' are entitled to it. Moreover the court relies on relevant material to be produced to the valuation experts upon which they can base their opinions in order to assist the court to arrive at its conclusions.

### *The areas of dispute and the company's approach*

14.    There are only two items which remain disputed in relation to the company's disclosure. The dissenters have served evidence that the discovery resisted by the company is likely to be relevant to fair value and would assist the valuation experts[2]. The company has not countered this evidence on relevance, but does so essentially in relation to the onerous practicality of complying with such broad requests, through the affidavit evidence of Jodi Hyde (the company's General Counsel) [3]. The company

---

[1] *Re JA Solar Holdings Co Ltd (unreported 18 July 2019 ) per Smellie CJ  at § 76*
[2] *Affidavit of Gwynn David Nevill Hopkins (**Hopkins 1**) §§ 11-29*
[3] *First and Second Affidavits of Jodi Lynn Hyde (**Hyde 1** and **Hyde 2**).*

says it would be unreasonably burdensome to provide what is requested in these two areas and has provided some alternatives.

15.  I accept that the company's approach in this case has been reasonable and proactive in agreeing a regime to provide an efficient and sensible way for discovery to be provided. This is demonstrated by the fact that 39 out of the 42 categories of information were agreed prior to this first case management conference and one was agreed at the hearing.

16.  Of course the point cuts both ways and I also accept that there have been compromises on the dissenters' side, but as I say the burden is on the company and it has approached the matter in an appropriate way. The resourcing requirements for the exercise are significant and if the universe of documents that needs to be reviewed for relevance, privilege, and confidentiality is unnecessarily broad that requires even greater resources, and would be disproportionate.

17.  In relation to the two categories that remain in dispute the company is not refusing disclosure but suggesting a different way of dealing with the disclosure of documents, due it says to the breadth of the drafting of the dissenters' requests.

18.  The company is also seeking to shift the burden of disclosure to the Information Request phase where the experts, if they identify material relevant to their task, can ask further questions about it and call for further documents which will refine further the particular scope. To that extent a question of not only proportionality but also principle arises.

19.  The company's discovery obligations are usually addressed by the established practice for categories to be identified of the documents that the company possesses that are likely to contain relevant material. That is what has happened in this case as well.

20.  This practice should not in principle be put over to the Information Request process, which is designed to elicit specific information and answers based upon the experts' prior and ongoing review of the relevant discovery.

21.  The two categories the dissenters press for are supported by the affidavit evidence of Mr Hopkins in relation to relevance to the expert process and involve significant transactions. Mr Hopkins is the managing director of Perun Consultants based in Hong Kong.

*Category I*

*Contractual agreements with business partners and investors*

22.   This concerns a restricted category of agreements and contractual arrangements with the Merged Company's business partners or investors with an annual value of US$25 million or more. It is to be noted in this regard that there are, according to Ms Hyde, only two specific agreements and one category of agreements which the company has above the value cut-off.

23.   The company objects to being obliged to disclose 'related communications' concerning these agreements because it says that it would be unreasonably burdensome to search for such a broad range of documents[4]. It is said that this would significantly increase the time required to complete disclosure and would require the search for and production of potentially many thousands of irrelevant communications. It would involve broadening the custodians whose mailboxes are collected and adopting broad search terms that would result in a material number of false-positive documents.[5]The company suggests that if the experts wish to ask about the contracts and want to see more detailed information they can do so during the Information Request process.

24.   I appreciate that it would not be proportionate for the company to have to have to search through thousands of emails of an administrative nature (having first produced sensible search terms) and to then review them unnecessarily.

25.   However to mitigate this, in my judgement the dissenters have put forward a sensible form of narrower wording:

> "*Agreements or other contractual arrangements (or any amendments thereto), including investment management agreements, with the Merged Company's business partners with an annual value of US$25million or more; documents and communications relating to the negotiation or renegotiation of those agreements, including drafts; documents and communications containing or evidencing requests for payment pursuant to any such agreements and records of payments made; reports, presentations or analyses provided to the Company by the counterparties to any such agreements, and minutes of meetings with those counterparties, in relation to their subject matter*". (my emphasis).

26.   I accept the reasons put forward by Mr Hopkins as to why that material would assist the valuation experts[6]. They may contain information relating to the company's business which will help them understand better it as well as the contracts themselves.

---

[4] Hyde 1 §§ 42-44 and Hyde 2 §§6-13
[5] Hyde 1 § 43
[6] *Hopkins 1 §§ 18-22*

27.    Communications concerning high value contracts may contain an insight into amendments, corrections or assumptions which may otherwise be difficult to ascertain. They may give an insight into the internal processing, amendment, approval and execution of these high revenue generating contracts.

28.    In my judgement this would be a proportionate exercise to conduct, by restricting them to the value threshold, on the basis of the approach and language proposed by the dissenters and should be ordered.

*Category X*

*Fidelity & Guaranty Life acquisition*

29.    The company in its current form commenced with an acquisition in 2017 (the FG Acquisition) which Miss Hyde accepts was a significant transaction for the company[7].

30.    The dissenters seek discovery of "*internal documents relating to*" the FG Acquisition including documents relating to the decision to make the acquisition and "*any internal projections, models, or other valuation analysis*".

31.    Originally the dissenters proposed a wider form of order seeking all internal documents relating to the acquisition, which for the reasons set out in Ms Hyde's affidavit evidence[8] would have been an extremely onerous expensive and time consuming exercise.

32.    Mr Hopkins explains[9] why he believes these materials would be relevant to fair value in that they will assist the valuation experts in assessing the basis for changes to the company's financial forecasts and projections over time. He says that since the acquisition occurred three years ago, events from such a reasonably recent history will assist the experts in assessing the financial forecasts insofar as they are an extension of past performance, as well as providing insight as to how the company assesses the value and potential performance for an executed transaction with regard to an entity that now forms part of the company.

33.    He also says that forecasting performance forms a large part of the valuation process and underlying information or source data with regard to the company's projections is highly relevant to the valuation exercise, particularly in relation to understanding and testing the inputs, assumptions and metrics.

---

[7] *Hyde 1 § 46*
[8] *Hyde 1 §47 and Hyde 2 §§14-20*
[9] *Hopkins 1 §§ 23-26*

34.    The company does not dispute this evidence.

35.    The company has however offered a more limited category of documents, which were made available to the board in relation to the transaction in the form of board packs (which contain detailed and relevant information)[10] and the due diligence data room from the transaction [11](which is said to comprise 3,000 documents) on the basis that to produce material beyond that would be unreasonably burdensome[12].

36.    Ms Hyde may well be right in that the material offered by the company might contain the documents sought by the dissenters, but it is not a satisfactory way to deal with the issue. There is a risk that relevant information covering the company's valuation process would be missing from what was distilled into the board materials. The disclosing party should not be able to make a choice as to the particular sources from which discovery should be made, unless it can give an assurance that there is no other relevant material.

37.    The company says the experts can always ask for more during the Information Request process. To give discovery on this basis and leave the experts to seek further documents by way of Information Requests insofar as they need them is likely to increase costs and reduce efficiencies. It would leave the experts to speculate as to what are the relevant documents that might exist and then to formulate the correct request.

38.    It would also be wrong in principle for the reasons set out above. Discovery by the company of relevant documents is not to be avoided by pushing off the issue to the experts to ask for it by way of Information Request.

39.    In my judgement the company should give the discovery requested by the dissenters which is a proportionate and reasonable request that should be complied with.

*Category MM*

40.    There had been a dispute concerning discovery of "*internal communications or documents in relation to the market price of the Merged Company's shares'*. This was agreed at the hearing and I need say no more about it.

---

[10] *Hyde 2 § 15*
[11] *Hyde 1 § 46*
[12] *Hyde 1 § 47*

*Dissenter discovery*

*The dissenter proposal*

41.     The dissenters have proposed to give discovery of documents created in the period from 1 December 2017 to the Valuation Date.

42.     This in summary would include documents which reflect or relate to any valuations or similar analyses of the Merged Company which they prepared, reviewed, or considered, including all written documents and Excel files which summarise or otherwise reflect valuation analyses of the Merged Company or its shares, and any internal valuations and any valuations reviewed or considered by them in connection with the Merger.

43.     They have also agreed to provide all documents, information and material created, issued received or shared between them and their investment managers and/or investment advisers and their Investment Committee in relation to the Merger, including file notes of meetings, meeting agendas and all forms of written communications.

44.     They also have agreed to provide a 'schedule of trades' detailing the history of their trading in the shares between 1 December 2017 and the Valuation Date (including the number of shares purchased, the dates on which they were purchased, and the prices for which they were purchased).

45.     This is they say is consistent with the discovery identified by the Court of Appeal in *Qunar.*

*The approach*

46.     The principles to be applied in respect of dissenter discovery were set out by the Court of Appeal in *Re Qunar Cayman Islands Ltd[13]*. The dissenters are not the main focus of the discovery exercise in s238 cases as they will not hold the lion's share of relevant material, although of course the Court of Appeal, overturning the decision of this court, made clear that the dissenters should give discovery of documents that are relevant to the exercise of determining fair value.

47.     However, it carefully delineated what those categories of documents should be which has been applied by this court since then[14]. There is no general discovery obligation on the dissenters.[15] That would be inconsistent with the careful analysis of the Court

---

[13] *2018 (1) CILR 199 (Qunar).*

[14] *JA Solar § 16*

[15] *The argument that dissenters should give general discovery was rejected by Smellie CJ in JA Solar at § 62*

of Appeal in settling the specific categories of documents that are discoverable by the dissenters.

48.    In particular, they are not obliged to disclose documents relating to their characteristics and their motivations, or the timing and amount of their investments.[16] This is because these matters are irrelevant to the determination of fair value[17], which is the sole issue before the court.

49.    The Court of Appeal in *Qunar* accepted the relevance of valuation analyses of those looking to invest in the market[18]. The dissenters are like any other investor in the market who are 'outsiders' to the company and if they possess relevant material in this regard they should disclose it.

50.    Of relevance too are reports which contain research and opinions on value produced by securities analysts engaged by investors to gather and interpret data on companies, industries and financial markets and who advise particularly in advance of a merger.

51.    The Court of Appeal took the view that the dissenters' reports were likely to be '..*all the more pertinent in that they were likely to be highly contemporaneous and professional reports of sophisticated members of the market who are not only observers ,but ready to act on their own research and scholarship.* '[19]

52.    The dissenters have agreed, as is set out at paragraphs 41- 44 above, to disclose these categories of documents. Such documents are to be disclosed and are relevant because they comprise, as they did in *Qunar*, all documents which reflect or relate to '*valuations or similar analyses of the company and documents issued or shared for internal consideration of the petitioner company's take private action and a history of the dissenters' trades in the shares of the company (*which in fact the Court of Appeal ordered to be scheduled).[20]

53.    This court has since *Qunar CICA* limited dissenter discovery to documents that are themselves reflective of or related to "valuations or similar analyses" and has rejected company requests going beyond that category[21] .

---

[16] *Although the schedule of trades will go some way to providing this*

[17] *Re Integra Group [2016] 1 CILR 192 per Jones J; Re Qunar Cayman Islands Ltd 2019 (1) CILR 611 at § 63 per Parker J and Re Ehi Car Services Ltd (unreported 24 February  2020) at § 64  per Parker J.*

[18] *Qunar CICA supra at § 75 per Rix JA*

[19] *§§68,and see 74 and 75*

[20] *Qunar CICA §§21 ,79 and 78,followed in JA Solar § 58 and Ehi §§67-74 and see Re Nord Anglia Education, Inc* (unreported, 1 June 2018) *at §§13 and 18*

[21] *JA Solar ,Ehi and Nord  supra*



*The company's arguments for expanded disclosure*

54.    The company argues that the limited discovery ordered in the cases since the decision of the Court of Appeal in *Qunar* is explained by reference to what was sought in the particular case and that *Qunar (CICA)* is authority for ordering more expansive discovery by dissenters and that the categories of documents are open ended, not closed.

55.    The company says that this case warrants the additional categories of documents it seeks from the dissenters in circumstances where there is a group of dissenters, with an investment manager, which was a significant and sophisticated stakeholder in the company over a long period of time and whose views therefore are particularly well informed and important.

56.    The company argues that disclosure is a mutual obligation and the dissenters should be ordered to provide documents in the additional categories because they will be of assistance to the parties and counsel and could feature in cross examination of both factual and expert witnesses.

57.    It relies on the evidence of Mr McAnally who is a principal and an experienced valuer at the Brattle Group, an economic consulting firm, based in the US.

58.    He explains the particular utility of dissenter derived documents in paragraphs 19 to 22 of his first affidavit (McAnally 1).

59.    Mr McAnally explains why in his opinion further categories of documents from dissenters are relevant and says.."*.. it would be uncommon for a highly sophisticated investor, like the Dissenters, to make such a sizeable investment without some valuation model or other information informing the investment thesis and their investment decision'.[22]*

60.    In my view this kind of material would be already caught by the scope of the disclosure agreed by the dissenters.

61.    However documents that are relevant only to the dissenters "rationale' or their expectations are, as I have said, not useful to the assessment of fair value. They do not assist the court in arriving at the fair value determination.The particular motives or commercial positions taken by the dissenters or other persons is not relevant. Neither are their subjective views and decisions they may have made as to valuation, as the exercise of the court and the valuation experts assisting it, is not one of 'weighting'

---

[22] *Second Affidavit of Timothy P. McAnally (**McAnally 2**) § 4.2.*

valuations produced by the parties -see *Ehi*[23].The exercise the court is engaged in is independent of the subjective views and the commercial decisions of the parties as to value.

62.     A line of enquiry that pursues how the dissenters dealt with their shareholdings in the company and their decisions to trade company shares, which is said to reveal the dissenters' views of the value of the company's shares and potential inconsistencies between their actions and their position on fair value at trial, is therefore in principle impermissible[24]. Documents which go to reasons why the dissenters may have believed the merger price was undervalued are not relevant. If any such views were based upon valuations or similar analyses those documents will be produced in any event.

63.     Mr McAnally says that they may assist a valuation expert in evaluating how much weight to give to the dissenter's valuation[25]. However, as I have said the court is not engaged in a weighting exercise between valuations produced by the dissenters or indeed anyone else.

64.     Furthermore discovery for the purposes of undermining the credit of a party or its witnesses is generally not appropriate in such cases. In s.238 cases the court is engaged in a process of arriving at the fair value of the dissenters shares, assisted by the experts who play a vital role and who owe duties to the court. The characteristics and motivations of dissenting shareholders are irrelevant as the court has now ruled on a number of occasions. Obtaining discovery simply to cross examine a factual witness who may give evidence on behalf of the dissenters is likewise not of assistance to the court in determining the fair value of the company's shares.

65.     I accept Mr Hopkins detailed evidence[26] which deals with  each of the categories the dissenters wish to expand.

66.     Any value relevant information regarding the dissenters' trading in the company's shares will be captured by the schedule of trades the dissenters have agreed to provide. The dissenters have agreed to verify the schedule of trades on affidavit if requested to do so in case its reliability is challenged by the company.

67.     Anything beyond that seems to me to go to the motives of the dissenters and the subjective views of brokers and counterparties, which are irrelevant[27], unless they constitute in themselves *valuations or similar analyses* which the dissenters have agreed to disclose.

---

[23] *EHi Car Services Ltd (unreported, 24 February 2020),* §70
[24] McAnally 1 §33
[25] McAnally 2 §11
[26] Hopkins 1 §§52-71
[27] Ehi § 70

68.    Similarly the company's request for material relating to the dissenters' particular investment strategies and decision-making processes are specific to each dissenter and has no relevance to a s.238 process. This would include documents and communications concerning decisions to purchase, hold or sell shares in the company, investment policies or guidelines in relation to those investments, and other discussions of the dissenters' investment objectives concerning those shares.

69.    If those strategies relied upon *valuations or similar analyses*, that material has been agreed by the dissenters to be produced.

70.    The company's request for all documents and communications concerning '*the company, its business and competitors, and the merger*' from the dissenters is a very broad request and is tantamount to a request for the dissenters to give general discovery. If there is material which is relevant to valuation of the company the dissenters have agreed to disclose it and it would not be necessary or appropriate to expand the obligation on the dissenters to search for large quantities of irrelevant material.

71.    In this regard I note that if there are formally commissioned comparable company analyses held by the dissenters which could be relevant, Mr Hopkins is of the view that ..*"without the benefit of company insider information those reports are little different from any other reports readily obtained from public sources[28]*.

72.    I accept that there will be inputs and assumptions that require the exercise of judgement and that reasonable experts can differ about what those inputs and assumptions should be, based upon their experience and approach. To that extent it may be relevant to know what inputs and assumptions were made by others in any comparable analyses.

73.    What weight is to be given to such comparable studies is a matter for trial. They are however relevant and the dissenters have agreed to disclose them.

74.    Indeed the court is typically provided at s.238 trials with a large volume of independent market analyses from independent financial institutions as well as technical academic papers and studies.

### *Brokerage records*

75.    The company, relying on the evidence of McAnally[29], argues that the schedule of trades agreed to be provided by the dissenters is not sufficient and the brokerage

---

[28] *Hopkins 1 §67*
[29] *McAnally 1§§23-26 ,McAnally 2 §§5-6*

records themselves  should be produced. Mr Hopkins is of the view that any material that goes beyond the trading records of the share transactions is not relevant to the fair value appraisal of the company[30].

76.    I again accept Mr Hopkins views on this issue[31].

77.    A review of brokerage records to ascertain trading activity by the dissenters is plainly designed to go to the dissenters' motivations and commercial strategies . To try to discover whether the dissenters subjective views at the time were different to those they may put forward at trial does not assist the court.

78.    The fact that the dissenters in this case may be significant and important market participants does not change the position. The expert process is concerned with the correct approach to and judgements concerning the valuation of the shares in the company, not the commercial motivation and subjective views of the dissenters.

79.    Since the subjective views of investors are irrelevant, so '*a fortiori*' are those that financed them, (who may well be interested in matters relating to their loans, rather than the fair value of the company).

80.    The company makes the point that the dissenters' trading records might inform how its expert should approach the formal valuations produced by the dissenters[32]. This again is not a relevant line of enquiry. The court is not conducting a weighting exercise in valuations produced by the dissenters. The court is not undertaking an exercise to test any dissenting shareholders' assessment of fair value[33]. There is no case made out for disclosure beyond the agreed schedule of trades, verified if necessary upon affidavit.

81.    The court has previously rejected the argument for discovery in relation to intermediaries.[34] An investigation of the individual investors' commercial motivation for decisions and instructions given to intermediaries is also irrelevant. There is no good reason to depart from that position in this case.

### Conclusion on dissenter discovery

82.    I do not accept any of the arguments for expanded dissenter discovery at this stage. None of the requests sought are on analysis clearly defined as relevant, necessary for

---

[30] *Hopkins 1 §35*
[31] *Hopkins 1 § 38*
[32] *McAnally 1 §25*
[33] *JA Solar §72*
[34] *Ehi § 74*

disposing fairly of the fair value question, proportionate, or likely to be sufficiently probative so as to make the exercise worthwhile[35].

### Miscellaneous issues on dissenter discovery

83.    The company also objects to the inclusion of a stipulation in the order that the dissenters' discovery obligations should be subject to the overarching limits of relevance to make it clear that documents that are irrelevant are not disclosed. It seems to me this is a sensible stipulation in the circumstances and has been endorsed by this court on a number of occasions[36]. It is sensible to clarify the dissenters' obligation to disclose relevant materials according to the way this court has interpreted and applied *Qunar (CICA)*.

84.    The company also seeks an earlier start date for the discovery the dissenters have agreed to give. It asks for three months before the dissenters first bought shares in the Merged Company, rather than 1 December 2017. However ,this is the date on which the shares began to be traded on the New York Stock Exchange, (and the date from which the company will give discovery for category MM.) This is not in my view is appropriate or necessary.

85.    The date on which the shares began to trade publicly is the date on which the object of the valuation exercise centres and is the logical starting point.

86.    The company finally asks for documents and communications that the dissenters intend to introduce or rely upon at trial. A large number of documents are typically produced for the court in s.238 cases in the form of agreed trial material which has not been produced on disclosure by either party, but which are documents which the experts in their researches and analyses have uncovered, or which are in the public domain and which the parties wish to refer to. That material should not fall within any party's obligation to give discovery but should in the normal course be notified to and if necessary provided to the other party as a matter of trial preparation and fairness in advance of trial, if they are to be referred to. If there is a dispute as to admissibility that can be dealt with at trial.

### Information Requests of dissenters

87.    Given that the dissenters are outside all the processes and information of the company and their subjective opinions on fair value are irrelevant it is hard to see how Information Requests of them by an expert would be useful or appropriate.

---

[35] *See Ehi § 66*
[36] *JA Solar § 55*



88.   This same request was made by the petitioner company in *JA Solar* and was rejected.[37] A summary of the Chief Justice's reasoning is: It is unclear what other material the dissenters might possess, besides the valuations and analyses identified in *Qunar (CICA),* which could possibly assist the valuation experts[38]; the court is not engaged in testing any assessment of fair value put forward by the dissenters (as opposed to their expert) which would in any event be irrelevant[39]; the position of the company is different as it is in possession of the essential material to determine fair value 'from the inside' and has put forward a fair value determination in its proxy statement[40]; there is no apparent good reason, nor is any explained, to require the dissenters to answer questions; such a requirement is not proportionate nor in keeping with the Overriding Objective.

89.   Applying the same clear principles here there is no reason to order that dissenters should respond to Information Requests at all, let alone at the first directions hearing, before any evidence has been served.

90.   In *Nord Anglia,* upon which the company (through Mr McAnally who was involved in that case, although not as a testifying expert), relies[41], there was limited and specific provision made by agreement for one group of dissenters to answer Information Requests.

91.   The point arose in the following way. One group of dissenters served an affidavit of fact which asserted that they had considered making a 'topping bid' for the company but were dissuaded from doing so. Following a disagreement as to the adequacy of disclosure in relation to that evidence the group of dissenters and the company agreed that they would provide further disclosure and would answer Information Requests about it. This was later reflected in a consent order.

92.   That is very different from the position here. No factual evidence has been  served in this case as yet. There was no reasoned judgment supporting any such requirement on dissenters as a whole in *Nord*, which arose in particular circumstances relating to one group of dissenters' factual evidence and was agreed.

*Confidentiality*

93.   The company (and the dissenters) should have liberty to seek confidentiality protection in respect of any highly confidential or commercially sensitive documents. In order to ensure the smooth progress of disclosure the company, as it has agreed, will in the process of collecting and reviewing the documents captured by the disclosure order, identify any documents which might require further confidentiality

---

[37] *Re JA Solar Holdings Co Ltd (unreported, 18 July 2019) §§70-76*
[38] *§71*
[39] *§72*
[40] *§§73-75*
[41] McAnally 1 §§ 28-30



protection. The company holds for example a lot of policy holder data. The company proposed the time for such an application to be 14 days prior to the expiry of the time limited for disclosure.

94.     The company should be able to identify those documents and to make an application a little bit before then. In my view 21 days in advance of the deadline for disclosure as suggested by the dissenters is reasonable for the parties to have the opportunity of deciding the matter before the deadline.

95.     For this reason I accede to the dissenters' proposal that any such application for confidentiality restrictions should be determined on the papers ,with any objections by the dissenters to be filed  within seven days, and any reply within a further three days. The court should then be in a position to rule on the matter without any slippage to the timetable for disclosure.

### *Timetabling*

96.     The company argues that the proposed timetable of the dissenters is intended to put the company under unnecessary pressure. I have in mind the Overriding Objective in terms of economy and expedition as well as fairness between the parties and the goal of producing a procedural timetable which allows ultimately for a fair resolution of the issues.

### *Appointment of experts*

97.     In relation to the appointment of an expert the company asks for 60 days and the dissenters 28 days from the date of the Order. The dissenters served their notices of dissent on 30 June 2020.The petition was issued on 7 August 2020 and from at least that date the parties would have been actively considering the identity of a suitable expert. It seems to me that 60 days is too long and I am prepared to order 40 days from the date of the Order.

### *General disclosure by company and disclosure by dissenters*

98.     For general disclosure the dissenters submit 42 days from the date of the Order should be sufficient. The company has asked for 125 days given that just the due diligence documents (comprising of over 3000 items) will have been produced within 28 days.

99.     The court has regard to: what is practicable and reasonable to achieve and in what timescale; the knock-on effect on other directions (and any later slippage of the expert evidence process) of delay to disclosure; and when the case could be ready for trial. I bear in mind again the Overriding Objective with its emphasis on expedition and economy[42]. I have carefully considered the evidence of Ms Hyde in this regard and

---

[42] *Ehi § 18*



the considerable resource the company needs to engage.[43] In my judgement 70 days would be a fair and achievable outcome for the company.

100.   The dissenters should exchange their discovery on that date as well.

### Information Requests

101.   The usual time for the experts to respond is 14 days. The order is usually "…. *within 14 days unless otherwise agreed or directed by the court*"[44].

102.   The company seeks 35 days for the first set of requests and then up to 28 days for subsequent requests. I appreciate that this can be a time and resource consuming process for a company but these time periods are too long. The usual order will be made.

### Management Meetings

103.   The company argues that Management Meetings are intended to operate as an open discussion between the experts and the company's management, the purpose of which is to allow the experts a better understanding of the company and its business. They are not intended to be a form of quasi-deposition from which oral answers to questions are elevated without warning into significant evidence on which great weight is placed.

104.   I accept this and insofar as is reasonably possible, within the constraints of a litigation process, am sympathetic to making them relatively informal, productive and of course fair. As has been said in previous cases Management Meetings are not intended to be pre-trial depositions processes. The weight to be given to what is said in the Management Meeting on any particular point will be a matter for the trial judge depending on what the point is, what the nature of the discussion was, and how it relates to other evidence.

105.   The company argues that if the experts wish to rely in their reports on any aspect of the transcript, they should first identify the passage and the company should then have an opportunity to clarify or confirm anything in the passage within a further seven days. The experts are not required to indicate what their intended reliance is.

106.   It is said that this will facilitate the company's management speaking freely and avoids the experts reaching erroneous conclusions about what was said or meant. It would avoid a "gotcha" moment where a loose comment or a comment is made that is

---

[43] *Hyde 2 § 26*
[44] *See JA Solar schedule of orders*

not accurate, because the person making it is not aware of a particular document, or there is a difficulty in the meaning intended to be conveyed. Although in this case the native language of all parties is assumed to be English, it is said it would avoid misunderstandings between the questioner and the company representative.

107.    Such a provision would be designed to prevent too much being made of a particular point in an expert report from the transcript, when the point has not been properly explained or understood and gives the employee involved and/or the company an opportunity before trial to deal with the issue.

108.    The dissenters whilst agreeing with the broad purpose of the meeting say this is unnecessary and is likely to be counterproductive. The company will in any case review the transcript of the meeting, identify any corrections to the transcript that it considers necessary, and provide the transcript to the dissenters and experts within 14 days of the meeting.

109.    On this issue, in order to make the process as fair as possible for the company, I am prepared to accept Mr Imrie's submissions and flex the procedure a little by requiring the valuation experts to identify any parts of the transcript which they wish to specifically rely upon in their reports so that the company has a further opportunity to make sure it is accurate, as requested by the company.

110.    The company will arrange for the meeting to be recorded and produce a transcript .It will then correct any errors within it and circulate it to the experts and the dissenters within 21 days of the meeting ( a week longer than proposed).

111.    After this the experts, if they wish to refer to or rely on any passage or information contained within the transcript  in their reports, should identify it within a reasonable period of time, say 14 days, and give the company an opportunity to comment upon it within a further seven days.

112.    The experts are not required to indicate the basis or purpose of their reliance. This change to the standard directions is designed to avoid the unfairness suggested by the company of the risk of being taken by surprise.

113.    To be clear it is not to be used to change or argue about what was said and recorded. It is intended to give the company an opportunity to make sure what is recorded is complete and accurate, having seen it is something the experts are intending to refer to in their reports. The experts will then have that before they draft their reports.

*Third party information*

114.    There was a minor dispute as to the information obtained from any third parties. The dissenters want to include the word 'relevant' in an order which required any party receiving documents from any third party to disclose it to the other party in the case.

115.    I do not believe there is any need for that restriction because anything obtained by way of third party disclosure will already have been determined to be relevant to the valuation or it would not have been sought and ordered. The party who receives the documents pursuant to the third party disclosure order should not have to reassess relevance again at that stage and should make available all the documents received from the third party to the other party in the case.

116.    The parties should draw up a draft order reflective of this judgment for my review.

_____
THE HONOURABLE MR JUSTICE RAJ PARKER
JUDGE OF THE GRAND COURT

# Exhibit 7

**[2009 CILR 342]**

## PHOENIX MERIDIAN EQUITY LIMITED

*v.*

## LYXOR ASSET MANAGEMENT S.A. and SCOTIABANK & TRUST (CAYMAN) LIMITED

*Grand Court*

(Smellie, C.J.)

**22 May 2009**

*Injunctions—anti-suit injunctions—injunction against foreign proceedings—on application to enjoin foreign proceedings, to show compelling reason to prevent other party from invoking legitimate right under foreign law (e.g. "unconscionable" to allow it to proceed)—not "unconscionable" to seek Title 28 depositions under US law if witness not amenable to Cayman discovery and since US courts aware of dangers of oppression*

The plaintiff brought an action against the defendant to recover the value of its investment in a group of funds administered by the defendant.

The defendant withheld a sum from the plaintiff's funds which it claimed it was entitled to do on behalf of its parent company, for the part it had played as investment adviser and leverage financier to the funds. The claim had only recently been clarified, having previously been pleaded as a penalty for early redemption, and consequently the plaintiff sought full and frank disclosure of all relevant information through the discovery process. The key witnesses were officers of the parent company resident in the United States and, since they were not parties to the proceedings, they could not be subject to oral interrogation under O.24, r.16 of the Grand Court Rules.

The plaintiff therefore resorted to the discovery process under §1782 of Title 28 of the US Code to seek oral depositions from the defendant's key

witnesses resident there. The defendant applied for an injunction restraining the plaintiff from continuing proceedings in the United States to compel the employees of the principal to give depositions.

The plaintiff submitted that it should be allowed to pursue the request to obtain depositions because (a) the defendant had changed its pleadings so considerably that they were inconsistent with the earlier affidavits of the witnesses; (b) it would provide significant benefits for the forthcoming trial in the Cayman Islands; and (c) Cayman law could not be invoked here and there were several significant and legitimate reasons why they wished to seek depositions from these officers.

The defendant objected to allowing the taking of the depositions on the ground that they would be unconscionable since (a) the witnesses to be deposed were due to testify at the Cayman trial and it would therefore amount to unwarranted and oppressive double cross-examination and the procedure could discourage them from attending the trial; (b) they were working towards the trial and it would be an unnecessary distraction; and (c) the inquiry was too broad and intrusive.

**Held,** dismissing the application:

The application seeking to enjoin the Title 28 proceedings would be refused since the defendant had not established that it would be unconscionable to allow the plaintiff to proceed and thus, given the need to show a compelling reason to prevent a party from availing itself of a right it enjoyed under foreign law, their legitimate right to invoke that procedure had not been overridden. The key witnesses were not amenable to the full Cayman discovery process under O.24, r.16 of the Grand Court Rules since they were not parties to the action, and as the US courts were well aware of the dangers of vexation and oppression (including the risk of the plaintiff's conducting a "fishing expedition") under the procedure, it would not be unconscionable for the plaintiff to seek these depositions under US law. Moreover, there was no suggestion that Cayman law regarded double cross-examination as an abuse of process (since O.24, r.16 provided for pre-trial discovery by way of depositions) and, further, it had been established that witnesses could be subject to pre-trial cross-examination under O.26, r.5(2) on the basis of their written interrogatories (para. 14; para. 19; paras. 25–26; para. 28; para. 30).

**Cases cited:**

(1) *Benfield Holdings Ltd. v. Richardson*, [2007] EWHC 171 (QB), referred to.

(2) *Cotorro Trust, In re*, 1997 CILR 1, referred to.

(3) *Intel Corp. v. Advanced Micro Devices Inc.* (2004), 542 U.S. 241; 124 S. Ct. 244; 159 L. Ed. 2d 355, considered.

(4) *Lemos v. Coutts & Co. (Cayman) Ltd.*, 1992–93 CILR 460, referred to.

(5) *Nokia Corp. v. Interdigital Technology Corp.*, [2004] EWHC 2920 (Pat), considered.

343

(6) *Omega Group Holdings Ltd. v. Kozeny*, [2002] CLC 132, referred to.

(7) *South Carolina Ins. Co. v. Assurantie Maatschappij "De Zeven Provincien" N.V.*, [1987] A.C. 24; [1986] 3 W.L.R. 398; [1986] 3 All E.R. 487; [1986] 2 Lloyd's Rep. 317, *dicta* of Lord Brandon of Oakbrook followed.

(8) *Unilever Plc v. ABC Intl.*, 2008 CILR 87, referred to.

**Legislation construed:**

Grand Court Rules 1995, O.24, r.16: "(1) In an action begun by Writ, the Court may make an order for discovery by oral examination of any party or, if the party is a body corporate, any officer thereof . . ."

O.26, r.5(2): "Where any person on whom ordered interrogatories have been served answers any of them insufficiently, the Court may make an order requiring him to make a further answer, either by affidavit or on oral examination as the Court may direct."

*G. Halkerston* and *Ms. M. Hudson* for the plaintiff;

*C.D. McKie* and *J.F. Pennay* for the first defendant;

The second defendant did not appear and was not represented.

1. **SMELLIE, C.J.:** This is an application by the first defendant ("Lyxor") for injunctive relief restraining the plaintiff ("Phoenix") from continuing proceedings in the United States instituted by Phoenix in which certain persons resident in the United States would be compelled to give depositions. Those persons are Samuel Rosenberg and Anthony Phlipponneau or any other officer, director, managing agent or employee of SG Americas Securities LLC ("SGAS"), resident in the United States. SGAS is an affiliate entity of Société Générale ("SG") and is incorporated and operating in the United States.

2. The background is as follows. Phoenix sues Lyxor in these proceedings before this court in respect of what Phoenix claims is the full value of its investment in a group of Phoenix Investment Funds administered by Lyxor. The dispute is over the sum of approximately $100m. which Lyxor claims it is entitled to withhold on behalf of its parent, SG. This large sum is in respect of what SG now claims as an "undisclosed margin" or profit to which it is entitled for its part as investment adviser and leverage financier to the Phoenix funds.

3. Lyxor's claim on behalf of SG has only recently been clarified in the pleadings. Until then, it was rather differently pleaded in terms of a penalty or levy which SG was entitled to impose because of Phoenix's early redemption of its investments. Not surprisingly, Phoenix seeks to examine every aspect of SG's claim and has required, through the discovery process, full and frank disclosure of any information in Lyxor's possession or control relating to SG's claim. Lyxor has provided extensive

witness statements and/or affidavits, from Mr. Rosenberg in particular, in support of its discovery.

4. A complicating feature of the case is that while Lyxor asserts the claim on behalf of its principal, SG, the relevant institutional information is held by SG which is itself not a party to this action. And, while Lyxor claims to have made full and frank disclosure, the issues which Phoenix seeks to explore by way of the depositions in the United States are matters within the knowledge of Messrs. Rosenberg and Phlipponneau (and perhaps others), who are officers of SGAS (and, in the case at least of Mr. Rosenberg, of SG itself) but not of Lyxor.

5. That being the nature of the inter-relationships, the witnesses—Mr. Rosenberg and Mr. Phlipponneau—are not immediately amenable to the process by which this court can compel officers of companies, which are parties to proceedings before it, to submit to oral interrogation by way of discovery under O.24, r.16 of the Grand Court Rules. Phoenix has therefore resorted to the discovery process available by way of notice under §1782 of Title 28 of the US Code. By that process, Phoenix seeks to depose Messrs. Rosenberg and Phlipponneau on a range of 11 separate topics relating to SG's business as investment adviser and financier, not just of Phoenix's funds, but—to the extent relevant to SG's claims—also to its dealings with other clients.

6. Phoenix argues that it should be allowed to pursue the depositions of Messrs. Rosenberg and Phlipponneau because Lyxor has significantly changed its case in a manner which is inconsistent with the earlier sworn affidavit of its chief witness, Mr. Rosenberg. It contends that the deposition of Mr. Rosenberg and his colleague, Mr. Phlipponneau, will provide significant "litigation benefits" to Phoenix (and, it is hoped, this court) in the trial to take place here in this action.

7. Lyxor objects to the Title 28 depositions on the grounds of oppression and prejudice. On its behalf, Mr. McKie argues that as Messrs. Rosenberg and Phlipponneau have both given witness statements in these proceedings and will be attending to testify at the trial, the proposed depositions are unconscionable for three main reasons:

   (a) They will subject Mr. Rosenberg and Mr. Phlipponneau to unwarranted double cross-examination and the trial in this court will suffer from that unwarranted duplication. Such interrogation of the proposed witnesses would be oppressive and could discourage them from attending the trial out of concern of being submitted to the same process again.

   (b) The parties are working flat out to prepare for this complex trial, albeit now postponed from May 2009 to September 2009. It is unnecessary and undesirable for there to be the distraction of depositions.

(c) The area of inquiry defined by the 11 topics is far too broad and intrusive.

8. Lyxor's summons now before me, by which it seeks to restrain Phoenix from pursuing the Title 28 depositions, raises an important issue of Cayman civil procedure. This is whether the Cayman courts should intervene to prevent depositions in the United States, ordered by the US court to be given by deponents who are residents there, when the deponents are potential witnesses in a Cayman action in respect of which it is clear that the Cayman court is the only appropriate forum for the ultimate trial of the action.

9. While the case law on this point has developed in other places in the Commonwealth, it is a point of first impression for this court—the question whether an anti-suit injunction should be issued to restrain foreign proceedings reported to have arisen before only in the context of cases where there were disputes over the *forum conveniens* (see *In re Cotorro Trust (2)*, *Lemos v. Coutts & Co. (Cayman) Ltd. (4)* and *Unilever Plc v. ABC Intl. (8)*). In the first two of those cases, the foreign proceedings were restrained on the basis that the Cayman Islands were the proper forum. In the *Unilever* case, arbitration proceedings in Paris were restrained on the basis that the defendant, ABC International, a Cayman company, was seeking vexatiously to compel the plaintiff to submit to those arbitration proceedings.

10. In the context of this application, there are competing discernible issues of principle involved. Unlike the position in many other Commonwealth jurisdictions including England, Cayman civil procedure does allow—pursuant to O.24, r.16 of the Grand Court Rules—oral discovery by way of depositions prior to trial. This is, however, as already noted, limited to officers of companies which are parties to the proceedings before the court. So, while it may not be said that Cayman law is hostile to witnesses being cross-examined prior to trial, such a procedure remains unusual. No case concerning this procedure has been reported since O.24, r.16 of the Grand Court Rules was amended in September 2003 to permit this mechanism.

11. Apart from O.24, r.16 of the Grand Court Rules, there is, generally, no power by which the Cayman courts, on behalf of parties to the actions before it, can compel persons who are not parties to give a full measure of pre-trial discovery, where it includes both the disclosure and production for inspection and copying of documents, as well as the giving of oral or written testimony. In this regard, Cayman law and procedure differs essentially from that of several foreign jurisdictions, including the United States.

12. This court must therefore be alive to the natural concerns of practitioners about the possibility of such pitfalls as duplication of effort and

oppression arising from the use of pre-trial depositions. These are considerations which are identified by Lyxor here as militating against the Title 28 proceedings from the perspective of the court in ways which, perhaps, would not trouble the US or other foreign courts where such pre-trial depositions are routine.

13. But the further issue of principle is the other side of the coin: it raises the question to what extent it is desirable or appropriate that a party to litigation before our courts should be prevented from availing itself of a statutory right which it may have under foreign law (here US federal law). The right here is one to apply for an order that persons resident in the foreign jurisdiction, who are themselves not parties to the action before this court and so not amenable to its process, should give pre-trial discovery by way of deposition evidence relevant to the issues in dispute before this court.

14. Framing the competing issues of principle in this way brings into stark relief the competing and equally important concerns which must be considered. It is plain from the outset that where a party has a right to avail itself of a legitimate foreign process, there must be a very compelling reason to prevent it from doing so—something more than just the philosophical differences of approach to litigation existing between jurisdictions.

15. The way in which the English courts have come to terms with the problem is, as ever, of highly persuasive value. The *dicta* of Lord Brandon of Oakbrook from the leading case of *South Carolina Ins. Co.* v. *Assurantie Maatschappij "De Zeven Provincien" N.V.* (7) sets the now classical framework for the consideration of the principles ([1987] A.C. at 40):

". . . [T]he power of the High Court to grant injunctions is, subject to two exceptions to which I shall refer shortly, limited to two situations. Situation (1) is when one party to an action can show that the other party has either invaded, or threatens to invade a legal or equitable right of the former for the enforcement of which the latter is amenable to the jurisdiction of the court. Situation (2) is where one party to an action has behaved, or threatens to behave, in a manner which is unconscionable."

And he continued (*ibid.*, at 41):

"It is difficult, and would probably be unwise, to seek to define the expression 'unconscionable conduct' in anything like an exhaustive manner. In my opinion, however, it includes, at any rate, conduct which is oppressive or vexatious or which interferes with the due process of the court."

16. Here, Lyxor, for the reasons already summarized above, does not rely

on what Lord Brandon of Oakbrook describes as situation (1) but rather on situation (2). I will come below to examine the arguments more fully, but before so doing there are further points of principle relevant to this application which may be gleaned from Lord Brandon's speech. They are conveniently summarized in *Nokia Corp.* v. *Interdigital Technology Corp.* (5), as adopted and applied by Pumfrey, J. ([2004] EWHC 2920 (Pat), at para. 25):

"(a) The English courts do not, in general, exercise any control over the way in which a party obtains the evidence it wishes to present to support its case . . .

[(and directly from Lord Brandon ([1987] A.C. at 42):

'Subject, however, to the help of the court in these various ways [*e.g.* pursuant to Orders 24 and 38], the basic principle underlying the preparation and presentation of a party's case in the High Court is that it is for that party to obtain and present the evidence which he needs by his own means, provided always that such means are lawful in the country in which they are used.']

(b) If a third party voluntarily assists a party by providing evidence, there can be no objection to that evidence being used by the party. The provision of material in this way does not interfere with the court's control of its own process.

(c) Consequently, by exercising a right potentially available to it under US law to obtain documents or evidence from a third party, a party to litigation is not departing from or interfering with the procedure of the English [Cayman] court . . .

(e) It is for the US court hearing the §1782 application to decide upon the merits of the application under US law and to determine the nature and scope of the relief to be granted. The fact that a party is enabled by exercising those rights to obtain documents and evidence which would not otherwise be available to it is not a ground for interference by the English court."

17. With those ground rules in mind, the main question arising in the present application is whether to allow the Title 28 deposition to proceed would be "unconscionable," within the meaning identified by Lord Brandon's situation (2). Mr. Halkerston, on behalf of Phoenix, refutes the suggestion of unconscionableness. He emphasizes the fact that, as neither Messrs. Rosenberg nor Phlipponneau is an officer of Lyxor, O.24, r.16 of the Grand Court Rules cannot be invoked by this court in aid of Phoenix's quest for information. He argues that there are several significant and legitimate litigation reasons why Phoenix wishes to seek depositions from those witnesses as officers of SGAS/SG. These include—

(a) identifying how Lyxor's/SG's valuation process of the Phoenix funds operated for the purpose of assisting Phoenix's expert witnesses to complete their reports for the trial. As Lyxor's witnesses have had access to SG's witnesses and processes in compiling their evidence, Phoenix should have the mutual benefit of access for the preparation of its expert evidence. This access is said to be confined only to certain levels of seniority of internal control at SG;

(b) given the degree of urgency which attended the preparation for this trial when the Title 28 proceedings were first instituted, exacerbated by the recent and important amendment to Lyxor's defence, the taking of depositions would be less prone to delay than the alternative means of written interrogatories available through this court's process. The taking of depositions would allow for the "drilling down" several levels of questions in one day, which would take several weeks (if not months) in the interrogatories process, pursuant to O.26 of the Grand Court Rules, and would also save the additional costs and court time likely to be taken by the interrogatories process;

(c) identification of the witnesses and documentation which would assist the case. For example, the identification of other clients of SGAS/Lyxor who may be expected to have had similar issues with this type of product because Lyxor and SG rely on market practice for the implication of the right to charge the undisclosed margin. Finding this information out at the trial in live evidence will not allow Phoenix the chance effectively to marshal this further evidence before the court;

(d) identifying the interaction between SGAS/SG and third parties involved in the Phoenix deal, particularly in relation to certain "kickbacks" which were allegedly paid; and

(e) identifying how the SGAS/SG/Lyxor audit process was conducted and the information which was or which was not available to PwC, the auditors of the funds.

18. Lyxor's complaint, that the Title 28 depositions would be merely duplicative of the testimony to be given at the trial, must be viewed in the context of what it is that Phoenix hopes to achieve by the depositions. It is acknowledged by Lyxor that Messrs. Rosenberg and Phlipponneau are indeed the officers who are privy to the kind of information to be elicited. While the scope of the 11 issues is criticized for being too wide, there is no denial of their general relevance to the trial.

19. As the depositions are to be regarded as part of the discovery process—a concept not yet readily embraced by Cayman lawyers—they may not be restrained simply for being duplicative in and of themselves. Moreover, on the basis of the *South Carolina* (7) principles, and bearing in mind that O.24, r.16 of the Grand Court Rules provides for pre-trial

discovery by way of depositions, I may not proceed on the basis that Cayman law regards double cross-examination as being, in and of itself, an abuse. Indeed, it is worth noting here again that it is well-established that for the purposes of eliciting full answers to written interrogatories, witnesses can be submitted to pre-trial cross-examinations, limited though that may be (see O.26, r.5(2) of the Grand Court Rules).

20. While it has been intimated that Messrs. Rosenberg and Phlipponneau may be daunted or discouraged by the Title 28 process from coming to testify again at the trial, Mr. McKie did not positively assert that that would be so. Such an assertion—given their seniority within SGAS and their importance as witnesses to Lyxor's case—would be surprising to say the least. The fact that they remain amenable to giving evidence before this court does not, however, diminish the concerns about unconscionableness.

21. There are proper concerns over the proportionality of what is sought by Phoenix when compared to the obvious inconvenience, costs and potential oppressiveness of the Title 28 depositions, especially if framed as widely as proposed. Messrs. Rosenberg and Phlipponneau have both given extensive witness statements (and/or affidavits) in this case and are required to attend the trial which is now postponed from this month to September 2009. Between now and then, there is, arguably, time enough for Phoenix to be able, by the written interrogatories process available through this court, to elicit the sworn information which it may properly require to complete the discovery process before the trial.

22. Accordingly, while I am sympathetic to Phoenix's concern at having been met with what it describes as the *volte-face* of Lyxor's change of defence, that circumstance must be weighed against allowing Phoenix to unleash the full brunt of the Title 28 process against key witnesses upon whom Lyxor must rely for its defence. The Title 28 process, if allowed to go unchecked, could result in the kind of real forensic unfairness which was perceived by the English courts in comparable circumstances in *Omega Group Holdings Ltd.* v. *Kozeny* (6) and *Benfield Holdings Ltd.* v. *Richardson* (1).

23. I have particularly in mind, as did Langley, J. in *Benfield Holdings* ([2007] EWHC 171 (QB), at para. 23), that English (Cayman) procedures provide for proofs of witness statements or affidavits which must contain the truthful account of evidence which witnesses may give orally. Evidence to be relied upon must be disclosed beforehand in statements or affidavits. Thus, Phoenix must be told just what evidence it is that Lyxor relies upon for its (and SG's) defence. Like any other litigant, Phoenix should be able to prepare for cross-examination by reference also to the documentary disclosure which has been given. If gaps in the evidence appear, Phoenix should be able to put specific interrogatories to Lyxor

requiring binding responses or may put requests for specific further disclosure of documentary evidence.

24. In other words, it seems to me that I am obliged to consider whether a comparable forensic objective to that sought by the Title 28 process can be achieved by means of the ordinary process of this court without exposing the witnesses to what is perceived to be the potential inconvenience, cost and oppression of the Title 28 process. The mere fact that witnesses have committed their positions to witness statements is not in and of itself a bar to Title 28 depositions. The question is whether there are proper concerns about vexatiousness and oppression.

25. However, the US courts are shown to be alive to such concerns. They have the power to control the scope. They have determined that it must ordinarily be a matter for them to control their own process (see *Intel Corp.* v. *Advanced Micro Devices Inc.* (3)). In the same vein, the US court will also be able to determine the extent, if at all, to which the application should be curtailed for being "fishing"—another objection raised by Lyxor.

26. And while the US courts have no separate direct interest in the application itself or the outcome of the proceedings in the court to be assisted by them, I may not proceed on the basis that they might fail to protect the witnesses from oppression. The evidence on US law indicates that very similar objections to those raised by Messrs. Rosenberg and Phlipponneau before this court as to oppressiveness can be raised before the US court.

27. Mr. McKie, in his usual careful arguments, also points out—as was observed in *Intel* (3)—that where the parties to a Title 28 proceeding are the same as those in the foreign proceedings, the need for assistance is not as apparent as it is when evidence is sought from a non-participant in the matter arising abroad, when the foreign tribunal can itself decide whether to order the parties to produce evidence. This view of the approach likely to be taken by the US court has been recognized as a factor to be considered by the English courts when deciding whether to injunct deposition proceedings: see *Nokia* (5) ([2004] EWHC 2920 (Pat), at para. 22).

28. However, the involvement of Messrs. Rosenberg and Phlipponneau in these proceedings as key witnesses on behalf of Lyxor seeking to advance what is ultimately SG's case, but being themselves not amenable to the process of this court as officers of SG, is a circumstance of a different kind. Treating them as parties who are fully amenable as contemplated by the *Intel* case would not be a realistic approach to take. Yet, this is a premise upon which Lyxor bases its objection to Phoenix's Title 28 application. It is, I conclude, a false premise.

29. It was also proposed in the arguments that without Lyxor having the reciprocal ability to examine Phoenix's witnesses, the Title 28 procedure must be inherently unfair. While there is no case law authoritatively to that effect, one may accept that, in broad terms, "equality is equity." In accepting this, Mr. Halkerston did offer that Phoenix's main factual witness—its principal and director Mr. Al-Ibrahim—would make himself amenable, pursuant to O.24, r.16 of the Grand Court Rules. As Title 28 would not apply to him because he is not a resident of the United States, that offer of reciprocity under O.24, r.16 of the Grand Court Rules can hardly be described as unreasonable.

30. In conclusion, I am not satisfied that Lyxor has established the threshold test of unconscionability for the grant of the injunction so as to override Phoenix's legitimate right to invoke the Title 28 procedure. On balance, in the exercise of discretion, I therefore refuse the order for the injunction.

*Application dismissed.*

*Appleby* for the plaintiff; *Maples & Calder* for the first defendant.

352

# Exhibit 8

**[2009 CILR 553]**

## LYXOR ASSET MANAGEMENT S.A.

*v.*

## PHOENIX MERIDIAN EQUITY LIMITED

*Court of Appeal*

(Chadwick, P., Forte and Mottley, JJ.A.)

**24 September 2009**

*Injunctions—anti-suit injunctions—injunction against foreign proceedings—on application to enjoin foreign proceedings, to show compelling reason to prevent other party from invoking legitimate right under foreign law (e.g. "unconscionable" to allow it to proceed)—not "unconscionable" to seek Title 28 depositions under US law if substantial and late amendment to defence and since US courts aware of dangers of oppression—safeguard may also be provided so that transcripts not used at trial without court order*

The respondent company brought proceedings in the Grand Court to recover the full value of its investment in a group of funds administered by the appellant.

The respondent, an investor in two Cayman funds which were managed by the appellant company, a wholly-owned subsidiary of a French bank, had redeemed the units it held in both funds before their maturity date and challenged the appellant's valuation of its investment. The appellant had only recently amended its defence, having first claimed the redemption price had to be reduced to take into account the right of its principal to be compensated for early redemption of its right to borrow units of the funds, and now clarifying it as a charge for the principal's role as leverage financier. As part of the respondent's trial preparations, it sought depositions from the appellant's key witnesses—both officers of a company in the group of its principal resident in the United States—under §1782 of Title 28 of the US Civil Procedure Code. The appellant applied for an injunction restraining the respondent from continuing proceedings in the United States to compel the witnesses to give depositions.

The Grand Court (Smellie, C.J.) held (in proceedings reported at *2009 CILR 342*) that the appellant's application seeking an injunction would be refused since it had not met the threshold test that it would be "unconscionable" to allow the respondent to proceed and it had therefore not overridden its legitimate right to invoke the procedure. Further, the US courts were well aware of the dangers of vexation and oppression under the procedure and there was no suggestion that Cayman law regarded double cross-examination as an abuse of process (since O.24, r.16 of the Grand Court Rules provided for pre-trial discovery by way of depositions).

On appeal against refusal to enjoin the Title 28 proceedings, the appellant submitted that the Grand Court, in considering whether the proceedings were unconscionable, had erred because (a) it relied on the US courts to protect witnesses from oppression; (b) it determined that Cayman law was not hostile to pre-trial cross-examination; (c) the respondent should have been restricted to the Cayman discovery process; and (d) it treated the principal as if it were the real party to the proceedings rather than the appellant but did not give it the status of being a participant in the action.

**Held,** dismissing the appeal and giving directions on the use of the depositions at trial:

(1) The decision of the Grand Court to refuse the injunction would be upheld since there was no basis to indicate that the lower court had erred in principle. The Grand Court had been correct to proceed on the basis that the US courts would provide adequate protection against potential abuse of the depositions or oppression of the witnesses. Protection was provided by the Federal Rules of Civil Procedure with the depositions taking place before a court reporter and the deponents would be accompanied by counsel, who could object to any question on the ground that it was embarrassing or oppressive. Moreover, there was no evidence that (a) the appellant would be exposed to any potential for oppression since the deponents were not its employees; (b) the employers of the witnesses had objected to the proceedings; nor that (c) it might discourage the witnesses from appearing at the trial. Further, it would be open to the Grand Court to restrict the use which could be made of the deposition transcripts, including their admissibility as evidence at trial, and this would provide further safeguards against abuse of process (paras. 43–47; para. 61).

(2) It was clear that the rules in Part II of O.24 of the Grand Court Rules made provision for discovery by oral examination and, while not identical to Cayman procedure, the proceedings under §1782 were not going far beyond the equivalent Cayman discovery process and thus it could not be said that Cayman law was hostile to pre-trial cross-examination (paras. 48–52).

(3) It was irrelevant that the respondent could have been confined to the ordinary Cayman process—through requesting better particulars or administering interrogatories—since *prima facie* a party who could invoke a legitimate right under foreign law would be entitled to do so and thus the relevant issue was whether it was acting oppressively by trying to rely upon it. Given the circumstances of the case—with the late and substantial amendment of the defence—it could not be said that the respondent was acting in abuse of process by seeking the depositions of the witnesses in New York rather than seeking interrogatories in the Cayman Islands (paras. 56–58).

(4) Finally, the Grand Court was entitled to recognize the commercial reality of the proceedings and that the principal's interest in the outcome

was a factor which indicated that it was not oppressive to allow the §1782 proceedings. Nor did it matter to the exercise of the respondent's legitimate right under US law whether the principal was treated as a participant in these proceedings. There was therefore no evidence that the Grand Court had erred in making its decision and since it was not for an appellate court to substitute its own view, the appeal would be dismissed. Further directions would be added that the transcripts of the depositions were not to be used at trial without an order of the Grand Court and that the appellant would be able to apply to have parts of the transcript redacted if they were to question the credit of the deponents (paras. 53–55; paras. 59–65).

**Cases cited:**

> (1) *Armstrong v. Armstrong*, [1892] P. 98; (1892), 61 L.J.P. 63; 66 L.T. 384; 8 T.L.R. 339, referred to.

> (2) *Nokia Corp. v. Interdigital Technology Corp.*, [2004] EWHC 2920 (Pat), referred to.

> (3) *South Carolina Ins. Co. v. Assurantie Maatschappij "De Zeven Provincien" N.V.*, [1987] A.C. 24; [1986] 3 W.L.R. 398; [1986] 3 All E.R. 487; [1986] 2 Lloyd's Rep. 317, referred to.

> (4) *Sternson Ltd. v. CC Chemicals Ltd.*, [1982] 1 F.C. 350; (1981), 124 D.L.R. (3d) 76; 58 C.P.R. (2d) 145; 36 N.R. 507, considered.

**Legislation construed:**

Grand Court Rules 1995, O.24, r.16: The relevant terms of this rule are set out at para. 49.

United States Code, Title 28, §1782: The relevant terms of this section are set out at para. 24.

*C.J.D. Style*, *Q.C.* and *C.D. McKie* for the appellant;

*G. Halkerston* and *Ms. M. Hudson* for the respondent.

1. **CHADWICK, P.,** delivering the judgment of the court: This appeal is from an order made on May 22nd, 2009 by the Chief Justice in proceedings ("the Cayman proceedings") brought by Phoenix Meridian Equity Ltd. ("Phoenix"), a company incorporated in the Cayman Islands, against Lyxor Asset Management S.A. ("Lyxor"), a company incorporated under the laws of France, and Scotiabank & Trust (Cayman) Ltd. (formerly, the Bank of Nova Scotia Trust Co. (Cayman) Ltd. and, hereafter, "Scotiabank"). Scotiabank has taken no part in the Cayman proceedings.

2. The issue raised by the appeal is whether the Chief Justice erred in principle in refusing an application on behalf of Lyxor for an order restraining Phoenix from continuing proceedings in the United States District Court for the Southern District of New York under §1782 of Title 28 of the US Civil Procedure Code ("the §1782 proceedings") in the

course of which it seeks to depose two individuals—Mr. Samuel Rosenberg and Mr. Anthony Phlipponneau—who have given witness statements in, and are potential witnesses at the trial of, the Cayman proceedings.

3. The appeal was heard, with expedition, on July 6th and 7th, 2009 at a special session of the court. At the conclusion of the oral argument we dismissed the appeal and gave directions as to the use that could be made at the trial of the action of transcripts of oral depositions that Phoenix proposed to take from the two witnesses in New York. We stated our reasons for taking that course, but indicated that we would put our formal judgment into writing and hand it down in due course. We now do so.

**The underlying facts**

4. Phoenix is the sole investor in two funds—Patriot I Protected Fund ("Patriot I") and Patriot Focus Protected Fund ("Patriot Focus") (together "the funds")—of which Lyxor is the manager and Scotiabank is the trustee and registrar. Lyxor is a wholly-owned subsidiary of a French bank, Société Générale S.A. ("SG"). The funds are established by supplemental deeds under the Patriot Cayman Trust, an exempted trust established under the Trusts Law of the Cayman Islands by deed ("the trust deed") dated March 12th, 2003.

5. The object for which the funds were established was to provide leveraged exposure to a diversified portfolio of alternative investments as well as some degree of principal protection if held to maturity. The funds are identical in structure but differ in the amounts of leverage and principal protection which each respectively provides. Each was the subject of a fund specific memorandum ("FSM"). Each FSM provides that, on launch date, the fund would invest 100% of its assets in a corresponding leverage fund—respectively, the Patriot I Leveraged Fund and the Patriot Focus Leveraged Fund—and would simultaneously enter into swap and option agreements with SG. The swap and option transactions were described in the FSMs in these terms:

"The swap and option strategy will provide investors with partial protection of the principal of their investment . . . The fund will receive from SG (i) a put option on zero coupon and (ii) a put option on units of the [leveraged fund], and [(iii)] give SG the right to borrow units of the [leveraged fund] for hedging purposes."

The swap and option transactions were implemented for each fund pursuant to a confirmation of stock lending agreement executed between Lyxor, as manager on behalf of the fund, and SG.

6. The maturity date of the funds was December 31st, 2015 but the FSMs provided that, from March 16th, 2007 ("the lock-up date"), unit holders were entitled to redeem their units prior to the maturity date. On

redemption prior to the maturity date, unit holders are entitled to receive a price in cash calculated by reference to the net asset value ("NAV") of the units at the time of realization. The realization price is to be calculated in accordance with the valuation rules in Schedule 1 to the trust deed. Put shortly, the valuation rules require the NAV to be calculated by valuing the assets of each fund and deducting the liabilities attributable to that fund.

7. The financial statements in respect of each fund for the year ended January 31st, 2007 were delivered on June 1st, 2007. The balance sheets for the year end each include, under "Liabilities," an item described as "Over the counter option" ("the OTC option"). Note 2(c) to the financial statements explains that the OTC option is "valued at its fair value based on the price provided by [SG]." As at January 31st, 2007, the liabilities said to be represented by the OTC option are US$68,339,256 (in the case of the Patriot I Fund) and US$14,648,856 (in the case of the Patriot Focus Fund). The treatment of the OTC option as a liability of the fund is reflected in the figure for its NAV published by Lyxor weekly on its website.

8. Phoenix challenges the treatment of the OTC option as a liability of the fund. It is said on behalf of Phoenix that, as at July 17th, 2007 (shortly before the issue of these proceedings), the effect was to understate, by some US$112,872,710, the amount that would have been payable by Lyxor to Phoenix had Phoenix then given (as it was entitled to do) a redemption notice in respect of its investment in the funds.

**The Cayman proceedings**

9. These proceedings were commenced by the issue of a writ of summons on July 25th, 2007. The amended statement of claim (dated September 25th, 2007) sets out the grounds on which Phoenix based its contention that the OTC options (as described in the FSMs) could not have a negative value: that is to say, could not constitute liabilities of the funds. It is asserted that since the lock-up date (March 16th, 2007), Phoenix had desired to redeem the units which it held in both funds and that it had been informed by both Lyxor and SG that the realization price would be based on the NAVs shown on the Lyxor website. It is further asserted that it is wrongful and impermissible for Lyxor and SG to take that position: it is said that—

"the realization price payable on the [units] should be calculated without taking account of any part of the alleged 'liabilities' referred to in para. 20 hereof [attributable to the OTC option] and should instead be calculated based on the Leveraged Funds' NAVs."

The relief claimed includes a declaration to that effect and an order that Lyxor and Scotiabank forthwith permit immediate redemption by Phoenix

of the units which it holds in the funds "at a realization price, payable in cash, calculated based on the Leveraged Funds' NAVs."

10. On October 25th, 2007, Phoenix filed an application for summary judgment on its claim. In response to that application, Lyxor relied on an affidavit sworn on December 2nd, 2007 by Samuel Rosenberg, then a managing director of SG Americas Securities LLC ("SGAS"), a member of the Société Générale group based in New York, and Head of Equity Derivatives Sales for the North American region. Mr. Rosenberg stated in his affidavit that he had been the principal contact within the Société Générale group for Phoenix and its advisers. He deposed to the circumstances in which Phoenix came to invest in the funds and to the negotiations which (as he said) had taken place between those acting for SG and those advising Phoenix.

11. Lyxor served a defence on or about December 3rd, 2007. The allegations in that defence accord closely with those in Mr. Rosenberg's affidavit: indeed, Mr. Rosenberg confirms (at para. 3 of his affidavit) that the facts and matters stated in the defence are true (in so far as they are within his own knowledge) and true to the best of his information and belief (paras. 35 and 36 of the defence are in the same terms so far as material as paras. 12 and 13 of the affidavit).

12. The thrust of the defence was that Phoenix and its advisers understood from the outset that (i) the assets of the funds would include a bundle of rights and obligations under financial instruments to be entered into between Lyxor and SG (the interest rate put, the principal protection put and the final NAV averaging swap and the right to borrow, respectively described and defined in para. 35 of the defence); (ii) account would be taken of the fair value of that bundle of rights and obligations (together "the derivative") in calculating the NAV of units in the funds; (iii) the value of the derivative could be negative; and (iv) if the value of the derivative were negative, the NAV of units in the funds would be less than the NAV of units in the corresponding leveraged fund.

13. The reason why it was said that the value of the derivative could be negative appears from Mr. Rosenberg's affidavit of December 2nd, 2007:

"41 As appears from [Lyxor's] defence, [Lyxor's] case is that s.2 of the confirmation [of stock lending agreement] does not entitle [Lyxor] to terminate a loan at any time. The language of s.2 is clear, providing only for a right to make a request. In any event it was not the intent of the parties that there should be a right to terminate without a request by one party being accepted by the other party. I refer above [at paras. 12.4 and 16.4] to the fact that the right to borrow was essential to the economics of the structure, partly because it enabled SG to hedge its exposure under the principal protection put. Without the right to borrow, the transaction would

have been wholly uneconomical for SG which would never have assumed substantial potential liabilities for no return. Section 2 gave the parties the right to make a request but they were of course required to act in good faith both in making any such request and in responding to it. [Phoenix] had subscribed to units in the protected funds on terms that SG had the right to borrow all the units in the leveraged funds held by the protected funds until the maturity date (December 31st, 2015). It was perfectly understood between [Lyxor] and SG that in the event of early redemption [Lyxor] would be asking SG to surrender that valuable right and that it would do so only if it were compensated by payment of the value of the right to borrow. I am advised that this is what was required by the duty under French law to act in good faith."

14. The right of SG to be compensated by a payment in the event that the right to borrow units held by the funds was terminated by the decision of Phoenix to redeem its investment in the funds prior to the maturity date—a right which, if it is established, arises under the financial instruments entered into between Lyxor and SG (to which Phoenix is not a party)—has been referred to (wrongly as Lyxor contends) as a claim by SG to charge a "levy" on early redemption.

15. The application for summary judgment was dismissed by Henderson, J. on December 18th, 2007. He was persuaded that, in so far as the financial instruments entered into between Lyxor and SG were determinative of the redemption price payable to Phoenix, those instruments were to be construed according to the laws of France (as to which expert evidence would be required) and, in so far as the redemption price fell to be determined by reference to the documents under which the investment was offered to Phoenix ("the offer documents"), those documents were to be construed in the light of industry practice (as to which again expert evidence would be required).

16. Having failed to obtain summary judgment on its claim, Phoenix sought the determination, as a preliminary issue, of the question of what were its contractual rights under the offer documents. That application, made by a summons dated May 20th, 2008, came before the Chief Justice in July 2008. He dismissed the application. He took the view (expressed in the ruling which he delivered on July 28th, 2008) that ". . . what should have been a dispute amenable to resolution simply by construction of written documents, is to become a dispute involving personal recollections of a complicated factual matrix and a contest between experts." It was not a dispute suitable for resolution by the determination of a preliminary issue of construction.

17. The proceedings came back before the Chief Justice at a case management conference on September 2nd, 2008. At that hearing, the

Chief Justice gave directions for documentary discovery, for the exchange of witness statements and expert reports, for a pre-trial review on March 29th, 2009 and for a three-week trial to begin on May 4th, 2009. Lists of documents were exchanged and requests for further and better particulars of both statement of claim and defence were served in December 2008. On February 2nd, 2009, the Chief Justice made an order for a split trial: with the determination of the damages (if any) suffered by Phoenix to follow the determination whether or not the derivative could have a negative value (or, as it was put by the Chief Justice, whether SG could charge a "levy" on the early determination of its right to borrow units of the funds).

18. On February 20th, 2009, the parties exchanged witness statements. The witness statements served on behalf of Lyxor included statements made on February 19th, 2009 by Mr. Rosenberg and by Mr. Phlipponneau. Mr. Phlipponneau is also a managing director of SGAS: he works in the Global Equities and Derivatives Solutions Division of Société Générale Corporate & Investment Banking, which is, itself, a division within SG.

19. On March 11th, 2009, Henderson, J. gave Lyxor leave to amend its defence. An amended defence was served on the following day. The amendments were both extensive and substantial. In particular, it was alleged, for the first time, that Phoenix was aware, from earlier transactions with SG described in Mr. Rosenberg's witness statement of February 19th, 2009, that SG would make a charge to the funds for the liabilities which it assumed under the derivative, and that—

"it is standard market practice in the financial services industry with respect to principal protected products for the provider of a principal protected product to charge for the principal protection feature. Since no explicit payment was made for this feature either at inception or periodically, any participant in the said market would have understood that the derivative provided for in the offering documents would be valued (and therefore the components of the derivative paid for) on the basis that SG was through [Lyxor] entitled to be paid by the leveraged funds management and other fees (previously described to [Phoenix] as dividends and agreed to as such)."

20. It was said (at para. 41(A)), again for the first time, that Lyxor had at all times calculated the NAV of units in the funds "in accordance with the requirements of the offering documents." The methodology is described at para. 41A(5):

". . . The trading function of SG in New York obtains the NAV of the Leveraged Funds from [Lyxor] in Paris. SG then, using its options pricing model, which employs a hybrid equity interest rate model commonly used in the financial services industry with respect to principal protected products, calculates the value of the derivative by

calculating the value of a zero coupon bond that pays 80 or 50 (in the case of the Patriot I Protected Fund and the Patriot Focus Protected Fund respectively) at the maturity date of the protected funds and also calculating and adding to that the value of a call option on the final year average of the Leveraged Funds with a strike price of 80 or 50 (again in the case of the Patriot I Protected Fund and the Patriot Focus Protected Fund respectively), and then subtracting from that sum the NAV of the leveraged funds (formerly the value of the interest rate put was added as well, but that expired in March 2007). This yields the mark to market of the derivative. To this is added the NAV of the leveraged funds and the unrealized margin, which results in the NAV of the protected fund. This information is provided to [Lyxor], which performs validation functions before releasing the weekly NAVs for publication . . ."

21. It was said, again for the first time (at para. 41(A)(6)), that that methodology complies with Schedule 1 to the trust deed and the FSM for the protected funds. Paragraph 41B is in these terms:

"In the premise, upon their true construction the offering documents provide that, in the event that [Phoenix] chooses to redeem its units in the protected funds before the maturity date at a time when the NAV of the protected funds is less than that of the leveraged funds, [Phoenix] is entitled to be paid by [Lyxor] a price calculated by reference to the NAV of units in the protected funds and [Lyxor] is obliged to pay SG the mark to market of the derivative."

22. Further—although Mr Rosenberg had asserted in his affidavit of December 2nd, 2007 ". . . that s.2 of the confirmation does not entitle [Lyxor] to terminate a loan at any time. The language of s.2 is clear, providing only for a right to make a request"—it is pleaded (at para. 57(1) of the amended defence) that "the confirmations are not clear on the question whether [Lyxor] is obliged to pay SG the mark to market of the derivative on early redemption . . ."

23. On March 27th, 2009, the matter came back before the Chief Justice for pre-trial review. On the application of Phoenix, the Chief Justice vacated the trial date (set for May 4th, 2009) and directed that the trial be relisted to commence on September 28th, 2009 with a time estimate of four weeks. It is common ground that he did so in order to give Phoenix time to respond to what he saw as the substantially new case advanced by Lyxor in its amended defence.

**The §1782 proceedings**

24. §1782 of Title 28 in the US Civil Procedure Code is in these terms (so far as is material):

"§1782. Assistance to foreign and international tribunals and to litigants before such tribunals

(a) The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal . . . The order may be made . . . upon the application of any interested person . . . To the extent that the order does not prescribe otherwise, the testimony or statement shall be taken, and the document or other thing produced, in accordance with the Federal Rules of Civil Procedure . . ."

25. On October 20th, 2008, Phoenix obtained an order under that section from the United States District Court for the Southern District of New York. The order required SGAS to produce documents at the offices of the New York counsel for Phoenix and provided for Phoenix to serve on SGAS subpoenas for deposition testimony at a future date without the need for a further application. SGAS did not move to discharge that order. We were told that, in due course, documents were produced to Phoenix by SGAS pursuant to that order.

26. Rule 30(b)(6) of the Federal Rules of Civil Procedure—which apply to deposition testimony under §1782 in a case (such as this case) where the order does not prescribe otherwise—provide that a party may name a corporation as the deponent and, where that has been done, that the corporation named must then designate one or more officers to testify on its behalf. On March 19th, 2009, Phoenix gave notice—pursuant to the §1782 order which it had obtained on October 20th, 2008 and r.30(b)(6)—requiring SGAS to identify and produce for deposition one or more officers or employees "who consent to testify on its behalf and are most knowledgeable as to" the 11 matters specified. Those matters included:

"The negotiation of, decision to enter into, and documentation of the Patriot investment structures between Lyxor and Société Générale, including without limitation any and all derivative components included therein, any payment terms intended to arise thereunder and the method of calculation of any such payments."

It is common ground that SGAS has identified Mr. Rosenberg and Mr. Phlipponneau as the persons to testify on its behalf in respect of the matters specified in the notice of March 19th, 2009.

27. Rule 30(d)(1) of the Federal Rules of Civil Procedure provides that unless otherwise ordered by the court, "a deposition is limited to 1 day of 7 hours." Rule 30(d)(3)(A) provides that "at any time during a deposition, the deponent or a party may move to terminate or limit it on the ground that it is being conducted in bad faith or in a manner that unreasonably annoys, embarrasses, or oppresses the deponent or party." We were told

that, in practice, the deposition would take place before a court reporter who would be a notary public; that the individual deponent would, or could, be accompanied by counsel for SGAS; and that counsel could object to questions put to the deponent and, if so minded, take that objection to the District Court.

**The application for an anti-suit injunction**

28. On March 20th, 2009—that is to say, on the day after Phoenix had served its notice requiring deposition testimony in the §1782 proceedings—Lyxor applied by summons in the Cayman proceedings for an order that Phoenix be restrained from continuing or seeking to enforce the §1782 proceedings "to the extent that those proceedings seek the deposition of Mr. Samuel Rosenberg, Mr. Anthony Phlipponneau (both residents of the State of New York) or any other officer, director, managing agent or employee of [SGAS] resident in the USA" whether by seeking to enforce the deposition notice of March 19th, 2009 or otherwise. The summons sought an order directing Phoenix to withdraw or discontinue the deposition notice.

29. The application was supported by an affidavit sworn on March 24th, 2009 by Mr. John Driscoll, Director of Litigation and Regulatory Affairs for SG in New York. He stated that both Mr. Rosenberg and Mr. Phlipponneau—whom he described as important witnesses for Lyxor—had indicated to him "that they are currently willing to appear at trial in the Cayman Islands to give oral testimony." He confirmed his view that, having examined the deposition notice, he was satisfied that "in respect of almost all of [the 11 topics there set out] the most knowledgeable person(s) at SGAS are Mr. Rosenberg and Mr. Phlipponneau." He referred to a letter from Lyxor's counsel instructed in the Cayman proceedings in which it had been asserted that the deposition notice was "an improper and unconscionable interference" with the forthcoming trial in the Cayman proceedings for three reasons: (i) that it would be an unnecessary diversion of the parties' legal and other resources to prepare for and attend such depositions; (ii) that the testimony sought at the depositions would be duplicative of the testimony to be given at trial; and (iii) that it would be vexatious and oppressive for Phoenix to subject Lyxor's witnesses to double cross-examination. He went on to say this:

"16 If Phoenix is not restrained from deposing Mr. Rosenberg and Mr. Phlipponneau in the United States, then they will be subjected to examination by Phoenix twice: first in the United States by deposition and then again in the Cayman Islands at the trial. The inevitable result, should Phoenix not be restrained in the manner sought, would be the duplication of evidence and the time and expense associated therewith.

17 In the circumstances I respectfully submit that Phoenix is acting in an unconscionable manner by seeking to depose Mr. Rosenberg and Mr. Phlipponneau in the United States and that this is an unjustified and improper interference with the due process of the Cayman Grand Court and the fair conduct of this proceeding."

30. In response to the application, Phoenix relied on an affidavit (his ninth affidavit) sworn on March 26th, 2009 by Mr. Howard Kaplan, attorney-at-law and a member of the New York firm representing Phoenix in the United States. He explained—and it is not, we think, in dispute—that the test applicable to discovery under §1782 in the United States, including discovery by way of deposition testimony, is that the discovery should be relevant and potentially useful. He said this:

"19 The discovery which Phoenix seeks pursuant to r.30(b)(6) satisfies the standard for discovery under §1782 as it would be relevant and useful. The topics Phoenix identified in its 30(b)(6) notice are unquestionably relevant as they relate directly to the subjects raised by Mr. Rosenberg in his February 19th witness statement. Moreover, given the switch in defences in the Cayman litigation, the false statements in the affidavits Lyxor has submitted to the Cayman court, and the complicated subject-matter at issue, these depositions will clearly be useful in dealing with the obfuscation SGAS and Lyxor have pursued over the course of the past 18 months. *These depositions will also be helpful in testing the credibility of key witnesses before trial.*

20 The 30(b)(6) deposition testimony Phoenix seeks will also be useful in helping Phoenix prepare for trial. Phoenix expects the deposition testimony to help identify additional documents and witnesses, including other clients of Société Générale and SGAS who may have had disputes with Société Générale similar to the dispute at issue in the Cayman litigation. The testimony will assist Phoenix in understanding how Société Générale and SGAS interacted with other non-parties to the Cayman litigation, including Phoenix's financial and legal advisers as well as Permal. The 30(b)(6) testimony Phoenix seeks will also assist Phoenix's experts in the Cayman litigation by providing them with information concerning the processes Société Générale and SGAS used to value the Patriot Funds, and how they accounted for various fees charged to the Patriot Funds." [Emphasis supplied.]

31. The application came before the Chief Justice on April 3rd and 6th, 2009, that is to say, shortly after his order of March 27th, 2009 (vacating the trial date of May 4th, 2009) to which we have referred earlier in this judgment. On May 22nd, 2009, the Chief Justice dismissed the application, for reasons which he set out in the ruling which he handed down on

that day. It is clear from that ruling that he had in mind the amendments to Lyxor's defence which had led to the vacation of the trial date. He said this (*2009 CILR 342, at paras. 2–3*):

"2 . . . The dispute [in the Cayman proceedings] is over the sum of approximately $100m. which Lyxor claims it is entitled to withhold on behalf of its parent, SG. This large sum is in respect of what SG now claims as an 'undisclosed margin' or profit to which it is entitled for its part as investment adviser and leverage financier to the Phoenix funds.

3 Lyxor's claim on behalf of SG has only recently been clarified in the pleadings. Until then, it was rather differently pleaded in terms of a penalty or levy which SG was entitled to impose because of Phoenix's early redemption of its investments."

32. He went on to note (*ibid.*, at *para. 6*) that Phoenix had argued before him that it should be allowed to pursue the depositions of Mr. Rosenberg and Mr. Phlipponneau "because Lyxor has significantly changed its case in a manner which is inconsistent with the earlier sworn affidavit of its chief witness, Mr. Rosenberg." He observed that it was contended (*ibid.*) that "the deposition of Mr. Rosenberg and his colleague, Mr. Phlipponneau, will provide significant 'litigation benefits' to Phoenix (and, it is hoped, this court) in the trial to take place here in this action." He then set out (*ibid.*, at *para. 7*) the three main reasons which had been advanced by Lyxor in support of its application for an anti-suit injunction. Two of those reasons were, in substance, a restatement of the points made in the letter from Lyxor's counsel to which we have referred: the third was that the area of inquiry defined by the 11 topics which are the subject of the deposition notice "is far too broad and intrusive."

33. The Chief Justice observed that the application raised an important issue of Cayman civil procedure (*ibid.*, at *para. 8*):

"[W]hether the Cayman courts should intervene to prevent depositions in the United States, ordered by the US court to be given by deponents who are residents there, when the deponents are potential witnesses in a Cayman action in respect of which it is clear that the Cayman court is the only appropriate forum for the ultimate trial of the action."

34. Smellie, C.J. set out what he saw as competing issues of principle (*ibid.*, at *paras. 10–14*):

"10 . . . Unlike the position in many other Commonwealth jurisdictions including England, Cayman civil procedure does allow—pursuant to O.24, r.16 of the Grand Court Rules—oral discovery by way of depositions prior to trial. This is, however, as already noted, limited to officers of companies which are parties to the proceedings

before the court. So, while it may not be said that Cayman law is hostile to witnesses being cross-examined prior to trial, such a procedure remains unusual. No case concerning this procedure has been reported since O.24, r.16 of the Grand Court Rules was amended in September 2003 to permit this mechanism.

11 Apart from O.24, r.16 of the Grand Court Rules, there is, generally, no power by which the Cayman courts, on behalf of parties to the actions before it, can compel persons who are not parties to give a full measure of pre-trial discovery, where it includes both the disclosure and production for inspection and copying of documents, as well as the giving of oral or written testimony. In this regard, Cayman law and procedure differs essentially from that of several foreign jurisdictions, including the United States.

12 This court must therefore be alive to the natural concerns of practitioners about the possibility of such pitfalls as duplication of effort and oppression arising from the use of pre-trial depositions. These are considerations which are identified by Lyxor here as militating against the Title 28 proceedings from the perspective of the court in ways which, perhaps, would not trouble the US or other foreign courts where such pre-trial depositions are routine.

13 But the further issue of principle is the other side of the coin: it raises the question to what extent it is desirable or appropriate that a party to litigation before our courts should be prevented from availing itself of a statutory right which it may have under foreign law (here US federal law). The right here is one to apply for an order that persons resident in the foreign jurisdiction, who are themselves not parties to the action before this court and so not amenable to its process, should give pre-trial discovery by way of deposition evidence relevant to the issues in dispute before this court.

14 Framing the competing issues of principle in this way brings into stark relief the competing and equally important concerns which must be considered. It is plain from the outset that where a party has a right to avail itself of a legitimate foreign process, there must be a very compelling reason to prevent it from doing so—something more than just the philosophical differences of approach to litigation existing between jurisdictions."

35 The Chief Justice found assistance in what he described (*2009 CILR 342, at para. 15*) as the "now classical framework" for the consideration of the principles which should guide a court seised of an application for an anti-suit injunction set out by Lord Brandon of Oakbrook in *South Carolina Ins. Co.* v. *Assurantie Maatschappij "De Zeven Provincien" N.V.* (3) ([1987] A.C. at 40). It is, we think, pertinent to have in mind, also, Lord Brandon's observation (*ibid.*) that the power of the court to grant an

anti-suit injunction is "to be exercised with caution because it involves indirect interference with the process of the foreign court concerned."

36. The Chief Justice found further assistance in the judgment of Pumfrey, J. in *Nokia Corp.* v. *Interdigital Technology Corp.* (2), a case (like the present case) in which Lord Brandon's principles fell to be applied in the context of an application to restrain a party from pursuing discovery from non-parties under §1782 of the US Civil Procedure Code. After expressing approval of propositions which counsel derived from Lord Brandon's speech—propositions which are set out in the judgment in *Nokia* ([2004] EWHC 2920 (Pat), at para. 25) and, by the Chief Justice, in his ruling in the present case (*2009 CILR 342, at para. 16*)—Pumfrey, J. went on to say this ([2004] EWHC 2920 (Pat), at para. 26):

"This summary . . . shows why the decision whether or not to restrain section 1782 proceedings is not a mere case management decision. There can be no doubt that leaving express or implied obligations aside, the jurisdiction to interfere is based on the need to show that the application is abusive in its context in the English proceedings. This is confirmed by *Banker's Trust International Plc* v. *PT Dharmala* (unreported, December 1st, 1995, Mance, J., as he then was) and *Omega* v. *Viktor Kozeny* [2002] CLC 132 (Mr. Peter Gross, Q.C., as he then was). In the former case, the application under section 1782 was made after trial but before judgment, no doubt with a view to improving the evidence in the proceedings and making an application to re-open the trial. Mance, J. appears to have found little difficulty in concluding that such an application was abusive. In the latter case, Mr. Gross, Q.C. was confronted by an application to depose individuals who would be giving evidence in this country, thereby exposing them twice to the burden of cross-examination, which he considered to be abusive in the context of the English proceedings."

37. After observing (*ibid.*, at para. 33) that "experience of the use of transcripts of deposition evidence in other cases suggests that it is most unusual for deposition evidence which is not focused on the issues in the English proceedings to be of any practical utility at all," Pumfrey, J. nevertheless refused the injunction sought. He said this (*ibid.*, at paras. 34–36):

"34 On the whole, I conclude that while it does not seem likely that the material requested in the 1782 proceedings will be of utility in this action, that possibility cannot in any circumstances be excluded. If I am to restrain Nokia from pursuing their request, InterDigital must satisfy me that in the context of these proceedings the request is not merely of doubtful utility but an abuse of process. If it were the case that the request would be automatically complied with by the

district court in the United States, then I would be prepared to confer a wide ambit on the term 'abuse of process.' But it is clear from the *Intel* case [*Intel Corp.* v. *Advanced Micro Devices Inc.*, 542 U.S. 241, decided by the US Supreme Court in 2004] that the district court is required to exercise a judicial consideration in considering the request and the factors urged on me are equally considerations which can be, and in fact are being, urged upon it as reasons for not exceeding to the request or, in the words of the Supreme Court, trimming it.

35 Accordingly, it seems to me that I must be able to identify abusive behaviour in the sense that the request is intended to, or at least will have the effect of, causing unfair prejudice to the opposing party in the present proceedings. This I cannot do . . .

36 Since there is nothing in the request that could be described as abusive in the context of the English proceedings, I must refuse the injunction sought."

38. The Chief Justice directed himself, in the light of his examination of the English authorities, that the main question which he had to decide was whether to allow the Title 28 deposition to proceed would be "unconscionable." After examining the arguments addressed to him on behalf of the parties, he reached the conclusion that Phoenix had not satisfied that threshold test. Accordingly, he refused the injunction sought. In reaching that conclusion he made the following findings:

(i) It could not be denied that the 11 matters described in the deposition notice were of general relevance to the trial (*2009 CILR 342, at para. 18*).

(ii) The depositions were not to be restrained "simply for being duplicative in and of themselves" (*ibid.*, at *para. 19*).

(iii) The existence of O.24, r.16 in the Grand Court Rules made it impossible to assert that Cayman law regarded "double cross-examination as being, in and of itself, an abuse" (*ibid.*).

(iv) It was not said—and could not credibly be said—that Mr. Rosenberg or Mr. Phlipponneau would be deterred by the deposition process in New York "from coming to testify again at the trial." Nevertheless, the fact that they remained amenable to giving evidence in the Cayman proceedings did not diminish the concerns about unconscionability (*ibid.*, at *para. 20*).

(v) There were proper concerns over the proportionality of proceeding with the deposition process "when compared to the obvious inconvenience, costs and potential oppressiveness of the Title 28 depositions . . ." (*ibid.*, at *para. 21*).

(vi) There was (arguably at least) time enough before a trial at the end

of September 2009 for Phoenix to be able, by administering written interrogatories in the Cayman proceedings, to obtain the information which it sought (*ibid.*).

(vii) It was necessary to consider "whether a comparable forensic objective to that sought by the Title 28 process can be achieved by means of the ordinary process of this court without exposing the witnesses to what is perceived to be the potential inconvenience, costs and oppression of the Title 28 process" (*ibid.*, at *para. 24*).

(viii) The fact that the witnesses had committed their positions to witness statements "is not in and of itself a bar to Title 28 depositions." The question was whether there were "proper concerns about vexatiousness and oppression" (*ibid.*). But the US courts "are shown to be alive to such concerns" (*ibid.*, at *para. 25*). He could not proceed on the basis that those courts might fail to protect the witnesses from oppression: the evidence indicated that very similar objections to those raised before the Cayman court could be raised before the US court (*ibid.*, at *para. 26*).

(ix) This was not a case where Mr. Rosenberg and Mr. Phlipponneau could be treated as fully amenable to the jurisdiction of the Cayman court since they were not officers of Lyxor. They were officers of SG "seeking to advance what is ultimately SG's case" (*ibid.*, at *para. 28*).

(x) Reciprocity could be obtained in the circumstances since Phoenix was content to offer its main witness of fact for deposition under O.24, r.16 (*ibid.*, at *para. 29*).

**The appeal**

39. As we have said, the Chief Justice dismissed the application for an anti-suit injunction by an order made on May 22nd, 2009. He had provided copies of his ruling in draft to the parties on May 15th, 2009. Notice of appeal from the order (not then made) was filed by Lyxor on May 21st, 2009. Grounds of appeal were lodged on May 29th, 2009 and a skeleton argument followed on June 23rd, 2009. The appeal was heard on July 6th and 7th, 2009.

40. Lyxor advanced five main grounds of appeal. These were that—

(i) the Chief Justice misdirected himself in law as to the correct test to be applied in considering whether to grant the injunction. It is said that he was obliged to address his mind to the issues of fact in evidence before him and make findings on whether the §1782 proceedings were or were not unconscionable. He erred in directing himself that he could not proceed on the basis that the US District Court might fail to protect the witnesses from oppression. If he had addressed his mind to the issues before him, he would have held that the §1782 proceedings were unconscionable;

(ii) the Chief Justice erred in his approach to the power conferred by O.24, r.16 of the Grand Court Rules. It is said that he was wrong to hold that Cayman law was not hostile to a witness being cross-examined in advance of trial. He ought to have concluded that the exercise of the power under O.24, r.16 depended on the circumstances. If he had done so, he would have concluded that in the circumstances of this case the §1782 proceedings were unconscionable;

(iii) the Chief Justice erred in his characterization of Lyxor's defence. It is said that he was wrong to hold that Lyxor was seeking to advance what was ultimately the case of its parent, SG, and that that approach led him, wrongly, to favour the deposition of SGAS employees in New York. He should have appreciated that Lyxor was "the real party in interest." If he had done so, he would have concluded that the §1782 proceedings were unconscionable;

(iv) although the Chief Justice was correct to hold that he needed to consider whether Phoenix could achieve a comparable forensic objective to that sought in the §1782 proceedings by means of the ordinary process of the Cayman court without exposing Lyxor to the potential inconvenience, cost and oppression of the §1782 proceedings, he failed properly to do so. He ought to have concluded that it was not necessary or desirable to subject the parties to the inconvenience, cost and oppression of the §1782 proceedings because Phoenix's legitimate interests in ensuring full and proper discovery could more efficiently be met through the administration of interrogatories in the Cayman proceedings; and

(v) the Chief Justice erred in holding that the witnesses could not be treated as "participants" in the Cayman proceedings, and in rejecting Lyxor's contention that, because they were properly to be regarded as participants, the need for recourse to discovery in the §1782 proceedings was "less apparent" as based on a false premise.

41. These grounds of appeal can be summarized in that the Chief Justice erred in five principal respects: (i) he left arguments on oppression to the New York court; (ii) he held that Cayman law was not hostile to pre-trial cross examination; (iii) he regarded SG, rather than Lyxor, as the real party in interest; (iv) he should have confined Phoenix to the ordinary processes of the Grand Court; and (v) he should have treated SG as a participant in this action. We will address the five grounds of appeal in turn.

**(1) Was the Chief Justice wrong to proceed on the basis that he could rely upon the New York District Court to protect Mr. Rosenberg and Mr. Phlipponneau from oppression?**

42. It is important to have in mind that the potential for abuse or oppression exists, first, in the course of the §1782 proceedings (that is to

say, in the course of the deposition process itself in New York) and, secondly, in the use to which Phoenix may seek to make in the Cayman proceedings of transcripts of the depositions taken in the §1782 proceedings.

43. It is difficult to see how Lyxor, itself, could be said to be exposed to any potential for oppression in the §1782 proceedings. The deposition notice has been served on SGAS, not on Lyxor, and the individuals to be deposed are employees of SGAS, not employees of Lyxor. It would have been open to SGAS to issue a notice to challenge both the original order made under §1782 and the deposition notice of March 19th, 2009 but SGAS has not chosen to do so. There is nothing in the affidavit of Mr. Driscoll (who does not purport to speak for SGAS) to suggest that SGAS—as distinct from SG or Phoenix—fears abuse or oppression if its employees are required to give deposition testimony in New York.

44. As we have said, the Federal Rules of Civil Procedure provide their own protection against the abuse of the deposition process or the oppression of individual deponents. The deposition can be expected to take place before a court reporter (who is a notary public). That officer will swear the deponent to his oath and record and certify the evidence that he gives. The deponent would be, or could be, accompanied by counsel for SGAS. The deponent, or counsel, could object to questions put on the ground that they were embarrassing or oppressive, and could take that objection to the New York District Court. The court could be expected to protect the witness against the misuse of the deposition process.

45. In those circumstances, we are satisfied that the Chief Justice was entitled to proceed on the basis that he could leave objections as to abuse or oppression arising in the course of the deposition process to be taken on behalf of SGAS (or on behalf of Mr. Rosenberg or Mr. Phlipponneau) before the officer taking the depositions under the Federal Rules of Civil Procedure, and (if and so far as necessary) before the New York District Court.

46. It was suggested, albeit faintly, that the deponents—having experienced cross-examination in the course of the deposition process—might, themselves, feel disinclined to undergo further cross-examination at a trial of the Cayman proceedings. We are not persuaded that senior executives in a major banking group—who, it must be assumed, are doing their best to give a truthful account of facts within their own knowledge—are likely to be intimidated by proper questions designed to probe and test their evidence. The point was not pressed before us.

47. The use to which the transcripts of depositions taken in New York may be put in the Cayman proceedings is, of course, a matter for the Grand Court. In contrast to the position under O.24, r.16 of the Grand Court Rules (to which we shall need to refer), no transcript of depositions

would be admissible as evidence at trial without an order of the Grand Court. In deciding what order to make in this respect, it will be open to the Grand Court to restrict the use which can be made of the deposition transcripts in the course of any cross-examination of Mr. Rosenberg and Mr. Phlipponneau at the trial. In our view, the Grand Court has ample powers to prevent abuse of its own process should the need arise.

**(2) Was the Chief Justice wrong to hold that the law of the Cayman Islands was not hostile to pre-trial cross-examination?**

48. The rules comprised in Part II of O.24 in the Grand Court Rules 1995 make provision for "discovery by oral examination." They were introduced in 2003 and are said to be derived from the rules in force in the Canadian provinces of Ontario and Saskatchewan. We were told that little use has been made of those Rules in the Grand Court but that they are part of Cayman law is not in doubt. They have no counterpart in the Rules of the Supreme Court formerly in force in England or in the current English Civil Procedure Rules.

49. Rule 16(1) provides that "in an action begun by Writ, the Court may make an order for discovery by oral examination of any party or, if the party is a body corporate, any officer thereof." Such an order may be made "if and so far as [the court] is of opinion that discovery by oral examination is necessary either for disposing fairly of the cause or matter or for saving costs": r.16(2). Rule 17 provides for the examination to "be taken down by a court reporter in the form of questions and answers" and the court reporter is "empowered to administer the oath." The examination of a person for discovery is in the "nature of a cross-examination": r.17(4). Objection may be taken to questions and the validity of any objection is determined by the court: r.17(8) and (9). Rule 18 provides for the use at trial of the transcript of an oral examination for discovery. In particular, "a party may put to an adverse party in cross examination any questions and answers contained in the transcript of his examination": r.18(4).

50. It is clear, therefore, that the Rules in Part II of O.24—that is to say, r.16, and its ancillary rules, r.17 and r.18—do make provision for pre-trial cross-examination (by way of oral discovery) in the course of litigation in the Grand Court. It cannot be said that the law of the Cayman Islands is hostile to pre-trial cross-examination. The most that can be said is that (i) it is not available generally in respect of non-parties or their employees and (ii) it is not available generally in circumstances where it might be relevant and useful, but only where "necessary either for disposing fairly of the cause or matter or for saving costs."

51. The interaction between §1782 proceedings in New York and examination for the purpose of discovery under comparable rules in Canada was considered by the Federal Court of Appeal in *Sternson Ltd.* v. *CC*

*Chemicals Ltd.* (4). *Sternson* was a case in which an injunction had been granted by the trial judge restraining the defendant from seeking to depose the assignor of a patent in the United States, under an order made pursuant to §1782. The trial judge had relied on the English authority of *Armstrong* v. *Armstrong* (1), a decision which may no longer be good law in England in the light of Lord Brandon's observations in *South Carolina Ins.* (3) (decided after *Sternson*). In reversing the trial judge—and distinguishing *Armstrong*—the Federal Court of Appeal said this ([1982] 1 F.C. 350, at paras. 17–18):

"17 . . . The most important distinction is that the process of compulsory oral examination for discovery under oath of an adverse party or of a witness was not available under the appropriate rules of the English Court. Under our Rules, such discovery is available in respect of an adverse party and of a party in the position of the party sought to be examined in this case, the assignor of the invention. It is, of course, true that Mr. Rehmar [the assignor] is not subject to such examination under Rule 465(5) [of the Canadian Federal Court Rules] because he is out of the jurisdiction. But he would be if he were in Canada. The procedure obviously is not a procedure we find vexatious or oppressive. It is a procedure which we ourselves apply in respect of assignors of patents who are within our jurisdiction. Mr. Justice Jeune [in *Armstrong*] was concerned that the witnesses in Vienna might be unwilling witnesses and might be subject to cross-examination. He was concerned that the mode of dealing with the testimony of the witnesses in Austria was a mode which would '. . . go far beyond any process of discovery recognised in the procedure of this country.' But that is not so in the present case.

18 It would also appear that the examination of Mr. Rehmar would be useful to the appellant. It may well be that the testimony could not be read in at the trial, but it would be of use in preparing the appellant's case, which is one of the purposes of an examination for discovery."

52. There are, of course, differences between the position in *Sternson* and that in the present case: in that O.24, r.16 of the Grand Court Rules could not be used, in the present case, to obtain discovery by oral examination from SGAS (or from Mr. Rosenberg or Mr. Phlipponneau) even if they were present in the Cayman Islands because SGAS is not itself a party to the Cayman proceedings. Mr. Rosenberg and Mr. Phlipponneau are not officers or employees of Lyxor; they are officers and employees of SGAS. But the underlying premise is the same: the existence of a comparable (although not identical) procedure for oral discovery in the jurisdiction in which the anti-suit injunction is sought is a relevant factor. The court, by allowing the §1782 proceedings to take their course, is not giving effect to procedure which (in its own eyes) is obviously

oppressive or vexatious: it is not going "far beyond any process of discovery" recognized by the law applicable in its own jurisdiction. The Chief Justice cannot be criticized for taking the view which he expressed in the course of his ruling.

### (3) Did the Chief Justice regard SG, rather than Lyxor, as the real party in interest?

53. It is said that the Chief Justice erred in treating SG, rather than Lyxor, as the real party in interest. We find it difficult to understand the basis for this criticism. The issue in the Cayman proceedings—as the Chief Justice appreciated—is the value to be attributed (as between Phoenix and Lyxor) to financial instruments issued by SG to Lyxor as administrator of the Patriot Funds. Both SG and Lyxor (but not Phoenix) have rights and interests under those instruments. It is plainly relevant to ask how, as between Lyxor and SG, those rights and interests should be valued, but the underlying question is whether (knowing that) the bargain made between those parties under those instruments was within the mandate of Lyxor as administrator of the funds. If Lyxor is obliged to pay SG in respect of the early determination of the right to borrow—and if that bargain was within the mandate of Lyxor as administrator of the Patriot Funds—then (*prima facie*, at least) the funds have to bear that liability. If, on the other hand, Lyxor is not obliged to pay SG in respect of the early determination of the right to borrow—or if the bargain made between Lyxor and SG was not within the mandate of Lyxor as administrator of the funds— then it may well be that the liability does not fall upon the funds. SG has an interest in the outcome of the Cayman proceedings, but it is not a party and it cannot be said that SG's interest is identical with, or displaces the interest of, Lyxor.

54. Nor, as it seems to us, can it be said that the Chief Justice thought that it did. Although he referred, in the course of his ruling, to Lyxor's defence to the Cayman proceedings as a claim "on behalf of SG" (see *2009 CILR 342, at para. 2* ("the sum of approximately $100m. which Lyxor claims it is entitled to withhold on behalf of its parent, SG"), at *para. 3* ("Lyxor's claim on behalf of SG"), and at *para. 4* ("Lyxor asserts the claim on behalf of its principal, SG")) he was, as it seems to us, doing no more than recognize the commercial reality which drives Lyxor to defend the Cayman proceedings. It is plain, as a matter of commercial reality, that Lyxor's underlying interest in the proceedings is to ensure that SG, as the counterparty to the derivative, obtains what it (and SG) regards as a proper return for the risk which SG had assumed. That the Chief Justice recognized this appears from his reference (*ibid.*, at *para. 2*) to the charge that Lyxor asserts it must make against the funds on early redemption being the sum "in respect of what SG now claims as an 'undisclosed margin' or profit to which it is entitled for its part as

investment adviser and leveraged financier to the Phoenix funds"; and, (*ibid.*, at *para. 28*) to Mr. Rosenberg and Mr. Phlipponneau as "key witnesses on behalf of Lyxor seeking to advance what is ultimately SG's case . . ."

55. The Chief Justice was entitled to take the view that, although the claim in the proceedings was brought against Lyxor (as it had to be), SG's interest in the outcome (both as Lyxor's parent company and as the counterparty to the derivative) was a factor which pointed to the conclusion that it was not oppressive to allow the §1782 proceedings and the request under the r.30(b)(6) notice to continue against SGAS and its employees, Mr. Rosenberg and Mr. Phlipponneau. There is no substance in the criticism advanced under this ground of appeal.

**(4) Should Phoenix have been confined to the ordinary process of discovery in the Grand Court?**

56. It was submitted on behalf of Lyxor that the Chief Justice should have appreciated that Phoenix could obtain all the information that it needed for the pursuit of its claim by the means provided by the Grand Court Rules: in particular, it could obtain what it needed by making a request for further and better particulars, by administering interrogatories, and by seeking further and specific discovery.

57. That submission may or may not be well-founded but it misses the point. As Lord Brandon explained in *South Carolina Ins.* (3), *prima facie* a party who can invoke the jurisdiction of the US District Court under §1782 may choose to do so. The choice (in the present case) arises from the fact that SGAS is resident in New York. The right to take pre-trial deposition testimony from Mr. Rosenberg and Mr. Phlipponneau is a right conferred by US law—it is not a right conferred by, or to be withheld under, Cayman law. The relevant question is not whether Phoenix could achieve a similar result in the Cayman Islands but whether (if it could) it is acting oppressively or abusively in seeking to rely on the right which it enjoys under US law.

58. In the particular circumstances of this case—having regard to the late amendment of the defence and the very considerable ground which needs to be covered arising out of the late amendment to the defence—Phoenix has taken the view that its interests are best served by seeking to obtain the information which it needs by taking oral depositions in New York—a relatively summary process—rather than by proceeding by way of further and better particulars and interrogatories in the Grand Court—with the potential for procrastination and delay inherent in that process. It cannot be said that, in making that choice, it is acting oppressively or unconscionably or that its choice amounts to an abuse of the process of the Cayman courts.

**(5) Should the Chief Justice have treated SG (or SGAS) as a participant in the Cayman proceedings?**

59. It is said that the judge should have treated SG as a participant in this action. That is a difficult submission to understand. SG is not (so far as we are aware) resident in New York and Mr. Rosenberg and Mr. Phlipponneau are not offered for deposition as employees of SG. It may be that the ground should be read as a criticism that the Chief Justice did not treat SGAS as a participant in the Cayman proceedings. But it is difficult to see any basis upon which it could be so treated.

60. If SGAS were a party to the Cayman proceedings, Mr. Rosenberg and Mr. Phlipponneau could be subject to requests for pre-trial oral examination under O.24, r.16 of the Grand Court Rules. It is because SGAS is not a party to the Cayman proceedings that Phoenix cannot proceed under that rule. Neither SGAS nor Lyxor have suggested that Mr. Rosenberg or Mr. Phlipponneau should be offered for pre-trial oral examination under that rule. There is nothing in this point.

61. We are satisfied that none of the grounds of appeal provide a basis for the appellant's contention that the Chief Justice erred in principle. It is accepted that, absent some error of principle, it is not for an appellate court to consider what order it might have made in the circumstances if it had been exercising its own discretion: it is not for an appellate court to substitute its own view for the view reached by the Chief Justice in the exercise of his discretion. *A fortiori* in the present case, where the Chief Justice has been closely involved in interlocutory matters in the Cayman proceedings since their inception and may be taken to be fully apprised of the detailed issues which arise in these proceedings.

62. Subject to one matter, therefore, we would have dismissed the appeal without further directions. But we were concerned to find in the affidavit of Mr. Kaplan of March 26th, 2009 the assertion that the pre-trial depositions of Mr. Rosenberg and Mr. Phlipponneau would "also be helpful in testing the credibility of key witnesses before trial." We have no doubt that that would not be a proper use of depositions in the context of a trial in the Cayman Islands.

63. The proper purpose of the pre-trial oral examination by way of discovery, in the context of a trial in this jurisdiction, is to ascertain what it is that the witnesses will say but not to seek to establish in the course of the oral examination that what they will say is not to be believed. It is for the trial court in the Cayman Islands to decide whether or not the evidence given at the trial is to be believed or not to be believed.

64. It was for this reason that we added directions in these terms:

"We direct that no use is to be made of the transcripts of the depositions of Samuel Rosenberg or Anthony Phlipponneau taken

pursuant to the deposition notice issued by the plaintiff, Phoenix Meridian Equity Ltd., under r.30(b)(6) of the US Federal Rules of Civil Procedure (whether by way of evidence or in the course of cross-examination) at the trial save as may be permitted by a future order of the Grand Court.

We further direct that the defendant, Lyxor Asset Management S.A., may apply to a judge of the Grand Court, who may be a judge other than the trial judge, for an order that such parts of the transcript of those depositions as may be specified in the application notice be redacted or deleted from the transcripts on the grounds that they constitute cross-examination going to the credit of the deponent."

65. If Phoenix were to trespass, in the course of taking depositions in New York, into cross-examination as to credit—an exercise which is recognized by counsel as inherently unwise (in that it is likely to be counter-productive to spring the cross-examination trap in advance of trial)—then Lyxor should have the opportunity of applying to a judge of the Grand Court, who may be a judge other than the trial judge (so that the trial judge does not have to look at the relevant passages), for an order redacting those parts of the transcripts. That, as it seemed to us, provided an adequate safeguard against the misuse of the depositions in the course of the trial. Further, of course, the trial is subject to the control of the trial judge, and he will allow only such use of the transcripts as seems to him to be useful and sensible in the context of the issues he has to decide.

*Appeal dismissed.*

*Maples & Calder* for the appellant; *Appleby* for the respondent.

[*July 7th, 2009: The Court of Appeal (Chadwick, P., Forte and Mottley, JJ.A.) refused the appellant leave to appeal to the Privy Council.*]

# Exhibit 9

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**
**FINANCIAL SERVICES DIVISION**

**CAUSE NO. FSD 235 OF 2017 (IKJ)**

**IN THE MATTER OF SECTION 238 OF THE COMPANIES LAW (2016 REVISION)**
**AND IN THE MATTER OF NORD ANGLIA EDUCATION, INC**

**IN COURT**

| | |
|---|---|
| **Appearances:** | Lord Grabiner QC and Mr Richard Boulton QC of counsel and Mr Mac Imrie, Mr Malachi Sweetman and Mr Lukas Schroeter of Maples and Calder on behalf of Nord Anglia Education, Inc. ("**the Company**") |
| | Mr Richard Millett QC of counsel and Mr Simon Dickson, Ms Jessica Vickers and Mr Harry Rasmussen of Mourant Ozannes on behalf of the Mourant Dissenting Shareholders |
| | Mr Jonathan Adkin QC of counsel and Mr Andrew S Jackson of Appleby on behalf of the Appleby Dissenting Shareholders |
| | Mr George Bompas QC of counsel and Mr Hamid Khanbhai of Campbells on behalf of the Campbells Dissenting Shareholders |

(together **"the Dissenters"**)

| | |
|---|---|
| **Before:** | **The Hon. Justice Kawaley** |
| **Heard:** | **2 December – 20 December 2019** |
| **Draft Judgment Circulated:** | **28 February 2020** |
| **Judgment Delivered:** | **17 March 2020** |



## HEADNOTE

*Appraisal of fair value of shares-section 238 of the Companies Law Petition-appropriate valuation method-whether market value or discounted cash flow analysis is appropriate valuation methodology-efficiency of market in the Company's shares-relevance of transaction price-rigour of transaction process-whether merger agreement an arms-length transaction-relevance of non-public information-minority discount*

# JUDGMENT

## INTRODUCTORY

1.    On November 9, 2017, the Company presented a Petition under section 238(9) of the Companies Law (2016 Revision) for the determination of the fair value of the Dissenters' Shares.  The Shares had been acquired by the Company pursuant to a merger agreement dated April 25, 2017 ("Merger Agreement") which was approved by the requisite majority of Shareholders at an extraordinary general meeting held on August 21, 2017 ("EGM").  The path to trial has been strewn with many (often flowery) interlocutory applications, the history of which need not be recited here. In the final event the parties cooperated very effectively to ensure that the scheduled trial was completed on time, despite the multiplicity of witnesses who appeared and the range of issues which were canvassed by counsel.

2.    The Company initially offered the Dissenters the Merger Consideration of US$32.50 for their Shares, before the present proceedings were commenced. At trial the Company contended that a market price of US$30.45 reflected the fair value of the Shares; the Dissenters contended that US$76.51 was, applying a discounted cash flow ("DCF") valuation methodology, the fair value of the Shares.

## THE ISSUES

3.    There was no material dispute on the general legal principles governing the Court's jurisdiction to determine the fair value of the Shares under section 238 of the Companies Law. How those principles should be applied to the facts of the present case, which were disputed to a material extent, in light of the expert evidence formed the central controversy.

4.    The governing legal approach was summarised in the Company's Written Opening Submissions as follows:

*"11. The meaning of fair value in the Cayman Islands has not been clarified by a precise legal definition. Nevertheless, the main concepts are becoming easier to express with the benefit of recent authority. For introductory purposes, the following points are the key ones:*

> *11.1 It is the Dissenters' shares in the Company that are being valued;*

> *11.2 The valuation is intended to compensate the Dissenters for the fair value of their shares and reflects an economic exchange of the rights and obligations attaching to the shares for cash;*

> *11.3 'Fair' adds the concepts of just and equitable treatment, and flexibility, to 'value';*

> *11.4 Fair value applies to both the Dissenters and the Company; neither side should be preferred, and fair value does not require that the price must be the highest possible;*

> *11.5 Excluded from fair value are the benefits and burdens of the merger transaction itself;*

> *11.6 Minority shareholdings are to be valued as such, subject to the particular rights and liabilities attaching to the shares.*

*12 Consistent with these principles, in this case the experts have proceeded on the basis that fair value is to be expressed on a "per share" basis and have agreed that fair value refers to the value of a share in the Company as a going concern, and does not include advantages which accrue to the Company as a result of the merger, including anticipated synergies, and that minority shareholdings are to be valued as such."*

5.    The Written Opening Submissions for Trial on behalf of the Dissenters described the governing legal principles concisely as follows:

> *"2. The term "fair value" has a well-established meaning in Cayman law. As will be set out in detail below, it does **not** mean "merger price" or "market value" or even "fair market value". Rather, it means what has been described as the **intrinsic** value of shares in the Company, valued as a going concern and taking into account all value-relevant information, whether or not available to the market, whilst leaving out of account any factors peculiar to a particular buyer or seller but irrelevant to the value of the business, and any enhancement*

*or reduction in value arising from the merger itself. The statutory meaning of "fair value" is the only matter of law in this case, and the law is well established. The rest is the application of the evidence."*

6.   The main headline factual issues in controversy were the following:

    (a)   whether the adjusted Market Price was the most appropriate valuation. The Company's primary position was that US$30.45 reflected the fair value of the Shares. It was common ground that it would only be appropriate to use this if:

        (i)   the market was semi-strong efficient; and

        (ii)   there was no material non-public information ("MNPI") about the value of the Shares;

    (b)   what, either as a check on the validity of the Market Price or because the Market Price was not an appropriate methodology to use, was the fair value of the Shares using the DCF valuation method. The Dissenters' primary position was that their Expert's DCF valuation should be adopted by the Court. Both Experts carried out what each contended was the correct valuation exercise but generated starkly different results:

        (i)   $33.23 per share (Professor Fischel's mid-range figure);

        (ii)   $76.51 per share (Professor Gompers);

    (c)   the critical elements for an appropriate DCF analysis were agreed in principle but the precise values to be applied to each input on the facts of the present case were contentious. The key elements are:

        (i)   central or reasonable estimates of projected cash flows;

        (ii)   a discount rate that reflects the risks attached to those projections, based on the Company's weighted average cost of capital ("WACC");

        (iii)   a perpetuity growth rate based on central or reasonable estimates of long-term growth; and

    (d)   whether the Merger Consideration or Take–Private transaction price of $32.50 (the "Transaction Price") was a relevant indicator as to the fair

value of the Shares. The Company contended that the Transaction Price
included a premium but was a useful indicator of fair value while the
Dissenters contended that the process adopted fell short of being an arms'
length transaction.

## THE COMPANY'S FACT WITNESSES

### Graeme Halder

#### Overview of witness

7.    Mr Graeme Halder was at all material times Chief Financial Officer of the Company.
A Chartered Accountant, he was responsible for the preparation of the Company's
financial statements and the financial projections which were central to the contentious
DCF valuation analysis. He left the Company in August 2018.

8.    I found Mr Halder to be a credible witness who generally gave his evidence in a careful
and (in the face of probing cross-examination) impressively objective manner. His
capacity for answering questions with precision is illustrated by the following
exchanges during cross-examination by Mr Adkin QC:

> "…So it looks like early part of December the
> Project Darwin process is halted; yes?
> A. I mean, obviously I'm not copied on any of the emails,
> so I can't comment on those, but I was aware that, you
> know, the Project Darwin did come to a halt in either
> late November or early December.
>  Q. I see.
> A. So, yes, I'm aware that that happened but not through,
> obviously, this process. I wasn't copied in on any of
> these emails.
> Q. I see. And were you involved in the decision to halt
> it?
> A. No.
> Q. Do you know who was involved in that decision?
> A. No.
> Q. Do you know why that decision was taken?
> A. Well, I can't if I did not know who was involved in
> taking it.
> Q. I think it's probably logically possible, but anyway,



*your answer is no, you don't?*
*A. Correct."*[1]

9.      His ability to respond to potentially contentious questions in a balanced, fair yet firm
manner is provided by the following extract from the Transcript:

> *"A. That is what EY are saying, yes.*
> *Q. That's what they are saying. And if we go to page 4,*
> *{HSD/18/4}, there is a number of quick wins, so we have*
> *got food and catering, books, IT, it seems to be around*
> *there, facilities and management on the edge. Yes, do*
> *you see that?*
> *A. Yes, I can see it.*
> *Q. And this was pretty realistic, wasn't it? There were*
> *some pretty -- there is some low hanging fruit, where*
> *savings could be made?*
> *A. I mean, you know, I think there was an opportunity in*
> *procurement to make savings. I think there weren't*
> *quick wins, as we discovered when we came to actually*
> *implement it, which was later on in this year. You*
> *know, to change the way a school operates -- it's*
> *a fairly individual place, it operates as it wants to*
> *operate per the principal, which is one of the*
> *challenges of managing a global education business and*
> *trying to get them to buy into the idea of, you know,*
> *that procurement is a foreign language that you have to*
> *work hard to try and get them to understand. So, you*
> *know, my view is I think there was an opportunity.*
> *I think there is an opportunity. I'm not sure how much*
> *of it has been got as of today but the idea of quick*
> *wins I thought was always going to be difficult because,*
> *you know, there is absolutely no doubt about the*
> *analysis that says there are opportunities."*[2]

10.     Perhaps the most important contentious aspect of his oral evidence was Mr Halder's
characterisation of the approach he followed in preparing forecasts of future
performance:

---

[1] Transcript Day 2 page 34 line 6-page 35 line 1.
[2] Transcript Day 2 page 169 line 17-page 170 line 22.



"Q...*And what it says is that you had told Houlihan Lokey that the projections you gave them had been reasonably prepared -- let's just ignore the word "reasonable", if you like -- that they had been prepared in good faith on bases reflecting the best currently available estimates and judgments of management as to the future financial results and condition of the company, and that is indeed the basis upon which they had been prepared, isn't it?*
A.  *Yes, the information at that point in time, yes.*
Q.  *Yes.  What you had done was produce projections that reflected what you believed in good faith, quite honestly, to be the best currently available estimates and judgment -- your estimates and your judgment -- as to the future financial results and condition of the company; yes?*
A.  *Yes, based on the way I produce forecasts.*
Q.  *Well, what do you mean by that?*
A.  *I mean, when I'm producing -- you know, so what I would like to say is, you know, when I was producing these forecasts, the one thing I didn't envisage would be sitting here two and a half years later discussing the forecasts.  I approached forecasts very similarly throughout my career for 30 years, that you mentioned, that I did forecasts and I defined it in the responses to some of the letters as ambitious but achievable, and I've also talked about the fact that I did not have risk weighting within that, and that's the way that I did forecasts, you know.  They were always stretching. That's what a CFO does in a business, he does stretching forecasts, stretching targets to push the business to try and achieve.  And I -- you know, these forecasts were no different to the August 16 forecasts I did or the November 16 forecasts I did or the April -- sorry, the August 17 projections I did or the ones I did for the IPO or any other projections I did at Nord Anglia or anywhere else.  They were stretching, they were ambitious but, in my view, achievable.  So I think that's sits within that wording that I had created forecasts that were my best view of, you know, what the company could achieve at that point in time.  What I didn't do was put in a risk weighting.  And I've discussed why I didn't do that in my affidavit; it's difficult -- it's difficult to know how to risk-weight*



> *things that you don't know, that invariably are probably*
> *going to happen in the future but haven't yet happened.*
> *And I can give, you know, a myriad of examples of that,*
> *things that have happened in the past that, when we did*
> *previous five year projections we didn't know about, you*
> *know, some of which are pretty material.*"[3]

11.    Save as regards the narrow issue of this portion of his evidence relating to the basis on which he prepared his projections, his credibility was not directly challenged. Even the sole challenge was advanced in a very nuanced way. I shall return to this issue in further detail below.

12.    Overall Mr Halder appeared to me to give his evidence in a level-headed non-partisan manner. He briefly departed from this approach after lunch on the day of his testimony, causing me to speculate whether during the short adjournment he had been subjected to a passing jibe about giving his evidence in an overly 'passive' manner. Under cross-examination by Mr Adkin QC about future earnings potentials at around 3.00pm, he responded as follows:

> "…*So that's a pretty promising outlook for the*
> *China Bilingual market, is it not, being expressed by*
> *Parthenon in this March 17 report?*
> *A. I mean, it might be that Ian Johnson was involved in*
> *either the agenda or reviewing this. So he might be*
> *a better person to ask because he was --*
> *Q. I will do.*
> *A. -- directly responsible for that. You know, what*
> *I would say about it is I'm sitting here thinking*
> *I wonder why we paid them the money because it's pretty*
> *useless because if you look on the previous page, if we*
> *can just go back, and I read the cities that they*
> *reviewed and I don't know why -- sorry, the one*
> *before -- why they chose the cities they chose, and Ian*
> *will be able to correct me...*"[4]

13.    A few minutes later, the witness was forced to admit that the Company itself had requested Parthenon to study the cities they chose to study[5]. This was a very minor error

---

[3] Transcript Day 2 page 49 line 19-page 51 line 17.
[4] Transcript Day 2 page 153 line 13-page 154 line 2.
[5] Transcript Day 2 page 155 line 8- page 156 line 7.

on a matter as to which the witness admitted he had limited information, but it struck me at the time as flowing from the witness atypically providing a loose answer designed to bolster the Company's case. Thereafter, it appeared to me, Mr Halder resumed the predominantly careful and neutral manner in which he gave his oral evidence.

## Overview of evidence-in-chief

14.    Mr Halder's First Affidavit was sworn on January 31, 2018 ("First Halder Affidavit") when he was still resident in Hong Kong and employed as Chief Financial Officer of the Company. For present purposes, this Affidavit pertinently supported the Petition by explaining the mostly non-contentious background to the Merger Agreement and the Company's business. In summary:

(a)    the Company's main business involved managing international schools from the pre-school to secondary level. At that time, the Company operated 54 schools in 24 countries with a student enrolment of over 49,000 and staff of over 9,000;

(b)    the Company's business originated (under a different corporate structure) in 1972 from a base in the United Kingdom. The Company's centre of management has been located in Hong Kong since 2012. The Company's initial public offering on the New York Stock Exchange ("NYSE") took place on March 26, 2014 and the Shares were listed until September 1, 2017;

(c)    since 2008 the Company's majority shareholder has been Premier Education Holdings ("Premier"). Some 96% of Premier's shares were held by The Baring Private Equity Fund III and the Baring Private Equity Fund IV (the "Selling Funds"/"Fund III" and "Fund IV"). The Selling Funds are affiliated with "*one of the largest independent alternative investment management firms in Asia*"[6], Baring Private Equity Group Asia Limited ("BPEA");

(d)    the Merger Transaction was an arms' length take-private acquisition transaction between the Company and a buyer consortium comprising:

(i)    The Baring Asia Private Equity Fund VI, L.P. 1, The Baring Asia Private Equity Fund VI, L.P. 2 and The Baring Asia Private Equity Fund VI Co-investment L.P. (the "Buying Funds"/"Fund VI LP 1", "Fund VI LP 2" and "Fund VI Co-investment LP"); and

---

[6] First Halder Affidavit, paragraph 10.

(ii)    Canada Pension Plan Investment Board ("CPPIB"), which represents 20 million contributors/beneficiaries

(together the "Buyer Group");

(e)    BPEA informed the Company's Board of Directors (the "Board") of its interest in an acquisition at a Board meeting on January 13, 2017. The Board established a special committee comprised of two independent directors unaffiliated with either the Buyer Group or the Company's management (the "Special Committee"). The Special Committee engaged Houlihan Lokey Capital, Inc. ("Houlihan Lokey"), a specialist adviser, to prepare a fairness opinion on the proposed transaction;

(f)    the Company created a transaction due diligence data room but was not involved in the negotiations between the Special Committee and, *inter alia*, the Buyer Group between January and April 2017. Discussions took place between the Special Committee's professional advisers, BPEA and the professional advisers of the Buyer Group;

(g)    an initial non-binding offer was made by the Buyer Group on April 4, 2017 of US$30 per Share, which offer was rejected. The Buyer Group raised its offer to US$32.00 per Share, but the Special Committee insisted on a "go-shop" provision to permit the pursuit of other offers within a 30 day period. Following further discussions, the Buyer Group increased its offer by 50 cents to US$32.50 per Share;

(h)    Houlihan Lokey verbally advised the Special Committee that the offer price was fair in advance of providing its formal written fairness opinion;

(i)    on April 25, 2017, the Special Committee determined that it was advisable to enter into the Merger Agreement, the Plan of Merger and the related transactions contemplated by those agreements. The Board decided to enter into the Merger Agreement on the same date subject to approval at an extraordinary general meeting ("EGM");

(j)    the main features of the Merger Agreement were as follows. US$32.50 was the consideration for each Share ("Merger Consideration"). Bach Acquisitions (the "Merger Sub") would be merged with the Company. The Company would continue to exist as a subsidiary of Bach Finance Limited (the "Purchaser"), but the Merger Sub would cease to exist. The

Company would cease to be a listed company and would be beneficially owned by the Buyer Group;

(k)    also on April 25, 2017, the Merger Agreement and a Share Sale and Support Agreement ("SSSA") were entered into between Premier and the Parent. The Merger Agreement was announced. The previous day, the closing trading price of the Shares was US$27.62;

(l)    the offer price represented a premium of 17.7% above the pre-announcement closing price and 24.2%, 31.7% and 33.8 % respectively above the weighted average daily trading price of the Shares over the previous 30-day, 60-day and 90-day period;

(m)    the go-shop period ended 30 days after April 25, 2017 and no other bids were received although Houlihan Lokey on behalf of the Special Committee contacted one potential strategic bidder and 14 potential financial bidders;

(n)    the EGM was held on August 21, 2017. 79,369,500 Shares (approximately 85% of the shares represented at the EGM) voted in favour of the Merger and 14,006,383 Shares (approximately 15% of the shares represented at the EGM) voted against. The Merger became effective on September 1, 2017 when the Plan of Merger was executed and filed with the Registrar of Companies.

15.    Mr Halder's Second Affidavit was sworn on April 10, 2019 ("Second Halder Affidavit"). By this time he was no longer Chief Financial Officer of the Company and was residing in England. The Second Halder Affidavit explained the basis on which he had prepared financial projections while in the Company's employ. In summary:

(a)    annual budgets prepared by a small team he directed were the primary basis on which the Company made its financial plans. Occasionally projections would be prepared for the purposes of raising debt and/or equity;

(b)    in August 2016, Mr Halder prepared 5 year projections for the first time as part of the annual budget process. These forecasts formed the basis for all subsequent Company forecasts;

(c)    in November 2016, Mr Halder prepared an updated version of the August 2016 5 year plan in connection with Project Darwin, another potential sale ("November 2016 Projections"). The 'Bank Model' sheet

was not prepared by him but was based on his figures insofar as it included 5 year projections. The additional "Projections to Reach Steady State" covering the period 2022-2026 were neither prepared by Mr Halder nor based on his figures. His own figures for financial years 2017-2022 represented his *"ambitious but achievable view at the time"*[7];

(d)     the next five year projections prepared by Mr Halder's team were in April 2017 ("April 2017 Projections") in the context of the Merger transaction. This update included additional updated material and included additional (presumably electronic) features (the option of turning on and off certain new developments)[8]. These projections were supplied to Houlihan Lokey. Mr Halder *"did not consciously apply any risk-weighting to the April 2017 Projections. They were ambitious"*[9];

(e)     after the Merger Agreement was consummated, the Buyer Group prepared its own projections which were more aggressive than the Company's as part of the Group's debt raising and syndication process. The main difference was that BPEA models assumed a positive impact on future earnings attributable to Operational Excellence. Based on Mr Halder's own experience in the business he regarded the BPEA assumptions as being *"very ambitious... [but] not outside the realms of possibility"*[10];

(f)     between April and August, Mr Halder's focus was on preparing a full budget. Ian Johnson and the China Bilingual team were requested to prepare more detailed projections because the China Bilingual project was a major area targeted for future development. Existing projections were based on the experience of one such school already operating in China. Between July 2 and August 1, 2017 Mr Johnson forwarded to Mr Halder revised projections for the China Bilingual project. The July 26, 2017 Projections for China Bilingual were far more conservative than those included in the April 2017 Projections. Because Mr Halder did not appreciate the significance of the distinction at the time, he did not include the new figures in the August 2017 5 year plan (the "August 2017 Projections"). Apart from this oversight, the August 2017 Projections represented Mr Halder's *"most up-to-date view of the Company's foreseeable performance as of the valuation date"*[11];

---

[7] Second Halder Affidavit, paragraph 12.
[8] In the course of the trial, various figures in Excel spreadsheets were digitally altered to demonstrate the financial impact of different inputs on projected share values.
[9] Second Halder Affidavit, paragraph 15.
[10] *Ibid*, paragraph 19.
[11] *Ibid*, paragraph 23.



(g) Mr Halder deposed that his projections were never risk-weighted in part because risks were difficult to model and in part because the Company operated on the basis that its core business was sufficiently robust that any adverse risks could be absorbed. He also noted that no provision had been made for possible depreciation in foreign currencies, because foreign currency earnings had been converted into US dollars.

### Alan Kelsey

### Overview of witness

16. Mr Alan Kelsey was at all material times Chairman of the Company and, as an independent director, one of the two members of the Special Committee which recommended to the Board of the Company that the Company could properly enter into the Merger Agreement. He obtained a BA and MA from Oxford University. He joined the Company's Board in 2003 and became Chairman in 2005. He left the Company at the end of August 2017, by which time he had a business career which spanned nearly 50 years.

17. I found Mr Kelsey to be a credible witness who generally gave his evidence in a careful and (in the face of vigorous cross-examination) impressively objective manner. He acknowledged that he had no experience of merger transactions and deferred to specialist advisers Houlihan Lokey and Kirkland & Ellis as regards the detailed management of the process. He also admitted that a key player in the Buyer Group was a longstanding colleague who might have sought to exploit their personal relationship. For instance:

> "Q. Didn't you see the inherent risk that, even
> unconsciously, your personal business relationship with
> Mr Hennessy might compromise your ability to represent
> the unaffiliated shareholders fearlessly and
> effectively?
>
> A. No, I had thought about that and I didn't think that and
>
> I felt -- I took comfort from the fact I had my own
> legal and investment banking advisers to give me advice,
>
> and I suppose subconsciously, I felt if I'm going to



*stray off the straight and narrow, they would put me right.*"[12]

18.   A mature man with a somewhat Churchillian air, he imperiously swatted away the suggestion that he had in personal terms been improperly motivated in approving the transaction, under cross-examination by Mr Millett QC:

> "*Q. So can we take it from that, Mr Kelsey, that the benefit*
>
> *to you of this   merger was that you would not only get*
> *$32.50 in cash for your Nord shares as at or after*
> *31 August, but you would also get that price in cash for*
> *your restricted units?*
> *A. Yes.*
> *Q. Was that something of an incentive to you personally to*
> *get this deal done?*
> *A. At the highest price, yes. But if -- I believe*
> *Professor Gompers is postulating a value of $76 and if*
> *it had been $76, I would have got 10 million more or*
> *something like that.*
> *Q. Never mind about what Professor Gompers does or doesn't*
> *say, Mr Kelsey, I think the answer is that it was an*
> *incentive to you personally to get the deal done.*
> *A. It was an incentive for me to get the highest price.*"[13]

19.   Although it was never positively asserted that Mr Kelsey had deliberately misled the Court, it was contended by way of submission that the Court should infer from his evidence that the transaction process was seriously flawed.

**Overview of evidence-in-chief**

20.   Mr Kelsey's First Affidavit was sworn on April 4, 2019 ("First Kelsey Affidavit"). Its main purpose was to explain his involvement in the Special Committee's work in relation to recommending the Company's entry into the Merger.  He deposed in summary as follows:

> (a)   the work of the Special Committee was primarily carried out by its advisers and he did not personally have a detailed recollection of all that occurred. However, the process is described in detail in the Company's

---

[12] Transcript Day 3, page 141 lines 1-11.
[13] Transcript Day 4 page 98 line 18-page 99 line 8.

proxy statement dated July 11, 2017 (the "Proxy Statement") and the minutes of various meetings and calls;

(b) both he and Mr Nicholas Baird (a former British Ambassador to Turkey and Board member since 2015) were appointed as Special Committee members in January 2017. Neither had in-depth experience of mergers, but they each understood the Company's business well. They considered they were well supported by Houlihan Lokey and attorneys Kirkland & Ellis;

(c) both Messrs Kelsey and Baird understood that their role was to negotiate and recommend a deal which was in the best interests of the shareholders in circumstances where Premier was controlled by BPEA and had the voting power to approve any merger. As far as Mr Kelsey himself was concerned:

> "...To me, this meant that the Special Committee had a particular responsibility to negotiate the best terms possible for the non-BPEA affiliated shareholders (which I refer to as the 'minority shareholders') and only to approve such a deal and recommend it to the Board and to shareholders if were satisfied that we had met this obligation. That is the mind-set that I took into this task and which I was confident we had achieved in the result we attained"[14];

(d) Mr Kelsey summarised his personal reasons for approving the transaction as follows:

    (1) Premier's interest in obtaining a high price, which he took for granted, was aligned with the interests of the minority shareholders,

    (2) the Special Committee was able to negotiate freely with CPPIB as the lead investor,

    (3) his job was to negotiate vigorously for the best possible deal for the Company and all its shareholders which was likely to succeed,

    (4) the Special Committee's experienced team of advisors helped it to negotiate a price which valued the Company fairly and was favourable to minority shareholders;

---

[14] First Kelsey Affidavit, paragraph 9.

(5)    the merger price of US$32.50 was higher than the traded share price had ever been and Houlihan Lokey advised that it was a fair price from a financial point of view;

(6)    if another party had been willing to offer better terms, the agreement with the Buyer Group could have been terminated.

21.    A secondary function of the First Kelsey Affidavit was to respond to Experts' questions. These questions related to, *inter alia*, the Company's relationship with BPEA (or Baring), any common interests on the sell and buy sides, why Project Darwin failed, the appointment of Special Committee members and conflicts of interest, the appointment of advisors, the negotiation of the deal price, why the deal was not first offered to a wider pool of investors, the terms of the Merger Agreement (including the dropping of the 'majority of the minority' clause and the 'go-shop' provisions).

22.    Mr Kelsey's Second Affidavit was sworn on July 17, 2019 ("Second Kelsey Affidavit) in response to the First Affidavit of Anil Seetharam filed on behalf of the 18th, 27th and 28th Respondents (the "Stockbridge Dissenters"). The essence of Mr Kelsey's more detailed response to criticisms of the 'go-shop' process is captured in the following portion of his written testimony:

> "...*I was and am unaware of there being any process failures with the go-shop process and I do not accept that the go-shop process was just window-dressing as Mr Seetharam tries to suggest. In fact, from my perspective as a member of the Special Committee, I considered the go-shop process to be competently and professionally managed...Had an offer been forthcoming from Stockbridge, the Special Committee would certainly have taken it seriously and considered whether it met the requirements to be taken forward.*"[15]

**Ian Johnson**

**Overview of witness**

23.    Mr Ian Johnson was at all material times Commercial Director of the Company's China Bilingual programme, who prepared the July 2017 projections which painted a less optimistic picture of this programme's prospects than was reflected in the Company's April 2017 and August 2017 financial projections. A Chartered Accountant, he joined the Company in 1995. He left the Company's full-time employ on August 31, 2019 and

---

[15] Second Kelsey Affidavit, paragraphs 9-10.

continued to work from England on a part-time basis, supporting the programme leader Ms Jian Tang.

24.    I found Mr Johnson to be a credible witness who generally gave his evidence in a straightforward and fair manner.

**Overview of evidence-in-chief**

25.    The First Affidavit of Ian Johnson was sworn on April 5, 2019 (the "First Johnson Affidavit"). It was intended to supplement explanations given at the Management Meeting about the China Bilingual programme. His written evidence may be summarised as follows:

      (a)    in China, the Company operated (1) schools for mostly foreign nationals and (2) China Bilingual schools for mostly Chinese nationals;

      (b)    although there were four types of competitor for the China Bilingual business, a greater difficulty was securing land on which to operate the schools. Accordingly, it had not been possible to replicate the initial success of the "NACIS" school;

      (c)    additional challenges included obtaining licenses, construction time and the lack of brand familiarity for Nord Anglia in cities where no international schools already existed;

      (d)    in May 2017 Mr Andrew Fitzmaurice and Mr Graeme Halder asked Ms Tang and Mr Johnson to prepare a 5 year forecast for the China Bilingual business. The forecast model was completed on July 26, 2017. Mr Johnson described the basis for this model as follows:

> "...*In preparing this model we had taken into account recent market research from Parthenon which gave details of the potential for the bilingual schools market in various tier 1, tier 2 and tier 3 cities, the competition which existed, the student numbers and growth in existing schools, the fee rates in those schools and other matters as well as input from our newly established business development team in Shanghai. Ms Tang and I looked at these findings, in order to establish the assumptions for the model...Between us we determined the inputs for student numbers and fee levels and this was developed into a model...*"[16];

---

[16] First Johnson Affidavit, paragraphs 19-20.

(e)     the result of this analysis was projections far lower than the previous China Bilingual projections which had been based solely on the performance of the NACIS school in Shanghai. Account had to be taken of the fact that fee increases required regulatory approval. The lower forecast projections were also because, *inter alia*, the proposed schools were to be set up in smaller, less wealthy and more remote cities, resulting in likely far lower full time enrolment ("FTE") targets being achieved;

(f)     a significant commercial problem unique to China was the problem of extracting cash from both international and bilingual schools, described as the "*non-fungible cash generated in China*" problem. Regulatory changes in 2016 were the source of this impediment to extracting distributable profits.

## Patrick Cordes

### Overview of witness

26.    Mr. Patrick Cordes was at all material times Chief Financial Officer of Baring Private Equity Asia ("BPEA"). By the date of the trial he was an employee of more than 13 years' standing who had also been a Managing Director since 2015. After graduating from Lehigh University in Pennsylvania in 1997, he had worked for some nine years with Deloitte in New York and Hong Kong. In 2006 he became Financial Controller for BPEA; and he was promoted to Chief Financial Officer in 2008. Mr Cordes was primarily cross-examined about the dual role played by Baring on the "Sell Side" and the "Buy Side".

27.    Mr Cordes was by far the youngest of the Company's fact witnesses. He had seemingly not previously given evidence in a court and at one juncture became somewhat discombobulated by the barrage of questions he was required to answer. He appeared to be a "bright young spark" comfortably embedded in the environment he worked in and with a firm grasp of the relevant facts. I found him to be a credible witness who gave his evidence in a straightforward and fair manner overall. On the contentious issue of the efficacy of the transaction process, for instance, he gave what appeared at first blush to be a very frank response to robust cross-examination by Mr Millett QC:

> "*Q. Who was representing the sellers -- other than the special committee for the unaffiliated shareholders, who was representing the BPEA affiliated funds on the seller's side?*
> *A. Technically, we had taken the team and separated it, meaning Kosmo Kalliarekos was serving the sell side,*



> Jack Hennessy was doing buy. But at the same time, it's
> not -- you know, there is no Chinese wall. You know,
> investment committee meetings, people are all present.
> So it's just something to have some consideration on
> sides.
>  Q. Yes. So is it right to say that actually there was no
> negotiation between the seller side -- the affiliated
>  BPEA funds on the seller side and those on the buyer
> side?
> A. Because, like I said, if anything, it was -- you had
> CPPIB, who was reticent about price, believing it's too
> high. So, in fact, we had to work to get them up. So
> it wasn't that Jack Hennessy was only trying to work
> down, we actually were working the buyer group up to the
> level that we believed was the full fair price."[17]

28.   The Dissenters did not suggest that he was not an honest witness but submitted that Mr Cordes "*was not a very impressive witness and the Court should be very cautious before relying on anything he said*"[18].

**Overview of evidence-in-chief**

29.   The First Affidavit of Patrick Cordes was sworn on July 11, 2019 (the "First Cordes Affidavit"). He was part of the team that structured the Merger transaction and sat in on various meetings where the transaction was discussed. The main function of his First Affidavit was to reply to the First Seetharam Affidavit. His evidence may be summarised as follows:

   (a)   the BPEA Funds which were relevant to the First Seetharam Affidavit were Funds III and IV, which had beneficial interests in the Company pre-Merger, and Fund VI which acquired a beneficial interest through the Merger. Each Fund had separate General Partners;

   (b)   BPEA was a subsidiary of Baring Private Equity Asia Group Limited ("BPEAG"), which was either the parent of or investment advisor to seven Funds established by BPEA from 1997. The deponent referred to BPEA, BPEAG, the Funds and their General Partners collectively as "BPEA Group" :

---

[17] Transcript Day 4 page 143 lines 4-24.
[18] Dissenters' Written Closing Submissions, paragraph 43.



"*12. BPEA is a subsidiary of Baring Private Equity Asia Group Limited ("**BPEAG**"), the investment advisor or parent to the investment advisor of all Baring Private Equity Asia funds (collectively '**BPEA Group**')*";

(c)     he further deposed that:

"*17...the BPEA Group, Fund III and Fund IV were strongly incentivised to achieve the highest possible price for the Company shares beneficially owned by Funds III and IV*";

(d)     Fund VI only acquired an interest post-Merger via the Merger process along with CPPIB. Fund III beneficially owned a 6.8% stake in the Company and Fund IV 63.7%;

(e)     although the Proxy Statement showed the Company's ownership post-Merger would be CPPIB 61.9% and Baring Filing Persons 38.1%, it was always intended to reduce that stake by selling on to co-investors. After the process of syndication which actually occurred, CPPIB only beneficially owned 36.9% and Fund VI beneficially owned 21.1% with co-investors beneficially owning 39.8% and the BPEA Group itself only owning 2.2%;

(f)     prior to the Merger, the BPEA Group had owned 1.8% so there was not any significant increase in its stake resulting from the transaction. Moreover, BPEA was very mindful of its fiduciary duties to the investors in Funds III and IV, whose interests lay in achieving the maximum possible price. In any event, the Advisory Boards of those Funds approved the Merger Consideration;

(g)     the threshold for the Baring General Partners to receive 20% of any sale proceeds received by Funds III and IV had been reached, so BPEA itself was incentivised on the Sell Side. There were no hidden benefits accruing to BPEA on the Buy Side.



**THE DISSENTERS' FACT WITNESS**

**Anil Seetharam**

**Overview of witness**

30. Mr Anil Seetharam was at all material times Managing Director of the Stockbridge Dissenters. The main function of his evidence was to explain why the Stockbridge Dissenters were, as long-term minority investors in the Company, dissatisfied with the value assigned to their Shares.

31. Mr Seetharam appeared to me, somewhat like Mr Cordes, also to be a "bright young spark", with a firm grasp of the private equity world he works in and the facts relevant to his testimony. Despite his obvious enthusiasm about advancing his company's cause I found him overall to be a credible witness who generally gave his evidence in a straightforward manner. Under cross-examination by Lord Grabiner QC, for instance, he fairly made the following concession:

> *"Q. Anyway, I think you are saying that you can't recall --*
> *well, correct me if I am wrong, you can't recall an*
> *occasion where you were asking for information which you*
> *reasonably thought you were entitled to but they*
> *wouldn't give it to you?*
> *A. We asked for lots of things and I would say the majority*
> *of times in most public companies, the answer you get*
> *is, 'No, we can't give that to you'.*
> *Q. What about Nord though? I'm not interested --*
> *A. Nord was no different."*[19]

32. His credibility was challenged as regards one aspect of his testimony in particular, namely his evidence that the Stockbridge Dissenters only prepared written valuations of the Shares after the Merger Agreement had been consummated. I shall return to this issue in more detail below.

**Overview of evidence–in–chief**

33. The First Affidavit of Anil Seetharam was sworn on February 15, 2019 (the "First Seetharam Affidavit"). It explained Stockbridge's role as an investor in the Company, why it dissented and expressed concerns about the fairness of the go-shop process. Mr Seetharam's evidence may be summarised as follows:

---

[19] Transcript Day 5 page 29 lines 12-21.

(a)     Stockbridge first invested in the Company's Shares in July 2014 and increased its stake until the Merger. It was a long-term investor, not an appraisal arbitrageur, and one of the largest outside investors, holding 6,049,035 Shares at the Merger Date;

(b)     over that three year period, Stockbridge maintained a constructive dialogue with BPEA's lead Board representative (Kosmas Kalliarekos), spoke to Company Management and visited school campuses in Hong Kong, Shanghai, Beijing and Houston;

(c)     Stockbridge strongly believed the Transaction Price seriously undervalued the Company, and made this position known to the Company as soon as the Merger was announced on April 25, 2017;

(d)     Stockbridge expressed an interest in making a joint bid to representatives of CPPIB on April 28, 2017 and expressed an interest in participating in the go-shop process to Houlihan Lokey on May 3, 2017. It did not pursue this option because it was told any bid would have to be based on publicly available information. Although after the Go-Shop period expired and before the Proxy had been belatedly filed Houlihan Lokey said an unsolicited bid could still be made, this was not viewed as a serious proposition in light of the informational advantages enjoyed by the Buyer Group and the 2/3rds majority interest of BPEA;

(e)     this left Stockbridge (and presumably other Dissenters) with the sole option of dissenting as they believed there was a significant gap between the Merger Consideration and fair value.

34.     The Second Affidavit of Anil Seetharam was sworn on May 28, 2019 (the "Second Seetharam Affidavit"). It dealt with Dissenter discovery issues.

## THE COMPANY'S EXPERT EVIDENCE

### Professor Daniel Fischel

#### Overview of Witness

35.     Professor Daniel Fischel is President and Chairman of Compass Lexecon, a consultancy, with specialities including Valuation and Financial Analysis. He qualified

as a lawyer in or about 1979 and in 1982 became a professor of law at Northwestern University School of Law. He was the Lee and Breena Freeman Professor of Law and Business at the University of Chicago Law School between 1984 and 2005 (with his chair being awarded in 1984). Professor Fischel has given expert evidence in numerous cases in the United States for over 40 years. Unsurprisingly, he has published extensively. He has in recent years been accepted as an expert in several appraisal cases in courts including the Court of Chancery of Delaware, which court has a broadly similar appraisal regime to section 238 of the Companies Law.

36.    Although obviously an eminent expert and an impressive witness in general terms, Professor Fischel from time to time gave what appeared to me to be obtuse answers to questions on potentially contentious issues and to be unwilling to countenance any modification of the opinions recorded in his Expert Reports. For instance, when questioned about academic literature suggesting that "go-shops" were transaction devices which might push the merger price down unless they were properly structured, he seemed reluctant to admit even as a matter of general principle that the form a "go shop" took might be even potentially relevant to the resultant merger price:

> "Q…*Let's see if we can cut this short. There
> is an article you cite yourself by Subramanian and Zhou.
> It's {F/86/46}.
> I'm sorry to dive in in the middle of a complex
> piece of academia, which is on this subject, but do you
> recognise this?
> A. Yes, I'm very familiar with this article and I actually
> discuss it at some length in my report.
> Q. You do, which is why I'm assuming you are familiar with
> it. It says in the last paragraph:
> "We agree with Vice Chancellor Laster's formulation
> of existing Delaware doctrine."
> He's got four bands about the sale process:
> 'As a matter of policy, we further believe that this
> is a sound formulation, because it encourages good deal
> processes. The key question, of course, is what deals
> should go in each band.
> 'On that key question, we are not suggesting that
> go-shops are categorically bad, ie automatically pushing
> the deal into Band 3 or Band 4. There may be good
> reasons for sellers to want to limit pre-signing
> competition (eg, to avoid leaks, grab the 'bird in
> hand', et cetera). However, the key doctrinal takeaway
> from this Article is that the use of a go-shop in lieu*



*of a traditional pre-signing market canvass*
*(particularly a 'pure' go-shop) should generally push*
*the deal down on this spectrum, but this presumption of*
*a downward nudge can be overcome by a properly*
*structured go-shop."*
*Do you agree with that?*
*A.  I don't know what's meant by "a properly structured*
*go-shop".  What I discuss in my report is, even with*
*respect to this article, which probably in the spectrum*
*of academic literature on go-shops is more critical of*
*go-shops than many other articles that I also discuss --*
*but even with respect to this article, it discusses the*
*number of topping bids that have resulted in*
*transactions with go-shops, so I would say that, even*
*based on the commentary in this article, there is not*
*a basis to conclude that go-shops are useless or*
*shams --*
*Q.  No --*
*A.  -- and don't encourage the existence of topping bids.*
*Q.  I haven't suggested that and nor do the learned authors*
*of this article..."[20]*

37.    However, the following day, dealing with the same broad topic of transaction process,
he gave a more straightforward and fair answer to a question of general principle:

"Q... *As a general question, though, it's right, isn't*
*it, that whether negotiated sales are better than*
*auctions at producing value for sellers will vary from*
*case to case depending on the facts and circumstances?*
*A. Yes, that's correct.*"[21]

38.    And under further cross-examination by Mr Millett QC on the "*go-shop*" question,
Professor Fischel was ultimately willing to make a concession about the limited
parameters of his Report:

"*Q. All right.  Let's turn to a different topic.  Do you*
*accept that the robustness of a go-shop doesn't depend*

---

[20] Transcript Day 6 page 198 line 18-page 200 line 16.
[21] Transcript Day 7 page 1 lines 20-24.



*solely on the legal terms of the go-shop but also the
way in which it was conducted?
A. Yes, of course, I would agree.
Q. And it's right, isn't it, in the way you deal with this,
apart from the proxy statement and the contractual
documentation, you don't refer to a single
contemporaneous document on the record as part of your
report, which tends to show how, in fact, the go-shop
exercise was conducted?
A. That may very well be true, I don't know.
Q. So, in fact, you were considering this go-shop entirely
in the abstract?
A. Well, I not only discussed the articles that you
referred to about go-shops, I also looked at the
empirical evidence about go-shops, including in the
exhibit that you just showed me, but I did not conduct
a detailed factual investigation of how this particular
go-shop was conducted, other than what's already stated
in my reports.*"[22]

39.    He was in general terms a credible and objective expert witness. The Dissenters sought
to paint the Company's Expert as "*an evangelist for the market price as the primary,
and in this case only, data point for fair value*"[23]. That argument deserves careful
consideration. It was further submitted that Professor Fischel gave his evidence in a
"*combative*" manner, as an "*advocate for the Company...inconsistent with the duties of
an expert witness before this court*"[24]. This argument is summarily rejected as an
unjustified characterisation of the manner in which the Company's Expert testified
overall.

40.    Nonetheless Professor Fischel did not appear to me to make a single concession on the
merits of any issue which was significant to his main opinions in the present case. In
these circumstances I consider that the most critical aspects of his testimony should be
approached with some care.

---

[22] Day 7 page 17 line 6-page 18 line 1.
[23] '*Written Closing Submissions of the Dissenting Shareholders*', paragraph 11.
[24] *Ibid*, paragraph 20.



## Overview of evidence-in-chief

41.     Professor Fischel's Expert Report was dated July 18, 2019. In paragraph 22 of his Report, he summarised his principal conclusions as follows:

    "

    - *Market evidence generally provides the best estimate of the fair market value of a company's common stock because market transactions reflect what willing buyers paid willing sellers for that stock. The closing price of Nord Anglia Education's ordinary shares on the day before the Announcement Date of $27.42 (the 'Unaffected Price') provides a reliable estimate of the fair market value of a Share if market participants believed that there was a possibility that the Company would have been acquired at a premium. When adjusted to account for interim changes in market and industry conditions, the Unaffected Price implies that the fair value of a Share as of the Valuation Date was $30.45.*

    - *The Merger Consideration of $32.50 per Share that the Buyer Consortium agreed to pay, and Nord Anglia Education agreed to accept, is another form of market evidence that is relevant to an assessment of the value of a Share. However, the value of the Merger Consideration likely exceeds the fair value of a Share because the Merger Consideration presumably reflects a sharing of the gains the parties anticipated would be created by the Transactions. This conclusion is supported by the process that led to the Transactions, the actions of insiders, the results of the go-shop process, analysts' target prices, and analysts' reaction to the announcement of the Transactions.*

    - *Based on a DCF analysis of the Company's contemporaneous projections, the fair value of a Share ranged from $28.64 to $41.19 on the Valuation Date, before adjusting for any discount that may be applicable to minority holdings. For various reasons detailed herein, however, I have concluded that a DCF analysis should be given little or no weight in the determination of the fair value of a Share.*

    - *The comparable company multiples analyses performed by analysts, and the financial advisor to CPPIB are consistent with my opinion that the Unaffected Price provides a reliable estimate of the fair value of a Share as of the Announcement Date. However, for reasons detailed herein, I have concluded that a comparable company multiples analysis*

*should be given little or no weight in the determination of the value of a Share.*"

42.    Further to the Experts' Joint Memorandum dated August 29, 2019, Professor Fischel prepared a Supplemental Report dated September 24, 2019. A summary of the main conclusions reached in the Supplemental Report is as follows:

> "*5. Professor Gompers' conclusion that the fair value of the Dissenters' Shares is $77.45 per Share is implausible on its face because that amount bears no relation either to prices that willing buyers paid willing sellers for the Shares or to the value of the Merger Consideration that the parties to the Transactions reached in arm's-length negotiations. Moreover, none of Professor Gompers' reasons for disregarding market evidence withstand scrutiny. Furthermore, Professor Gompers' DCF analysis is fundamentally flawed, unreliable and fails the reasonableness check that he himself proposed but did not perform. Finally, Professor Gompers' analysis of the value of control is flawed...*
>
> *7. Section VI of this supplemental report describes three revisions to my DCF analysis, which, as revised, results in an estimated equity value per Share of $28.34 to $41.32 on the Valuation date, depending on the discount rate. This range contains my estimate of the fair value of Dissenters' Shares on the Valuation Date of $30.45 per Share. However, for the reasons discussed in my initial report and §IV.A infra, it is my opinion that DCF analysis should have little or no weight in the determination of the fair value of Dissenters' Shares.*"

43.    In Professor Fischel's oral examination-in-chief, he formally produced updated versions of Exhibit S-5 and S-8 to his Supplemental Report and produced four further Exhibits. The revisions reduced the lower point DCF valuation range by 30 cents per Share and increased the upper point in the range by 13 cents. This was a reduction of roughly 1.05% of the initial bottom figure in his range and an increase of roughly 0.31%. As trifling as these changes seem to be, it is noteworthy that they are minor changes to the upper and lower figures in a more generous range of potential values with a gap of just under $13 between top and bottom.



**THE DISSENTERS' EXPERT EVIDENCE**

**Professor Paul Gompers**

<u>Overview of witness</u>

44. Professor Paul Gompers has since 2000 been the Eugene Holman Professor of Business Administration at Harvard Business School. After graduating from Harvard College in in 1987 and obtaining a Masters from Oxford University in 1989, he obtained a PhD in Business Economics from Harvard University in 1993. His pre-2000 academic career includes University of Chicago (1993-1995) and Harvard Business School (1995-2000). Unsurprisingly, he has an impressive list of publications. Professor Gompers has provided expert evidence to various United States courts over, *inter alia*, the last 5 years, including appearing as an expert in appraisal litigation before the Delaware Court of Chancery.

45. Applying the standards of <u>British</u> common law courts, it was surprising that Professor Gompers as an experienced expert witness often appeared to me to give his testimony on hotly contested issues in what for me seemed an overly partisan manner. This may partly be attributable to legal cultural differences and partly personality. Professor Gompers' resume reveals that that he is a marathon runner who in his youth was an alternate member of the US Olympic team. The Dissenters' Expert's engagement with Mr Boulton QC, who displayed admirable mastery of the expert materials in the course of his cross-examination spanning three days, often resembled an Olympian intellectual contest. A man with stellar academic credentials, Professor Gompers was an expert with strong views which were typically forcefully expressed. He was always clear (if not always convincing), but his initial reluctance to accept hypothetical scenarios which were inconsistent with his clients' cause diluted any semblance of objectivity on his part. Inevitably, this increased the need for his evidence to be approached with considerable care. Viewing his evidence fairly overall, I would reject the submission advanced in closing arguments that Professor Gompers fundamentally failed to discharge his duties as an independent expert witness altogether.

46. The following exchange reflected the adversarial and somewhat bombastic stance that Professor Gompers often exhibited under cross-examination. The topic under discussion was four different ways of making adjustments to financial projections to take into account potentially negative outcomes:

> "*Q. And if you didn't like any of those, you might add a premium to the discount rate to reflect the fact that your projections didn't build in the possibility of bad outcomes.*
> *A. I would fail you in finance if you did that. There is*



*no basis to do that. That's absolutely wrong.*
*Q. It's sometimes criticised, isn't it, as being a fudge*
*factor, I think is the Brealey and Myers term for it.*
*A. Sir, if I might, I think the best way to do it is, when*
*you are projecting out capacity on schools you would buy*
*or schools that you would build, you would build in what*
*you think historically has been your average across all*
*the schools. So let's just say hypothetically -- and at*
*Nord it's roughly 80 per cent, but some are above and*
*some are below, so projecting those new schools or*
*projecting those schools at that capacity would take*
*into account that some are going to be above and some*
*would be below. So that is, I would think, how you*
*would do it. But at the end, the way you would really*
*want to assess, sir, is to assess how Nord had done*
*historically relative to, in aggregate, they projected.*
*Q. Can I be absolutely clear here, that you say that adding*
*a premium to the discount rate would lead to a fail in*
*finance?*
*A. Correct.*"[25]

47.    Mr Boulton QC returned to the same topic later the same day by reference to the
Expert's own writings:

*"Q. If we go to page 3, {F/82/3}, what you are doing here is*
*helping your readers understand how you might account*
*for specific types of risk, diversifiable, firm and*
*country-specific risks.*
*A. Correct.*
*Q. And if we pick it up in the largest paragraph on the*
*page, you talk about the possibility that management of*
*a company steals the assets of the firm away and you*
*say, how can you deal with that. You say you've got to*
*factor it into the cashflows. One method:*
*'... would be to create two scenarios that are*
*probability weighted ...'*
*That would be, on my example, 80 per cent and*
*20 per cent. And you go on to say:*
*'It is always possible, however, to adjust the*
*discount rate in such a way to achieve exactly the same*

---

[25] Transcript Day 9 page 37 line 25-page 39 line 2.



valuation as the one reached by adjusting the cashflows
with this weighted scenario.'
Do you see that?
A. I do.
Q. Do you stand by that as being the two ways that you can
do it?
A. That is correct. So mathematically, if you have
a constant per period probability that
a country-specific risk factor materialises, that you
can derive the maths to show that that would be the
case. And so one way, for example, to interpret these
country risk premia, which come from Damodoran, is that
it's equivalent to assessing whether it's stealing the
company, whether it's regulatory imposition, whether
it's restrictions on cash, as we were talking about
earlier. These are country-specific things. That sort
of says that this accounts for that as these constant
per period probabilities. Mathematically, it's
identically the same thing.
Q. I think on the next page, please, operator, {F/82/4}, we
can see that you work through an example, a specific
example in the penultimate paragraph, and you are
considering a risk that a firm will go out of business
and you say you can deal with it through the cashflows
but you can also deal with it through the discount rate,
which is the final paragraph on the page.
A. That's correct. This is just deriving the math
Q. Yes. So if we could look at page 37 of today's
transcript, {Day9/37:7}. I was going through four ways
you could deal with a bad outcome, and one of them was
you could specifically model a bad outcome or you could
do a general provision or you could model different
scenarios. That's at {Day9/37:21}. That's one of the
two approaches that you take in your article. And the
final question I put to you is: {Day9/37:25}
'And if you didn't like any of those, you might add
a premium to the discount rate to reflect the fact that
your projections didn't build in the possibility of bad
outcomes.'
Do you see that?
A. I do.
Q. And you said:
'I would fail you in finance if you did that.'



*A. And I still would.*

*Q. But, in essence, that's dealing with exactly the same situation that you're writing about in your article, isn't it?*

*A. No, actually I would ask you to -- and if you want to pull a copy from Harvard Business School publishing, if you pull my note on valuation in private equity, you will see a discussion exactly of this. So one of the things, sir, that private equity professionals and venture capital investors often do is they increase their discount rates to 25, 30 or 50 per cent. In that note, sir, you will see that I discuss why that's wrong and why you shouldn't do it. They do it because they think they are adjusting for the risk. And the real question is, if you do that, you are missing all of the important underlying assumptions that go into a DCF, as well as a whole other set of issues. So generally speaking, sir, if I had a student who was looking at a project and they goosed up the discount rate by 20 or 30 per cent, that student would fail.*

*Q. Indeed, Professor Gompers, but nothing about adding 20 or 30 per cent to the discount rate was in my question to you earlier. It was the principle that you have two ways of dealing with this. One is through the cashflows and the other, in certain circumstances, is through the discount rate ....*"[26]

48.  The Dissenters' Expert had an elaborate explanation as to why he believed it was in all circumstances, save for dealing with country risks, inappropriate to provide for risks in financial projections by adjusting the discount rate. However, it seemed obvious that he had responded to the initial very general question in an unjustifiably broad and combative manner. This was not a fair representation of Professor Gompers' approach overall. He also gave very straightforward answers to some questions about the key (and contentious) elements of his DCF model. For instance:

> "*Just simply want to demonstrate how much money on your valuation turns on this, Professor. Your long-term growth rate here is, I think you say, 1.5 times the weighted average inflation rate. That's correct; yes?*

---

[26] Transcript Day 9 page 166 line 12-page 169 line 21.

> *A. Yes.*
>
> *Q. So if we remove the 1.5 times multiplier and simply use the weighted average inflation rate, your 4.23 per cent would go down to 2.82 per cent. Is that right?*
>
> *A. Correct.*
>
> *Q. Let's insert that at B45, simply to see the sensitivity that arises from that assumption. 2.82 per cent, please, operator. $54.10. So something like $21 of value arises simply from an assumption that the company for ever more will be able to increase its tuition fees at 1.5 times the rate. I think that may be an underestimate. If we could go to exhibit 3B, and we have a separate long-term growth rate here for China Bilingual. So on the same assumption, we will change B93 to 3 per cent, please, operator. That's changing long-term growth rate from 4.5 per cent to 3 per cent. Thank you.*
>
> *Let's go back to exhibit 3A. Diluted price per share is now down to $49.71. So a third of the value in your DCF model arises solely from your assumption that from ten years' time forever the company will be able to increase its tuition fees in dollars by 1.5 times the rate of inflation.*
>
> *A. That is correct under the conservative assumptions of no expansion of capacity or acquisitions after the terminal period, but the math is what it is.*"[27]

49.   Professor Gompers also admitted that the most value-relevant criticism he made in his Report of the Houlihan Lokey valuation related to the fact that their projections were limited to a five year period. He further admitted that the documentation evidencing the work that they did (obtained by the Dissenters pursuant to section 1782 applications in the United States) "*would be helpful in assessing the work*"[28]. Without expressly admitting that the Houlihan Lokey work product was not subject to any criticism, the Court was left with the distinct impression that had it been subject to serious criticism the work carried out would have been put to the sword by Professor Gompers in a detailed and reasoned manner. Instead the position appeared to be that either the Expert's support team had not seen fit to draw the supporting documentation to his attention or (improbably) he had failed to review documents which were obviously relevant to advancing a reasoned critique of Houlihan Lokey's DCF analysis:

---

[27] Transcript Day 10 page 123 line 20-page 124 line 124.
[28] Transcript Day 10 page 225 lines 20-21.

"Q. So it appears that, despite the time and cost of the
1782 application, that you, in the end, chose not to
rely on any of the 2,900 documents?
A. I would have to go back and see which documents were
produced to me, but they are certainly not relied upon
in my first report.
Q. And I don't have an equivalent appendix to your
supplemental report. But if one searches that document
for Houlihan Lokey references, take it from me,
Professor, that all we have are a document relating to
the go-shop process and the financial model, which we
will find at footnote 379 to your second report, that's
{HSD/6/112}.
A. There is appendix 3 in the supplemental report at
{E/85/1} and going forward.
Q. It's not up on the court bundle.
A. I'm sorry, sir.
Q. That's not your fault. Are you aware, Professor, that
Houlihan Lokey did, in fact, perform internal analyses
that extended the April 2017 projections to reach
a steady state?
A. They did not utilise them in their valuation in the
fairness opinion.
Q. That wasn't my question. Are you aware, Professor, that
Houlihan Lokey did, in fact, perform internal analyses
that extended the April 2017 projections to reach
a steady state?
A. I don't recall seeing such projections...

Q. You can see that these projections -- if we blow up the
middle of the page, please, operator -- have been
extended out to 2026, can't we?
A. Again, I don't know whether or not -- again, not having
the underlying spreadsheets for how they calculated
this, I don't know if they did the proper thing, which
was to take the schools that weren't in capacity and
put -- get them up to capacity. So again, I have no way
to evaluate how they did the five years of extension in
this model."[29]

---

[29] Transcript Day 10 page 226 line 23-page 227 line 25; Transcript Day 10 page 228 line 9-18



50.    This exchange took place at the end of Day 10 and the second day of the Dissenters'
Expert's testimony. Thereafter, on Days 11 and 12, it appeared to me that Professor
Gompers generally responded to questions put to him in cross-examination in a
somewhat more balanced and less combative manner. It remains to consider the
following arguments set out in the Company's Closing Submissions:

> *"127 A particularly telling exchange about how Professor Gompers approaches
> his expert assignments is recorded at {Day11/178:18} - {Day11/179:23}. In
> response to the question:*
>
> *'Well, yes, you've relied on other class certification reports, but you yourself
> have never filed a report that concluded that a market was semi-strong efficient.'*
>
> *Professor Gompers answered:*
>
> *'Because I've only been asked to work for the defendants in matters in class
> certification. It's not in their interests to pay me to write that report, so even once
> I find it, I either won't write a report or I would write about other issues that I
> find might be relevant to class certification. I've clearly worked with plaintiffs
> on other types of matters but, for whatever reason, plaintiffs in securities class
> action have never approached me to work for them.'*
>
> *128 That response is a blatant contradiction of the duties imposed on experts by
> the FSD Users Guide, particularly B5.2(b)(i), (ii), (iii), (iv), (vii). In ordinary
> circumstances one might be able to excuse Professor Gompers' statement as a
> Freudian slip partway through a long cross-examination. Sadly, on the present
> facts such an excuse is not credible. Professor Gompers made the statement on
> his second attempt at Mr Boulton QC's question. The statement is consistent with
> pointed criticism of Professor Gompers in the United States courts. Most
> damningly it aligns with Professor Gompers' performance in this case where he
> took a clearly partisan approach, refused to make sensible and obvious
> concessions and misrepresented key evidence and academic authorities.*
>
> *129 In light of the above, the Company respectfully submits to the Court that
> the evidence of Professor Gompers cannot be relied upon when determining the
> fair value of the Dissenters' shares."*

51.    In my judgment the answer relied upon does not, properly understood, support a finding
that Professor Gompers has breached his fundamental duties as an expert in the present
case. As Mr Bompas QC pointed out in his oral closing submissions, the role of an
expert in a class certification case is fundamentally different to that of an expert at the
trial of an appraisal action:

> "*My Lord, Monroe. That case is at authorities
> bundle 31.1, {AB/31.1/1}, and we covered it in our
> closing at paragraphs 157 and 158. My Lord, the Monroe
> case was used mainly as a vehicle for an attack on
> Professor Gompers' credibility. In our submission, that
> was unjustified, and there is, you will note from my
> learned friend's closing submissions, the fact they have
> chosen at paragraph 128 to say, somehow, that, because
> of what Professor Gompers said to you about the way in
> which he was routinely instructed in those kinds of
> cases, somehow he has not complied with his obligations
> under the FSD experts' declaration. That is an odd
> point, to put it at its most polite.*
>
> *But what he says in the passage that's seized upon
> by my learned friends and quoted -- it needs to be
> understood in the context of certification procedures in
> fraud on the market actions in the United States. What
> happens, as I'm instructed -- and you can see this from
> all these cases, if you are so minded to take the time
> to burrow through them -- is that the claimants serve an
> experts report, the defendants choose whether or not to
> answer it. It's sequential. There is no burden on the
> defendant to show efficiency. So if the defendants'
> expert thinks he can't undermine the claimants' case on
> efficiency, he won't write a report or he'll write on
> something else, a different Cammer factor, liquidity,
> the number of analysts covering the stock. There are
> four others to choose from. That's all he was saying.
> And although it's correct that the court in that case in
> Atlanta rejected Professor Gompers' opinion on market
> efficiency, it did so in the context -- the very limited
> context, of a challenge to the rebuttable presumption of
> market efficiency for the limited purpose of
> a preliminary application to determine the constitution
> of a plaintiff class.*"[30]

52.    More fundamentally still, the suggestion that Professor Gompers would in any legal
       context indicate to a client seeking a desired opinion that he was unable on the facts of

---

[30] Transcript Day 14 page 83 line 11-page 84 line 20.



that case to provide it is on its face entirely consistent with the proposition that Professor Gompers understands his duties of independence to this Court.

## Overview of evidence –in-chief

53.    The Expert Report of Paul A. Gompers was dated July 18, 2019. The Dissenters' Expert's key conclusions may be gleaned from the following portions of that Report:

> "*12. As an economic matter, the price paid for an asset in an arm's length negotiation between informed parties may be viewed as a reliable indicator of fair value, particularly if that price results from an open, competitive sales process designed to attract multiple potential buyers who are given equal opportunity to bid on that asset. Where an open and competitive process does not exist, it cannot be assumed that the transaction price reflects fair value.*
>
> *13…I understand that the question of the extent to which Stockbridge was able to participate in the go-shop process is an issue between the parties but that this is not an issue for the expert to resolve. However, I consider that it is relevant in this regard to note that my analysis described in Section VII does not support the contention that the Take-Private Transaction resulted from an arm's length process nor one that was competitive with multiple bidders…*
>
> *15. The price at which a company's stock trades may provide evidence of the company's value as a going concern…*
>
> *16….the evidence here shows that Company insiders, including Baring, had access to relevant private information of the Company that was not available to other market participants. Thus the market price cannot be taken to be reflective of the Company's fair value.*
>
> *17. In addition, my analyses show low liquidity of the Company's shares (which I establish empirically, and which was acknowledged by the Company itself in public filings), and a lack of response of the trading price to the disclosure of earnings-related information. Under these circumstances, I conclude that Nord Anglia's market price prior to and at the time of the Take-Private Transaction cannot be taken to reflect the Company's fair value…*
>
> *19. Given that the so-called market indicators of value …cannot be taken as reliable evidence of fair value, I calculate the fair value of the Dissenters shares using DCF methodology. One of the central tenets of modern finance is that the*

*intrinsic value of a firm is equal to the discounted value of its expected after-tax cash flows...*

*20. The calculation of fair value in this case is well-suited for the DCF approach, among other reasons, because there were a number of reliable cash flow projections available for the Company, including projections prepared and approved by the Company's management...*

*26. Based on my DCF analysis, using the midpoint of the valuation implied by the August 2017 Projections (projections prepared by Company management and closest in date to the Valuation Date) and the valuation implied by the Bank Model, I find that the fair value of the Company's shares equalled $77.35 per share as of the Valuation Date.*

*27. While my valuation represents a significant premium over the pre-announcement market and Take-Private Transaction prices, in my opinion this difference can be reconciled based on differences in the information available to the market and to Company insiders, (e.g., Baring) as well as based on the particular features of the deal process, such as absence of competitive bidding and inability of potential bidders to access internal information about the Company."*

54. Further to the Experts' Joint Memorandum dated August 29, 2019, Professor Gompers prepared a Supplemental Report dated September 24, 2019. A summary of the main conclusions reached in the Supplemental Report is as follows:

*"5...My calculation in the Gompers Report yielded a fair value of the Dissenters shares [of] $77.35 per share as of the Valuation Date. I have further revised my calculation in light of discussions with Professor Fischel in drafting of the Joint Report, whereby Professor Fischel and I agreed to use common values for certain inputs in our cost of capital calculations in order to narrow the scope of differences between the experts, as well as to make an adjustment for stock-based compensation. This yields a value of $76.51 per share as of the Valuation Date...*

*8. My conclusions regarding Nord Anglia's fair value expressed in the Gompers Report remain unchanged with the exception of the adjustment described above. It is also my opinion that Professor Fischel's analysis of fair value significantly understates the fair value of Dissenters' Nord Anglia shares, as described in the Gompers Supplemental Report, and that correcting for even some of the problems in his analysis would lead one to conclude that fair value*

*of the Dissenters' shares was substantially higher than the Take-Private Transaction Price and closer to my valuation of $76.51 per share. "*

55.    As a result of agreed input changes, Professor Gompers reduced his initial valuation by 84 cents (or approximately 1.08%). Like Professor Fischel, he was only willing to agree that minimal adjustments were required to his initial DCF analysis. Unlike Professor Fischel, he was not willing to explicitly acknowledge that an appropriate DCF valuation might fall within a range of potential valuations rather than being definitively reflected in a specific sum.

## JOINT MEMORANDUM BETWEEN FISCHEL AND GOMPERS

### Agreed Matters

### Preliminary Matters

56.    It was common ground that the valuation opinions should be expressed as at the Valuation Date on a per share basis. Each Expert also understood that "fair value" meant the value of a Share of the Company operated as a going concern and excluding any advantages which might accrue as a result of the Merger.

### Valuation Approaches Considered

57.    Each Expert considered the same four valuation methodologies, although they disagreed as to whether the Market Price or DCF approach was more appropriate in the circumstances of the present case.

### Market Efficiency

58.    It was agreed that the stock market is not generally considered to be "*strong-form efficient*" i.e. with market prices reflecting both public and private information. A market is "*semi-strong form efficient*" if the market fully reflects all public information. It was agreed that in a semi-strong efficient market:

(a)    stock prices respond to and rapidly incorporate new value-relevant publicly available information (market, industry and/or company-specific); and

(b)    no significant changes in stock price would be expected on days when there was no new value-relevant information.

**Event Studies**

59.    It was agreed that the event study methodology is an accepted means of testing semi-strong market efficiency and that a properly designed event study tests whether a company's stock price has reacted to company-specific news to a statistically significant extent. The effect of market or industry factors on stock returns is calculated by regression analyses using either a market index (a 'one-factor model') or both market and industry indices (a 'two-factor model').

**Relevance of trading volume**

60.    It was agreed that a relatively high trading volume can be an indicator that newly available information is being incorporated into a company's stock price and low trading volumes can raise concerns that such incorporation is not occurring and that the stock is not semi-strong efficient.

**Comparable Companies and Precedent Transaction Analyses**

61.    Neither Expert relied on these analyses.

**DCF Analysis**

62.    The Experts were agreed on the following matters:

    (a)    the general mechanics required;

    (b)    the appropriateness in general terms of using the Company's August 2017 Projections;

    (c)    the need to modify those Projections (by extension) to reflect a transition to a steady state and to correct minor errors; and

    (d)    the discount rate can be calculated using the Company's weighted average cost of capital ("WACC").

63.    As regards the elements of WACC, the Experts agreed that:

    (a)    the country risk premium (if any) should be 1.17%;

    (b)    recent academic literature cast doubt on the validity of using a size premium;

(c)     the equity risk premium should be 5.985%;

(d)     the risk-free rate should be 2.52% (based on the 20 year U.S. Treasury bond;

(e)     although they used different market indices and capital structure assumptions to calculate the Company's equity beta, they agreed that these choices did not account for any material differences that their respective beta calculations yielded; and

(f)     the depreciation and amortisation assumptions should be consistent with the August 2017 Projections.

**Main areas of disagreement between the Experts**

64.     The Joint Memorandum lists almost 30 "major" areas of disagreement between the Experts. Based on the way the parties conducted the case at trial[31], I would distil those areas of disagreement into the following headline issues:

(a)     whether fair value was adequately reflected in the Market Price or whether a DCF analysis was required; and (assuming a DCF analysis was required);

(b)     what adjustments should be made to the August 2017 Projections as regards the China Bilingual Project;

(c)     what adjustments should be made to the August 2017 Projections as regards exchange rates in relation to foreign currency earnings; and

(d)     how the appropriate discount rate or "beta" should be determined and, having regard to materiality, the following sub-issues:

(1) the length of the estimation period,
(2) the use of weekly data,
(3) the cost of debt, and
(4) the terminal growth rate.

---

[31] See e.g. '*Company's Closing Written Submissions*', paragraph 110 *et seq*, and paragraph 130 *et seq* '*Written Closing Submissions of the Dissenting Shareholders*', paragraph 282 *et seq*, paragraphs 336 *et seq*, paragraph 392 *et seq* and paragraph 406 *et seq*.

## LEGAL FINDINGS: PRINCIPLES GOVERNING THE SELECTION OF THE APPROPRIATE VALUATION METHODOLOGY

### Cayman Islands authorities

65.    The pivotal statutory provision to the present case is section 238 (1) of the Companies Law which provides as follows:

> "(1) A member of a constituent company incorporated under this Law shall be entitled to payment of the fair value of his shares upon dissenting from a merger or consolidation."

66.    The Dissenters centrally argued:

> "70. To summarise the legal position, in assessing 'fair value' what the Court is aiming at is not merely the market price of its shares but rather their value, taking into account all value-relevant information whether or not it was available to the market at the time, leaving out of account any advantages or disadvantages accruing to the Company arising from the Merger Transaction itself. _The usual way of arriving at such a value, and one which forms a part of the Court's assessment of "fair value" in all prior s.238 cases, is through a DCF analysis._"[32] [Emphasis added]

67.    Rather than considering which valuation approach should be adopted based on the contending views of the Experts viewed in light of the isolated facts of this case, it seems logical to me to first consider how this question has been resolved by this Court in previous cases. Is there a governing legal principle or does the choice of valuation methodology turn on purely factual considerations? The previous section 238 cases that have gone to trial appear to number only three: _Re Integra Group_ [2016 (1) CILR 192] (Jones J); _Re Shanda Games Limited_, FSD 14 of 2016 (NSJ), Judgment dated April 25, 2017 (unreported) (Segal J); and _Re Qunar Cayman Islands Limited,_ FSD No 76 of 2017, Judgment dated May 13, 2019  (Parker J) (unreported).

68.    In _Re Integra Group,_ Jones J described the transaction as being "_a management buyout…structured as a statutory merger_" (paragraph 5). The petitioner contended that the market price of the listed shares reflected fair value and the respondents contended for a DCF analysis combined with (applying a 25% weighting) a market-based comparables approach. These positions were advanced through expert witnesses. Jones J concluded, having considered the expert evidence:

> "38. The mere fact that a company's shares are listed on a major stock exchange, in this case the LSE, does not lead to the conclusion that a valuation

---

[32] '_Written Opening Submissions for Trial on Behalf of the Dissenter Groups_'.



*methodology based upon its publicly traded prices is necessarily the most reliable approach towards determining its fair value for the purposes of a section 238 court appraisal.*"

69. The presumed free float was 67.5% of the issued capital and the trading volume of that free float was 16% and 9% in the last two years before the merger. The trading volume was dramatically lower and the median bid-ask spread marginally higher than the corresponding figures for comparable companies. Based on his view of the expert evidence, Jones J rejected the full-blown market price approach contended for by the petitioner. The shares were valued at $11.70 per share rather than the offer price of $10.

70. The transaction in *Re Shanda Games* was described by Segal J as a "*take private transaction led by the principal shareholders and management of Shanda*" (paragraph 6). That shareholder indirectly controlled approximately 69% of the company's voting shares; the Second Buyer Group controlled just over 90% of the voting power (paragraphs 34, 50). Both experts agreed on the DCF approach. The offer price was $7 per ADS; the petitioner's expert valued the shares at $7.10 per ADS and the respondents' expert valued the shares at $27.03 per ADS, reflecting what Segal J described as a "*fundamentally different view*" (paragraph 66). Segal J recorded helpful findings on the general approach to expert evidence in the section 238 appraisal context. Although Segal J's views were expressed in the context of a dispute as to how a DCF analysis should be applied rather than whether it is appropriate to use the methodology at all, they provide valuable general guidance on the section 238 judicial function:

> "*85. I note, and find persuasive, the comments of Vice Chancellor Strine in Andaloro v PFPC Worldwide Inc, (Andaloro) Court of Chancery, Delaware, New Castle 2005 Del. Ch. Lexis 125 at [34].*
>
> > *In making the fair value determination, the court may look to the opinions advanced by the parties' experts, select one party's expert opinion as a framework, fashion its own framework, or adopt piecemeal, some portion of an expert's model methodology or mathematical calculations. But, the court may not adopt an 'either-or' approach and must use its judgment and an independent valuation exercise to reach its conclusion.'*
>
> *More recently in his opinion in Re Appraisal of Dell Inc 2016 WL 3186538 (Dell) Vice Chancellor Laster quoted with approval dicta in this issue from a number of other cases as follows ...[33] :*

---

[33] At pages 42-43.

> '"In discharging its statutory mandate, the Court of Chancery has discretion to    select one of the parties' valuation models as its general framework or to fashion its own". M.G. Bancorporation, 737 A.2d at 525-26. "The Court may evaluate the valuation opinions submitted by the parties, select the most representative analysis, and then make appropriate adjustments to the resulting valuation". The court also may "make its own independent valuation calculation by . . . adapting or blending the factual assumptions of the parties' experts." M.G. Bancorporation, 737 A.2d at 524. It is also "entirely proper for the Court of Chancery to adopt any one expert's model, methodology, and mathematical calculations, in toto, if that valuation is supported by credible evidence and withstands a critical judicial analysis on the record." Id. at 526. "When . . . none of the parties establishes a valuation that is persuasive, the Court must make a determination based on its own analysis."'

71.    Instructive approaches adopted by Segal J to the expert evidence included averaging the beta figures proposed by the experts and averaging the experts' proposed terminal growth rates (over a terminal period following a 5 year transitional period). These were approaches which subsequently received the *imprimatur* of the Court of Appeal: *In re Shanda Games* [2018 (1) CILR 352] at paragraphs 75 and 92 (Martin JA).

72.    *Re Qunar*, FSD No 76 of 2017 (RJP), Judgment dated May 2, 2019 (Parker J) (unreported), is the third trial judgment in a section 238 case. The company in that case had its shares listed on NASDAQ and the merger was a take-private transaction supported by the majority shareholders. As here, a special committee recommended the transaction to the board of directors and engaged Duff & Phelps who opined that the negotiated price of $30.39 per ADS was a fair one. This was midway in their DCF range which implied values of between $26.59 and $34.52 per ADS. The company's expert's valuation was based 50% on a DCF valuation and 50% on a market price analysis and contended for $28.09 per ADS applying a 4.7% minority discount. The dissenters' expert contended for $125.96 per ADS, using a DCF analysis alone and applying no minority discount. *Re Qunar's* factual matrix has important similarities with that in the present case and accordingly Parker J's judgment provides valuable guidance as to how issues such as, *inter alia*, the following should be approached:

     (a)    when a DCF valuation approach alone should be preferred to a market price approach;

     (b)    the inferences to be drawn from a huge gap between a DCF valuation and the market price;

(c)    the determination of when a market is sufficiently efficient to enable the market price to provide reliable evidence as to fair value; and

(d)    the correct approach to a DCF computation as regards matters such as assessing the reliability of management projections, the calculation of the appropriate beta, whether a 'Blume adjustment is required' and the appropriate terminal growth rate.

73.    Parker J unsurprisingly described the gap between the valuations as "*very considerable*" (paragraph 16). He concluded that a 100% DCF approach was not warranted because the market was not shown to be inefficient and the transaction was conducted fairly. However, the merger process and merger price did not apparently play a central role in the case. The majority shareholder held 95% of the shares, but this did not mean in and of itself that the market in the shares was inefficient. He found that the market price "*can reasonably be relied upon as good evidence of value. It therefore also provides a good cross check against the DCF outcome of fair value*" (paragraph 141). The blended approach contended for by the company's expert was approved but the minority discount was valued at nil. Parker J also approved the dissenters' expert's China-based terminal growth rate of 4.75%. He left the experts to revise their valuations in light of his findings on various disputed issues, which included the various elements of the appropriate discount rate. It seems self-evident that the ultimate result must have been far closer to the petitioning company's expert's valuation than to the dissenters' valuation. The most significant general findings made by Parker J which have potential persuasive weight for the purposes of the present case were the following:

"*408. The huge difference to the financial outcome of fair value in this case as contended for by the parties, is attributable primarily to the reliance by the Dissenters and Mr Osborne solely on a DCF method of calculation. This method has given rise to a number of issues where, in addition to the arguments concerning the Management Projections, the reliability of models, comparators, assumptions and the validity inputs have been tested. It has also given rise to the consideration of much academic and practitioner literature and financial analysis.*

*409. It has produced, on the Dissenters' case, a valuation which is way off the market price. It is, as Mr Osborne accepted, not credible once the systemic undervaluation theory of shares in companies with their operations in the PRC, but which are listed on US exchanges, has been rejected. Such a result would mean that investors and others who work in the US markets had significantly underestimated the Company's value prior to the Merger and has wider implications for other businesses with similar operations…*"

74.   Just over a month after I reserved judgment in the present case, the Judicial Committee of the Privy Council delivered its judgment in *Re Shanda Games* [2020] UKPC 2. As regards the approach to interest, not an issue in controversy at the present stage, Lady Arden summarised the Judicial Committee's views as follows:

> "*57. The judge exercised his discretion on the rate of interest that should be paid by Shanda in a manner which on its face was unassailable on appeal. He followed the practice in Delaware. He took the midway point between a rate of interest representing the return on the unpaid appraisal monies that a prudent investor could have made and the rate of interest that the company would have had to pay to borrow the equivalent sum.*"

75.   As regards the minority discount issue, of potential relevance to the present case but not addressed by either Expert, the Privy Council held that in principle a minority discount was applicable to a valuation under section 238 of the Companies Law. Lady Arden summarised the Judicial Committee's conclusions on this issue as follows:

> "*55. It follows that the judge should not have held that fair value always means no minority discount (see, for example, judgment of the judge, para 93, second sentence). That could not be a bright-line rule to be applied in every case. Similarly, it was not open to CICA to hold that a minority discount should invariably be applied as a matter of law. The legislature's direction is to find the "fair value" of the dissenter's shareholding. Because of the narrow scope of this appeal, the Board is not in a position to rule out the possibility that there might be a case where a minority discount was inappropriate due to the particular valuation exercise under consideration.*"

76.   It is noteworthy that the question before the Court was not what value should be assigned to the relevant shares, but whether section 238 mandated a *pro rata* valuation or not:

> "*56. As explained, the only issue which the parties have argued is whether the shares of the dissenters should be valued on a pro rata basis or not. The parties have not sought to argue that the value should be something other than CICA found it to be if section 238 does not require a pro rata valuation of the dissenters' shares...*"

77.     It is helpful to compare some general features of the present case with those of the previous section 238 cases. Compared with *Integra,* where there was seemingly no controlling shareholder at all and a 'free float' of 67%, here Baring and affiliates beneficially owned 67% of the Company's Shares pre-Merger reflecting a free float of roughly 33%. Professor Gompers opined without apparent contradiction that the weekly trading volume of the Company's Shares was just over 0.5% of all stock (over the 5 years up to and including 2017), far lower than for comparable companies[34]. Measured in relation to the one third of all Shares reflected by the free float that means roughly 1.5% of that float traded weekly.    In *Integra*, trading volumes were also comparatively low. In *Shanda Games,* the size of the free float was apparently comparable to the present case, roughly 31%. It appears that the market in the shares in the latter case was far less liquid than in the present case. In contrast, the free float in *Qunar* where the controlling stake was 95% was much smaller and the trading volumes presumably even lower.

78.     There is no precedent for placing primary or sole reliance on the market price in any of the three previous section 238 cases which went to trial.

**Delaware authorities**

79.     The potential relevance of Delaware and/or Canadian appraisal jurisprudence to the application of section 238 of the Companies Law is now well settled. The fact that section 238 "*was heavily influenced by the Delaware and Canadian law*" was seemingly first judicially acknowledged by Jones J in *In re Integra Group* [2016 (1) CILR 192] at paragraph 20. As noted above, Segal J found Delaware jurisprudence in appraisal litigation to be of persuasive value in *Re Shanda Games Limited*, FSD 14 of 2016 (NSJ), Judgment dated April 25, 2017 (unreported) (at paragraph 156 et seq). In *Re Qunar* FSD No 76 of 2017 (RJP), Judgment dated May 2, 2019, Parker J observed:

> "*34. The jurisprudence in Cayman is relatively young in comparison to Delaware and Canada and guidance from those jurisdictions has been found to be helpful by the Cayman courts in terms of the approach to the similar issues the courts of those jurisdictions have adopted. However, the approach is not always to be followed in Cayman as there are differences in the language of the relevant legislation, the policy behind it, insofar as one can identify that, and procedure.*
>
> *35. I have considered in this case the principles from, in particular, the Delaware jurisprudence in the same way as Segal J and the Court of Appeal*

---

[34] Expert Report, paragraph 201; Appendix VIII-5.

*did in Shanda, but I have also had regard to, for example, English cases concerned with solving problems relating to the concept of fair value, albeit in different statutory contexts, as did the CICA in Shanda.*"

80.    The most authoritative judicial support for the relevance of, in particular, Delaware appraisal case law at the date of the trial was to be found in recent Cayman Islands Court of Appeal decisions. *Re Shanda Games* [2018 (1) CILR 352] was a case where the Court of Appeal directly held that the Delaware approach to computing interest should be followed but the Delaware approach to minority discounts should not be followed. The more general reliance placed by Segal J on Delaware jurisprudence was not doubted. In the present case, the general relevance of Delaware case law was not in dispute, as regards the general approach to appraisal cases. *In re Qunar* [2018 (1) CILR 199] was a case where the Court of Appeal was guided by the Delaware approach to dissenter discovery. Rix JA (Field JA and Goldring P concurring) opined as follows:

> "*63. Next I go to the jurisprudence of Delaware, which has had long familiarity with the concept of fair value in the context of dissenting shareholders and a statute with similar wording to s.238...I do not however take any account of Dole[35] as constituting any authority or precedent. In any event it comes from a separate jurisdiction. However, I cannot ignore considerations which are addressed in Dole as though such matters did not exist in the world. That would be to shut my eyes to the realities of life.*
>
> *64. What I find in Dole is a sophisticated, well-informed, modern judgment (delivered in 2014) with extensive citation of jurisprudence...I cite passages in Laster V.C.'s opinion to exemplify the power of its reasoning...*"

81.    In my judgment there is (or ought to be) a distinction between the relevance of Delaware authorities on matters of law and procedure and the relevance of such authorities to the more commercially-focussed mechanics of the appraisal process. For the section 238 trial judge at least, seeking to appraise shares which have been listed on a US stock exchange based on expert evidence from witnesses who predominantly give expert testimony in Delaware and other US courts, the commercial and 'cultural' elements of US appraisal jurisprudence will likely more often than not be very helpful indeed. The same applies to commentary on the distinctive judicial characteristics of the Court's appraisal function. After I reserved judgment in the present case, the Privy Council confirmed that the Delaware approach to valuing the shares of a minority (on a *pro rata* basis as opposed by reference to the value of the actual minority shares) does not apply

---

[35] *In re Dole Food Co. Inc. (Appraisal)*, (2014), 114A.3d 541 (Laster V.C.).



to section 238 appraisals: *Shanda Games Ltd.-v-Maso Capital Partners Ltd et al* [2020] UKPC 2. Lady Arden nevertheless opined as follows:

> "*49. The Cayman Islands courts would still be able to use the jurisprudence of the Delaware and other courts if placed before them as a source of guidance on some particular issue. It goes without saying that the jurisprudence of Delaware is of great value in this field. However, it should also be borne in mind that there may be different rules in related contexts, such as a different regulatory scheme for corporations issuing securities to the public and the duty of fairness owed by a controlling stockholder to other stockholders, which are not found in English and Welsh law. In addition, there may be different economic and social policy considerations affecting legislation in Delaware.*"

82.   Lord Grabiner QC in his opening oral submissions primarily sought to demonstrate that the Delaware courts now favour a market-based evaluation approach to a DCF analysis. However, a passage counsel cited indirectly helped to illumine (a) the Court's distinctive commercially-focussed role under section 238, and (b) the fact that US appraisal experts are possibly generally more partisan than a British Commonwealth judge might expect them to be. In *Dell, Inc.-v-Magnetar Global Event Driven Master Fund Limited* 177A.3d 1 (2017) (Supreme Court of Delaware). Valihura J opined as follows (at paragraph 35):

> "*We pause to note that this appraisal case does not present the classic scenario in which there is reason to suspect that market forces cannot be relied upon to ensure fair treatment of the minority. Under those circumstances, a DCF analysis can provide the court with a helpful data point about the price a sale process would have produced had there been a robust sale process involving willing buyers with thorough information and the time to make a bid. When, by contrast, an appraisal is brought in cases like this where a robust sale process of that kind in fact occurred, the Court of Chancery should be chary about imposing the hazards that always come when a law-trained judge is forced to make a point estimate of fair value based on widely divergent partisan expert testimony.*" [Emphasis added]

83.   *Dell, Inc.* helpfully warns trial judges that their legal training does not really equip them to resolve valuation disputes between valuation experts whose estimates are based on the DCF approach and are far apart. Where market indicators such as share or transaction price are reliable indicators of the intrinsic value of the shares, these

ultimately straightforward indicators should not be ignored in favour of far more esoteric financial estimates. It is noteworthy, however, that the gap between the merger price and the dissenters' DCF valuation was a stunning $23 billion in *Dell*. The company had a "*deep public float*" with more than 5% of its shares trading each week[36]. There was no controlling shareholder; Mr Dell owned only 13.9% of the company's shares[37]. The merger process was found to be "*robust*". Yet the Delaware Supreme Court did not direct the Court of Chancery to simply apply the transaction price; the matter was remitted for reconsideration in light of the following critical findings (at paragraph 37):

> "*Given that we have concluded that the trial court's key reasons for disregarding the market data were erroneous, and given the obvious lack of credibility of the petitioners' DCF model—as well as legitimate questions about the reliability of the projections upon which all of the various DCF analyses are based—these factors suggest strong reliance upon the deal price and far less weight, if any, on the DCF analyses.*"

84.  The position under Delaware law post-*Dell* appears to me to be that even when the market price (either based on an efficient market or a robust sales process) is a good indicator of the intrinsic value of a company's shares, a DCF valuation will at least be taken into account if the relevant management projections about future cash flows are themselves reliable[38]. This appears to have been the case prior to *Dell* based upon cases referred to by the Dissenters' counsel in their opening oral submissions, including *In re Petsmart*, Inc 2017 WL 2303599, upon which Mr Adkin QC relied. Vice-Chancellor Slights crucially opined as follows (at paragraph 32):

> "*The first key to a reliable DCF analysis is the availability of reliable projections of future expected cash flows, preferably derived from contemporaneous management projections prepared in the ordinary course of business. As this court has determined time and again, if the 'data inputs used in the model are not reliable,' then the results of the analysis likewise will lack reliability. And, as the experts in this case both agree, to be reliable, management's projections should reflect the 'expected cash flows' of the company, not merely results that are 'hoped for'.*"

---

[36] Paragraph 7.

[37] Paragraph 9.

[38] The Company's counsel forwarded two more recent Delaware decisions to the Court after I had reserved judgment and had almost completed the present Judgment. The Dissenters' counsel objected. I have not taken these decisions into account.

85. At the beginning of the Vice-Chancellor's judgment, however, the following insightful observations were made about the peculiar nature of the judicial appraisal function (at paragraph 1):

> "*I would not be the first to observe that the trial of an appraisal case under the Delaware General Corporation Law presents unique challenges to the judicial factfinder. The petitioner bears a burden of proving the "fair value" of his shares; the respondent bears a burden of proving the 'fair value' of the petitioner's shares; and then the judge, as factfinder, assumes, in effect, a third burden to assign a particular value 'as the most reasonable in light of all of the relevant evidence and based on considerations of fairness.' The role assigned to the trial judge in this process independently to review 'all relevant factors' that may inform the determination of fair value, if not unique, is certainly unusual. It is unusual in the sense that the judge is not bound by the positions on fair value espoused by either of the parties. Indeed, the trial court commits error if it simply chooses one party's position over the other without first assessing the relevant factors on its own.*
>
> *Yet it cannot be overlooked that the judge's decision in an appraisal case follows a trial—an honest-to-goodness, adversarial trial—where the parties are incented to present their best case, grounded in competent evidence, and to subject their adversary's evidence to the discerning filter of cross-examination. The trial court then reviews the evidence the parties have placed in the trial record and does its best to 'distill the truth'. In this regard, at least, the appraisal trial is no different from any other trial. The court's determination of 'fair value', while based on 'all relevant factors', must still be tethered to the evidence presented at trial. The appraisal statute is not a license for judicial freestyling beyond the trial record.*"

86. *In re Appraisal of Petsmart, Inc.* is also instructive as regards illustrating what type of auction process has been judicially viewed as robust. The merger process was initiated by an "*activist hedge fund*" which had acquired a 9.9% stake in the company, not by a controlling shareholder. 27 potential bidders were identified between August 2014 and October 2014, and 15 potential bidders signed non-disclosure agreements. A data room including non-public information was made available to the potential bidders and management made presentations to them. Five bids were received by October 31, 2014; on November 3, 2014, four were allowed to continue further with their bids. The Board in early December was still considering alternatives to a sale. Final bids were considered on December 10, 2014. There were three separate competing bidding groups, and one group expanded its membership near the end of the auction process.

increase its bidding capacity. The highest bid was ultimately accepted. The merger was approved by over 77% of all shareholders and over 99% over those who voted. The dissenters did not challenge the efficacy of the <u>process</u> as such. The valuation process deployed by the Ad Hoc Committee's advisers was subjected to apparently strong criticism, as was their impartiality; it was also argued, *inter alia*, that market conditions limited the range of participants in the auction process, such that the Board did not make a properly informed decision. The Vice-Chancellor crucially concluded:

> "*Importantly, the evidence reveals that the private equity bidders did not know who they were bidding against and whether or not they were competing with strategic bidders. They had every incentive to put their best offer on the table…*
>
> *…Respondent has carried its burden of demonstrating that the Merger Price of $83 per share was the result of a 'proper transactional process' comprised of a robust pre-signing auction in which adequately informed bidders were given every incentive to make their best offer in the midst of a 'well-functioning market.'*"

## FINDINGS: THE RELEVANCE OF THE MARKET PRICE TO THE FAIR VALUE ASSESSMENT

### Overview

87.    In my judgment the only real dispute between the Experts as regards the relevance of the Market Price of the Shares is one of degree or emphasis. Professor Fischel opined that the Market Price was the best indicator of fair value, but acknowledged that a DCF analysis was a useful cross-check of the market value. Professor Gompers agreed that the NYSE as a whole constituted a semi-strong efficient market and opined, in effect, that because of MNPI a DCF analysis was in the circumstances more reliable as a guide to the intrinsic value of the Shares. As the Company submitted in its Closing Submissions:

> "*216. At the outset it is important to note that Professor Gompers does not conclude that the market is not semi-strong efficient. He simply says that he has not seen evidence that it is semi-strong efficient.*"

88.    Having regard to the way in which this Court and the Delaware courts have previously approached the question of fair value in the cases referred to above, the Court's appraisal function does not permit me to simply make a choice between the Market Price contended for by Professor Fischel and the DCF valuation contended for by Professor Gompers. Nonetheless in assessing the expert evidence, I cannot ignore the fact that Professor Fischel adopted a more balanced and less absolutist position by

explicitly acknowledging that a DCF analysis could properly be taken into account and carrying out his own detailed DCF analysis (which essentially provided a range of potential values). He did this despite contending that the Market Price was the only appropriate valuation method and he further implied in his oral evidence that his DCF analysis could be used by the Court to confirm the appropriateness in general terms of his Market Price figure, if the Court had doubts about the reliability of the Market Price[39].

89.    Professor Gompers did not appear to me to even tacitly concede the possibility that his assigned DCF valuation might benefit from downward adjustment in light of the far lower Market Price and Transaction Price figures. In the final substantive paragraph of his Supplemental Report, Professor Gompers opined as follows:

> *"429. My conclusions regarding Nord Anglia's fair value expressed in the Gompers Report remain unchanged. It is further my opinion that Professor Fischel's analysis of fair value significantly understates the fair value of Nord Anglia, as described in this Gompers Supplemental Report."*

90.    Professor Fischel concluded his Supplemental Report by opining that:

> *"106....the estimated equity value of a Share based on the Adjusted August 2017 Projections ranges from $28.34 to $41.32 on the Valuation Date, depending on the discount rates. This range of estimated equity values per share contains my estimate of fair value of Dissenters' Shares on the Valuation Date of $30.45 per Share. However, for the reasons discussed in Fischel Report...it is my opinion that DCF analysis should have little or no weight in the determination of the fair value of Dissenters' Shares."*

91.    While all critical opinions must be weighed on their respective merits, I feel bound to approach the most controversial aspects of Professor Gompers' opinions with considerable caution. Professor Fischel generally appeared to me to approach his valuation task with more objectivity than Professor Gompers. That said, the clear picture painted by the evidence overall points to the following broad conclusion. A DCF analysis should be given considerable weight in the Court's valuation process, but not to an extent which generates a value which is significantly at variance with the Market Price, viewed together with the Transaction Price.

## Efficiency of the market in the Company's Shares

92.    Professor Fischel conducted an Event Study to assess the extent to which the market in the Company's Shares responded to the publication of value-relevant information. The

---

results showed far greater volatility on News Days than on other days which he opined was consistent with the market being "*efficient*"[40]. Appendix C-2 recorded a 4.5% deviation on "News Days" compared with a 1.81% deviation on "Other Days". He also opined that the "*Cammer*" requirements for establishing efficiency in the context of securities fraud litigation were met in relation to the market for the Company's Shares. It was not suggested that any recognised test for establishing "semi-strong form efficiency" had been met.

93.    Professor Gompers conducted an Event Study with the specific aim of discovering whether evidence existed for "semi-strong form efficiency"[41], although nothing seems to turn on this terminological difference. In general terms, he set out to measure the same cause and effect relationship to value-relevant information as did Professor Fischel. However, he considered that a 5% variation on News Days (two out of 10 days) was statistically significant. His analysis was based on 10 days when earnings announcements were made; Professor Fischel took into account not just days when earnings reports were published, but other information (Form 6K filings and annual reports) as well . In addition, Professor Gompers opined that it was necessary to analyse whether the price deviation was consistent with what one would expect having regard to the nature of the information published. In his Expert Report, he opined:

> "*182. In an efficient market, the stock price should not only respond to new and value-relevant information, but the direction of response (in terms of the sign of the residual return, i.e. whether it was positive or negative) on each event day should be in line with the expected impact of the news being disclosed to the market.*"

94.    Professor. Gompers recorded the results of his analysis of this additional criterion in Appendix VIII-3 to his Expert Report. He concluded that "*the price movements of Nord Anglia's stock on earnings announcement days were rarely consistent with the various measures of expected impact of news (or lack thereof)*"[42].

95.    Professor Fischel criticised the conclusion that a statistically significant variation on two of 10 days did not meet the 5% threshold; but this was a case of apples and oranges. Professor Gompers only treated as significant a variation or "residual" on any day of at least 5%; Professor Fischel in his Supplemental Report applied the 5% standard to both the amount of the variation on any relevant day <u>and</u> to the number of days on which a statistically relevant variation occurred as a percentage of the total number of "News Days"[43]. When Professor Fischel was cross-examined on Day 6 by Mr Millett QC on his Event Study, attention focussed on the amount of the variation (5% for a one-tail test and 10% for a two-tail test) but not on the import of the number of days on which statistically significant variations occurred. Brief mention was made of the percentage of days on which he found statistically significant variations (roughly one-third) shortly before a short adjournment, but Professor Fischel did not initially suggest that this percentage of days on which statistically significant variations occurred was

---

[40] Expert Report of Daniel Fischel, Appendix C, paragraph 7.

[41] Expert Report of Paul Gompers, paragraph 174.

[42] Expert Report, paragraph 191.

[43] Supplemental Report of Daniel Fischel, paragraph 15.



particularly meaningful[44]. The matter was pursued after the break, and Professor Fischel clearly stated that 8 out of 23 days was statistically significant without meeting counsel's challenge to explain the precise basis for that opinion[45].

96.    In essence, Professor Fischel opined that if there was a statistically significant variation on only one occasion out of 23, this might be attributable to mere chance, but 8 such occurrences were inconsistent with the hypothesis that no value-relevant information was reflected in market activity in relation to the Shares. He also opined one would not expect to see a 100% alignment of statistically relevant price fluctuations on News Days. While I accept this conclusion, I also find by way of partial acceptance of Professor Gompers' opinions on this issue that neither Event Study provided compelling evidence of market efficiency. I accept that some efficiency was demonstrated by each Expert's findings, objectively viewed.

97.    Was it relevant to assess whether the market reacted in a way that you would expect the market to react? I find that Professor Gompers was right to suggest that this is a potentially relevant consideration. However, as Professor Fischel convincingly asserted under cross-examination and in his Supplemental Report[46], it is not entirely straightforward in all instances to identify what would qualify as a logical reaction to a particular announcement and Professor Gompers' analysis of this issue is arguably flawed. I do not consider it necessary or possible to resolve this specific difference between the Experts as to whether the statistically relevant price fluctuations also reflected logical responses to the relevant announcements. This controversy ultimately depends on underlying facts which were not adequately explored in evidence.

98.    In my judgment the pivotal consideration is that the statistical evidence generated by both Experts' Event Studies does demonstrate that there is some evidence of semi-strong form market efficiency, albeit not as compelling as it might be in other cases. As Professor Fischel opined in his oral evidence[47]:

> *"First of all, I didn't say it's binary. I said I can imagine circumstances where some cases are clearer than others but, generally speaking, there aren't degrees of semi-strong efficiency. That's really what I meant to say."*

### Liquidity of the market in the Company's Shares

99.    I find that it is ultimately obvious that while the Shares were to some extent actively traded, the free float was not a large one (some 33% of the total Shares) and so the market was not so liquid that the need to look beyond the Market Price does not seriously arise. Professor Fischel appeared to me to exaggerate the weight to be attached to the liquidity factor while Professor Gompers understated it. I consider it to be self-

---

[44] Transcript Day 6 page 52 line 16-page 53 line 21.
[45] Transcript Day 6 page 61 line 10-page 63 line 6.
[46] At paragraphs 17-21.
[47] Transcript Day 6 page 13 lines 13-17.



evident that the more heavily shares are traded the more weight that can be attached to the cumulative weight of commercial judgments being made by the buyers and sellers of a particular company's shares. In *Dell, Inc.-v-Magnetar Global Event Driven Master Fund Limited* 177A.3d 1 (2017) (Supreme Court of Delaware), the fact that there was a "*deep public float*" was one of the reasons for criticising the trial judge's decision to give no consideration at all to the relevance of the market price.

100. Professor Fischel points out that in the year before the Merger was announced, 1.53% of the public float was traded every week which suggests that the Shares not held by insiders were actively traded by some 98 institutional investors over the year[48]. Clearly the Shares were <u>not</u> illiquid. But this does not undermine Professor Gompers' point that the percentage of Shares which were traded was comparatively low[49]. In my judgment this factor does serve to diminish the weight which might otherwise be attached to the Market Price of the Shares.

101. As regards the comparatively wide "*bid-ask spread*" which Professor Gompers suggested could constitute evidence of an impediment to market efficiency, I find no sufficient evidential foundation for concluding that this factor had any material impact on the efficiency of the market in the Company's Shares.

102. My critical finding on liquidity is that the proportionate size of the public float in the Company's Shares was sufficiently small to limit the weight that might otherwise be attached to the Market Price alone as reflective of the fair value of the Shares. However, I also find that the volume of Shares traded was not sufficiently small to raise real doubts about whether or not the relevant market was semi-strong form efficient.

## MNPI

103. In the Company's Closing Submissions, the contending positions on MNPI are summarised as follows:

> "215...Professor Gompers claims that 'there is evidence that the market did not have access to all relevant information about Nord's fair value' because 'it did not have access to internal management projections'. 'As a result', Professor Gompers claims, 'Nord Anglia's stock price would have deviated from the Company's fair value if those projections were value-relevant.' Professor Fischel demonstrates that Professor Gompers' analysis is flawed for two reasons. First, there is a difference between raw information about a company (such as information about its business, business strategy, and its quarterly operating results, which the Company was obligated to and did disclose) and management projections, because management projections reflect management's opinions about the company's prospects, which are not necessarily material. Therefore, even if management projections were not publicly disclosed, that would not establish that 'the market did not have access to all relevant information about

---

[48] Supplemental Report, paragraph 23.
[49] Expert Report of Paul Gompers, paragraphs 201-203.



> *Nord's fair value' as Professor Gompers claims. Second, Nord's management*
> *projections were publicly disclosed when the Company filed a preliminary proxy*
> *statement on 9 June 2017 {H/414}, and when the Company filed the Proxy*
> *Statement on 11 July 2017 {H/444}. However, the Company's stock price did not*
> *increase significantly following either of these disclosures and closed at $32.54*
> *on 21 August 2017. Moreover, the release of management's projections did not*
> *cause analysts to substantially change their assessments of the value of the*
> *Company. Both these findings imply that the management projections did not*
> *contain material information."*

104.    This summary is helpful because it captures the high point of Professor Gompers'
        evidence on MNPI, which relies primarily on the non-publication of Management
        Projections. What individual actors (be they insiders or outside market analysts)
        subjectively thought of the market value from time to time I regard as being of minimal
        relevance for the reasons advanced by Professor Fischel. However I am bound to reject
        the submission that the Management Projections should be disregarded "*because*
        *management projections reflect management's opinions about the company's*
        *prospects, which are not necessarily material*".  It is well recognised that reliable future
        cash flows prepared by management provide a sound basis for a DCF valuation. And
        in this case the Company's Mr Halder was personally involved in assisting Baring to
        raise financing for the Merger in reliance on the relevant Management Projections. It
        surely does not lie in the Company's mouth to contend post-Merger that its Projections
        are not at all material, and the equivocal assertion that they are "*not necessarily*
        *material*" is, perhaps, tacit acknowledgment of this. The Company's non-materiality
        case is ultimately, with respect, a somewhat unimpressive one. The Management
        Projections were indeed published with the Proxy Statement on June 9, 2017. The
        publication did not result in any discernible market reaction; accordingly, it is
        submitted, the previously non-public information was not material.

105.    In fairness, both the "*not necessarily material*" and "*not material points*" are supported
        by Professor Fischel's written evidence[50]. But based on the Company's own factual
        evidence, I find that the November 2016 Projections, the April 2017 Projections and
        the August 2017 Projections were clearly material to an assessment of the intrinsic
        value of the Shares in a general sense. These Management Projections, I find contained
        (to use Professor Fischel's words) both "*raw information about*" the Company and
        "*management's opinions about the company's prospects*", being opinions based on that
        raw information. Mr Halder agreed that the Company when retaining Houlihan &
        Lokey to advise the Special Committee gave the following representation:

> *"The Company further represents and warrants that*
> *any financial projections delivered to Houlihan Lokey*
> *have been or will be reasonably prepared in good faith*
> *on bases reflecting the best currently available*
> *estimates and judgments of the future financial results*
> *and condition of the Company.  The Company will promptly*

---

[50] Supplemental Report paragraphs 12-13.

> *notify Houlihan Lokey in writing of any material*
> *inaccuracy or misstatement in, or material omission*
> *from, any information previously delivered to, or*
> *discussed with, Houlihan Lokey.*"[51]

106.    Mr Halder testified that his primary task was preparing budgets and making forecasts for future budgeting purposes. The forecasts were clearly based on hard data, not speculative guesswork, although future risks were difficult to predict and short-term forecasts were more reliable than longer term ones. He explained under re-examination by Lord Grabiner as follows:

> "*Q. Which parts of the business specifically, if there are*
> *such parts of the business -- which parts of the*
> *business would be less predictable?*
>
> *A.  So I think the 43 schools, as I say individually, are*
> *fairly certain because you know what they are.  You then*
> *move on to acquisitions and green fields and they are*
> *more difficult because there is a degree of uncertainty*
> *then in terms of timing and where and how much.*"[52]

107.    It appears to be factually undisputed that after the Projections were published on June 9, 2017 (preliminary proxy statement) and July 11, 2017 (Proxy Statement) the Company's Share price did not increase significantly. However, I do not accept Professor Fischel's invitation to infer from this fact that the Management Projections did not contain material information which had not previously been published. After all, as Professor Fischel himself opined in a parallel context, it is not always logical to expect a specific market reaction from particular information. If that proposition holds good in the ordinary course of business, it must have even greater force in the uniquely complicated context of the Company with its controlling shareholder on the eve of an EGM to consider and likely approve the Merger Agreement. I do infer that the Projections and related proprietary information did not contain an easily identifiable 'smoking gun' which made it obvious that the Merger Price was grossly undervalued. This is entirely consistent with the nature of the Projections as estimates not containing easily digestible "good news" or "bad news". Rather, the Projections contained material which might be fed into complex modelling designed to generate a clearer prediction of how Management's judgment as to the Company's future performance would potentially translate into share value. The April Projections were used by Houlihan Lokey to develop a DCF analysis and by Baring to develop its own models for raising financing for the Merger.

108.    In another context, Professor Fischel convincingly opined that it is not always straightforward to determine what an expected and rational response is to particular

---

[51] Transcript Day 2 pages 58-59.
[52] Transcript Day 2 page 214 lines 11-18.

items of market information about a listed company. In the present case, the Proxy Statement was filed in circumstances where the market had reasons to expect that the Merger would be approved so that many (if not all) purchasers at this juncture would (by the Company's own account) be arbitrage investors "*betting that by dissenting they will be able either to negotiate a settlement above their share purchase price or to persuade the Court to adopt a DCF analysis reflective of a high valuation, all with the safety net that the likely minimum fair value figure even if the dissent litigation is unsuccessful would not be much lower than the merger price*"[53]. If arbitrage investors were indeed purchasing after the announcement of the Merger Agreement with a view to exploiting dissenter rights, it is not easy to draw any clear inferences as to the impact of the publication of the April 2017 Projections embedded in the Proxy Statement on the Share price in the weeks immediately preceding the EGM. If bets were being placed on the vagaries of appraisal litigation, the commercial context is far removed from the traditional context in which market reactions to public information are assessed. The Experts after all essentially agreed that in the merger context the relevant market price measure (assuming it is appropriate to use the market price to determine share value) is the market price <u>unaffected</u> by knowledge of the Merger Agreement.

109.   The Company also argued that there was no MNPI because it gave regular briefings as required by the NYSE. I summarily reject that argument as the relevant question is not whether there was some disclosure of material information but the converse: was there <u>some</u> material information which was not publicly disclosed. Obviously there was <u>some</u> material information which was not publicly disclosed; the elaborate Highly Sensitive Documents ("HSD") regime which the Company championed for the present proceedings, not to mention the non-disclosure agreement aspects of the Go-Shop process, are the proof of the pudding in this respect. It matters not that the Dissenters were unable to identify a non-disclosed "smoking gun" which clearly pointed to a value far higher than market value.

110.   In my judgment the relevant threshold question pertinent to deciding whether a DCF valuation should be pursued is whether the existence of MNPI, and the <u>possibility</u> that the Shares were undervalued by the market, justifies looking beyond the Market Price with a view to arriving at a more reliable conclusion as to fair value. As Professor Gompers stated under cross-examination by Mr Boulton QC in explaining why he had not considered the Market Price:

> "*A. It would only be necessary to perform if you could conclude that the market for Nord's shares were both semi-strong efficient and that there was no material non-public information because, in order for this to be a relevant benchmark or metric, you have to be able to assume that the pre-offer share price reasonably reflected the underlying value of Nord. Absent that, if the market isn't semi-strong efficient and/or if there is material non-public information, this analysis is*

---

[53] Company's Written Opening Submissions for Trial, paragraph 23



*totally irrelevant.*[54]

111.    A secondary question is to what extent (if any) an analysis of any potentially material non-public information (such as the Projections and the Parthenon Reports) suggests that a higher value should be placed on the Shares than the value reflected in the Market Price or the Transaction Price. I find that the Market Price did not incorporate MNPI which was potentially relevant to fair value. I am unable to go so far as to find, without the cross-check of a proper DCF valuation, MNPI which was actually relevant to fair value was not incorporated.  The extent to which this MNPI actually indicates a fair value which is significantly different to the Market Price can only be determined by reference to the DCF analysis which both Experts carried out. Professor Fischel agreed that even if the Market Price was a valid measure of fair value, a DCF analysis was a useful cross-check. If there was quite obviously no potentially relevant MNPI in this case, it makes no sense that Houlihan Lokey should have asked Management to provide information which was not at that point public and conducted its own DCF analysis for the purposes of its fairness opinion.  Potential lenders should not have been interested in Mr Halder's presentations on, *inter alia*, future cash flows, presentations which apparently revealed internal information about the Company's past and projected future performance. Baring in preparing its own models for the Buy Side ought to have been content to rely on public market information; instead they were (according to Mr Halder) very interested in the Company's internal projections. Market analysts ought to have been content to reference the market value of the stock without considering it useful to consider a DCF analysis.

112.    However in my judgment the most compelling evidence of the existence of MNPI which was not disclosed to the market by the Company during the relevant Adjusted Market Price period is the HSD "hullabaloo" at the hearing of the Summons for Directions. I was persuaded by the Company to approve (in part in relation to "*valuable proprietary research*") what Mr Steinfeld QC referred to as "*a quite draconian protective regime*"[55].

## Summary: relevance of the Market Price

113.    For these reasons I find that although there is some evidence that the market in the Company's Shares was semi-strong form efficient, the Market Price does not provide reliable *prima facie* evidence of the fair value of the Shares because:

(a)    the evidence of the efficiency of the market in the Company's Shares is not sufficiently strong to justify appraising the fair value based on the Market Price alone; and

(b)    further and in any event, there was private information (most significantly Management Projections) which was material to the

---

[54] Transcript Day 10 page 15 line 20-page 16 line 5.
[55] *In re Nord Anglia* [2018 (1) CILR 164] at paragraphs 19, 22.



intrinsic value of the Shares and which key market actors involved in the Merger felt it desirable to take into account.

## FINDINGS: RELEVANCE OF THE TRANSACTION PRICE

### Overview

114.    There was a dispute between the Experts and between the factual witnesses as regards the efficacy of the Transaction Process and how reliable the Transaction Price is as a guide to the fair value of the Shares. The Company's broad position was that the Transaction Price was the product of a genuinely arms' length and fair process which generated the highest possible price which could be achieved through a sale to an available buyer. The Dissenters' broad position was that the Transaction Process was seriously flawed and was effectively designed to achieve a sale between related parties which was likely to generate an artificially depressed price. By the end of the trial it was clear that:

      (a)    the Transaction Process had been carried out in good faith in circumstances where the beneficial interests on the Sell Side and the Buy Side had no or no material overlaps and to the extent that Baring was involved on both sides of the transaction, it was incentivised to achieve the best possible price;

      (b)    the Transaction Process was not as robust as it might have been, primarily because Baring was motivated in part by the desire to effect a quick sale and in part by the desire to sell to one of its existing clients (CPPIB) and held (through Premier's 66.8% shareholding in the Company) what amounted to a blocking vote in relation to approving the Merger Agreement at the EGM and potentially blocking any competing bid; and

      (c)    accordingly, while the Transaction Price could obviously be relied upon to some extent as an indicator of fair value, it was not, standing by itself, a sufficiently reliable cross-check for the Market Price-based valuation.

115.    Mr Kelsey's straightforward evidence satisfied me that the Transaction Process was carried out by the Company through the agency of an independent Special Committee who relied heavily on reputable financial and legal advice. The Dissenters' primary case that the entire process was in effect a complete sham tainted by unmitigated conflicts of interest, formulated prior to discovery, was revealed to be little more than a conspiracy theory which was not supported by an objective analysis of the actual facts. Mr Cordes' evidence satisfied me that there was no significant overlap of beneficial interests on both sides of the Transaction, despite the fact that Baring Funds

were indeed involved on both sides of the negotiating table. I find that the Transaction Process was an arms' length one despite the fact that it was entered into between related parties, was negotiated by human actors who generally worked as part of the same team and also involved a controlling shareholder. Those factors do not discredit the evidential value of the process altogether; they merely diminish the extent to which reliance can be placed on the Transaction Price as indicative of the fair value of the Shares. Mr Cordes in my view described the underlying commercial position honestly when he stated (under cross-examination by Mr Millett QC):

> "*I look at it slightly differently, actually. The way*
> *I look at it is there was an intention to sell the*
> *interest from Funds III and IV and there was a fiduciary*
> *duty to get the highest price and the question then was*
> *what do we believe is full fair value and at that level*
> *is there a transaction to be done that we would*
> *participate in, you know, or -- if someone else, that's*
> *fine.*"[56]

116.    The Dissenters' initial suspicions about conflict of interest were justified by the fact that Premier and Management pre-Merger held nearly 70% of the Company's Shares and the purchaser (Bach Finance Ltd, also controlled by Baring) was acquiring 100% of the Shares. However, Mr Cordes explained that Fund III and Fund IV (the main investors in Premier) were not beneficially involved (either before or after the process of post-Merger syndication) on the Buy Side. Fund VI (with different investors) held a 21.1% interest on the Buy Side and the largest single investor on the Buy Side was CPPIB (admittedly a client of Baring). The BPEA Group itself only beneficially held 2.8%. The true position was not easy to ascertain because of confidentiality obligations owed to the underlying investors, and was hardly obvious as the Proxy Statement affirmed that no change of control would be triggered by the Merger Agreement. The proposed deal was touted in partial reliance on the fact that the change of control rules would not be triggered, which implied the same parties were involved on both sides of the Transaction.

117.    Having accepted the critical assertion that Baring had a fiduciary duty to the beneficial owners of Funds III and IV to maximise the sale price, the suggestion that the negotiated price was an entirely uncommercial one must be rejected. Mr Cordes attended one Advisory Council meeting for Funds III and IV on the Sell Side and one meeting for Fund VI on the Buy Side and prepared minutes of those meetings (which were not produced). He testified that the largest investors in each Fund attended the joint meeting for Funds III and IV and that no one voted against the Merger[57]. I see no basis for doubting his testimony that the main underlying investors on the Sell Side on April 24, 2017 approved the Merger Agreement and the main Buy Side investor, CPPIB, had not invested on the Sell Side. There was therefore no factual support for the opinion expressed by Professor Gompers in Part VII of his Expert Report that there was no

---

[56] Transcript Day 4 page 142 lines 16-23.
[57] Transcript Day 4 page 162 line 15 –page 164 line 19.



evidence that the Merger was an arm's length transaction. His potential reasons "*Why the Baring Funds Would Be Willing to sell Below Fair Value*"[58] were not supported by the factual evidence at trial.

118. On the other hand Professor Gompers was clearly right, to an extent, to opine that the existence of a controlling shareholder appears to have influenced the Special Committee's negotiating stance to some extent. It seems obvious that potential outside bidders would have regarded the blocking vote as a potential negative factor, especially since the Buy Side had what the Dissenters' Expert described as "*unlimited matching rights*". The go-shop period was only 30 days; the Merger Agreement omitted a "majority of the minority" voting requirement for the EGM; potential bidders were indeed at an informational disadvantage to the Buy Side. His conclusions on this issue were comparatively modest:

> "...*there is evidence to conclude that, as an economic matter the Take-Private Transaction price can be taken as a reliable indication of the fair value of Nord Anglia. Ultimately, however, whether the deal process as it occurred resulted in the fair value of the Nord Anglia's shares to be paid to the Company's shareholders is an empirical question that can be answered by performing a properly executed valuation.*"[59]

119. Professor Fischel concludes in Part V of his Expert Report that an analysis of the process, viewed in light of the Market Price (and, implicitly, without any need for a DCF valuation), supports a finding that the Transaction Price was higher than fair value. This conclusion is in my judgment not supported by the facts proven at trial which cry out for a DCF analysis to confirm (or as a cross-check for) the true extent to which the Transaction Price does or does not reflect fair value.

120. I accept Professor Fischel's more general proposition that the Transaction Price "*is another form of market evidence that is relevant to an assessment of the fair value of a Share*"[60]. I find that it carries evidential weight because it does reflect an arm's length bargain negotiated between loosely related parties through the agency of closely connected human actors but also significantly:

(a) the Merger Agreement was concluded in circumstances where at least some attempts were made to find other bidders and none came forward in a serious way; and

(b) the Transaction Price offered a premium on the then current market price.

---

[58] Expert Report page 50.
[59] Expert Report paragraph 136.
[60] Expert Report, paragraph 44.



**The Transaction was an arm's length process - but not a "robust" one**

121.  The Transaction process *was not a "robust sales process" in the sense described in Dell, Inc.-v-Magnetar Global Event Driven Master Fund Limited* 177A.3d 1 (2017) (Supreme Court of Delaware) (discussed above). Here there was a controlling shareholder <u>and</u> there were no competing bidders. There was a potential conflict of interest arising from Baring being involved on both sides of the Transaction, but this was addressed through the establishment of the Special Committee. Mr Kelsey was one of the two members and he freely admitted that he had never served on such a committee during his previous career. In answer to a question from Mr Millett QC he described his own qualifications for being Chairman of the Board as follows[61]:

> *"So what was your particular sphere of expertise that*
> *you brought to the board?*
> *A. I don't think it was a particular sphere of expertise.*
> *It was common sense and the desire to run a board*
> *properly."*

122.  It is relevant that the Transaction was not the first and only attempt by Premier to sell its Shares. Mr Kelsey testified that there were numerous approaches from potential purchasers but that Project Darwin in late 2016 was regarded by him as being the most substantive one. He and fellow Company director Mr Hennessy sat on the transaction committee in relation to Project Darwin. He rejected as "*far too simplistic*" the suggestion that, because Premier controlled appointments to the Board, it in reality controlled the transaction committee itself[62]. When the same issue was raised again later, Mr Kelsey responded[63]:

> *"And the board was independent, the special committee was*
> *independent. The only way that Barings could do*
> *anything about it was to actually replace the board, and*
> *to replace the board would have been a major operation*
> *and I've no doubt the New York Stock Exchange and the*
> *SEC and a few other people would have had a great*
> *interest if they had seen that taking place. So*
> *I disagree fundamentally with what you are saying."*

123.  Mr Kelsey acknowledged that he had considered with Mr Hennessy, who sat with him on the Project Darwin transaction committee, acting for the Buy Side that there might

---

[61] Day 3 page 51 lines 20-22.
[62] Transcript Day 3 page 70 line 23.
[63] Transcript Day 3 page 118 lines 12-19.



be a risk of their generally close personal relationship influencing his ability to act in the best interests of the independent Shareholders. However, he explained[64]:

> *"No, I had thought about that and I didn't think that and I felt -- I took comfort from the fact I had my own legal and investment banking advisers to give me advice, and I suppose subconsciously, I felt if I'm going to stray off the straight and narrow, they would put me right."*

124. However it is important to acknowledge the extent to which the negotiated terms of the Merger Agreement did support Premier's majority position, as Mr Kelsey conceded. An initial draft proposed by the Special Committee included a requirement that a majority of the minority should approve the Transaction at the EGM; this was excised at the insistence of the Buyer Group. A 45 day Go-Shop period was reduced to 30 days. A "force the vote" clause was inserted entitling Premier to call for a vote at an EGM even if the Board changed its recommendation, unless the Company was entitled to terminate the Merger Agreement[65]. On top of this, under the SSSA, Premier agreed to vote in favour of the Merger Agreement at the EGM. This guarantee of voting support might appear significant to the uninitiated, but Professor Fischel's evidence demonstrated that this is a common feature in negotiated transactions involving controlling shareholders[66].

125. I nonetheless find that the Special Committee acted in good faith in the best interests of minority Shareholders acting on independent legal and financial advice in approving the proposed Merger. The Transaction was substantially an arm's length one, albeit one entered into between connected parties on terms that made competing bids from highly motivated parties possible, rather than on terms which positively encouraged competition. Although the Go-Shop period started on April 25, 2017, at the end of the month Houlihan Lokey were still working on a list of potential bidders to contact which Mr Kelsey admitted he was only actioning through an email dated May 3, 2017. However, the contents of the email give an insight into why at the time Mr Kelsey appears to have acknowledged that the Go-Shop process was a somewhat ritualistic undertaking:

> *"Dear Louis,*
> *I attach a copy of the list of names that Houlihans are going to contact in the go-shop process. I know some of them are long odds hopes and that anybody really interested will probably make*

---

[64] Transcript Day 3 pages 141 lines 6-11

[65] Transcript Day 4 page 5 line 18-page 56 line 21.

[66] FISCHEL 4: *'Negotiated Transactions with a Controlling Selling Shareholder August 1, 2014 to August 31, 2019'.*

> *contact themselves but we want to be sure we have*
> *conducted the process thoroughly and 'left no stone*
> *unturned…"*

126.    In my judgment the admitted informality of the way the obvious conflicts were dealt
with by sophisticated actors during a commercially significant negotiation suggests a
'relaxed' transparency that would not be manifested if the Transaction was not an
honest one. For instance, during Mr Cordes' cross-examination by Mr Millett QC, the
following exchanges took place[67]:

> *"Q. Yes. So my question again: when did Premier make that*
> *commitment?*
> *A. The thing is that with Premier and with the buyer entity*
> *here, being related, it's not something that requires*
> *such a formal process, so in fact, in the real world*
> *it's not so formal as you are implying.*
> *Q. I see, and that's because they are both on the same*
> *side, effectively?*
> *A. On opposite sides but in the same team, if you will.*
> *Q. Yes, it wasn't arm's length, was it?*
> *A. Yes, it was."*

127.    Although the robustness of the entire process was diminished to an extent which was
material by the existence of a controlling shareholder which had already agreed to sell
to the affiliated bidder, this did not deprive the Transaction of all commercial reality.
There was a genuine desire to sell at that time because of the maturity of Funds III and
IV. As Mr Cordes stated, "*the nine year holding is a long time so the desire to sell was
there*"[68]. Although the terms of the Go-Shop process were not as enticing to other
bidders as they might have been (not least because Premier had already agreed to vote
its Shares in favour of the Merger Agreement at the EGM), there is no credible evidence
that any seriously interested bidders willing to pay a substantially higher price were
rebuffed. And the Transaction Price was (a) approved by the Special Committee based
on credible independent financial advice, and (b) higher than any price the Shares had
traded at in the preceding year.

128.    In my judgment Mr Kelsey (who made it clear that Houlihan Lokey, "*the experts*", were
"*running the process*"[69]) appeared to be somewhat confused by legal nuances rather
than speaking untruthfully when he disagreed with a portion of the Proxy Statement
recording the views of the Special Committee about the unlikelihood of a successful
competing bid being accepted in light of Premier's support for the bid accepted on the
terms of the Merger Agreement[70].  This view was confirmed when Lord Grabiner put

---

[67] Transcript Day 4 page 170 line 19-page 171 line 4.
[68] Transcript Day 4 page 188 lines 18-19.
[69] Transcript Day 4 page 86 lines 22-24.
[70] Transcript Day 4 page 50 line 4- page 53 line 19.



the controversial extract from the Proxy Statement in its wider context to the witness in re-examination[71]. Mr Kelsey's real disagreement was with the implication that at the time he regarded the Go-Shop mechanism as, in effect, a sham. At the end of this portion of his testimony, he critically explained his clear and coherent practical view of the status of the Go-Shop mechanism as follows:

> "*I go back to what I said many times before, that under the go-shop we were entitled to entertain superior proposals and if we found a superior proposal that was -- that qualified, we would follow that superior proposal.*"[72]

129.    Mr Millett's cross-examination of Mr Kelsey clearly established that the Go-Shop process made it somewhat difficult for competing bids to be made, Premier's blocking position apart. The Proxy Statement containing detailed information about the Company was only filed after the process ended. Access to 'inside' information without negotiating a non-disclosure agreement was problematic. Raising financing within the requisite timeline could be potentially difficult for some interested competing bidders. But whether any of these factors mattered in real commercial terms crucially turns on whether any serious potential bidders were actually deterred from making a superior proposal.

130.    Mr Seetharam attacked the fairness of the process and most pertinently stated in his First Affidavit that Stockbridge did not pursue a bid through the Go-Shop process because it was told it would have to do so based on publicly available information. Although Stockbridge was also told it could later make an unsolicited bid, this was not viewed as a viable option because of the informational advantages enjoyed by the Buyer Group and the controlling position of Premier. On its face, this evidence did not even seek to support a finding that the Go-Shop process operated in a way which actually (as opposed to merely hypothetically) deprived the minority Shareholders of the benefit of a superior competing bid.

131.    Under cross-examination by Lord Grabiner QC, it was admitted that Stockbridge was closely connected with Berkshire Partners LLC and that "*together Stockbridge and Berkshire had a first-class understanding of private equity investments… [i]ncluding take-private transactions*"[73]. Mr Seetharam was reluctantly forced to admit that whatever ongoing review of the position may have taken place, after Stockbridge learned of the Merger in April 2017 and considered its options, it never decided to actually make a topping bid[74]. The strong inference from this evidence is that the Go-Shop process itself had no pivotal impact on Stockbridge's decision not to make a competing bid. Mr Seetharam was also keen to point out that Stockbridge was a long-term Shareholder, and in this regard creditably conceded that pre-Merger attempts to

---

[71] Transcript Day 4 page 106 line 12–page 108 line 5.

[72] Transcript Day 4 page 53 lines 15-19.

[73] Transcript Day 5 page 4 line 17-page 5 line 1.

[74] Transcript Day 5 pages 16 line 22-page 17 line 4.



obtain information about the Company's affairs had been dealt with by the Company in the same generally restrictive way that other public companies dealt with similar requests[75]. However I also inferred from this evidence in relation to Stockbridge's historical connection with the Company that it was in a better position than a complete outsider to form a view as to whether it made sense to make a "topping bid".

132. So Stockbridge clearly elected not to make a competing bid, in part at least because its best judgment was that it would be an uphill task to out-bid a deal supported by a controlling shareholder. It also seems somewhat surprising that if the Transaction Price was viewed by Stockbridge as obviously far lower than fair value that it did not demonstrate a greater interest in making a superior bid. Other potential bidders were notified of the Go-Shop process but, as Mr Kelsey suggested at the time, any seriously interested parties would likely have made an unsolicited bid after the Merger Agreement was announced without waiting for the Go-Shop process to start and without waiting for the Special Committee to solicit competing bids. No other potential bidders came forward.

133. The absence of competing bids is a factor which cuts both ways. I accept that in part the Transaction as consummated in the Merger Agreement broadly viewed did not encourage competing bids from the speculative investor or the faint-hearted. But I equally accept that the absence of competing bids also suggests that there was no deep reservoir of untapped alternative potential purchasers ready and willing to make a purchase. The Special Committee was commercially entitled to form the view that 'a bird in the hand was worth two in the bush', assuming of course that the Transaction Price was indeed fair to the minority public Shareholders. The proposed Merger Transaction was in broad principle one Premier was entitled to press for. Mr Kelsey explained why the final offer was accepted rather than risking losing the deal and considering alternative possible transactions in the following logical way:

> *"No, what we -- at that stage we looked at -- we assessed what alternatives there could be, other than accepting an offer, if that offer was deemed to be fair and we wanted to accept it. And the alternatives didn't look attractive, weren't really going to add anything and, in any event, BPH, Barings, whatever you want to call it, could block it, because they were a [majority] shareholder, if they didn't like them."[76]*

## Summary

134. Accordingly, the Transaction Price does provide some evidence of what price a willing sophisticated seller and a willing sophisticated buyer were willing to exchange for the Company's issued Shares in the real world, namely cash consideration in excess of US$2

---

[75] Transcript Day 5 page 29 lines 12-21
[76] Transcript Day 4 page 42 lines 1-8



billion[77]. Moreover, Houlihan Lokey advised that the price was fair. The fact that it was in the 'same ballpark' as the Market Price does suggest to some extent that the Market Price is not a wholly inappropriate indicator of the fair value of the Shares, either as a cross-check for the Market Price or in its own right. The Transaction Price is what the Company itself initially represented was the amount which reflected the fair value of the Shares (including a premium). At first blush, the Transaction Price appeared to me to have much more credibility than the Market Price as an indicator of fair value, most importantly because it was informed by MNPI which was not available to the market. But the entire concatenation of circumstances surrounding the Transaction process still leaves room for anxious doubts about whether it can be relied upon (in part or in whole) without considering the more elaborate DCF analysis in relation to which both Experts, for somewhat different reasons, undertook to assist the Court.

## FINDINGS: WHAT VALUE CAN BE DERIVED FROM AN APPROPRIATE DCF VALUATION OF THE SHARES?

### Overview

135.    The question of what weight should be given to a valuation based on a DCF analysis will be considered after first determining what value is indicated by an appropriately reliable DCF analysis. The main competing valuations were the following:

  (a)    Professor Fischel: a range of US$28.04-US$41.45;

  (b)    Professor Gompers: US$76.51; and

  (c)    Houlihan Lokey, independent advisers to the Special Committee: US$27.63 - $39.03 (relied upon by the Company as a fall-back position).

136.    In his closing oral arguments, Mr Boulton QC invited the Court to consider Houlihan Lokey's work when evaluating the competing DCF analyses:

> "*I do want to spend three or four minutes, my Lord, on Houlihan Lokey because, in my submission, they have not featured as heavily in this hearing as they should have done, given their role.  They were -- and this is not contradicted -- the independent financial adviser appointed by the special committee.  More than that, they used the April 2017 projections that had been*

---

[77] Proxy Statement, page 49.



*prepared by management and they, therefore, had
unfettered access to anything that Professor Gompers
identifies as MNPI. We will come on to the slight
expansion of that category in Professor Gompers' oral
testimony from his written. But your Lordship will
recall in his reports he only identifies the
projections. Well, Houlihan Lokey have those
projections, my Lord. Nobody has suggested they are not
independent....*

*And one sees that from their analysis at
{H/337.3/1}, which is the presentation to the special
committee, which has been referred to -- this is the
version referred to and relied on by Professor Gompers.
If we go to page 6, {H/337.3/6}, your Lordship will
recognise the football field. And this essentially is
the basis by which Houlihan Lokey satisfied themselves
that the consideration in this transaction was fair to
the holders of shares, and they did that by reference to
a DCF that covered a broad range from $27 to $39,
rounding down in each case, and also by reference to
three selected companies analysis comparables, two of
which produced ranges below the transaction
consideration and one produced a range that covered the
transaction consideration, although was, at its
midpoint, somewhat lower[78]..."*

137.   The Dissenters' Written Closing Submissions summarised their position as follows:

"*465. Finally on this part of the valuation case, there is striking support for the
conclusion as to value reached by PG, namely a value of $76.51 per share.*

*466. This is to be found in the Bach Model which passed back and forth between
the Company and its management and Baring during the summer of 2017 (see
the numerous iterations of the Bach Model, with email discussion about detailed
aspects of the inputs, set out in the Appendix of Bach and Bank models with this
Closing. Within the Bach Model not only were there very detailed spreadsheets
concerned with all aspects of the Company's business, including of course
borrowing and covenant compliance, but there was also a spreadsheet tab
containing a DCF valuation. This spreadsheet was designed to allow the user*

---

[78] Transcript Day 13 pages 87 lines 9- 24; page 89 line 19 –page 90 line 9.

*to choose between various scenarios. This DCF valuation is referred to by PG at PG1, [360] to [367]377. The valuation would imply a range of per share values at the $80 to $90 mark.*"

138.   The Experts were agreed in general terms on the appropriateness of using the August 2017 Projections as the foundation for the DCF analysis. Professor Fischel, of course, in principle believed that management estimates of what might happen were less reliable than other market data such as the Market Price and the Transaction Price. However, there was some controversy as to precisely how they should be interpreted. Should they be interpreted, as it were, as "best estimates" on their face? Or should account be taken of Mr Halder's evidence at trial that they were "*stretching*" estimates which were not risk-adjusted? Ancillary to this question was whether the Company should be able to rely on downwards adjustments to the China Bilingual projections based on work concluded by Ian Johnson in late July but not initially incorporated in the August 2017 Projection, supposedly due to an oversight. In my judgment it is obvious that those adjustments must be taken into account, even though the timing of the adjustments (shortly before presumably huge sums had been borrowed on the strength of more optimistic projections) was at first blush somewhat eyebrow-raising.

139.   As noted above, the following headline issues were controversial at trial:

   (a)   what adjustments should be made to the August 2017 Projections as regards the China Bilingual Project and as regards exchange rates in relation to foreign currency earnings;

   (b)   the appropriate terminal growth rate; and

   (c)   how the appropriate discount rate or "beta" should be determined and, having regard to materiality, the following sub-issues:

      (1) the use of weekly data,
      (2) the need for a 'Blume' adjustment, and
      (3) the cost of debt.

**The reliability of the August 2017 Projections**

140.   In the Dissenters' Written Closing Submissions, it was argued that Mr Halder "*parroted the party line on a number of issues, most notably, projections. For example, where he was questioned on the forecasts, he was at pains to repeat that the mantra that these*

*were "ambitious but achievable" though, tellingly, he said that he couldn't remember "the exact person who came up with the [phrase]" {Day2/190:9-14}*[79]. In the next paragraph, the following point was made:

> *"36. The Court is invited to have regard to the numerous contemporaneous documents which contradict Mr Halder in which it was suggested to third parties that the projections represented 'best estimates'. That is what he himself told the SC on 21 April 2017 – that the April projections were management's 'current best good faith estimates of the Company's future performance' {H/301/2}."*

141.   It matters not that the term *"ambitious but achievable"* may well have been suggested to Mr Halder by an attorney in the process of preparing his written evidence for trial. The question is whether that term accurately reflected the way in which the estimates had been prepared.  I accept Mr Halder's characterisation of the estimates as being *"ambitious but achievable"* as truthful, and that this was not only the way in which he prepared his own forecasts but also the way in which he believed management projections were typically prepared[80]. Clearly during the Transaction process Mr Halder did not seemingly mention the limitations of the estimates; that they were not risk-weighted and that he always prepared "stretching forecasts"[81]. Nor did he, perhaps, mention that short-term estimates were likely to be more accurate than long-term estimates. There is no suggestion that he was asked about any such limitations by the Special Committee and omitted to mention them. In supporting the loan-raising efforts of the Buy Side which the Sell Side (Premier) would benefit from, it seems obvious that his "brief" was to "talk up" up future prospects, not to talk them down. In preparing his evidence for the present trial, his "brief" was clearly to focus on the limitations inherent in the estimates rather than strengths.

142.   In my judgment there was no material inconsistency between Mr Halder's pre-Merger Agreement position and his evidence at trial. The April and August 2017 Projections were both *"current best good faith estimates of the Company's future performance"* (as he told the Special Committee) and *"ambitious but achievable"* as he told this Court. As I noted above, the Vice-Chancellor in *In re Petsmart, Inc* 2017 WL 2303599, upon which Mr Adkin QC relied in his opening oral submissions, adopted the following test for reliability in relation to management forecasts (at paragraph 32):

---

[79] Paragraph 35
[80] Transcript Day 2 page 226 line 10-page 228 line 6.
[81] Transcript Day 2 page 50 lines 19-21.



> "*The first key to a reliable DCF analysis is the availability of reliable projections of future expected cash flows, preferably derived from contemporaneous management projections prepared in the ordinary course of business. As this court has determined time and again, <u>if the 'data inputs used in the model are not reliable,' then the results of the analysis likewise will lack reliability. And, as the experts in this case both agree, to be reliable, management's projections should reflect the 'expected cash flows' of the company, not merely results that are 'hoped for'.</u>*" [Emphasis added]

143.    Professor Fischel cited an academic text in support of his opinion "*a DCF analysis requires the use of expected cash flows, which reflect the probability-weighted average of all possible outcomes*". On this basis, he contended that even with the adjustments proposed in Appendix D to his Report, the August 2017 Projections were "*not well-suited for use in a DCF analysis*"[82]. Such a strict reliability test was not supported by any judicial authority. Professor Gompers contended for a more flexible reliability test without seeing the need to cite any authority. As mentioned above, the Company argued in Lord Grabiner's opening oral submissions that *Dell, Inc.-v-Magnetar Global Event Driven Master Fund Limited* 177A.3d 1 (2017) (Supreme Court of Delaware) reflected a general move away from traditional reliance on DCF valuations in Delaware. *Dell* can be read as sounding a warning about relying wholly on a DCF analysis to produce an improbable appraisal result: the trial judge valued the company at $7 billion more than the transaction price and gave no weight at all to strong market price evidence (based on a large public float and a robust sales process). However, *Dell* does not support any new approach to determining when management forecasts are sufficiently reliable to be used to construct a credible DCF model. The management projections in *Dell* were held to be "*obviously unreliable*" in circumstances quite different to those in the present case:

> "*The record simply does not support the Court of Chancery's favoring of management's optimism over the public analysts' and investors' skepticism—especially in the face of management's track record of missing its own projections. (Even Mr. Dell doubted his management team's forecasting abilities and conceded at trial, "We're not very good at forecasting.")...*
>
> *Given that we have concluded that the trial court's key reasons for disregarding the market data were erroneous, and given the obvious lack of credibility of the petitioners' DCF model—as well as legitimate questions about the reliability of the projections upon which all of the various DCF analyses are based—these*

---

[82] Fischel Report, paragraph 68.



> *factors suggest strong reliance upon the deal price and far less weight, if any,*
> *on the DCF analyses."*[83]

144.   Mr Adkin QC in his closing oral arguments aptly relied upon the following passage in
       the Delaware case of *Open MRI Radiology v Kessler*, Court of Chancery for the State
       of Delaware, C.A. 275-N (Strine, Vice Chancellor):

> *"The most important input necessary for performing a proper DCF is a*
> *projection of the subject company's cash flows.   Without a reliable estimate of*
> *cash flows, a DCF analysis is simply a guess.   Fortunately, Delaware*
> *Radiology was not engaged in a complex business and the operations of*
> *Delaware I and II provided a foundation for making some reasonable estimates*
> *of future performance.   Of even greater utility, Carr of Tri-State made detailed*
> *projections of the performance of Delaware I, III, and IV for non-litigation*
> *use ...*[84]

> *The projections for Delaware I were used in contemplation of securing financing*
> *from the Wilmington Savings Fund Society when Delaware I was being expanded*
> *and adding a second MRI magnet.   The pro forma projections present the*
> *anticipated performance for Delaware I, including scan volume projections, for*
> *the two years from October 2003 through September 2005.   These were*
> *provided to the Kessler Group in October 2003 when the Broder Group was*
> *requesting personal guarantees for Delaware I's expansion.   The projections*
> *for Delaware III also were disclosed to the Kessler Group in October 2003, and*
> *these projections were used to secure financing for the equipment to be used at*
> *the Center. The projections for Delaware III, then, were prepared by October*
> *2003.   Similarly, Carr prepared two-year projections for Delaware IV to secure*
> *financing for that Center's equipment, which was provided by PNC Bank on*
> *March 9, 2004.   Traditionally, this court has given great weight to projections*
> *of this kind because they usually reflect the best judgment of management,*
> *unbiased by litigation incentives.   That is especially so when management*
> *provides estimates to a financing source and is expected by that source (and*
> *sometimes by positive law) to provide a reasonable best estimate of future*
> *results.   Therefore, we have regarded with rightful suspicion attempts by parties*
> *who produced such projections to later disclaim their reliability, when that*
> *denial serves their litigation objective."*

145.   In the present case, the Management's Projections were represented to the Special
       Committee as "*best estimates*" and provided to Baring for deployment in finance-

---

[83] At pages 44; 64.
[84] At pages 64-65.

raising efforts. They were used by Houlihan Lokey to prepare a DCF model which was relied upon together with other *indicia* as the basis of its fairness opinion. Any suggestion that the April and/or August 2017 Projections are <u>entirely</u> unsuitable for conducting a DCF analysis must be roundly rejected. Finding that forecasts are sufficiently reliable in general terms to be deployed in the context of producing a DCF model does not discharge the Court's duty to critically assess, with the help of expert and factual witnesses, how reliable particular elements of the estimates are in the circumstances of the particular case. It is inherent in the nature of all estimates, as the Proxy Statement cautioned, that they are subject to various contingencies and risks and that they do not purport to represent "actual" future performance. This conclusion finds support in the previous decisions of this Court.

146.    In *Re Integra* [2016 (1) CILR 192], Jones J was required to choose between a market-based valuation approach contended for by the company's expert or a (75%) DCF valuation which was contended for by the dissenters' expert. The company's management projections had been prepared against the background of the pending merger and were used as the basis for the fairness opinion. The company's expert contended that *"management and the analysts have been repeatedly over-optimistic about the company's anticipated performance"*. Jones J, after noting this criticism, proceeded to tacitly accept without elaboration that the projections met the minimum requirements for reliability, subject of course to further scrutiny:

> *"54…The fact that a high proportion of the value reflected in the experts' DCF calculations is derived from the terminal value calculation means that the resulting value is very sensitive to small assumption changes. For these reasons it is particularly important that the cash flow projections/models are subjected to an in-depth review and analysis."*

147.    In *Shanda Games,* for instance, both experts carried out a DCF valuation and Segal J resolved disputes about the extent to which the relevant management projections were entirely reliable in their original form or required adjustment in light of criticisms by the dissenters' expert. It was common ground that the projections could be used to some extent. The *"revenue intensity"* column was a particular aspect of the management projections the reliability of which was disputed. Segal J resolved the dispute in the following way:

> *"113. It seems to me that on balance the evidence suggests there was an error in the model which needed to be corrected. I also consider that in circumstances where Shanda had been given an opportunity to provide such an answer*

> *resolve the apparent errors and inconsistencies and demonstrate that their model and projections were reasonable) but failed to do so, I can and should infer and conclude against Shanda that there were errors and that the forecasts in this respect are unreliable. Furthermore, it seems to me to be right that, having concluded that there is an error which needs correcting, in the absence of any alternative corrections from Professor Jarrell (or evidence from Shanda), I should accept Mr Inglis' evidence and corrections. His methodology seems to be reasonable and realistic and, in so far as he has adopted a correction that treats revenue intensity as being in need of an upward adjustment (rather than royalties and fees as being in need of a downward adjustment) this seems to be fair …"*

148.    The approach Segal J adopted to resolving disputes between the experts as to how future cash flows should be estimated was only partially subject to appeal and was ultimately approved by the Court of Appeal. These judgments illustrate that a DCF valuation can be relied upon by this Court even if the reliability of management projections are disputed in significant respects. Martin JA in *In re Shanda Games* [2018(1) CILR 352] described the disputes in the following way (at page 395):

> *"64   In the present case, the judge had to resolve disputes between the experts relating to whether cash flows should be estimated in two stages or three; as to whether cash flows in the first period should be based on the company's own management projections or on figures derived from the performance of similar companies; as to how certain elements of the company's business, in particular the likely performance of one of its internet games, should be reflected in the cash flow estimates; and as to how the discount rate should be ascertained. Only three of his conclusions on valuation methodology are now disputed, all of them by the dissenting shareholders. The first two concern the judge's assessment of beta ("the beta point") and the small stock risk premium ("the SSRP point") in the ascertainment of the discount rate; the third of them arises out of his decision to adopt a three-stage approach to the assessment of cash flows ("the transitional period point")."*

149.    In *Re Qunar Cayman Islands Limited*, FSD No 76 of 2017, Judgment dated May 13, 2019, Parker J placed more reliance on the adjusted management projections in a section 238 appraisal case where both experts were seemingly agreed on the general reliability of the projections.  Parker J explained his approach as follows:

"**Management Projections**

177. As the basic premise underlying the DCF methodology is that the value of the company is equal to the value of the projected future cash flows (discounted to the present value at the opportunity cost of capital), the first part of the calculation involves estimating the values of future cash flows for a discrete period based on contemporaneous management projections. Both experts agree that the Management Projections are the most useful starting point when determining the value of the Company using the DCF method and so it is necessary to consider the important matters between them on this issue.

178. Since they were produced in August 2016 and the Valuation date is some six months later on 24 February 2017, the experts agree that the Management Projections should be updated to reflect the Company's actual performance. Actual results for 2016 and the 2017 budget had been produced by then and the results for Q1 2017 were beginning to be known. The experts worked from the updated projections.

*Approach*

179. I accept the Dissenters' argument that the court should not defer to projections of the future performance of the Company simply because they have been made by those within the business at the relevant time. Where there are legitimate concerns that projections are unreliable, the court with the assistance of expert evidence and all relevant information available to it, is able to determine whether those projections are reasonable.

180. However, an important part of the analysis is what view the senior management of the Company came to and on what basis. They will ordinarily be in the best position to make reliable projections because it is they who have experience of running the actual business. In addition, country, sector and competitor knowledge will also be critical to the assumptions made in the forecasts. Ordinarily, absent a good reason to do so, one would not second guess the Management Projections. They are, after all, subjected to external scrutiny by market analysts on an ongoing basis and one might reasonably expect some contemporaneous challenge or public comment if that had come to light.

181. If nevertheless it can be shown that they are obviously wrong, careless, or tainted by an improper purpose (biased), that is a different matter and the court would revise them.

> *182.It is important to bear in mind that they are being challenged in litigation, ex post facto, through expert evidence. Neither expert is experienced in the OTA market in China, nor the Company's specific business or strategy at the relevant time. An expert coming to a different view in this context is not a sufficient reason to make adjustments to the projections. The Company was making projections from real time information and knowledge. Here the analysis is to a large extent second hand, made some time later and involves second guessing judgments that were made at the time. It seems to me that I would need persuasive evidence to find that the projections made were flawed and to substitute my own opinion (or that of the expert's) for that of the management at the Company and therefore adjust them in the ways Mr Osborne and the Dissenters require."*

150.    This valuable judicial commentary does not suggest a fundamentally different approach to that adopted by Segal J in *Shanda Games*. But Parker J's observations do add an important gloss. If management projections are generally reliable, the Court should be cautious about allowing expert witnesses to effectively substitute their uninformed judgments about the company's future business prospects for the judgments of those with intimate inside business knowledge. The degree of caution, to my mind, will usually depend on whether the disputed adjustments are indeed primarily dependent on questions of insider business judgment, rather than matters which are really questions of common sense or expert valuation methodology.   However, *Re Qunar* also provides helpful guidance as to how to approach the issue of whether or not management projections are suitable in general terms as a basis for a DCF valuation analysis. Earlier in his judgment, Parker J made the following critical assessment of the way in which the management projections had been prepared:

> *"112. Mr Zhu, the Company's former CFO, was responsible for preparing the Management Projections. I found him to be an intelligent and straightforward witness. He had experience in accountancy and banking. I formed the view that he understood the Company's business in depth, from which he was able to prepare the projections and he defended them on a reasonable basis under cross examination.*

> *113. I have reviewed the transcript of the Management Meeting which took place on 7 November 2017 and I am satisfied that the evidence he gave in court is consistent with the answers he gave to questions put to him at that meeting, as well as the responses to the various information and data requests from the experts. At trial he strongly and credibly refuted any suggestion that the Management Projections were prepared from the point of view of financial self-interest or a desire to assist the majority shareholder to keep the share price low to effect the merger."*

151.   The approach Parker J effectively adopted to the threshold question of the general
       reliability test was to find that management projections can potentially be used as the
       basis for a DCF valuation where they have been prepared in good faith by a competent
       management team which understands the business and is capable of making informed
       judgments about future performance.  This appears to me to be consistent with the tacit
       approach in the earlier local cases and the Delaware appraisal cases to which I was
       referred. Mr Halder described the Company's April and August 2017 Projections as
       "*ambitious but achievable*" forecasts. The Company expressly advised Houlihan
       Lokey, for the purposes of their advice to the Special Committee dated April 25, 2017,
       that they could assume that the Projections had been "*reasonably prepared in good
       faith on bases reflecting the best currently available estimates and judgments of such
       management as to the future financial results and condition of the company*"[85].  In my
       judgment they meet the legally recognised minimum standards of reliability for use as
       a basis for a potentially credible DCF model in all the circumstances of the present case.
       They were not prepared with the starry-eyed frame of mind described by Jane Austen
       in '*Sense and Sensibility*': "*to wish was to hope, to hope was to expect*".  After all, Mr
       Halder was a Chartered Accountant.

152.   The April 2017 Projections were developed over time out of annual budgets and
       prepared under Mr Halder's oversight. Although it seems clear that both the November
       2016 Projections and the April 2017 Projections were prepared with the proposed sale
       of Premier's majority stake to some extent in view, there is no suggestion that Mr
       Halder was forced to prepare his projections in an overly optimistic way. Nor is there
       any suggestion that any significant market actors viewed the Projections as wholly
       unreliable. The August 2017 Projections which were substantially based on the earlier
       Projections were, I find, sufficiently reliable (subject perhaps to some adjustments) to
       form the basis of a credible DCF valuation.

153.   But, it bears repeating, this does not exclude the need in the context of a judicial
       appraisal proceeding to test the accuracy of the estimates and make appropriate
       adjustments with a view to determining the most realistic forecast of the Company's
       future performance. Accepting management forecasts as sufficiently reliable for use in
       a DCF valuation does not mean that the Court cannot limit the weight to be given to the
       resultant valuation depending on the degree of reliability the Court can properly place
       on the estimates in question.

---

[85] Proxy Statement Annex E, page E-3.

**The need to make downward adjustments to reflect adjustments made to the China Bilingual 5 Year Forecast**

**How the need to consider making adjustments to the August 2017 Projections arises**

154.    As already noted above, Ian Johnson testified that in May 2017 Mr Andrew Fitzmaurice and Mr Graeme Halder asked Ms Tang and Mr Johnson to prepare a 5 year forecast for the China Bilingual business. The forecast model was 'completed' on July 26, 2017. The result of this analysis was projections far lower than the previous China Bilingual projections which had been based solely on the performance of the NACIS school in Shanghai. Account had to be taken of the fact that fee increases required regulatory approval. The lower forecast projections were also because, *inter alia*, the proposed schools were to be set up in smaller, less wealthy and more remote cities, resulting in likely far lower full-time enrolment ("FTE") targets being achieved. Mr Halder received this update before the August 2017 Projections were completed, but was so busy at the time that he failed to consider it and incorporate it into those projections. However, he conceded that he was aware "*at a high level*" that the numbers had to come down and made some partial downward adjustments in the August 2017 Projections[86]. The way in which Mr Halder explained the failure to give full effect to the China Bilingual 5 Year Forecast was perhaps the least convincing aspect of his testimony, albeit on a very peripheral matter.

155.    It seemed more likely to me during his evidence that Mr Halder was somewhat uncomfortable with the notion of making significant downward adjustments to more optimistic projections he had recently been involved in 'hawking' in the lender presentations. On any view, if his professional approach was to prepare forecasts which had no risk weighting in them, it would be odd for one slice of the August 2017 Projections to have risk weighting while most of the forecasts did not. Another possible explanation for their omission is that the new model was incomplete and only preliminary in character. Whether or not the China Bilingual downward adjustments were omitted in full-blown form by accident or design is really by the way.

156.    Not only did Mr Johnson contend for modifying the China Bilingual element in the April 2017 Projections. He also supported the Company's case by testifying under cross-examination by Mr Adkin QC that the Parthenon Reports did not provide a solid basis for projecting future cash flows. This was because despite the general utility of those reports in terms of providing background research "*they failed to take into account any of the difficulties and the barriers to entry.*"[87] The Dissenters contended that the true value of this project was being understated. Although it is entirely understandable that the Dissenters should cry "foul", I can find no basis for doubting the straightforward, coherent and clear evidence of Mr Johnson on this issue. Before a

---

[86] Transcript Day 2 page 204 line 24-page 205 line 21.
[87] Transcript Day 3 page 20 lines 2-14.

detailed analysis of the China Bilingual project was carried out, reliance was placed on the past performance of one successful school. This aspect of the April Projections gave a rose-tinted view of the prospects; so did the Parthenon Reports which were deployed by Baring when making pitches for lending. But there was no deception, because it was clear on the face of the relevant document that no specific projections had been made in relation to projected future schools.

157.    Would it be naïve to believe that the timing of Mr Johnson's work, after the Merger Agreement and before the EGM which would likely trigger dissenter litigation, was entirely neutral in its effect on the contents and of the China Bilingual 5 Year Projections? While I accept the core integrity of the analysis that was carried out, I do not ignore the fact that the work carried out by Mr Johnson and his colleague Ms Tang (who was said to possess valuable local knowledge) appeared designed to identify downside risks rather than to carefully evaluate the appropriate weight to be given to both upside and downside risks. Professor Gompers objected to these new Projections on the grounds that they appeared to be "*too conservative*"[88].  To the extent that Mr Johnson conceded that the China Bilingual Model he emailed to Mr Halder on July 2, 2017 contained numbers which were "*a work in progress*", and the document was acknowledged by Mr Fitzmaurice as a "*a useful start*", caution is required in evaluating what adjustments should indeed be made[89].  Further work was done on this draft after Mr Halder commented in an email dated July 21, 2017 on what he described as "*a good start*". The model ("*Bilingual Schools-Rolling Forecast Model-26 July 2017*") incorporating these comments was sent back to Mr Halder (copied to Mr Fitzmaurice) by Mr Johnson by email dated August 1, 2017.

158.    Mr Halder's Second Affidavit gives a fulsome explanation as to how it is (in a busy time leading up to the EGM) that he failed to appreciate that the new model justified a materially lower forecast for that business segment than was suggested by the August 2017 Projections. He fairly points out the latter document was only intended to be for internal management use. Mr Halder avers that "*these projections could and should have been subject to adjustment for Mr Johnson's China Bilingual projections and risk-weighting (please see paragraph 24 below)*" (paragraph 23). He then explains (in paragraph 24) that his projections are not usually risk-weighted:

        "*…This arises in part from my desire to stretch the business, in part from the difficulty in modelling the risks and in part from the fact that modelling risk weighting would not have materially improved our day-to-day decision making because the business was sufficiently strong to withstand individual schools materially underperforming…and as a business we had already*

---

[88] Supplemental Report, paragraph 294-300.
[89] Transcript Day 3 page 6 line 12-page 8 line 4; page 10 line 16-page 11 line 1.



> *decided to accept the large risks associated with doing business in many of the*
> *markets we were in, particularly China.*"

159.  The assertion in a single sentence that "*these projections could and should have been*
      *subject to adjustment for Mr Johnson's China Bilingual projections and risk-*
      *weighting*" is somewhat lukewarm support for the Company's position on this issue.
      No explanation is offered as to why risk-weighting should, contrary to his historic
      approach, have been applied exclusively to this aspect of the Company's Projections.
      And Mr Halder in explaining his own contrary approach to projections casts doubts on
      both (a) the viability of undertaking a risk-weighting exercise at all, and (b) the utility
      of such an exercise as a practical management tool. It is also unsatisfactory that as the
      Company's Chief Financial Officer at material times who was ordinarily in charge of
      preparing Projections, it was unclear to me when, if at all (prior to his Second Affidavit
      sworn on April 10, 2019 after the termination of his employment), Mr Halder himself
      actually blessed the China Bilingual Model as an update to the August 2017 Projections.

160.  Professor Fischel appeared to regard it as obvious that the August 2017 Projections
      should be adjusted "*to reflect management's latest views on the prospects for its China*
      *Bilingual initiative*"[90]. Professor Gompers countered that July 2017 China Bilingual
      modifications "*are incomplete and do not appear to be a measure of expected cash flows,*
      *which makes them unreliable to be used in a DCF valuation*"[91]. The Company succeeded
      in demonstrating (principally through Mr Johnson's evidence at trial) that the July 2017
      China Bilingual analysis was obviously more sophisticated (or detailed) than the
      previous analysis, so I am unable to accept Professor Gompers' broad-brush dismissal
      of the work described by Mr Johnson. On the other hand the Dissenters succeeded in
      raising doubts about what to make of the somewhat curious circumstances in which it is
      contended that the August 2017 Projections should be adjusted on the basis of the first
      set of risk-weighted projections conveniently prepared on the eve of the EGM with a
      whiff of dissenter litigation in the air. Accordingly, in light of the importance of this
      question to his valuation, Professor Gompers' more detailed critique of the extent to
      which this new material should be used to make the adjustments to the August 2017
      Projections which were applied by Professor Fischel requires more careful assessment.

---

[90] Expert Report, paragraph 67.
[91] Supplemental Expert Report, paragraph 289.



**China Bilingual 5 Year Forecast: was it incomplete?**

161.    Professor Gompers in his Supplemental Report[92] opined that the Model finalised on
July 26, 2017 was incomplete because a Summary page which had projections for a
total of 8 schools leaving blank placeholder rows for another 9 schools. The April 2017
Projections contemplated 20 school openings through FY2023 while the August 2017
Projections contemplated 22 openings during the same period. Responses to
information requests during the trial preparation period indicated that the Company
contemplated 3-5 new schools each year from FY2020 through FY2024. Professor
Fischel countered in his Supplemental Report the responses to management questions
were in fact framed to reflect current views of openings, qualified by statements about
the uncertainties and that accordingly the July Model's forecasts could not be said to
be incomplete.   Professor Gompers accepted under cross-examination that the post-
Valuation Date views of Management could not be used in a DCF calculation, but
explained that he was simply relying on the responses to requests for information to
explain why it seemed more reasonable to rely on the similar school openings numbers
in the August 2017 Projections, which were far higher than the numbers in the July 26
2017 Model[93].

162.    Despite the somewhat equivocal way in which Mr Halder asserted in evidence that the
August 2017 Projections should be adjusted to include the China Bilingual 5 Year
Forecast prepared by Mr Johnson and finalised on or about July 26, 2017, I find on
balance that the latter document does reflect Management's revised and risk-weighted
views as to expected future performance. Those views cannot be dismissed altogether
on the grounds that it was incomplete. Moreover, as Professor Fischel rightly pointed
out[94], although the July 26, 2017 Model's 'China Bilingual Schools Forecast 5 Year
Summary' page reduced the projected number of schools, it still projected a substantial
increase in capacity. That suggests a more balanced and considered assessment of future
performance than is implied by looking solely at the number of schools. Moreover, it
was clear from the terms of the response to the information request put to Professor
Fischel by Mr Adkin QC in cross-examination, that the interviewed Company
representative was only expressing hopes as opposed to expectations[95]. This prompted
Professor Fischel to observe: "*there is a difference between hopes and expects*".

163.    In the end, the reliability of the competing valuation approaches to the China Bilingual
project is best confirmed by cross-checking them through a broad-brush commercial
judgment of the relative plausibility of the projected outcomes.

---

[92] Paragraph 291.
[93] Transcript Day 10 page 5 line 15-page 6 line 14.
[94] Supplemental Report, paragraph 78.
[95] Transcript Day 8 page 3 line 4-page 5 line 11.



**China Bilingual 5 Year Forecast: how much value?**

164.   The July 26, 2017 Model contemplates 6 new schools over the relevant period. Professor Gompers projects 22 based on the August 2017 Projections, and Professor Fischel projects 9 new schools (adding an additional 3 to the Company's adjusted Projections). Accepting that this approach is perhaps an overly conservative one, relative to the approach the Company generally adopted to preparing its forecasts, I prefer Professor Fischel's general approach on the grounds that there is no credible basis for continuing to rely on the August 2017 Projections as regards the expected number of schools. On balance I found Professor Fischel's approach to this issue, while conservative, to be more objective and commercially realistic than Professor Gompers' comparatively inflexible analysis.

165.   The commercial result of Professor Gompers' approach to valuing the China Bilingual business, assigning US$3 billion in value, was simply incredible. I accept the following assessment of the evidence on this point in the Company's Written Closing Submissions:

> "*141. The fact that the August 2017 Projections used by Professor Gompers in his DCF valuation were far too optimistic as regards China Bilingual was starkly revealed on Day 9. Professor Gompers was seemingly unaware {Day10/20:1} - {Day10/21:2} that the value attributed to China Bilingual in his valuation was approximately $3 billion ($29 per share); although he did not express any surprise at that figure {Day10/29:1-6}, he was wholly unable to explain how a business with a single operating school could be worth anything like that amount or to reconcile that figure to the $1 billion market value of China Maple Leaf [Exhibit XIII-2 at {E/21}], one of Nord's closest competitors (per Professor Gompers Exhibit XIII-2 at {E/21/1} (he agreed that was his description on Exhibit {Day10/34:9-17} although he backtracked on Day 12) and the owner and operator of 71 bilingual schools in China {HSD/1/147}. Subsequent attempts to compare an operator of schools, many of them not-for-profit schools, to Apple and the launch of a new iPhone did not enhance his credibility {Day10/88:1-18}. See also Qunar where the Dissenters' expert had valued the company at more than Expedia [{AB/8/33} paragraph 175].*"

166.   The attribution of US$3 billion to China Bilingual by Professor Gompers was asserted by the Company's counsel in opening and not contradicted by Professor Gompers under

cross-examination. It does not appear on the face of his Reports. It may well be that the $3 billion figure is an extrapolation from Professor Gompers' $1.454 billion "*Present Value of Incremental China Bilingual*". The latter figure formed part of a global total equity value of US$8.1 billion (also presumably discounted to present value) which Professor Gompers used in his Expert Report to support a diluted share price of $76.12[96]. In any event I regard that global valuation, more than twice the Market Price and the Transaction Price, as inherently improbable, for reasons set out near the end of this Judgment.

167.  That said, the unusual circumstances under which the China Bilingual 5 Year Forecast was prepared with the introduction for the first time of risk-weighting after the Merger Agreement had been consummated cannot be considered as having no impact on the reliability of the adjustments which Professor Fischel himself adopted. It is not necessary for me to decide whether the Company was engaging in sharp practice by trying to massage the estimation evidence in anticipation of the present litigation. It suffices to conclude that because the China Bilingual 5 Year Forecast was prepared on a more conservative basis than the August 2017 Projections, there is a risk that the former estimates are somewhat understated and a risk that the latter estimates are somewhat overstated.

### China Bilingual: summary

168.  In summary, I approve Professor Fischel's adjustments to the August 2017 Projections to take into account the China Bilingual 5 Year Projections. While it was unattractive for the Company to prepare for the first time risk-adjusted estimates for an important part of its business at the time when it did, I accept that overall the adjustments increased rather than decreased the reliability of the estimates. This is essentially because the revised estimates were based on far more relevant data.

### DCF Methodology: overview

169.  In his Expert Report, Professor Fischel opined as follows:

> "*62. A DCF analysis also requires an estimate of the 'terminal value'…The terminal value in a DCF is typically calculated using the "Gordon Growth Formula", under which the value of the company at the end of the explicit forecast period is equal to $FCF_{t+1/r-g}/(r-g)$, where '$FCF_{t+1/r-g}$' is the expected free cash flow in the first year after the end of the explicit forecast period, 'r' is the discount rate, and 'g' is the assumed annual growth rate of free-cash flows*

---

[96] Expert Report, Exhibit XI-3A.

> *into perpetuity (which is commonly referred to as the 'perpetuity growth rate' or 'PGR').*

> *63. Once the terminal value is estimated, it is discounted to present value and added to the estimated present value of the free cash flows in the explicit forecast period to estimate the value of the company's operating business. Then, the company's total enterprise value is estimated by adding the estimated value of cash and cash equivalents and non-operating assets (such as unconsolidated subsidiaries, and other equity investments) to the estimated value of the company's operations. The aggregate equity value of the company is estimated by subtracting the estimated value of debt and other non-equity claims from the estimated total enterprise value of the company. The value per share is estimated by dividing the aggregate equity value by the number of fully diluted shares outstanding.* "

170.    Essentially the same methodology is described by Professor Gompers in paragraph 219 of his Expert Report. As indicated above, the Experts were agreed on the key elements of a DCF model.

**The Bach Bank Model and other contemporaneous views on value**

171.    Professor Gompers carried out two DCF analyses, one based on the August 31, 2017 Projections and the other based on the Bach Bank Model prepared by Baring, not the Company's Management. In my judgment the Bank Model clearly cannot be used as the basis for a DCF valuation because, I find as a fact, despite the fact that it was prepared with input from the Company's Management, that it was <u>not</u> prepared in the ordinary course of the Company's business as a tool for predicting its future performance. I accept the evidence of Mr Halder in this regard. It seems obvious from all the relevant evidence that the Bank Model was used by Baring to raise financing in connection with the Merger Transaction and/or for monitoring the investment in the post-Merger period.

172.    In section B of his Supplemental Report, Professor Fischel opines that the Bank Model projected how the Company would perform post-Merger. In addition, it was not a model prepared by Management even though it drew on information provided by Management. Professor Gompers in his Reports advances no convincing rationale for using the Bank Model as a basis for a DCF analysis.

173.    Professor Gompers, and the Dissenters, placed considerable reliance on the views of Baring and various individuals connected with the Company to the general effect that the Shares were undervalued by the market and/or had an intrinsic value far higher than the Transaction Price. This evidence was used to support the credibility of the far higher DCF valuation contended for by Professor Gompers rather than the more modest range proposed by Professor Fischel. I do not find any credible support from such sources for a valuation at the remarkable level contended for by Professor Gompers. However I am bound to accept the following far more modest and factually supported argument advanced in the Dissenters' Written Closing Submissions, which does no more than to support in general terms the need to have regard to an appropriate DCF analysis:

> "288. A telling way of testing whether DF's refusal to give any weight to a DCF analysis in this case is a reasonable and realistic one is to look at what the economic actors and other market participants did. When this is done, the picture is stark. All of the economic actors operating in the real world used a DCF analysis in seeking to establish the value of the Company and its shares, and every one of those DCF analyses showed the stock to be undervalued by the market. Conversely, not a single one of them adopted the approach used by DF and tested the efficiency of the market to arrive at the conclusion that the market price should be relied on."

174.    I accept that the credibility of the Market Price, which was primarily relied upon by Professor Fischel as the best evidence of the fair value of the Shares, is materially undermined by the extent to which various players had recourse to DCF models. However I do not find that any of these comparatively informal analyses provides any meaningful support for Professor Gompers' ultimate US$76.51 DCF valuation outcome.

**Terminal Growth Rate "TGR"/Perpetuity Growth Rate ("PGR")**

175.    Professor Fischel explained his approach to terminal value in his Expert Report as follows:

> "78. If the Company were to make replacement capital expenditures that sufficed to maintain the productive capacity of its assets but made no new capital investment, then the company's PGR would be equal to the long-run expected inflation rate, which was 1.81% as of August 1, 2017. In order to obtain a larger PGR, the Company would have to reinvest a portion of the after-tax operating profits it earns back into the Company

*and earn a positive return on that reinvestment. Therefore, the assumed PGR must be consistent with assumptions made about the amount of, and return on, new investments made in the terminal period.*

*79. I understand that Nord Anglia education's existing schools operate in competitive markets…Moreover, economic theory indicates that returns that exceed a company's costs of capital will be competed away over time. Accordingly, our DCF analysis assumes that Nord Anglia Education's rate of return on new investment capital ('RONIC') will be equal to its WACC during the terminal period. This assumption is consistent with the concept of a steady state. Under those circumstances, the amount of new capital investments would affect the expected PGR but would not affect the terminal value. Therefore, the results of our DCF analysis do not depend on the assumed amount of new capital investment in the terminal period.*"  [Emphasis added]

176.    In Appendix D, Professor Fischel explains in further detail how the projections are extended to reach steady-state. He adopts a 1.81% long-term growth rate (TGR or perpetuity growth rate) based on the rate projected in the Company's Adjusted August 2017 Projections for 2027, the last year of the main forecast period.

177.    Professor Gompers in his Expert Report opined as follows:

"*313. Steady state cash flows are cash flows generated after the explicit forecast period, once a company is in a steady-state growth period. It is generally assumed that, at some point, the company's cash flows follow a predictable, steady state pattern. This steady-state cash flow is used to calculate the value of the company, which is assumed to exist in perpetuity. Nevertheless, even though infinite life is assumed for the company, cash flows that occur far out in the future receive progressively less and less weight (the weights become closer and closer to zero as the horizon increases) due to the nature of discounting for time value of money and risk using the discount rate (WACC).*

*314. Overall, I take a conservative approach (resulting in a lower valuation) to the calculation of the steady-state cash flow. My approach is conservative because I assume that Nord Anglia will stop growing its footprint in the terminal period…This means that any growth in cash flow during the terminal period comes only from increases in tuition. This is conservative because, as discussed previously, Nord Anglia had a proven track record of identifying and completing value-enhancing acquisitions, and the Company expected to continue those acquisitions going forward…*

*343. It is a common assumption in DCF valuation that the long-term growth rate for a company is expected to fall between the expected rate of inflation and the expected nominal GDP growth rate. Weighting the expected nominal GDP growth rates for 2022 in the countries in which Nord Anglia operated by the Company's last year of projected revenue in the August 2017 Projections and Bank Model in those countries yielded a weighted average expected nominal growth rate of 6.68% and 6.21% using the August 2017 Projections and Bank Model respectively. The growth rates I use are significantly below the GDP growth rates."* [Emphasis added]

178.  In his Supplemental Report, Professor Gompers further explained his approach as follows:

*"247...the growth rate I use is equal to 1.5x the weighted average (by revenue) inflation rate for Nord Anglia, based on the Company's historical and targeted tuition fee increases at 1.5x to 2.x inflation. The August 2017 Projections and the Bank Model make different assumptions about the exact geographical mix of revenue for Nord Anglia in the future. Therefore, the weights associated with inflation in each country differ to the extent the geographical mix of revenue is different across these projections. As a result, a growth rate equal to 1.5x weighted average inflation rate will be different as well. This implies a long-term growth rate of 4.23% for the valuation using the August 2017 Projections and 3.99% for the valuation based on the Bank Model."*

179.  With the Dissenters' Expert propounding a long-term growth rate of 4.23%, more than twice the Company's Expert's 1.81%, Professor Fischel understandably strongly criticised the Gompers approach, invoking Professor Gompers' own writings in support of his analytical cause. In his Supplemental Report, Professor Fischel opined as follows:

*"86...if the Company's tuition revenues were expected to grow at 1.5 times the local currency inflation rates of the countries in which the Company operates in, as Professor Gompers assumes, then the U.S. dollar value of the Company's tuition revenue would be expected to grow at 1.5 times the U.S. dollar inflation rate. As of August 1, 2017, the long-run expected U.S. dollar inflation rate was 1.81% 1.5 times that amount is 2.715%, not the 4.23% or 3.99% U.S. dollar growth rates that Professor Gompers assumes.*

*87. Professor Gompers' assumption that the Company's long-term tuition growth rate would substantially exceed the expected inflation rate is also implausible...Moreover, in his recently published casebook, Professor Gompers states that '[w]e often assume...zero real growth in the future'. A zero real growth rate would imply a long-term nominal growth rate equal to the expected long-run inflation rate, or 1.81% in U.S. dollars, not the 4.23% or 3.99% growth rates that Professor Gompers assumes.*

*88. As Professor Gompers states in his recently published casebook, '[v]aluation[s] in which the terminal value represents a substantial majority of the value are likely to be very sensitive to small changes in growth rate assumptions'. That is precisely the case here, as terminal value represents approximately 94.1% of the Company's enterprise value in Professor Gompers' DCF analysis based on the August 2017 Projections and approximately 87.2% of the Company's enterprise value based on the Bank Model...."*

180.    The differences between the Experts were summarised in the Dissenters' Written Closing Submissions as follows:

    (a)    whether the growth rate should be at or above inflation;

    (b)    what inflation rate should be used; and

    (c)    whether return on capital will equal the cost of capital in the terminal period.

181.    Professor Gompers persuasively argued (based on facts that I considered to be uncontroversial) that it was reasonable to assume that the Company's tuition fees would increase at 1.5 times the rate of inflation in the countries the Company did business in having regard to the profile of those countries, historic returns, the particular prospects of education as a vibrant (as opposed to dying industry) and taking into account that in reality the perpetuity period was only really taking into account 30-40 years. Under cross-examination by Mr Boulton QC, he admitted that the question of whether or not an assumption should be made that growth would be higher than inflation had significant financial consequences for the valuation question:

    *"Q. So if we remove the 1.5 times multiplier and simply use*
    *the weighted average inflation rate, your 4.23 per cent*



Case 1:22-mc-00018-TNM    Document 5    Filed 02/03/22    Page 361 of 392

> *would go down to 2.82 per cent. Is that right?*
> A. *Correct.*
> Q. *Let's insert that at B45, simply to see the sensitivity*
> *that arises from that assumption. 2.82 per cent,*
> *please, operator. $54.10. So something like $21 of*
> *value arises simply from an assumption that the company*
> *for ever more will be able to increase its tuition fees*
> *at 1.5 times the rate. I think that may be an*
> *underestimate."*[97]

182. In my judgment Professor Fischel's assumptions, which align with the economic theory which predicts a loss of competitive advantage over time, and take into account the sensitivity of the valuation to minor changes in growth rates in cases such as the present, are more reasonable overall. I reject Professor Gompers' approach of applying a 1.5 multiplier to the inflation rate on the basis that I find that it is based on an optimistic view of the Company's long-term fee-generating capacity with insufficient consideration being given to downside risks.

183. What should the terminal growth rate be? Professor Fischel in his Supplemental Report did not appear to me to challenge Professor Gompers' view that the terminal growth rate should ordinarily be somewhere between the inflation rate and GDP. Mr Boulton QC also appeared to accept Professor Gompers' position on the latter issue in cross-examination[98]. The main justification Professor Gompers advanced for going above the inflation rate was applying the 1.5 multiplier based on an assumed 1.5% fee increase through the terminal period. The main challenge put to the Dissenters' Expert on this point, as already noted, was that his general approach was simply inherently unrealistic:

> *"Q. Do you not find it worrying that half of your value turns on a debate about*
> *whether one should be using a US inflation rate or 1.5 times local inflation rates*
> *in      a      period      that      starts      ten      years      from      now?*
> *A. So does it concern me? It certainly -- I certainly think about it. It doesn't*
> *change my opinion. I think -- as I mentioned earlier, the cash flows that*
> *Professor Fischel and I get are sort of reasonably close. I think the important*
> *issues for this court to think about is what is that long run terminal growth rate,*
> *as well as the discount rate, which I'm sure we will have a discussion, but I*
> *agree with you that if you change the long run terminal growth rate to 1.81 per*
> *cent, which I think is absolutely wrong, it causes the value to fall by nearly half."*

---

[97] Transcript Day 10 page 123 line 25-page 124 line 3.
[98] Transcript Day 9 page 105 lines 9-15.



184.   The Dissenters in their Written Closing Submissions also relied on representations made by the Company to Houlihan Lokey about the terminal growth rate which were seemingly accepted by the advisers to the Special Committee:

> "*432. Importantly, in the context of the take-private, the Company told Houlihan Lokey, as advisors to the Special Committee, that tuition in the steady state would grow at 1-2% above inflation. This representation was not simply directed at the immediate future, but at the terminal period…*
>
> *433. Houlihan Lokey relied on that message in the presentation they gave to the meeting of the Special Committee on 24 April 2017 and then to the Company's Board at their meeting on 25 April 2017, a presentation which came to be filed with the Proxy. Houlihan Lokey included a sensitivity table showing equity values at different discount rates and TGRs. The alternative TGRs in the steady state were 3.50%, 3.75% and 4.00%. Footnote 4 on that page makes clear that 'revenue growth [was] based on information provided by Company management'.*"

185.   This submission does not support Professor Gompers' use of a growth rate above the rate of inflation because, whatever growth rate Houlihan Lokey used for their DCF analysis, it produced a range of values far closer to Professor Fischel's valuation results than to Professor Gompers'. I accordingly approve the use of the [US$] long-term inflation rate of 1.81% as the terminal growth rate because on a balance of probabilities it appears to me to be based on the most reasonable assumptions it is possible in all the circumstances to fairly make.

186.   The Dissenters finally complain that Professor Fischel's assumption that the Company will make new investment in the terminal period but that any return on investment will not exceed the cost of capital to be "*extraordinary*". As Professor Gompers assumes no growth in the terminal period at all, the practical valuation result appears to be the same, albeit via different analytical routes. In these circumstances I see no need to decide to prefer either approach, being firmly of the view that no justification exists for a terminal growth rate above the long-term inflation rate.

187.   In summary, I approve the terminal growth rate of 1.81% as proposed by Professor Fischel in his Supplemental Report].



**Cost of equity: Capital Asset Pricing Model ("CAPM")**

188.    Both Experts used the Capital Asset Pricing Model ("CAPM") to calculate the Company's cost of equity. The formula used is the risk-free rate of interest + the *beta* x the equity risk premium. The formula is mathematically expressed as *cost of equity = Rf+ β x ERP*. The main dispute at trial was the appropriate *beta*, the appropriate risk-free rate of interest and the equity risk premium being agreed.

**Cost of equity: the appropriate discount rate and "beta"**

<u>Overview</u>

189.    The Company submitted that using Professor Fischel's *beta* number "*in Professor Gompers's August 2017 DCF calculation would reduce his share price from $75.21 to $51.69*"[99]. So I cannot ignore the fact that what appears to be a narrow technical dispute is nonetheless in commercial terms a "big ticket item". Identifying an appropriate beta is the first step in calculating the actual discount rate which is designed to determine the present value of the Shares based on an assessment of the likely future cash flows.

190.    Professor Fischel in his Expert Report described the function of the discount rate in a DCF analysis as follows:

> "*61. A DCF analysis is a method of estimating the value of an asset (i.e., what a willing buyer would pay a willing seller for that asset). In a typical DCF analysis, the expected stream of free cash flow available to investors in the company (i.e., equity holders, debt holders and any other nonequity investors) for an explicit forecast period (e.g., five years) is discounted to present value using an appropriate discount rate in the first stage. The discount rate in a DCF analysis is calculated using a company's weighted average costs of capital ('WACC'), which represents the opportunity costs of capital of investors in the company. As suggested by its name, the WACC is a weighted average of the company's cost of equity and its cost of debt, where the weights are based on the share of each type of capital in the company's capital structure.*"

191.    Professor Gompers in his Expert Report opined as follows:

> "*215. One of the central tenets of modern finance is that the value of an asset, such as a share in a company, is equal to the discounted value of an asset's expected after-tax cash flows. A valuation textbook notes that DCF valuation is 'the foundation on which all other valuation approaches are built.' In the*

---

[99] Company's Written Closing Submissions, paragraph 131.4.

*present circumstances, the objective is the calculation of the fair value of the Dissenters' shares in Nord Anglia. Because shares are claims on the value of an underlying company (equity being a residual claim after debt holders have been paid), the starting point in valuing shares is the overall value of the company as a standalone entity, which is then adjusted to account for outstanding debt. The residual value is then divided by the number of shares outstanding to arrive at the per share valuation."*

192.   It is helpful to bear these uncontroversial statements of basic principles in mind when considering the controversial elements of their application to the facts of the present case. The dispute on the calculation of the discount rate ultimately involves a choice between Professor Gompers' lower 1.1% figure which resulted in a WACC of 8.23% (without a size premium) and Professor Fischel's 1.3% rate, which produced a WACC ranging from 8.98% (without a country risk premium or a size premium) to 10.90% (with both such premiums taken into account).   Accordingly, the most significant threshold dispute in relation to the DCF analysis is how *beta* should be calculated. The two main disputes were:

   (a)   what weekly data should be used for computing the beta; and

   (b)   whether the resultant beta figure should be adjusted downwards using what is known as a 'Blume adjustment'.

**The correct approach to weekly data**

193.   In the Company's Written Closing Submissions, its position on the weekly data issue was summarised as follows:

   "*146 The textbooks show that beta is commonly estimated using either two years of weekly returns or five years of monthly returns (Damodaran on Investment Valuation at {G/85/84}). There is a trade-off between obtaining more data points and going further back before the Valuation Date, in which case there it is more likely that the risk profile of the company will have changed.*

   *147 In this case, Professor Fischel has estimated Nord's beta using weekly returns (Friday to Friday) for the two year period before the Announcement Date, regressed against the S&P 500:*

      *147.1 Nord had only been public for three years and therefore it would not have been possible to use five years of monthly data;*

      *147.2 Professor Fischel's approach is wholly consistent with the default approach taken by Bloomberg and many other data providers (whose business is to provide this sort of data to their clients);*

*147.3 Professor Fischel's approach is therefore entirely normal and it cannot be suggested (and was not suggested) that he was in any way influenced by what the raw data shows.*

*148 Professor Gompers, in contrast, has adopted an approach of his own devising which he has not previously used and which is not the subject of any academic literature {Day 10/164} and {Day 10/166}. (The Dissenters sought for the first time in re-examination to suggest that Mr Osborne had applied the same method in Qunar, but a "five day trailing average" is not the same approach as adopted by Professor Gompers. Further it is a remarkable coincidence that these two "innovative" approaches were used by independent experts on behalf of the same clients in s.238 proceedings, and the court is respectfully asked to be sceptical about their provenance)."*

194.    In the Dissenters' Written Closing Submissions, the following contrary case was advanced:

*"339. It follows that the principal differences between the Experts relate to (i) the length of the estimation period and (ii) how to use the weekly data. PG uses as much of the available data as possible in order to reduce estimation error in his regression analysis. He then cross-checked his result against other methods of arriving at beta. By contrast, DF appears to have selected a series of simplified parameters, each of which serve to increase the beta; he did not cross-check his beta against any other results.*

*340. PG's approach should be adopted as the empirically rigorous approach, which has support in the academic literature. Despite DF's suggestions to the contrary, DF's approach is not recommended in any of the material before the Court.*

**The Experts' approaches to beta**

*341. PG arrived at his beta of 1.04 in a scientific way, as follows:*

*341.1. He chose the longest possible period for the comparison between the volatility of returns of the Company's stock, as compared to a stock index, from 22 September 2014 to 24 April 2017 (a period of 2.6 years). This is the longest period of time because it includes all available weekly return data for the Company up until the last day prior to the Merger Announcement, with the exception of the first 180 days after the Company's IPO which were excluded due to potential anomalous trading behaviour during this period which has been documented in finance academic literature.*

*341.2. As an index, he chose his return data from the broad CRSP value-weighted NYSE/AMEX/Nasdaq/ARCA return index. However, he also cross-checked this against the S&P 500 returns, which was the index used*

*by DF. In any event, the Experts agree that in this case their different choice of index makes no material difference.*

*341.3. PG observed the weekly returns for each day of the week (Monday-to-Monday, Tuesday-to-Tuesday, Wednesday-to-Wednesday, Thursday-to-Thursday, and Friday-to-Friday) against the index returns, and carried out five separate regression studies resulting in 5 separate results: for these the lowest was 0.97 (with two others at 0.98 and 0.99), and the highest was 1.24. He averaged the 5 (see rows 41 to 45 in column c of the summary sheet tab/spreadsheet in exhibit A-1 {E/23}) to reduce estimation error. This is a case of using more data when available, but without the risk attendant on taking data from periods in the more remote past.*

*341.4. He applied a Blume adjustment because computing the cost of equity is forward-looking, and the derivation from past returns is backwards looking. The Blume adjustment (which can be compared with the smoothing adjustment made by Bloomberg) produced an adjusted beta of 1.04 (equivalent to the relevered beta of 1.01).*

*341.5. PG compared his beta of 1.01 against the results that are produced by other recognized methodologies used to arrive at beta198. In particular, he crosschecked and found his beta consistent with (1) the beta produced by Barra Inc (0.88), (2) betas applied by analysts covering Nord in 2017 (typically around 1.00), and (3) three US-traded (that is NYSE-listed) companies in the same education sector as the Company, viz. Bright Horizons, New Oriental, and TAL Education. He also used as a comparator the Fama-French Three Factor Model using two different ways of using that model to calculate the cost of equity –both of which produced a lower cost of equity (9.35% and 8.67% respectively) than his use of the CAPM with a historical adjusted beta201.*

342. DF estimated the Company's beta to be 1.30. He did so simply by taking returns from Friday-to-Friday, with weekly intervals, and using an estimation period of 2 years. He did not take into account the 2-year weekly results of any other day of the week. He did not take into account the data available over the longer period used by PG, viz. 2.6 years. He performed no cross-check, whether against other methodologies or contemporaneous estimates of beta, when arriving at his beta. He rejected his own 3 year study, used when estimating volatility in the context of his event study, to come up with the highest beta possible. DF's beta should be rejected

343. DF's beta should be rejected for the following reasons. First, he has selected Friday-to- Friday, which yields the highest beta, for no principled reason and without advancing any academic text that recommends such an approach. Second, he has chosen to limit the estimation period to 2 years, when 2.6 years of data is available and can and should be used because it reduces estimation error. Third, he has not cross-checked his beta against betas derived from any other methodologies, and a cross-check reveals that DF's beta is an outlier.

...

*345. By choosing only to use Friday-to-Friday data, DF has arbitrarily excluded data which could be taken into account in arriving at beta, and which should be taken into account in order to reduce estimation error. As PG says, "There is no basis in economic theory to prefer any one seven-day period vs. another, because all the estimates are estimates of the same quantity – beta. Therefore, the appropriate approach would be to minimize estimation error, which is what I have done."*

195.  I found this issue difficult to initially evaluate as, bearing in mind the broad consensus between the Experts on many technical matters, it seemed somewhat surprising that they should each contend that the other was adopting an approach wholly unsupported by academic literature. The first question seems to me to be whether it matters which seven day period one uses. Professor Fischel, under cross-examination by Mr Bompas QC, initially asserted that there was no logical basis for different results over different seven day periods and so any differences should be disregarded. He stated that the Bloomberg approach of Friday to Friday was standard and there was no support for Professor Gompers' averaging approach[100]. When it was suggested that in fact using different weekly periods yielded different results (and his Friday to Friday period happened to generate a higher *beta* in this case), Professor Fischel insisted that such differences should be disregarded rather than taken into account, because the differences made no sense[101].

196.  Professor Gompers under cross-examination by Mr Boulton QC admitted that his using different days of the week and averaging was not a widely-used approach to calculating *beta*. He also admitted that he was unaware of any academic support for what was effectively a novel approach:

> "*Q. Let's see how you describe what you've done and I'm going to come on to this averaging of five sets of weekly returns.*
> *Let's go to {HSD/1/162}. You explain here that you obtained an average historical beta across days of the week and you say in the last sentence of 435:*
> *"There is no strong theoretical basis to prefer any one seven-day period versus another."*
> *You are stating that because you are aware that what you've done by averaging the five days of the week is highly unusual, aren't you?*
> *A. So I would -- highly unusual. So what I would say is that it's not employed by numerous people, but it is the*

---

[100] Transcript Day 8, page 52 line 3-page 54 line 15.
[101] Transcript Day 8 page 55 line 22-page 57 line 1.



*correct way to do it, and, in fact, in revisions of my*
*own work, I'm now stating that one should look at this,*
*for the following reason, which is --*
*Q. I'll come on to ask you about why.*
*A. I would really like to finish this answer, sir. I was*
*in the middle of it. And the reason that's the case is*
*just what we were talking about earlier, which is that*
*betas are estimated with error. And, in fact, I talk in*
*my chapter, which we talked about earlier, that when you*
*estimate betas, you would like to have as many different*
*ways to cross-check it as possible. Perhaps the ideal*
*way to cross-check it is with the exact same company.*
*So the company returns for Nord Friday to Friday can be*
*cross-checked by the Nord returns Wednesday to*
*Wednesday, Tuesday to Tuesday. So the cross-checking it*
*there makes a lot of sense. By averaging across all of*
*these observations, we are actually reducing the*
*standard errors around the beta because we have multiple*
*draws. And therefore, averaging it gives us a much*
*better estimate and reduces the error around our*
*estimate of beta. We get a better estimate of beta....*
*Q. So beta has been commonly used for, what, 50 years or*
*so, Professor?*
*A. Yes.*
*Q. And in those 50 years, where we have seen extensive*
*research into beta, no one -- and I'm putting to you*
*this -- no one has ever written an article or any other*
*publication that suggests that one should average five*
*sets of weekly returns. That is right, isn't it?*
*A. I'm not sure that that would be a topic for an academic*
*journal, but certainly it is the case that if one thinks*
*a priori from both a theoretical and an empirical point*
*of view –*
*Q. Sorry, let me have an answer to the question before we*
*have another lecture. That is right, isn't it?*
*A. I have not seen such an article but, as a tenured*
*finance professor at Harvard Business School, who has*
*written extensively on the topic, one wants to*
*triangulate the cost of capital to make sure that you*
*have the right number in this case, there is no reason*
*not to use a beta on another day. Therefore, it makes*
*sense that averaging would give us a better estimate of*



*what the beta is.*"[102]

197.    In the course of the hearing I saw more immediate logic to Professor Gompers' approach to taking steps, as it were, to neutralize randomness than in Professor Fischel's contention that random differences in weekly data depending on the last week day chosen should be ignored. On reflection, however, it is difficult to avoid drawing the inference that Professor Gompers' innovative and elaborate approach to calculating *beta* in this case would not have been deployed if the Friday to Friday data generated by Bloomberg had not happened to produce a higher figure than the average of data for weeks ending on other days of the week. He used data published by the Center for Research in Security Prices ("CRSP"), which itself provided data for the last day of the week (like Bloomberg) and indicated a *beta* figure of 1.24, far closer to the Bloomberg figure than the weekly average the Dissenters' Expert calculated for himself. Professor Fischel also suggested that the use of the CRSP figures reflecting a combination of exchanges rather than the S&P 500 market proxy he used was unusual, but had no material impact on the result in the present case[103].

198.    I accept the approach of Professor Fischel which I find to be more orthodox and straightforward and I approve his adoption of a *beta* of 1.3 subject to deciding whether or not a 'Blume adjustment' is required.

**The need for a 'Blume adjustment'**

199.    Professor Gompers in his Expert Report explained why such an adjustment was in his view required:

> "*436...I next computed Nord Anglia's CAPM historical adjusted beta by applying a two-thirds weight to the average CAPM historical beta of 1.06 and a one-third weight to the market beta of 1.00. This adjustment is consistent with Bloomberg's beta calculation methodology, and it accounts for the expected future movement of betas towards a value of one (which has been empirically documented in the academic literature by the economist Marshall Blume), and is consistent with the notion of computing the cost of equity in a forward looking context. The adjustment yielded a CAPM adjusted beta of 1.04 based on the historical beta estimate of 1.06...*"

200.    Professor Fischel in his Supplemental Report firstly questions the support provided by an article Professor Gompers relies on to justify this approach[104]. He then proceeds in

---

[102] Transcript Day 10 page 159 line 21 —page 161 line 4; page 164 line 8-165 line 4.
[103] Supplemental Report, page 84 note 261.
[104] Robert C Klemkosky and John D. Martin, '*The Adjustment of Beta Forecasts*', 30 The Journal of Finance (1975) 1123-1128.

the same paragraph to justify not applying the Blume adjustment on the following grounds:

> "93…Blume's explanation does not support adjusting the Company's historical beta downwards (as Professor Gompers does) because the Company's new projects (i.e., new China Bilingual schools) are likely to be riskier than its existing projects (i.e., established premium international schools)."

201.  I found that Professor Fischel's criticism of Professor Gompers for relying on the Klemkosky and Martin article was effectively neutralised by Mr Bompas QC in cross-examination[105]. Professor Fischel agreed that he had not proffered the reason he advanced in his Supplemental Report for using an unadjusted historical *beta*. This was in part, he explained, because in his view it is more usual to use an unadjusted *beta* than an adjusted *beta*[106]. As regards his opinion that the Company's future risk profile was a circumstance which justified not making an adjustment to the historic *beta* figure, the following critical cross-examination took place:

> "Q. And when you are arriving at your beta, what you are looking for…I mean, you can perhaps explain the difference to me.  What you are looking for is systematic risk, not idiosyncratic risk.  Idiosyncratic risk is the particular risk to do with the company.  A systematic risk is really a more general correlation between the company and the area in which it works.  Q is that fair?
> A. That's fair.
> Q. So that the idiosyncratic risk shouldn't be relevant for the point at hand.
> A. It may or may not be."[107]

202.  I reject Professor Fischel's argument that no 'Blume adjustment' is required because of the Company's idiosyncratic future risk profile. It remains to consider whether he is nonetheless right that, in effect, it is for the person contending for an adjustment to the historic *beta* (Professor Gompers in this case) to justify the need for an adjustment, because the need for such an adjustment is the exception rather than the norm.  Mr

[105] Transcript Day 8 page 72 line 23–page 77 line 15.
[106] Transcript Day 8 page 79 line 25-page 80 line 5.
[107] Transcript Day 8 page 81 line 23-page 82 line 9



Boulton QC carefully explored the underlying rationale for the 'Blume adjustment' a few days later in his cross-examination of Professor Gompers[108]:

> *"Q. Let's look at what Marshall Blume himself said. Let's go to {F/10/1}. This is an article that you cite. So you can see it's 'Betas and Their Regression Tendencies' by Marshall E Blume. This is from 1975. If we go to page 2, first paragraph: {F/10/2}*
>
>> *'A previous study showed that estimated beta co-efficients, at least in the context of a portfolio of a large number of securities, were relatively stationary over time. Nonetheless, there was a consistent tendency for a portfolio with either an extremely low or high estimated beta in one period to have a less extreme beta as estimated in the next period. In other words, estimated betas exhibited in that article a tendency to regress towards the grand mean of all betas, namely one.'*
>
> *Q. Ie the whole market, Professor?*
>
> *A. You read that quite well, yes.*
>
> *Q. And this consistent tendency that Marshall Blume refers to is in respect of either an extremely low or a high estimated beta. That's right, isn't it?*
>
> *A. That's what at least this is talking about, the beginning of the paragraph, yes.*
>
> *Q. And your average beta of 1.06 before a Blume adjustment would not fit the definition of extremely high or extremely low, would it?*
>
> *A. It's close to 1.*
>
> *Q. I take it that's a yes, you are agreeing with my question?*
>
> *A. Yes.*
>
> *Q. And this article by the man behind the Blume adjustment, as we might say, goes on to examine why this might be the case. And we can see this at page 11. {F/10/11}. Picking it up, I think, at the bottom of the page, in the summary:*
>
>> *'In other words, companies of extreme risk -- either high or low -- tend to have less extreme risk characteristics over time. There are two logical*

---

[108] Transcript Day 10 page 176 line7-page 178 line 24.



*explanations. First, the risk of existing projects may*
*tend to become less extreme over time. This explanation*
*may be plausible for high risk firms, but it would not*
*seem applicable to low risk firms.'*
*There is no suggestion that that first logical*
*explanation would apply in respect of a beta of 1.06 for*
*Nord, is there?*
*A. I don't quite know what you mean. Remember, we are*
*measuring this off into the future. And again, it might*
*be the case, but the first explanation is about the*
*nature -- he is offering us one potential theory that*
*the projects are closer to -- are less risky than the*
*rest of the firm.*
*Q. Yes. Well, and his second explanation, which I think*
*you are touching on there, is:*
*'... new projects taken on by firms may tend to have*
*less extreme risk characteristics than existing*
*projects.'*
*So those are his two explanations. Neither of those*
*could be said to apply to Nord in such a way that you*
*would feel it necessary to apply a Blume adjustment from*
*1.06 towards the market beta of 1. They just don't*
*apply in this context, do they?*
*A. Again, I would think perhaps in the very long run, if we*
*think about the beta, they might, and, as I said -- he*
*doesn't talk about it in this paper, but it's certainly*
*the case that others have talked about the idea that,*
*given measurement error, a beta above 1 has the*
*potential to be above 1, just because of noise in the*
*data, and similarly below 1. And that clearly could*
*apply here."*

203.   Professor Gompers was unable to convincingly refute the proposition, based on the
writings of Marshall Blume himself, that the rationale for the Blume adjustment is to
neutralize the effects over time of "*extremely low or high estimated beta*" based on data
that showed that such extreme historic figures usually normalised over long periods of
time[109]. This provides a coherent explanation as to why Professor Fischel did not feel
the need to justify not using a 'Blume adjustment' in his DCF analysis and regarded
recourse to the technique as more the exception than the rule. I find this dispositive of
the issue.

---

[109] Transcript Day 10 page 176 line 24 – page 178 line 24.

204.  Accordingly, I find that no Blume adjustment should be applied to the historic *beta* figure calculated by Professor Fischel (based on, *inter alia*, the two year period he justifies in paragraph 91 of his Supplemental Report) of 1.30.

**Country Risk and/or Size Premiums?**

205.  Professor Fischel's cost of equity calculation was done with only an "*Equity Risk Premium*" (10.28%), with only an additional "*Size Premium*" (11.79%), with only an additional "*Country Risk Premium*" (11.38%) and with both additional premiums (12.89%). However, in his Expert Report, he fairly admitted that both the Size Premium and Country Risk Premium were controversial and essentially left it to the Court to decide[110].  The Experts disagreed on the need for a Country Risk Premium but ultimately agreed on a Country Risk Premium Rate (if applicable) of 1.1%. Professor Gompers in his Supplemental Report argued against a Size Premium, in part citing Professor Fischel's acknowledgment that the application of a Size Premium is controversial and in part opining that the real question was whether account had to be taken of any specific size risk factors[111].  Under cross-examination by Mr Bompas QC, Professor Fischel made no real attempt to persuade that the Court that a Size Premium was required on the facts of the present case:

> "*A. No, here is the difference.  He -- I think we both agree*
> *that there is a debate that the finance literature, to*
> *quote Professor Gompers, is inconclusive, that the*
> *academic -- the modern academic literature has been more*
> *critical of the existence of a size premium than was*
> *earlier the case.  Practitioners, however, continue to*
> *use a size premium, and that's really the*
> *state-of-the-art, as it exists today, and I think*
> *Professor Gompers and I agree completely on that's the*
> *state-of-the-art.*
> *Professor Gompers took that present state of*
> *knowledge and decided a size premium was not*
> *appropriate, and I took the same thing and said there is*
> *no consensus, so, therefore, I calculated a cost of*
> *equity with and without a size premium and reported the*
> *results in my report.*"[112]

206.  This answer did not really engage with the true extent to which Professor Gompers in his Supplemental Report took issue with the general principle of a Size Premium, the very existence of which Professor Fischel himself acknowledged in his own Expert

---

[110] Paragraphs 73-75.

[111] Paragraphs 324-328.

[112] Transcript Day 8 page 28 lines 7-22.



Report was in doubt. I find that the case for the inclusion of a Size Premium in the costs of equity calculation has <u>not</u> been made out. Because of the predominant reliance I have decided to place on the DCF methodology of Professor Fischel, and having regard to my general sense of the appropriate ultimate fair value result, I find that no Country Risk Premium should be applied either. Professor Fischel opined that academic doubt existed about both forms of premium and I am not persuaded that they are appropriate to be used within the framework of the model that he constructed, Professor Gompers' "agreement" on the need for a Country Risk Premium notwithstanding

### Cost of debt

207.   Professor Fischel in his Supplemental Report opined as follows:

> "*95. Both Professor Gompers and I noted that Moody's Investors Service had assigned Nord Anglia Education a long-term corporate debt rating of B1 and Standard & Poor's had assigned the Company a corporate credit rating of B before the Announcement Date, and, for that reason, we both estimated the Company's cost of debt based on the yield of corporate debt issued by companies with approximately the same debt rating. However, Professor Gompers used the effective yield of the ICE BofAML U.S. High Yield Index, which was 5.80% as of the Valuation date, whereas I used the effective yield of the ICE BofAML 10+ Year Single B U.S. High Yield Index, which was 8.15% as of the Valuation date, a difference of 2.358%....*
>
> *96.... In other words, Professor Gompers used an index comprised of below investment grade securities with remaining maturities of one year or more, whereas I used an index comprised of bonds rated B1 to B3 with remaining maturities of ten years or more...*
>
> *97. Because 'it is important to attempt to match the time period during which the cash flows are expected with that of the risk-free rate,', Professor Gompers used the 'yield on long-term U.S. Treasury Bonds' in his calculation of the costs of equity. For the same reason, Professor Gompers should have used a long-term corporate debt rate to calculate the cost of debt...Because Professor Gompers used an index that included intermediate term debt with maturities of one to ten years, not just long-term debt with maturities of 10 years or more, he substantially understated the Company's pre-tax cost of debts.*"

208.   Professor Gompers countered in his Supplemental Report that his own 5.80% Cost of Debt figure was more reasonable than Professor Fischel's 8.16% for the following key reasons:

(a)    the "Fischel Bond Index" included only 26 bonds, 18 of which (69%) were either energy or retail companies. The "Gompers Bond Index" covered 731 bonds across 18 industries and was less biased;

(b)    the average years to maturity for the Company's existing debt was only five years, which was closer to the six year average in the Gompers Bond Index; and

(c)    the Gompers 5.80% figure was closer to the Company's historical cost of debt (5.88% at year-end 2015 and 6.88% per the May 31, 2017 audited financial statements). Professor Gompers' figure was higher than the corresponding rate used by Houlihan Lokey in its fairness opinion (4.90%), a Goldman Sachs valuation (5.00%) and closer to the 6.20% used in the Project Bach Model than Professor Fischel's estimate[113].

209.    Professor Gompers dealt with this aspect of his cross-examination in, at first blush, a convincing manner. He explained that the Cost of Equity was a long-term claim ("forever") and it was therefore appropriate to match it with the cost of long-term risk-free investment. The relevant criterion when assessing the Cost of Debt was assessing what the duration of the Company's debt was likely to be. The Company's borrowing had been and was likely to be for no more than 5 years, so his chosen Index (covering bonds with an average 5 year term) was more appropriate than Professor Fischel's. However, on reflection, the dismissive assertion that different periods of time logically applied when measuring the Cost of Debt and the Cost of Equity for the purposes of a DCF analysis did not deliver a knock-out blow to Professor Fischel's insistency that the temporal element of equity and debt should be the same[114]:

> "Q. What you do disagree with then is if the average
> long-term debt of Nord was, say, six years or seven
> years, you would say that's too short?
> A. Yes, if you are trying to match the length of time for
> cost of debt, for example, to the length of time that
> you are using for a risk-free rate, where
> Professor Gompers and I both used 20 years, I would not
> use six years, if you are trying to match 20 years or
> longer because of the nature of a discounted cashflow
> model."

210.    Professor Fischel relied on two sources of support for his conclusion in his Supplemental Report. The first was Shannon P. Pratt and Roger Grabowski, 'Cost of Capital, Applications and Examples' (5th Ed., John Wiley & Sons, Inc, 2014) at 1206-

---

[113] Paragraphs 318-321.
[114] Transcript Day 8 page 103 lines 8-17.

1207. The relevant passage (only partially reproduced in the Supplemental Report[115]) reads as follows:

> "…*But many companies have taken advantage of low short-term interest rates and have borrowed short term for long periods of time. The cost of debt capital should reflect the expected average of interest rates over a long period of time. If the current yield curve is upward sloping…that indicates that future interest rates are likely to be higher than current short-term rates. You should consider using the long-term equivalent interest for bonds that would be comparably rated to the subject company…*" [Emphasis added]

211.   The quoted text supports the use of long-term rates, but only if there is a basis for believing that borrowing costs will likely rise over the long-term. It clearly suggests that the aim of the calculation is to predict what the actual likely borrowing costs will be over a long period of time; not that long-term borrowing costs should be applied to a company which is only likely to borrow on a short-term basis indefinitely into the future. I find the idea that one calculates the cost of debt over the period of predicted cash flows by reference to what the relevant borrowing costs are likely to be to be entirely consistent with the dominant aims of the valuation exercise. Using long-term debt rates simply because the relevant period is a long one makes no obvious sense.

212.   The second passage relied upon by Professor Fischel, from Aswath Damodaran, '*Damodaran on Valuation*' (2nd Ed., John Wiley & Sons, Inc., 2006) at page 65, does not provide any clear support for the relevant Expert opinion either. It supports the approach of using the rates of similarly rated widely traded bonds, but also suggests that "*recent borrowing spreads* [may be used] *to come up with a cost of debt*". It is common ground that similarly rated and widely traded bonds may be used; but only Professor Gompers contends that it is desirable to match the indexed debt term with the actual debt term the Company has in the past used and is likely to use well into the future.

213.   In the Company's Written Closing Submissions, the case on cost of debt was summarised as follows:

> "*165. The other component of WACC is the cost of debt. Here the difference between the experts boils down to whether it is appropriate to estimate Nord's cost of debt for inclusion in WACC on the basis of the short term or long term cost of debt. Professor Fischel says that it is appropriate to use the long term cost of debt, because this matches the time horizon of the cash flows to be discounted and is also consistent with the experts' approach to the risk free rate (based on a 20 year government bond): {E/58.1/93} at paragraph 97. Professor Gompers uses the short term cost of debt which he said (incorrectly) matched*

---

[115] Page 90 footnote 285.

*the duration of the Company's existing debt: {E/72.1/115} at paragraph 320. Professor Fischel therefore derived his rate from bonds of 10+ years {HSD/3/67}; Professor Gompers used the same index but included all bonds {HSD/1/171}. As was put to Professor Gompers in cross-examination, this is like measuring the height of everyone in the room to estimate the height of the women in the room: {Day12/54:25} - {Day12/55:3}."*

214.   I am unable to accept this submission. The evidence of Professor Gompers and the submissions of the Dissenters on this issue (i.e. whether future borrowing costs should be estimated based on the term of the loans the Company is likely to be subject to rather than the long-term nature of the estimation period) are far more cogent and coherent overall. In the Dissenters' Written Closing Submissions, in addition to pointing out that Professor Fischel's choice of index is unsupported by the academic materials he relies upon, they make the following central point:

> *"398. What is relevant is matching the maturity of the debt issued by the Company: '... the debt rate you want has to match up to the maturity and the type of debt that the company has'. The Gompers Bond Index is consistent with the maturity profile of the Company's actual long-term debt, which was approximately five years as of the announcement of the Merger; conversely the Fischel Bond Index is not comparable. The Company never issued debt with a maturity close to the average maturities in the Fischel Bond Index. That is unsurprising, given that a company can roll over maturing debt in the future, with the result that the maturities of its debt profile remain the same."*

215.   I do accept the principle (explicitly supported by Shannon P. Pratt and Roger Grabowski, '*Cost of Capital, Applications and Examples*') that if there is evidence that borrowing rates are likely to rise, that increase should be taken into account. The object of the exercise is to estimate the likely costs of debt for the subject company over the same period of time projected for estimating cash flows (perpetuity). However, Professor Fischel did not point to any such general market evidence. Under cross-examination by Mr Bompas QC, he agreed that he had possibly himself in previous cases calculated the cost of debt by reference to a company's historical borrowing costs[116]. Accordingly, while I prefer Professor Gompers' broad approach, and prefer his chosen Index to that of Professor Fischel's, I do not consider it appropriate to accept his chosen rate of 5.80% uncritically without comparing it with the historic borrowing cost position as he accepts it is appropriate to do.

216.   Professor Gompers justified his figure in his Supplemental Report in the following way

---

[116] Transcript Day 8, page 100 lines 16-19.



*"321. Further, as explained in the Gompers Report, in addition to the estimate based on a ratings-based bond index, I also considered the cost of debt calculated based on the historical cost of debt disclosed in Nord Anglia's financial statements and measured as interest expenses divided by the sum of long-term and short-term interest bearing debt. The historical cost of debt is 6.38% as of the most recent publicly available financial statements on May 31, 2017, and 5.88% as of fiscal year-end 2016 on August 31, 2016. Both estimates are significantly lower than the 8.16% used in the Fischel Report, and more consistent with the 5.8% used in the Gompers Report based on the bond index. Moreover, the costs of debt that I used in the Gompers Report is conservative compared to the estimates used in the Houlihan Lokey Fairness Opinion (4.9%) and in the valuation analysis by Goldman Sachs (5.00%), and broadly consistent with the cost of debt used in the Project Bach Model (6.20 %), all of which are lower than Professor Fischel's estimate.*

*322. As an additional check on the appropriateness of the 5.80% cost of debt used in the Gompers Report, I examined the yield on Nord Anglia's actual outstanding debt. Specifically, I calculated the weighted-average yield on Nord Anglia's actual outstanding debt borrowings prior to the announcement of the Take-Private Transaction to be 5.21%. Therefore, the cost of debt used in the Gompers Report is well supported across a number of different sources, which are inconsistent with Professor Fischel's estimate."*

217.   Three points arise in relation to these opinions which I initially found problematic. First, the historical cost of debt figures derived from the Company's audited accounts are described as "*estimates*", which diminishes their significance. Calculations based on historic figures in audited financial statements of the Company ought, *prima facie*, to be accorded a higher evidential status than what are genuinely only estimates as to future debt costs. Secondly, Professor Gompers characterises his 5.80% figure as conservative relative to other economic actors (Houlihan Lokey and Goldman Sachs), but departs from his predominant stance of placing reliance on the Project Bach Model to justify his ultimate DCF result. In this instance, the Project Bach Model figure of 6.20% is closer to the May 31, 2017-based historic debt figure of 6.38%. And, thirdly, while Professor Gompers' analysis cogently demonstrates that his index-derived cost of debt figure is closer to the Company's historic cost of debt figures, the estimates of other market participants and, indeed, the costs of the Company's existing outstanding debt, he does not really explicitly justify privileging a figure derived from generic data over Company-specific historic borrowing information.

218.   Having considered substituting the historic costs of borrowing rate of 6.38% for Professor Gompers' 5.80 % figure, I consider I should defer to the consensus between the Experts that the appropriate measure to use is a rate derived from an index of comparably rated stock. Reference to historic borrowing is clearly regarded by *Damodaran* as a default reference point where the stock is not rated at all. The learned author explains the functional reason why the cost of debt is calculated in the following way which is instructive to the uninitiated[117]:

---

[117] '*Damodaran on Valuation*' (2nd Ed., John Wiley & Sons, Inc., 2006) at pages 64 -65.

> "*The cost of debt measures the current cost to the firm of borrowing funds to finance its assets. In general terms, it should be a function of the default risk that investors perceive in the firm. As the perceived default risk increases, lenders will charge higher default spreads (on top of the risk-free rate) to lend to the firm...*
>
> *The most widely used measure of a firm's default risk is its bond rating, which is generally assigned by an independent ratings agency. The two best known are Standard & Poors and Moody's. Thousands of companies are rated by these two agencies, whose views carry significant weight with financial markets....*
>
> *Many firms have bonds outstanding which do not trade on a regular basis. Since these firms are usually rated, we can estimate their costs of debt by using their ratings and associated default spreads... When there is no rating available to estimate the costs of debt, there are two alternatives:*
>
> *1.     Recent borrowing history...*"

219.   I accordingly approve Professor Gompers' 5.80% cost of debt figure, which is a pre-tax figure. Applying the 31% statutory tax rate proposed by Professor Gompers and eventually agreed to by Professor Fischel[118], to 5.80%, the post-tax cost of debt figure should be reduced to 4.00%.

## WACC

220.   I will leave the parties to calculate precisely what impact the cost of debt figure I have approved has on the WACC calculation which should in all other respects be performed using Professor Fischel's figures. My own best efforts suggest a figure in the region of 8.7%.

## Summary of findings on main DCF valuation issues in dispute

221.   To summarise, I resolve the disputed DCF valuation issues as follows:

(a)   I approve Professor Fischel's use of 'Adjusted August 2017 Projections' (taking into account the Company's China Bilingual 5 Year Forecast);

---

[118] Supplemental Report, paragraph 104.

(b)    I approve Professor Fischel's terminal growth rate of 1.81%;

(c)    I approve Professor Fischel's *beta* figure of 1.30 (with no Size Risk Premium or Country Risk Premium and without a 'Blume adjustment');

(d)    I approve Professor Gompers' (pre-tax) cost of debt figure of 5.8% which results in a post-tax figure of approximately 4%; and

(e)    I find as a result that the WACC must be reduced to a figure to be agreed between the parties, but which I very roughly estimate as being in the region of 8.7%.

222.    It follows that the appropriate DCF valuation must be adjusted upwards applying the reduced WACC (in an amount to be calculated by the parties but which I estimate to be in the region of 8.7%) to Professor Fischel's valuation figures based on what he described as the Adjusted August 2017 Projections. I leave the parties to calculate the precise uplift which results from reducing the WACC from Professor Fischel's low of 8.98% which produced an equity value per Share of US$41.32. My expectation is that this would result in a *pro rata* Share value in the region of US$44.

223.    Such a valuation falls just above the Houlihan Lokey DCF range and at the top of the Professor Fischel Reports range.

224.    It now remains to determine what the fair value of the Dissenters' Shares should properly be, having regard to all the evidence, most notably the DCF valuation which I have just approved together with the Market Price and the Transaction Price.

**FINDINGS: THE FAIR VALUE OF THE DISSENTERS' SHARES**

225.    Occasionally the critical issues in a case are best captured in one or two key submissions. In this case the overarching question in controversy was whether the Transaction Price or Merger Consideration of US$32.50 had been undervalued by more than 50% because the true intrinsic value of the Shares was US$76. In this case the best 'jury point' made on behalf of the Company came from Lord Grabiner QC, when he concluded his oral opening submissions as follows[119]:

> "*In conclusion, I just want to say as follows, that if Professor Gompers is correct, then a large number of people were wrong. The special committee, including its advisers, they were all wrong. The analysts who published contemporary views, they got it all wrong. A majority of the minority shareholders at the date of*



---
[119] Transcript Day 1 page 84 line 18-page 86 line 2.

*the merger announcement -- they were people who either sold their shares or assented them to the merger -- they got it all wrong. The New York Stock Exchange and people investing on that exchange, they got it all wrong. Management who sold their shares, they were all wrong, which is interesting because they were insiders. CPPIB, the Canadians, which syndicated a proportion of the shares they had agreed to acquire in Nord, they got it all wrong, although they had done a good deal of their own scrutiny before coming to a decision as to whether or not to participate in the deal.*

*Professor Fischel, he has got it all wrong -- but they would say he is parti pris but that will be a matter for your Lordship to decide. And then sophisticated investors, who had been, for example, in Fund IV -- and this is quite a nice point, that there were people who were investors in Funds III and IV, but in particular Fund IV, but who never came back for some more in Fund VI, which they were perfectly entitled to do, or would have been, but they, for some reason or another, decided that they would not participate in the post-merger syndication. These are very smart, sophisticated people. They obviously took the view that the kind of value that Professor Gompers suggests or contends for is simply not there.*

*So essentially the whole world has got it wrong except for Professor Gompers. It's perfectly possible that he is right but in my respectful submission it is improbable in the extreme...*"

226. The Dissenters, on the other hand, quoted from Oscar Wilde at the beginning of their Written Closing Submissions ("*A cynic is a man who knows the price of everything and the value of nothing*"[120]) as a riposte to the Company's primary reliance on the Market Price as indicative of fair value. Mr Adkin QC in his opening oral submissions cogently advanced the Dissenters' own main jury point[121]:

*"In this case, the majority shareholder, Baring, reached the well-informed view that the market significantly undervalued the shares in Nord and, quite lawfully, forced out the minority by way of a process in which it made clear that it would only sell its shares in the company to itself and its affiliates.*

*Having done that, it has now performed, through the company it controls, a complete volte face and now*

---

[120] '*Lady Windermere's Fan*'.
[121] Transcript Day 1 page 99 line 19-page 100 line 9.



> *pretends to your Lordship, through the company, that the*
> *market got the value of the shares right all along and*
> *that the merger transaction was a sale process open to*
> *all which properly tested the market.*
> *This should be seen, we submit, for what it is,*
> *a piece of commercial opportunism, designed by Baring to*
> *play fast and loose with its obligation to pay fair*
> *value for what it has taken.*"

227.    How I have evaluated these two seemingly starkly opposed views of the merits of the present case can perhaps be prefaced by reference to another Oscar Wilde quotation: "*the truth is seldom pure, and never simple*"[122]. As I have already indicated in recording my preliminary findings on the main controversial factual issues above, I have found merit in the main points advanced by both sides and essentially conclude that both sides are partly right and partly wrong, albeit leaning far more heavily towards the Company's proposed valuation outcome. In summary:

(a)    I accept the Company's broad submission that it simply beggars belief that the Sell Side acting as sophisticated investors would under-sell a valuable asset by more than 50%. There is no credible support for Professor Gompers' valuation of US $76.51 as opposed to a Market Price of US$30.45 and a Transaction Price of US32.50;

(b)    I accept a much-diluted version of the Dissenters' broad submission that the circumstances of the Merger Agreement call for a DCF valuation to be taken into account. This is principally due to (1) the involvement of Baring on both sides of the Transaction, (2) the existence of a controlling shareholder keen to sell yet eager to retain some indirect albeit significantly reduced interest in the Company, and (3) the fact that key market participants involved in and/or observing the Transaction (most importantly Houlihan Lokey, who gave a Fairness Opinion to the Company's Special Committee) considered a DCF valuation was required;

(c)    I unequivocally reject any suggestion that the Transaction was less than a *bona fide* one and find no credible evidence of any intent, on the part of Baring or the Company, to confer a windfall on the Buy Side and to effectively cheat the Sell Side (which included Premier) on a massive scale. There were no material conflicts of interest which were not adequately dealt with through the Special Committee process which was deployed;

(d)    the Transaction Price, after critical scrutiny, provides important and credible evidence of fair value because the sales process was an arms' length one and, despite concerns more of perception rather than

---

[122] '*The Importance of Being Earnest*'.

substance, reflected a transaction between a willing seller and buyer in circumstances where no serious competing bids were either made or shut out;

(e)    I find that the Transaction Price is a more reliable indicator of the fair value of the Shares than the Market Price because it was arrived at taking into account MNPI which may have resulted in the market undervaluing the Shares. Nonetheless there is a risk that because of a commercial desire to effect a sale as soon as possible, Baring's preference for a sale to a known buyer as opposed to a complete outsider, and Premier's blocking position, the Merger Consideration did not reflect the full intrinsic value of the Shares;

(f)    in a sale involving connected parties with no competing bidders and the 'Sell Side' clearly adopting a 'bird in the hand' stance, it would be surprising if the Transaction Price was above the intrinsic value of the Shares and more plausible that the Transaction Price was somewhat lower;

(g)    neither side has persuaded me that either the Transaction Price or, alternatively, a far higher DCF-derived valuation provides the sole solution to fairly appraising the fair value of the Shares. However:

(1)    the Company has persuaded me that the fair value is clearly much closer to the Transaction Price than the US$76.51 contended for by the Dissenters' Expert, Professor Gompers, and

(2)    in light of the Houlihan Lokey DCF analysis (which suggested a mid-range value of just over $33 per Share) and the more rigorously tested Fischel (modified by Gompers) DCF analysis herein (which is indicative of a value over $40 per Share), I find that the fair value most likely lies somewhere between the Transaction Price and the DCF value approved by this Court.

228.    The independent DCF analysis of Professor Fischel (which I have accepted with one notable modification which results in a slightly lower discount rate and, as a result, a slightly higher per Share value than he contended for at the top of his range) points to a value of just over $40 per Share. The independent DCF analysis of Houlihan Lokey (the technical validity of which the Dissenters' Expert did not challenge) indicates an upper value of just under $40. This lends credibility to the DCF value I have reached, subject to concerns about the precise level of reliability of the August 2017 Projections, even as adjusted to take into account the China Bilingual 5 Year Forecast.

229.    These concerns are ultimately not about the fairness with which the Projections have been prepared by honest and skilled professionals. It is more that, it seeming obvious to me that "sales patter" by insiders provide no reliable evidence as to value, the Company's business prospects while largely stable were also materially unpredictable.

If short-term budgetary projections were indeed "stretching" ones which were never actually achieved, long-term projections must be viewed as even less reliable, as Mr Halder testified. The most insightful part of his testimony in this respect, which I accept, was the following passage (already quoted more fully above):

> "*modelling risk weighting would not have materially improved our day-to-day decision making because the business was sufficiently strong to withstand individual schools materially underperforming...and as a business we had already decided to accept the large risks associated with doing business in many of the markets we were in...*"

230.  In my judgment, this evidence serves as a window through which the 'real world' in which the Projections were prepared can best be viewed, and supports the firm conclusion that the DCF valuation alone should not form the main foundation for appraisal in the particular circumstances of the present case where there is also other credible but not <u>entirely</u> reliable evidence of fair value. How then, can the Court take market indicators into account following a trial at which one Expert contended for reliance on market data alone and the other placed sole reliance on a DCF analysis?

231.  *Re Qunar* provides a valuable example of how to resolve the conundrum of an imperfect DCF analysis and imperfect market evidence as to the fair value of a company's shares in a section 238 appraisal case.  In that case the Court was presented with a choice between:

(a)  a dissenters' expert who contended for a DCF valuation producing a value nearly five times the merger consideration; and

(b)  a company's expert who proposed a blended approach of 50% DCF and 50% market trading price, resulting in a value of less than the transaction price.

232.  Nonetheless, Parker J adopted the blended approach of Ms Glass for the company because he was clearly unable to confidently rely <u>exclusively</u> on either a market price or a DCF analysis. This conclusion was reached against the background of the following findings:

> "*73. The DCF methodology can be an accurate measure of fair value. However, it depends upon the reliability of the models/projections, the various assumptions, and the validity of the inputs. Even a sligh*

*difference in these inputs can produce large variances. It also relies on subjective judgments to a large extent and can be easily manipulated by applying certain assumptions in the context of litigation <u>As it is also something of an abstract concept, a cross-check may also be needed to bring a DCF valuation back to the 'real world' and prevailing commercial context</u>.*

- "141. I have concluded that the share price of the Company in the particular circumstances of this case and the NASDAQ market at the time can reasonably be relied upon as good evidence of value. It therefore also provides a good cross check against the DCF outcome of fair value";

- "173. I do not accept that Mr Osborne's valuation is sustainable against the market price analysis of Ms Glass which I have accepted was reasonably conducted. Nor is it sustainable against the contemporaneous views of the analysts' community";

- "176. The logic of this finding is that a 100% DCF valuation is not the only appropriate valuation method in this case. I accept the blended approach adopted by Ms Glass as the best way of arriving at the fair value of the Dissenters' shares. The DCF and market trading approach both have advantages and disadvantages. Giving equal weight to both is in my view the most appropriate way to determine fair value in this case."

- "188. Projections of this length were not prepared as a matter of course by the Company and it needs to be borne in mind that they were prepared in connection with approval sought for a statutory merger with Ctrip, its 94% majority shareholder at the time. D&P relied on Management Projections produced for the purpose and the Proxy Statement."

- "189. I accept that the reliability of such projections may be affected by the purpose for which they are prepared and are in theory are susceptible to optimistic or more conservative treatment. The question in this case is whether they have in fact been prepared on a basis which means they are not reasonable, because they were prepared in order to fulfil another purpose which sought to reduce the value of the Company (i.e. were biased), or because they have been carelessly prepared, or contain obvious errors and are therefore unreliable or wrong for that reason."

- "201. Ms Glass concluded, after having conducted her own detailed analysis, that the projections were by and large reasonable, save for one

> *adjustment she made relating to income tax as a result of an exchange*
> *with Mr Zhu at the Management Meeting.*"

233.    Although the justification for the company's expert adopting a blended approach in that
case is not explicitly set out, it seems clear that Parker J felt a combination of the market
price and a DCF valuation was more reliable overall than a standalone valuation basis
in circumstances where:

    (a)    the management projections were considered reasonable, but it had been
alleged they were unreliably conservative;

    (b)    the market in the shares was regarded as providing good evidence of
value, but it was said that the shares were grossly undervalued;

    (c)    since the DCF valuation methodology was "*something of an abstract*
*concept, a cross-check may also be needed to bring a DCF valuation*
*back to the 'real world' and prevailing commercial context*"; and

    (d)    Parker J concluded:

> "*411.    The consequence of a blended approach between a market*
> *trading valuation approach of the shares prior to the Merger and*
> *the DCF method leads in my view to a just and equitable*
> *outcome which will determine fair value for the Dissenters'*
> *shares*"  [emphasis added].

234.    A blended approach between the Transaction Price and the DCF valuation appears to
me to lead to a just and equitable outcome in the present case where I have partially
accepted each Expert's criticisms of, *inter alia*, the Transaction Price and/or a DCF
valuation as suitable sole valuation methodologies. But neither Expert has proposed a
blended approach. In *Re Shanda Games Limited*, FSD 14 of 2016 (NSJ), Judgment
dated April 25, 2017 (unreported), Segal J approved the following statement of
principles which were uncontroversial in the present case, and to which I have already
referred above:

> "*85… in his opinion in Re Appraisal of Dell Inc   2016 WL*
> *3186538 (**Dell**) Vice Chancellor Laster quoted with approval*
> *dicta in this issue from a number of other cases as follows… :*

> *"In discharging its statutory mandate, the Court of Chancery has discretion to select one of the parties' valuation models as its general framework or to fashion its own". M.G. Bancorporation, 737 A.2d at 525-26. "The Court may evaluate the valuation opinions submitted by the parties, select the most representative analysis, and then make appropriate adjustments to the resulting valuation". The court also may "make its own independent valuation calculation by . . . adapting or blending the factual assumptions of the parties' experts." M.G. Bancorporation, 737 A.2d at 524. It is also "entirely proper for the Court of Chancery to adopt any one expert's model, methodology, and mathematical calculations, in toto, if that valuation is supported by credible evidence and withstands a critical judicial analysis on the record." Id. at 526. "When . . . none of the parties establishes a valuation that is persuasive, the Court must make a determination based on its own analysis.""* [emphasis added]

235.   I am satisfied that section 238 of the Companies Law confers jurisdiction on this Court which permits *"adapting or blending"* the approaches proposed by the Expert valuers. Should I give more weighting to either the Transaction Price or the DCF valuation or should each valuation measure be given equal weighting? I find this a very difficult question. Looking at matters in the round, it is on balance clear that my findings thus far overall justify the further finding that I consider that more weight should be given to the Transaction Price than to the DCF valuation. In other words, I have in substance used the DCF valuation as a cross-check for the Transaction Price rather than the other way around. I have not formed the view that the Transaction Price is so seriously lacking in credibility that the starting point should be a DCF analysis, with some account being given to the negotiated Transaction Price. In many important respects (save for rejecting his view that I should ignore a DCF valuation altogether), I have preferred the approach of Professor Fischel to that of Professor Gompers, who championed exclusive recourse to a DCF valuation approach. However I have accepted Professor Gompers' opinions on the unreliability of the Market Price and (in part) the unreliability of the Transaction Price.

236.   I accordingly apply a 60% weighting to the Transaction Price and a 40% weighting to the DCF valuation approved by this Court (to be computed by the parties based on the findings recorded above). That should (and is intended to) result in a valuation which is modestly more than the Transaction Price of $32.50 but still within the potential range of DCF values calculated by Houlihan Lokey for the purposes of their Fairness Opinion.



**Minority Discount**

237. Neither the parties nor the Experts positively proposed the application of a minority discount. Professor Fischel opined as follows in his Expert Report:

> "*92. Finally, a DCF analysis…does not incorporate any valuation discount that may be applicable to minority holdings in a controlled company like Nord Anglia Education. However as noted above, I understand that the CICA has ruled that when a dissenting shareholder possesses a minority shareholding, it is to be valued as such.*"

238. Professor Gompers in his Expert Report opined in the salient part as follows:

> "*422. The empirical evidence…is consistent with no minority discount and suggests a minority discount of no greater than 2% for the Dissenters shares in Nord Anglia if one were to be applied…Based on my review of the literature, I have identified no empirical studies that focus on the Cayman Islands, and as such, I relied on the values above for the United States and Hong Kong. These articles suggest a minority discount of up to 2% and potentially smaller and are consistent with no minority discount.*"

239. Mr Bompas QC in his closing oral submissions argued that having regard to the state of the evidence and the failure of the Company's counsel to address the minority discount issue in their closing submissions, the Court should direct no discount at all[123].

240. After the conclusion of the trial on December 20, 2019, the Judicial Committee of the Privy Council on January 27, 2020 delivered judgment in *Shanda Games Ltd.-v-Maso Capital Partners Ltd et al* [2020] UKPC 2. This was an appeal by dissenters' against, *inter alia*, the Cayman Islands Court of Appeal decision holding that a minority discount should generally be applied in section 238 cases. In that case the experts agreed at trial that (a) fair value should be determined on a DCF valuation basis, and (b) if a minority discount was required, it should be 23%. Lady Arden (delivering the advice of the Judicial Committee) summarised the crucial findings as follows:

> "*42. In the opinion of the Board, it is a general principle of share valuation that (unless there is some indication to the contrary) the court should value the actual shareholding which the shareholder has to sell and not some hypothetical share. This is because in a merger, the offeror does not acquire control from any individual minority shareholder. Accordingly, in the absence*

---

[123] Transcript Day 14 page 177 lines 5-22.

*of some indication to the contrary, or special circumstances, the minority shareholder's shares should be valued as a minority shareholding and not on a pro rata basis.*

*55. It follows that the judge should not have held that fair value always means no minority discount (see, for example, judgment of the judge, para 93, second sentence). That could not be a bright-line rule to be applied in every case. Similarly, it was not open to CICA to hold that a minority discount should invariably be applied as a matter of law. The legislature's direction is to find the 'fair value' of the dissenter's shareholding. Because of the narrow scope of this appeal, the Board is not in a position to rule out the possibility that there might be a case where a minority discount was inappropriate due to the particular valuation exercise under consideration."*

241.   The general rule and governing legal principle is that "*in the absence of some indication to the contrary, or special circumstances, the minority shareholder's shares should be valued as a minority shareholding and not on a pro rata basis.*" However, if section 238 does <u>not</u> require "*that a minority discount should invariably be applied as a matter of law*", in my judgment it must be for the parties and their experts to determine, in the first instance, what minority discount, if any, they consider is appropriate in each individual case. The starting assumption is that a minority discount should be applied; but this does not justify the Court determining that a particular minority discount should be applied as a matter of law without any evidential foundation.

242.   In *Shanda Games,* the Court of Appeal (on March 6, 2018) applied a minority discount in an amount agreed by the respective experts, holding that a discount must be applied as a matter of law. The Privy Council upheld this decision, while clarifying that a minority discount might not be required in the particular circumstances of individual cases. The governing legal principle applicable to fair value appraisals under section 238 was articulated by Lady Arden as follows:

>        "*47…where it is necessary to determine the amount that should be paid when a shareholding is compulsorily acquired pursuant to some statutory provision, the shareholder is only entitled to be paid for the share with which he is parting, namely a minority shareholding, and not for a proportionate part of the controlling stake which the acquirer thereby builds up, still less a pro rata part of the value of the company's net assets or business undertaking…*"

243.   When the Experts in this case prepared their Reports, the state of the law was that a minority discount was required as a matter of law. The Company adduced no expert evidence supporting the need for a minority discount on economic grounds, let alone proposed a specific discount figure. The Dissenters have adduced evidence through Professor Gompers to the effect that:

    (a)           no minority discount is required on the facts of the present case, in effect because there is no economic justification for viewing a minority shareholder's Shares in the Company as being financially impaired;

    (b)           if a discount is legally required in general terms, the basis for the discount must be based on the value of control to the controlling shareholder or the negative value impact of the absence of control for the minority shareholder; and

    (c)           if a minority discount is required as a matter of law to subtract the value of control, it would not (based on US and Hong Kong source material) exceed 2%.

244.    Professor Gompers' evidence that no minority discount is economically justified is not contradicted by any other evidence. On that basis alone, in my judgment I could perhaps find that no minority discount is required, the legal assumption in favour of a minority discount having been displaced. Should I without the assistance of expert evidence decide for myself that Professor Gompers' uncontradicted economic views have no merit? I am required to form my own independent judgment and I find that the economic position is relevant in light of the governing legal position which trumps Professor Gompers' view that economically speaking, "*a company's DCF value equals its fair value*"[124].

245.    There is no judicial guidance as to how to determine the appropriate minority discount under section 238 where the figure is not agreed. In *In re Shanda Games* [2018 (1) CILR 352] (CICA), the experts were agreed as to the amount of the discount, if one was required; the legal requirement for one was what was in controversy. How one assesses the amount of the discount, assuming a legal requirement to value the actual shares held by the minority, was not considered. Martin JA's central finding was as follows:

> "*50  For these reasons, it appears to me that s.238 requires fair value to be attributed to what the dissentient shareholder possesses. If what he possesses is a minority shareholding, it is to be valued as such. If he holds shares to which particular rights or liabilities attach, the shares are to be valued as subject to those rights or liabilities. As a matter of mechanics, this can be done by adjusting the value that the shares would otherwise have as a proportion of the total value of the company; but failing to make such adjustments means that particular rights or liabilities will often be ignored, and the shares will be valued as something they are not.*"

---

[124] Expert Report paragraph 413.

246. This decision was upheld by the Privy Council with the addition of an important and practical *caveat.* This was to the effect that in some cases, where the amount of the minority discount was not agreed (as it was in *Shanda Games)*, it might be open to this Court based on the specific valuation evidence before it to find that no discount at all was required. Again, the question of what factual issues might be relevant to deciding whether or not a discount was or was not required was not judicially considered.

247. In *Re Qunar*, the company's expert admitted that she would not ordinarily apply a minority discount "*assuming a publicly traded liquid security*", but proposed a 4.7% minority discount, presumably based on the legal assumption that one was required. The dissenters' expert contended for a 0% discount. Parker J (at paragraph 406) found that "*that the value of any discount to be attributed to the Dissenters being minority shareholders in the present case is nil*"[125] It appears to me that that Parker J concluded that there was no reliable evidence before the Court to support a finding that a minority discount in a specific amount or based on specific valuation considerations was required. He astutely adopted a legal approach the correctness of which has only been recently confirmed by the Privy Council in *Shanda Games.*

248. In the present case, I am bound to accept that a minority discount is required to take into account any value attached to control which cannot be attributed to minority shares. The Dissenters' Expert has provided an opinion as to what that discount should be, assuming that the value of control should be assessed in the same way as in the US and/or Hong Kong. However I feel unable to fairly assess the validity of that opinion.

249. I find myself in a similar position to that of Parker J in *Re Qunar* of having no sufficient evidential basis for deciding the factual dimension of the valuation issues flowing from the legal requirement to value the Dissenters' Shares as minority shares, rather than simply as a *pro rata* portion of the Company's shareholding as a whole.

250. In future cases, in light of the guidance only recently received from the Privy Council in *Shanda Games*, expert witnesses and this Court will doubtless be able to develop on an incremental basis well-formed views on what economic factors are relevant to determining the need for and size of a minority discount under Cayman Islands law.

251. If, contrary to my primary findings, I were required to evaluate and reject Professor Gompers' uncontradicted opinion that no minority discount is required, I would have applied a minority discount of 2% based on his also uncontradicted opinion that this is the maximum discount which could be required.

252. For these reasons I find that no minority discount should be applied as part of the valuation process in all the circumstances of the present case.

---

[125] Paragraphs 403; 406.

**CONCLUSION**

253.   In summary, I find that the fair value of the Dissenters' Shares should be computed by a blended approach comprised of (a) 60% of the Transaction Price of US$32.50, and (b) 40% of a DCF valuation based on the model constructed by Professor Fischel, with the WACC or discount rate adjusted downwards[126] to a precise amount which I leave the parties (in consultation with their Experts, if required) to calculate. The reduction of the discount rate from Professor Fischel's lowest proposed rate of 8.98% to what I very roughly estimate will likely be in the region of 8.7% should result in a total DCF *pro rata* share valuation no more than 10% above the upper limits of Professor Fischel's range (US$41.45). I leave the precise result to be calculated by the parties.

254.   The net result will be a valuation of the Dissenters' Shares which falls within the DCF valuation range originally proposed by both Professor Fischel within these proceedings and by Houlihan Lokey, independent advisers to the Special Committee, in connection with the approval of the Merger Agreement.   I have adopted a blended approach which was not proposed by either Expert because I found that the Transaction Price and, to lesser but significant extent, a DCF valuation provided more reliable indications of the fair value of the Shares than the Market Price.

255.   This result reflects my findings that fair value may properly be found well above the Market Price of US$30.45 contended for by the Company, but far below the US$76.51 contended for by the Dissenters. Neither Expert positively proposed the application of a minority discount, despite being aware of a legal presumption that there should be such a discount under Cayman Islands law. Professor Gompers positively opined that no minority discount was required without being challenged by Professor Fischel. I accordingly find that no such discount should be applied.

256.   I will hear counsel as to the terms of the final Order and costs, as well as in relation to any other matters arising from this Judgment, if required.


THE HONOURABLE MR JUSTICE IAN RC KAWALEY
JUDGE OF THE GRAND COURT

---

[126] By reason of substituting Professor Gompers' pre-tax Cost of Debt figure of 5.8% for Professor Fischel's 8.16%.